IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY <br><br> Plaintiff, <br><br> v. <br><br> INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION and BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, <br><br> Defendants. | Civil Action No. 3:22-CV-00083 |

**COMPLAINT FOR DECLARATORY JUDGMENT**

### Introduction

Plaintiff BNSF Railway Company (BNSF) brings this civil action for declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Railway Labor Act (RLA), 45 U.S.C. §§ 151-163, against Defendants International Association of Sheet Metal, Air, Rail and Transportation Workers–Transportation Division (SMART-TD) and Brotherhood of Locomotive Engineers and Trainmen (BLET) (collectively, the Defendants or the Unions). The dispute here is over BNSF's January 10 announcement that it intends to modify its attendance program, effective February 1, 2022. Those policy modifications extend a practice of more than two decades of BNSF unilaterally modifying and adopting attendance standards to meet the ever-changing needs of service.

BNSF's new attendance program is permitted by that long-standing past practice, the express and implied terms of the parties' agreements, arbitral authority, and legal precedent.

Because this dispute implicates conflicting interpretations of the parties' existing rights under the collective bargaining agreement (CBA) and/or past practice, it is a "minor dispute." As a minor dispute, it must be resolved through negotiation and/or binding arbitration. And the RLA forbids work stoppages over minor disputes.

But in response to BNSF's January 10 announcement, the Unions have taken the position that the new policy constitutes a unilateral change in the parties' agreements in violation of Section 2 Seventh of the RLA (a so-called "major" dispute). BLET's president approved a strike-authority vote, and SMART-TD general chairmen asked their president for strike authority approval. As result, BNSF seeks declaratory relief to settle the issue of whether the attendance policy dispute is properly classified as major or minor.

## Parties

1. Plaintiff BNSF is a common carrier by railroad engaged in interstate commerce and is a "carrier" within the meaning of the RLA Section 1 First, 45 U.S.C. § 151.

2. Defendant SMART-TD is an unincorporated association and a labor union. SMART-TD is a representative within the meaning of the RLA, 45 U.S.C. § 151 Sixth, and represents conductors and other individuals employed by BNSF. SMART-TD's principal place of business is 24950 Country Club Blvd., Suite 340, North Olmstead, Ohio 44070.

3. Defendant BLET is an unincorporated association and a labor union. BLET is a representative within the meaning of the RLA, 45 U.S.C. § 151 Sixth, and represents engineers and other individuals employed by BNSF. BLET's principal place of business is 7061 East Pleasant Valley Road, Independence, Ohio 44131.

4. The BNSF employees represented by the Unions play key roles in ensuring the safe movement of the more than 1,000 trains that operate across the BNSF system each day.

## Jurisdiction and Venue

5. This Court has jurisdiction over the subject matter of this civil action under 28 U.S.C. §§ 1331, 1337, and 1367 because this matter raises a question under the RLA, a federal law.

6. Venue in this judicial district is proper under 28 U.S.C. § 1391(b). BNSF employees represented by the Unions work in this district.

## Past Practice of Unilaterally Changing Attendance Standards

7. BNSF has a long-standing and well-settled past practice of unilaterally changing practices and standards governing attendance for the employees at issue here: train-service employees charged with operating trains both in yards and between terminals. All of the attendance-standard examples described below apply to the train-service employees BLET and SMART-TD represent.

8. In 1999, BNSF adopted a formal written Availability Policy requiring train-service employees be available for work a minimum number of days per month. Repeated failure to meet those minimum standards triggered a series of progressive discipline actions. BNSF implemented that attendance standard unilaterally.

9. BLET and SMART-TD (actually, SMART-TD's predecessor union, the United Transportation Union (UTU)) objected to the Availability Policy. Each claimed unilateral implementation of that Policy qualified as major dispute under the RLA. BNSF contended any dispute over its ability to implement that Policy was minor, and should be resolved in arbitration and not via union self-help. That question, whether the dispute was major or minor, was litigated in this Court before Judge Jerry Buchmeyer. Judge Buchmeyer held the dispute minor and, in September 1999 referred the issue to arbitration.

10. In October 1999, Referee Richard Kasher decided the subsequent arbitration in BNSF's favor, finding that implementing the Availability Policy was within BNSF's managerial prerogative (Kasher Award).

11. In 2000, BNSF modified the Attendance Policy and replaced it with Attendance Guidelines (ATG). BNSF implemented that attendance standard unilaterally.

12. In 2006, BNSF modified the ATG and instituted additional attendance standards including: established additional thresholds (the amount of time an employee can be off without being in violation) for 5 and 6 day assigned service (jobs where employees had specific days off) and mixed service (employees who work multiple jobs, some with rest days and some without); established a three-month "rolling" measurement period; identified "excluded" time consisting of layoffs that affect an employee's threshold for allowable time off; and, established that the company would not be precluded from challenging an employee's full-time attendance requirement based on other reasonable standards. BNSF implemented these attendance standards unilaterally.

13. In 2010, BNSF implemented a low-performance standard, which was separate from the ATGs. Under the low-performance standard, an employee could technically be in compliance with the ATG (for example, by not working due to a series of absences not counted under the ATG) but still be subject to discipline if that employee's number of "starts" was extraordinarily low compared to their peers. BNSF implemented that attendance standard unilaterally.

14. The BNSF ATG was again modified in 2011. Specifically, attendance discipline handling was removed from the Policy for Employee Performance Accountability (PEPA) and the progressive discipline steps were reduced from 5 to 4 before an employee could be dismissed

for failure to perform full time service; the calculation of weekend handling was modified; and employees were notified that their absences in a subsequent one or two month period could lead to a violation after a prior discipline event. BNSF implemented these attendance standards unilaterally.

15. In 2012, the following changes were made to the BNSF ATG: attendance thresholds were added for employees who are covered under rest agreements; employees were notified that after they had been bumped from their assignment, their failure to take notification after 10 hours would result in a layoff; weekend calculations were again modified, allowing an employee to be charged with three weekend days in a given week depending upon their layoff behavior; the definition of a layoff period was defined as 0—25 hours for employees not on assigned jobs with rest days; working a portion of a calendar day would not negate a layoff period beginning or ending on that same day; and an employee who failed to comply with the single tie-up process (the process of clocking out at the end of their work day) would also count against them for attendance purposes.  Again, BNSF implemented these attendance standards unilaterally.

16. In 2015, BNSF altered how the ATG measured time available for service for some pool-service employees. As a result of that modification, time an employee spent "waiting turn" (a period when a pool-service employee is marked off, and is not marked up until the train they missed is back at the employee's home terminal) was recategorized as unavailable time and subject to the ATG.  Before that modification, such waiting-turn time was not considered when deciding if an employee met their the ATG's availability standards.

17. In 2019, BNSF added a new attendance standard for high-impact days (basically holidays).  An employee could be in compliance with the ATG, but if they laid off on a majority of the 14 identified high-impact days (when employee availability has historically been very low)

they could still be subject to progressive discipline. BNSF implemented that attendance standard unilaterally.

18.   In 2021, BNSF instituted actual suspension and removed a progressive step of discipline from the ATG. BNSF implemented these attendance standards unilaterally.

### The High Visibility (Hi Viz) Attendance Standards

19.   On January 10, 2022, BNSF announced new attendance standards—the Hi Viz program—to replace the ATG, effective February 1, 2022.

20.   Over the years, numerous employees expressed that, under the ATG, it was sometimes difficult to know when exactly they might exceed the ATG "threshold," and thus possibly be subject to progressive discipline.

21.   As a result, BNSF developed Hi Viz, an attendance program assigning varying "points" to different types of absences (weekday, weekend, holiday, a missed call, etc.) and triggering progressive discipline if an employee's points went to zero. The program is "Hi Viz" because it has a dashboard where employees can easily check their current point total and see how particular events subtracted or added to that total.

### Arbitral Authority

22.   The rail industry is a "reserved rights" industry. As such, a railroad may do unilaterally whatever is not proscribed by the CBA. Authority from railroad arbitrations supports that position.

23.   The principle of reserved rights applies to attendance, providing that a railroad may unilaterally set attendance standards unless it has expressly surrendered its authority to do so in a collective bargaining agreement. In fact, the Kasher Award specifically cites managerial

prerogative and reserved rights as a basis for BNSF's authority to enact the 1999 Attendance Policy.

### The Current Dispute

24. In response to BNSF's announcement of the new attendance program, the Unions have taken the position that the railroad is engaged in a unilateral change of agreements in violation of Section 2 Seventh of the RLA, which they refer to as a "major dispute."

25. On January 11, 2022, SMART TD's BNSF General Chairmen formally asked their President, Jeremy Ferguson, to authorize strike authority over the February 1 implementation of Hi Viz. Exhibit 2.

26. On January 12, 2022, BLET President Dennis Pierce directed his BNSF General Chairmen to poll their memberships to "withdraw service" (that is, strike) over the February 1 implementation of Hi Viz. Exhibit 1.

27. Once a strike is authorized, the Unions' practice in these circumstances has been to initiate a strike without warning.

28. A strike could occur at any time prior to or after implementation of the new attendance program on February 1, 2022.

### Threat of Irreparable Harm to BNSF and the Nation's Rail Network

29. BNSF is the nation's largest freight railroad by number of cars moved annually. It has more than 30,000 employees and operates over more than 30,000 miles of track, in twenty-eight different states, including Texas. BNSF serves thousands of industrial and commercial customers, dozens of whom have no other access to rail transportation, and provides a crucial link between a number of country's other major freight carriers, which in turn transport cargo

throughout the United States and into Canada and Mexico. Any disruption of BNSF's operations would therefore have a serious impact on interstate and international commerce.

30. Any use of self-help by the Unions could shut down BNSF's operations, deprive shippers of transportation, deprive BNSF of the use of its tracks, facilities, and revenues, threaten the safety or well-being of the general public, and put other BNSF employees out of work for the duration of the strike. In addition, any strikes or job action by the Unions will cause immediate, substantial, and lasting disruptions to BNSF's schedules, and will most likely result in delays long after any strike is ended. Such strikes or job actions will result in a substantial loss of business by BNSF, both during the duration of the work stoppage and during the period of lingering delays after it ends. Moreover, delays and disruptions resulting from a strike or other self-help by the Unions will likely cause BNSF to suffer a loss of customer goodwill and future business.

31. In addition, because BNSF interchanges traffic with other major railroads, a work stoppage by the Unions would soon disrupt the operations of other railroads, as well. These disruptions could quickly impact rail traffic all across the country.

32. Because of the scope of BNSF's operations, even a partial or temporary shutdown would have a drastic impact on large segments of the public and the national economy. Thus, any strike or other self-help has the potential to interfere with the nationwide transportation in interstate and international commerce.

### COUNT I: Request for Declaratory Judgment Under the RLA

33. BNSF realleges and incorporates by reference as if fully set forth herein the allegations of paragraphs 133, above.

34. Under Section 2 First of the RLA, railroad employees and the unions that represent them have a duty to "exert every reasonable effort to make and maintain agreements concerning

rates of pay, rules, and working conditions, and to settle all disputes, whether rising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First.

35. In addition, if Defendant-represented employees attempt to engage in a job action or self-help without the authorization of the Defendant, the Defendant is required under Section 2 First of the RLA to exert every reasonable effort to prevent the employees from doing so, including by imposing union discipline. 45 U.S.C. § 152 First.

36. Any work stoppages or slowdowns by the Defendant over the disputes referred to above would violate the union's statutory obligation to "exert every reasonable effort" to settle disputes without interruptions of railroad transportation, under Section 2 First of the RLA, 45 U.S.C. § 152 First.

37. A "minor dispute" under the RLA is any dispute arising out of a grievance or over the interpretation or application of the parties' collective bargaining agreements concerning rates of pay, rules, or working conditions. Such disputes are subject to conference between representatives and mandatory arbitration by specialized boards of adjustment. 45 U.S.C. §§ 152 Sixth, 153. Self-help is unlawful in the case of minor disputes.

38. Plaintiff and Defendants are engaged in a dispute over the interpretation and application of their express and implied agreements regarding BNSF's right to impose an Hi-Viz attendance standards.

39. If Defendants take a different view, it amounts to a dispute over the interpretation or application of agreements, which is a minor dispute subject to the mandatory and exclusive procedures of Section 3 First of the RLA, 45 U.S.C. § 153 First. BNSF is entitled to a declaratory

judgment to that effect and a declaration that any strikes, work stoppages, or other self-help by Defendants over the dispute alleged above are unlawful.

## PRAYER FOR RELIEF

WHEREFORE, BNSF asks for judgment against Defendants, and respectfully prays that the Court, as appropriate:

A.  Issue a Declaratory Judgment that:

1.  The parties' dispute over BNSF's Hi Viz standards is a minor dispute, within the meaning of the RLA; and

2.  Defendants may not lawfully strike, picket, engage in a work stoppage, sick out, or slowdown, threaten to do so, or otherwise exercise coercive self-help against BNSF, its operating rail subsidiaries and/or affiliates, or encourage others to do so as a result of the parties' present dispute.

B.  Award BNSF its costs and expenses incurred in this proceeding; and grant damages and such other and further relief as the Court deems just and proper.

Dated:  January 13, 2022

                                             Respectfully submitted,

                                             */s/ Russell D. Cawyer*
                                             David M. Pryor
                                             Texas Bar No. 00791470
                                             BNSF Railway Company
                                             2500 Lou Menk Drive, AOB-3
                                             Fort Worth, Texas 76131-2828
                                             Tel.: (817) 352-2286
                                             Fax: (817) 352-2399
                                             David.Pryor@BNSF.com

Donald J. Munro
D.C. Bar No. 453600
J*ONES* D*AY*
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: dmunro@jonesday.com

Russell D. Cawyer
State Bar No. 00793482
Taylor J. Winn
State Bar No. 24115960
**K*ELLY* H*ART* & H*ALLMAN* LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Facsimile: (817) 335-2820
russell.cawyer@kellyhart.com
taylor.winn@kellyhart.com

**A*TTORNEYS FOR* P*LAINTIFF*
BNSF R*AILWAY* C*OMPANY***

# BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

**NATIONAL DIVISION**
7061 East Pleasant Valley Road
Independence, Ohio 44131

Phone: 216.241.2630
Fax: 216.241.6516
www.ble-t.org

**DENNIS R. PIERCE**
National President



VIA ELECTRONIC MAIL

January 12, 2022

Mr. M. R. Cunningham
Chairman, BNSF–ATSF GCA, BLET
101 N. Beverly
Crowley, TX 76036

Mr. T. R. Martin
Chairman, BNSF–C&S/CRI&P/FWD GCA
2012 Carson Ave.
La Junta, CO 81050

Mr. K. J. Psota
Chairman, BNSF/MRL GCA, BLET
215 West Oak, Suite 500
Fort Collins, CO 80521

Mr. J. L. Thurman
Chairman, BNSF–SLSF GCA, BLET
P. O. Box 118587
Carrollton, TX 75011

Re: Request for Strike Authority

Dear Sirs and Brothers:

This responds to your letters pertaining to the above-referenced subject, which were received by my office on January 12, 2022. Your letters advise my office of the BNSF's new "Hi-Viz" attendance policy. Each letter provides a detailed explanation of how the Carrier's new attendance policy repudiates numerous collectively bargained agreements currently in place on each former property. I have also received dozens of communications from BLET members sharing their views on the proposed policy.

I share your concerns and those of the BLET membership. This latest attempt by BNSF to force a policy on its employees can only be described as the worst and most egregious attendance policy ever adopted by any rail carrier. It repudiates direct and clear contract language, and in application, will force BLET members to make additional trips without regard for their medical condition while we struggle to come out of a pandemic. It also stands to take away any ability by the employees to avoid working fatigued when they are routinely called without warning due to the complete lack of reliable train lineups, thus creating the potential for an even more unsafe railroad operation. So called "forced overtime" in an industry where safety is so critical not only repudiates our agreements, it stands to enact irreparable harm on hundreds of full time employees whose non workplace obligations prevent them from being at work every day of their life.

Accordingly, and in response to each of your requests to poll the membership on the question of withdrawing from service, permission is hereby granted, and you are authorized to mail ballots to

**EXHIBIT 1**

A Division of the Rail Conference–International Brotherhood of Teamsters

**Mr. M. R. Cunningham**
**Mr. K. J. Psota**                            (2)                            January 12, 2022
**Mr. J. L. Thurman**
**Mr. T. R. Martin**

your membership, or to your Local Chairmen where applicable. Our internal rules must be followed to accomplish the poll, which is to be conducted in accordance with the provisions of Section 17 – General Committee Rules ("GCR") of the BLET Bylaws. As a general matter, GCR Section 17(a) requires that strike votes be conducted among the active members employed on the road, system or portion thereof that will be affected by a strike; in this case, per your joint request, the strike vote would cover the entire BNSF system. Accordingly, if you are directly polling your membership, in order to participate in the strike vote, a member: (1) must be employed by BNSF; (2) have locomotive engineer seniority and not be a Company Officer; and (3) be an active member (*i.e.*, either working or in one of the National Division Rules Section 29(h) statuses).

Alternatively, GCR Section 17(b) states that "[i]n cases where the best interests of the BLET would be jeopardized by the delay incident to the circulation of a referendum strike ballot, the general chairman may vote the GCA by the most convenient means available in lieu of the circulation of a referendum to the membership, provided that consent to do so has already been obtained from the active membership by a referendum vote or adopted by the GCA while in session." In a GCR Section 17(b) vote, only those Local Chairman having jurisdiction over BNSF assignments may participate.

I am enclosing herewith the ballot forms that are to be used when conducting the strike vote. Please note that a strike vote conducted pursuant to GCR Section 17(a) requires a majority of voting members to be approved, whereas a vote conducted pursuant to GCR Section 17(b) requires a two-thirds vote of the members of the GCA (*i.e.*, the Local Chairmen). Therefore, be sure the correct ballot is used for the type of strike vote you will conduct.

Lastly, a strike ballot must be signed by the member in order to be counted. Please stress this fact in your cover letter to the membership or to your Local Chairmen. Also, keep in mind that approval by the membership or the GCA does not, in and of itself, convey strike authority. Rather, GCR Section 17(c) prescribes that—after membership/GCA approval—the general chairman, with the concurrence of the National President, shall have authority to set a strike date and withdraw the engineers or trainmen of the road, system, or portion thereof from service.

With warmest personal regards, I remain

Fraternally yours,

*[signature]*
National President

encls. (2)

cc:   E. L. Pruitt, First Vice President (w/o encls.)
      S. J. Bruno, National Secretary-Treasurer (w/o encls.)
      M. D. Priester, Vice President (w/encls.)



**General Committees of Adjustment**
**BNSF Railway Company**

January 11, 2022

Jeremy Ferguson
President
SMART-Transportation Division
24950 Country Club Blvd Ste 340
North Olmsted OH 44070-5333

Re: Strike Authority – BNSF Attendance Guidelines Policy

Brother Ferguson,

The undersigned General Chairpersons herein request your office authorize strike authority for members under our jurisdiction as a result of BNSF issuing a new Attendance Guidelines Policy "Hi-Viz".

All of us have, for multiple years, attempted to negotiate attendance and time off. BNSF has turned down every offer from SMART-TD to negotiate an agreement outlining our members' attendance requirements.

The New "Hi-Viz" attendance policy slated to take effect on February 1, 2022, is a unilateral attempt by BNSF to modify attendance. We believe this to be in direct violation with the Section 6 Notices and current National Negotiations.

This policy, and particularly its formulation at this point in time when active National Negotiations are taking place is likely in conflict with the RLA and the National Handling process.

Thank you in advance for any assistance/guidance you can provide regarding this issue. Do not hesitate to contact any of us if you require additional information.

Fraternally,

J. M. LaPresta
General Chairperson GO-001

Scott Swiatek
General Chairperson GO-009

Sign For
Johnny P. Martinez, Jr.
Acting General Chairperson GO-017

Justin Schrock
General Chairperson GO-020

Matthew Burkart
General Chairperson GO-341

Larry Miller
General Chairperson GO-386

EXHIBIT 2