**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION and BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>3:22-CV-00083-M |

**APPENDIX IN SUPPORT OF PLAINTIFF'S**
**<u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

NOW COMES, Plaintiff BNSF Railway Company and files this Appendix in Support of its Motion for Temporary Restraining Order.

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | Declaration of Andrea Smith dated January 18, 2022 | App. 1 - 8 |
| A | BNSF Availability Policy effective October 1, 1999 | App. 9 - 14 |
| B | Kasher Award - PLB 6264 and 6265 | App. 15 - 72 |
| C | BNSF Guidelines for TY&E Employee Assistance Effective 2000 | App. 73 |
| D | BNSF Guidelines for TY&E Employee Assistance Effective 10-10-06 | App. 74 |
| E | Response to Question re: Low Hours | App. 75 - 76 |
| F | BNSF Ry. v. UTU, PLB No. 6721, Award No. 121 (Jan. 20, 2012) | App. 77 - 85 |

| | | |
|---|---|---|
| G | BLET v. BNSF Ry Co., PLB No. 7092, Award No. 59 (May 15, 2012) | App. 86 - 91 |
| H | SMART-TD v. BNSF Ry. Co., PLB 7425 Award No. 153 (Dec. 7, 2018) | App. 92 - 93 |
| I | BNSF Guidelines for TYE and Yardmaster Attendance Effective 3-1-11 | App. 94 - 96 |
| J | BNSF Guidelines for TYE and Yardmaster Attendance Effective September 1, 2012 | App. 97 - 99 |
| K | BNSF System General Notice No. 94 Former CBQ-Waiting Turn dated July 29, 2015 | App. 100 - 101 |
| L | Letter from BNSF to Employees re: Holiday Lay-Offs dated November 2019 | App. 102 |
| M | BNSF Guidelines for TYE and Yardmaster Attendance Effective January 11, 2021 | App. 103 - 105 |
| N | *UTU v. BNSF Ry.* (July 1, 2005) | App. 106 - 132 |
| O | *UTU v. DT&I R.R.*, PLB No. 2991, Award No. 1 (May 11, 1983) | App. 133 - 151 |
| P | *Richard Fetzer v. Ill. Central Gulf R.R. Co.*, NRAB 3rd Div., Award No. 24998 (Sept. 26, 1984) | App. 152 - 156 |
| Q | *BRS v. Southern Ry.*, NRAB 3rd Div., Award No. 23133 (Jan. 15, 1981) | App. 157 - 160 |
| R | Letter from Salvatore Macedonio to Dennis Pierce re: Hi-Viz Attendance Policy Offer of Arbitration dated January 17, 2022 | App. 161 |
| S | Letter from Salvatore Macedonio to Jeremy Ferguson re: Hi-Viz Attendance Policy Offer of Arbitration dated January 17, 2022 | App. 162 |
| 2 | Declaration of Salvatore Macedonio dated January 18, 2022 | App. 163 - 173 |
| A | Hi-Viz Attendance Programs - System General Notice effective February 1, 2022 | App. 174 - 184 |

| | | |
|---|---|---|
| B | Letter from BLET to Dennis Pierce re: BNSF Attendance policy - request for strike authority dated January 10, 2022 | App. 185 - 187 |
| C | Letter from SMART to Jeremy Ferguson re: Strike Authority - BNSF Attendance Guidelines Policy dated January 11, 2022 | App. 188 |
| D | Top/Middle/Low UNB usage Random Employees | App. 189 |
| E | Letter from BLET re: Request for Strike Authority dated January 12, 2022 | App. 190 - 191 |

Dated: January 18, 2022

Respectfully submitted,

*/s/ Russell D. Cawyer*

David M. Pryor
Texas Bar No. 00791470
BNSF RAILWAY COMPANY
2500 Lou Menk Drive, AOB-3
Fort Worth, Texas 76131-2828
Tel.: (817) 352-2286
Fax: (817) 352-2399
David.Pryor@BNSF.com

Donald J. Munro
D.C. Bar No. 453600
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: dmunro@jonesday.com

Russell D. Cawyer
State Bar No. 00793482
Taylor J. Winn
State Bar No. 24115960
**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Facsimile: (817) 335-2820
russell.cawyer@kellyhart.com
taylor.winn@kellyhart.com

**ATTORNEYS FOR PLAINTIFF**
**BNSF RAILWAY COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served upon counsel for Defendants (listed below) by electronic means on January 18, 2022.

Kevin C. Brodar
Smart Transportation Division
24950 Country Club Blvd., Suite 340
North Olmsted, Ohio 44070
(216) 228-9400
kbrodar@smart-union.org

James Petroff
Wentz, McInerney, Piefer & Petroff
3311 Bear Pointe Cir.
Powell, Ohio 43065
(614) 756-5566
jpetroff@lawforlabor.com

*/s/ Russell D. Cawyer*
Russell D. Cawyer

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION and BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-cv-83-M |

**DECLARATION OF ANDREA SMITH**

I, Andrea Smith, hereby declare as follows:

1. I submit this declaration based on my personal knowledge and documents that BNSF Railway Company ("BNSF") maintains in the regular course of business. The purpose of this Declaration is to support BNSF's motion for a preliminary injunction filed in the above-captioned matter.

2. I am currently employed as General Director, Labor Relations at BNSF. I have held this position for the past seven years. I have been employed at BNSF since 2004. I am responsible for managing all aspects of labor relations with the Unions that represent BNSF's "operating" employees, *i.e.*, the conductors and engineers who crew the trains. That includes engaging in collective bargaining as well as managing arbitrations and other aspects of dispute resolution.

EXHIBIT
1

3. I am familiar with the details of the current dispute between BNSF and the Unions over BNSF's implementation of the Hi Viz Attendance Policy. I have been involved in communicating the attendance policy and responding to objections raised by the Unions.

4. The Unions represent several different crafts of employees at BNSF. BNSF and the Unions are parties to a number of different collective bargaining agreements. Because railroad labor agreements never expire, many of these agreements have been in place for decades. These agreements include both express written terms as well as a range of implied terms based on and evidenced by the parties' past practices. There are also hundreds, if not thousands, of arbitration awards interpreting these agreements.

5. Some of the parties' collective bargaining agreements are system-wide in scope; they cover all of the employees represented by the Unions who are employed by BNSF. Other agreements cover only a portion of the BNSF network. There are a number of agreements that cover only those portions of the system that correspond to the properties of former railroads that have since been merged into BNSF. BNSF is also party to a number of multi-employer agreements that are negotiated on a "national" basis with other railroads.

6. Over the course of many decades, BNSF—and its predecessors, including Burlington Northern ("BN") and Atchison, Topeka and Santa Fe Railway ("ATSF")—have implemented and/or adapted employee work policies, rules, standards and/or procedures related to attendance. It has always done so without prior bargaining. More specifically, BNSF has a long-standing and well-settled past practice of unilaterally changing practices and standards governing attendance for train-service employees charged with operating trains both in yards and between terminals.

7. There are a number of examples of this past practice summarized below. All of these examples involve attendance standards for the train-service employees BLET and SMART-TD represent.

8. In 1999, BNSF adopted a formal written Availability Policy requiring train-service employees be available for work a minimum number of days per month. Repeated failure to meet those minimum standards triggered a series of progressive discipline actions. BNSF implemented that attendance standard unilaterally. Ex. A.

9. BLET and SMART TD (actually, SMART TD's predecessor union, the United Transportation Union (UTU)) objected to the Availability Policy. And each claimed unilateral implementation of that Policy qualified as a major dispute under the RLA. BNSF contended any dispute over its ability to implement that Policy was minor, and should be resolved in arbitration and not via union self-help. More specifically, BNSF argued there—as it does here—that the railroad had an implied right (as illustrated by past practice) to manage employee attendance, and that to the extent the Unions disagree, that amounted to a dispute over interpretation or application of those implied terms. That question, whether the dispute was major or minor, was litigated in this Court before Judge Jerry Buchmeyer. Judge Buchmeyer held the dispute minor, and in September 1999 referred the issue to arbitration.

10. In October 1999, Referee Richard Kasher decided the subsequent arbitration in BNSF's favor, finding that implementing the Availability Policy was within BNSF's managerial prerogative (Kasher Award). Ex. B.

11. In 2000, BNSF modified the Attendance Policy and replaced it with Attendance Guidelines (ATG). Ex. C. BNSF implemented that attendance standard unilaterally.

12. In 2006, BNSF modified the ATG and instituted additional attendance standards including: established additional thresholds (the amount of time an employee can be off without being in violation) for 5 and 6 day assigned service (jobs where employees had specific days off) and mixed service (employees who work multiple jobs, some with rest days and some without); notified employees that their absences in a subsequent one or two month period could lead to a violation after a prior discipline event; modified the discipline handling after 12 months (discipline was no longer cleared from employees' records); identified "excluded" time consisting of layoffs that affect an employee's threshold for allowable time off; and, established that the company would not be precluded from challenging an employee's full-time attendance requirement based on other reasonable standards. Ex. D. BNSF implemented these attendance standards unilaterally.

13. In 2010, BNSF implemented a low-performance process, which was separate from the ATG. Under the low-performance process, an employee could technically be in compliance with the ATG (for example, by not working due to a series of absences not counted under the ATG) but still be subject to discipline if that employee's number of "starts" was extraordinarily low compared to their peers. Ex. E. BNSF implemented that attendance standard unilaterally.

14. The Unions challenged the low-performance process, but arbitral authority has continually upheld this standard as part of BNSF's managerial rights. *BNSF Ry. v. UTU*, PLB No. 6721, Award No. 121 (Jan. 20, 2012) (Ex. F) ("the Board notes that employees who occupy full-time jobs are expected to be available on a full-time basis . . . The Carrier acts reasonably in establishing processes to measure employee availability and to counsel and discipline full-time employees who fail to be available on a reasonably full-time basis."); *BLET v. BNSF Ry Co.*,

PLB No. 7092, Award No. 59 (May 15, 2012) (Ex. G) (same); *SMART-TD v. BNSF Ry. Co.*, PLB 7425 Award No. 153 (Dec. 7, 2018) (Ex. H) (same).

15. The BNSF ATG was again modified in 2011. Specifically, attendance discipline handling was removed from the Policy for Employee Performance Accountability (PEPA) and the progressive discipline steps were reduced from 5 to 4 before an employee could be dismissed for failure to perform full time service; the calculation of weekend handling was modified; military service was addressed; and time on the bump board was added to the list of excluded time. Ex. I. BNSF implemented these attendance standards unilaterally.

16. In 2012, the following changes were made to the BNSF ATG: yardmasters attendance thresholds were added; attendance thresholds were added for employees who are covered under rest agreements; time furloughed or on work retention boards were added to the list of excluded time; employees were notified that after they had been bumped from their assignment, their failure to take notification after 10 hours would result in a layoff; weekend calculations were again modified, allowing an employee to be charged with three weekend days in a given week depending upon their layoff behavior; the definition of a layoff period was defined as 0-25 hours for employees not on assigned jobs with rest days; working a portion of a calendar day would not negate a layoff period beginning or ending on that same day; and an employee who failed to comply with the single tie-up process (the process of clocking out at the end of their work day) would also have that counted against them for attendance purposes. Ex. J. Again, BNSF implemented these attendance standards unilaterally.

17. In 2015, BNSF altered how the ATG measured time available for service for some pool-service employees. Ex. K. As a result of that modification, time an employee spent "waiting turn" (a period when a pool-service employee is marked off, and is not marked up until

the train they missed is back at the employee's home terminal) was recategorized as unavailable time and subject to the ATG. Before that modification, such waiting-turn time was not considered when deciding if an employee met the ATG's availability standards.

18. In 2019, BNSF added a new attendance standard for high-impact days (basically holidays). An employee could be in compliance with the ATG, but if they laid off on the majority of 14 the identified high-impact days (when employee availability has historically been very low) they could still be subject to progressive discipline. Ex. L. BNSF implemented that attendance standard unilaterally.

19. In 2021, BNSF instituted actual suspensions and removed a progressive step of discipline from the ATG. Ex. M. BNSF implemented these attendance standards unilaterally.

20. BNSF imposed each of these measures based on its own determination that they were necessary to manage employee attendance or otherwise enforce existing attendance standards, without bargaining with the Unions over BNSF's right to do so.

21. Even if BNSF did not have a long-standing implied contractual right to modify and manage attendance rules and implement standards like the new Hi Viz policy, it would still retain the right to do so as a function of its reserved managerial rights. Railroads like BNSF retain an implied management right to implement reasonable rules and policies as long as such rules and policies are not inconsistent with the express terms of applicable collective bargaining agreements.

22. Ample arbitral authority confirms that BNSF's collective bargaining agreements reserve for the railroad implied "managerial prerogatives" or "reserved rights," which allow BNSF to take actions that constitute a reasonable extension of its managerial discretion. *See, e.g., UTU v. BNSF Ry.* (July 1, 2005) (Ex. N) (finding that "[n]othing in the language of Section

6 [of the collective bargaining agreement] takes away from the Carrier its managerial prerogatives to run the railroad according to standard managerial principles," where "[u]nder a union-management format an employer keeps control of all areas of decision-making not given away in contract").

23. These awards on BNSF and its predecessors are consistent with extensive precedent across the industry. *See, e.g., UTU v. DT&I R.R.*, PLB No. 2991, Award No. 1 (May 11, 1983) (Ex. O) ("It is well settled that a Carrier has the right to make reasonable rules in the furtherance of orderly and efficient conduct of its business, so long as such rules are not inconsistent with or in violation of the collectively bargained agreements it has entered into with labor organizations."); *Richard Fetzer v. Ill. Central Gulf R.R. Co.*, NRAB 3rd Div., Award No. 24998 (Sept. 26, 1984) (Ex. P) (holding that "[t]he Carrier has a right to issue such rules as it sees fit for the government of its employees, except to the extent limited by Agreement, and has the right to expect such rules to be complied with," noting that "in all matters that have not been limited by agreement, the Carrier's authority remains unrestricted") (internal citation omitted).[1]

24. My understanding is that other railroads have exercised similar managerial discretion to set and modify attendance policies. In particular, BNSF's primary competitor, Union Pacific Railroad, recently adopted a new version of an attendance policy that is similar in many respects to BNSF's Hi Viz policy. Union challenges in court to that change in Union Pacific's policy were rejected.

---

[1] *See also BRS v. Southern Ry.*, NRAB 3rd Div., Award No. 23133 (Jan. 15, 1981) (Ex. Q) (finding no violation of collective bargaining agreement where, "[g]iven the absence of any specific restriction, Carrier was free, under well established labor relations principles, to implement the change back to the normal work week," noting that "it is axiomatic that Carrier retains all managerial prerogatives not relinquished by the Rules Agreements").

25. I am aware that in the course of ongoing collective bargaining, the Unions have asked for changes in work rules that could impact or relate to employee attendance standards. BNSF is bargaining over those issues in accordance with its obligations under the RLA. However, unless and until the parties agree otherwise, BNSF retains the right to apply its *existing* contractual rights to modify and manage attendance and employee availability.

26. BNSF stands ready to arbitrate, in the normal course and pursuant to well-settled procedures, any and all employee claims involving or relating to BNSF's attendance policies. We have communicated that willingness to arbitrate to the Unions. *See* Exs. R and S.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 18, 2022.

Andrea Smith
General Director, Labor Relations

**BNSF AVAILABILITY POLICY**
**FOR TRAIN, YARD AND ENGINE EMPLOYEES**
**Revised Effective October 1, 1999**

This policy applies to all BNSF operating craft employees. Its goal is to distribute the workload more fairly and consistently among all TY&E people. It also supports our efforts to make sure all employees are taking their fair share of the workload and have equal access to reasonable time off. The policy states BNSF's expectation that TY&E employees generally will be available for work 75 percent of the time on weekdays and weekends.

Every TY&E employee has an equal responsibility to the other members of the BNSF community. Each TY&E employee fulfills that responsibility by being a full-time employee and doing his or her part to provide transportation services that consistently meet our customers' expectations 24 hours a day, seven days a week.

**Unassigned Service**

Employees in unassigned service must be available for service approximately seventy-five percent (75%) of total time on weekends (defined as Saturday and Sunday, midnight to midnight) and seventy-five percent (75%) of total time on weekdays figured independently and applied on a calendar month basis. For purposes of this Policy, unassigned service is defined as service that does not provide for assigned rest days or does not provide a specific start time or start window. Seven-day assignments are considered as unassigned service. If a layoff or mark-up involves any portion of a weekend day as defined above, that entire day is considered a weekend absence. Availability will be calculated on the basis of the number of days in a calendar month that the employee is in unassigned service during that month. In every case, absence for personal business, sickness, sickness in family, missed calls, or other similar absence on any part of any day will be counted as a day that the employee was not available for the purpose of determining that employee's availability. Vacation days (full week or single day), personal leave days, jury duty, bereavement, union business, company business, granted leave-of-absence, medical leave, excused absence as defined in this Policy or other similar absences ("excluded time") will not be considered in determining employee availability. When an employee has "excluded time" in a month, percentage availability is based on the number of days actually available for work in that calendar month. For example, the month of April 1999, has 30 calendar

EXHIBIT
A

days (22 weekdays and 8 weekends, which would afford the employee 5.5 weekdays and 2 weekend days off).  If an employee is on vacation for the first 14 days in that month, his or her availability for April will be based on a 16-day maximum possible period of availability (12 weekdays and 4 weekend days which would afford the employee 3 weekdays and 1 weekend day off).  Below is an "availability threshold" chart that may be used to determine how many weekend and weekdays may be taken off dependent upon the number of days the employee is available for service:

| Available Days In Service | Threshold Days Allowed Off |
|---|---|
| 0 to 3.5 | 0 |
| 4 to 5 | 1 |
| 5.5 to 7 | 1.5 |
| 7.5 to 9 | 2 |
| 9.5 to 11 | 2.5 |
| 11.5 to 13 | 3 |
| 13.5 to 15 | 3.5 |
| 15.5 to 17 | 4 |
| 17.5 to 19 | 4.5 |
| 19.5 to 21 | 5 |
| 21.5 to 23 | 5.5 |

**Assigned Service**

Assigned rest day pools, window pools, bid pack/track pools, assigned rest day extra boards, yard assignments, road switchers, assigned locals, assigned work trains, and any other assignments providing any scheduled days off, start times or start windows are considered as assigned service for purposes of this Policy.

The following table lists the maximum numbers of days off allowable for assigned service employees exclusive of assigned rest days, personal leave days and vacation.

| Conditions of Assignment | Maximum Additional Days off per Month |
|---|---|
| 6 Day Assignment* | 3 ( 1 Weekend & 2 Weekdays) |
| 5 Day Assignment* | 1 |
| Assigned Rest Day Boards* | 1 |

When an employee in assigned service has "excluded time" in a month, e.g., vacation, jury duty, excused absences, etc., the number of days off allowable is based on the number of days actually available for work in that calendar month as follows:

| 5 Day*/Assigned Rest Day Boards* | | Days per Month Allowed Off |
|---|---|---|
| 0-15 | Total Days Available | 0 |
| 15.5-31 | Total Days Available | 1 |

| 6 Day Assignments* | | Weekend Days Off | Weekdays Off |
|---|---|---|---|
| 0-5 | Weekend Days Available | 0 | |
| 5.5-10 | Weekend Days Available | 1 | |
| 0-7 | Weekdays Available | | 0 |
| 7.5-15 | Weekdays Available | | 1 |
| 15.5-23 | Weekdays Available | | 2 |

* In addition to scheduled days off

Within a given month, for any individual moving between assigned and unassigned service (voluntarily or involuntarily), the provisions of unassigned service will govern availability.

## GENERAL PROVISIONS-ALL SERVICE

Layoffs must be requested from and authorized by crew support.  Authority will be based on "needs of service."  To facilitate auto-markup and other considerations, the duration of layoff must be agreed to by crew support.

The crew superintendent will designate, by pool, board or location, the number of pre-arranged layoffs that may be granted in advance.  Advance layoff requests will be accepted 90 days in advance of the layoff, with a response within one week of the request.  Pre-arranged layoff requests will be granted on a first-come-first-serve basis and with respect to "needs of service."  As soon as the maximum number of pre-approved layoffs has been reached, no other pre-approved layoffs will be granted.  Employees are encouraged to use pre-arranged layoffs where possible.  All layoffs approved or otherwise, are subject to the availability guidelines stated in this Policy.  Once granted, pre-arranged layoffs will not be cancelled by management.

"Needs of service" dictate how many employees may be off at any one time at a particular location as determined by the vice president operations or his designee.

When an employee marks off initially, that layoff, 24 hours or less, will count as one full day of unavailability.  However, time unavailable after the first 24-hour period will be calculated in one-half day increments as shown below:

| Absence in Hours | Value in days |
|---|---|
| 0-24 | 1.0 |
| 24-36 | 1.5 |
| 36-48 | 2.0 |
| 48-60 | 2.5 |
| 60-72 | 3.0 |
| Etc. | Etc. |

## Policy Administration

Employees whose conduct is inconsistent with this Policy in any calendar month will be required to meet with the Superintendent or his or her representative. At this meeting the employee will be advised of the requirements that must be met to comply with the Policy. A second failure to comply with this Policy within 36 months of the initial meeting with the Superintendent or his or her representative (12 months for employees with a clear record for the preceding 36 months) will be considered a "standard handling" offense under the Policy for Employee Performance Accountability (PEPA). Any subsequent failure to comply with this Policy within 36 months of a previous failure will be considered another "standard handling" offense under PEPA. An employee who misses a call, lays off on call or is a "no-show," will be subject to PEPA separate and apart from this Availability Policy.

An employee held accountable under PEPA for a missed call, layoff on call or a "no-show," shall not again be held accountable should that particular absence result in that employee being in noncompliance with this Policy.

## Excused Absences

If an employee has not fulfilled his or her availability responsibility during any one month due to his or her own illness, the employee may appeal to BNSF's Medical Director or his or her designee and must provide the results of a medical evaluation conducted during that period of illness including diagnosis, supporting objective exam with test results and provider's recommendation to avoid work. The Medical Director may, at his or her discretion, excuse the absence. Such absences will be noted as excused in the system, and availability for that month will be recalculated.

If an employee has not met his or her availability responsibility during any one month due to personal reasons, the employee may appeal to his or her Superintendent or his or her designee. The Superintendent may, at his or her discretion, excuse the absence. Such absences will be noted as excused in the system, and availability for that month will be recalculated.

For other extraordinary circumstances, an employee not meeting the Policy requirements in any one month may appeal to BNSF's Labor Relations team for consideration. A Labor Relations Director may excuse the absence. Such absences will be noted as excused in the system, and availability for that month will be recalculated.

This Policy does not apply to employees in training for initial ground service or locomotive engineer promotion.  Availability for trainees will be determined by the Technical Training Center and/or the governing Superintendent's office.



PUBLIC LAW BOARD NOS. 6264 and 6265
BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
and BROTHERHOOD OF LOCOMOTIVE ENGINEERS and
UNITED TRANSPORTATION UNION
AVAILABILITY POLICY DISPUTE
ARBITRATION OPINION AND AWARD
OCTOBER 29, 1999

In the Matter of an Arbitration Before

PUBLIC LAW BOARD NOS. 6264 and 6265

involving

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY

THE BROTHERHOOD OF LOCOMOTIVE
ENGINEERS

and

THE UNITED TRANSPORTATION UNION

## Introduction

As the result of litigation in the United States District Court for the Northern District of Texas, Fort Worth Division, 3:99-CV-675-R involving the Burlington Northern and Santa Fe Railway Company (hereinafter the "BNSF" or the "Carrier") and the Brotherhood of Locomotive Engineers (hereinafter the "BLE") and the United Transportation Union (hereinafter the "UTU"), the above-

EXHIBIT B

CARRIER'S EXHIBIT # 5



captioned Public Law Boards (hereinafter the "Board") were established pursuant to the provisions of Section 3 of the Railway Labor Act to hear a dispute concerning the propriety of the Carrier's intended implementation of a so-called "Availability Policy".

After receipt of pre-hearing submissions, a hearing was conducted on October 14, 1999 at the offices of the National Mediation Board in Washington, DC. The Board was composed as follows:

John J. Fleps, Esquire - Carrier Member
President Charles Little - Organizations Member
Richard R. Kasher - Chairman and Neutral Member

The parties were represented by counsel who entered their appearances as follows:

Ronald M. Johnson, Esquire
Aiken, Gump, Strauss, Hauer & Feld
for the Carrier

Harold A. Ross, Esquire
Ross & Kraushaar
for the BLE

Clinton J. Miller, III, Esquire
General Counsel - UTU
for the UTU

Counsel were afforded a full opportunity to present relevant evidence through the testimony of witnesses and in



documentary proofs, cross-examination was permitted and counsel raised points and contentions in support of their respective positions in oral and written statements.

## Background Facts

As a result of the Carrier's analysis of statistical data regarding the non-availability of train/yard and engine service employees for work during weekdays and weekends, the BNSF made known its intention to implement a policy which, among other provisions, would limit the number of days train/yard and engine service employees could "mark off" or be otherwise unavailable for service during a calendar month.

The Policy further provided that if a train/yard or engine service employee exceeded the number of permissible days of unavailability during a month that that employee would be subject to progressive discipline in accordance with a schedule specified in the Policy.

The Availability Policy was first published, for informational purposes, in the spring of 1999. The Carrier announced its intention to implement the Policy on or about October 1, 1999. As the result of the above-referred to



litigation these Public Law Boards were established in September, 1999.

The Neutral Member of the Board, in discussions with the parties' counsel in an effort to make arrangements for a timely hearing and decision in this matter, requested that the Carrier move the date of its intended implementation of the Policy from October 1, 1999 to November 1, 1999. The Carrier agreed to do so.

At the October 14, 1999 hearing before the Board, the Carrier advised that it had made certain modifications to the previously published Availability Policy, and the modified Policy, Carrier Exhibit No. 3, contains a number of excerpts relevant to the instant dispute.

In the introductory language of the Policy, revised effective October 1, 1999, BNSF states as follows:

> Employees in unassigned service must be available for service approximately seventy-five percent (75%) of total time on weekends (defined as Saturday and Sunday, midnight to midnight) and seventy-five percent (75%) of total time on weekdays figured independently and applied on a calendar month basis. For purposes of this Policy, unassigned service is defined as service that does not provide for assigned rest days or does not provide a specific start time or start window. Seven-day assignments are considered as unassigned service. If a layoff or mark-up involves any portion of a weekend day as defined above, that entire day is considered a weekend absence. Availability will be calculated on the basis of the number of days in a calendar month that the employee is in unassigned service during that month. In every case, absence for personal business, sickness, sickness in family, missed calls, or other similar absence on any part of any day will be counted as a day that the employee was not available for the purpose of determining that employee's availability.



The Policy then provides that vacation days, personal leave days, jury duty, bereavement, union business, company business, granted leave-of-absence, medical leave, excused absence or other similar absences (all considered to be "excluded time") would not be considered in determining employee availability.

The Policy then, in graphic form, charts examples of the maximum allowable days off for employees in both unassigned and assigned service.

Additionally, the Policy states in a General Provisions-All Service Section as follows:

> Layoffs must be requested from and authorized by crew support. Authority will be based on "needs of service." To facilitate auto-markup and other considerations, the duration of layoff must be agreed to by crew support.
>
> * * *
>
> "Needs of service" dictate how many employees may be off at any one time at a particular location as determined by the vice president of operations or his designee.

The Policy also speaks as to how it will be administered. The Policy Administration Section reads, in part, as follows:

> Employees whose conduct is inconsistent with this Policy in any calendar month will be required to meet with the Superintendent or his or her representative. At this meeting the employee will be advised of the




> requirements that must be met to comply with the Policy. A second failure to comply with this Policy within 36 months of the initial meeting with the Superintendent or his or her representative (12 months for employees with a clear record for the preceding 36 months) will be considered a "standard handling" offense under the Policy for Employee Performance Accountability (PEPA). Any subsequent failure to comply with this Policy within 36 months of a previous failure will be considered another "standard handling" offense under PEPA. An employee who misses a call, lays off on call or is a "*no-show*", will be subject to PEPA separate and apart from this Availability Policy.

The Policy also specifies the manner in which employees may obtain "excused absences".

As will be more fully discussed below when the positions of the BLE and UTU are addressed, the two Labor Organizations argued, inter alia, that the 1999 Availability Policy was in conflict with the language, spirit and intent of the March 18, 1999 agreement between the Organizations and the carriers represented by the National Carriers' Conference Committee (hereinafter the "NCCC"), which agreement addresses the subject of Work/Rest Guidelines Principles.

The BNSF was a party to this agreement, which agreement had its genesis in an Award by Arbitration Board No. 559. In that May 8, 1996 Award, Arbitration Board No. 559 recognized that the parties had "agreed to establish a Wage and Rules Panel 2000 which would study and make recommendations concerning various pay and work rules".




Article XIII of the Award established the National Wage and Rules Panel, and the Panel was given jurisdiction in Section 2 of the Article to "comprehensively examine" certain subjects, including "Quality of Work Life".

The Work/Rest Guidelines Principles include the following relevant excerpts:

> II. Purposes and Principles
>
> To meet the needs of rail service, many operating craft employees work highly variable duty schedules. The impact of those schedules on the employee's health, quality of life, and safety on the job, and implementation of appropriate corrective measures, are prominent issues facing the railroad industry today.
>
> Recent sleep research counsels that irregular work schedules may disrupt natural human sleep-wake cycles in certain circumstances, which could result in the potential for disrupted, shortened and poor quality sleep and, in some cases, reduced alertness and fatigue on the job.
>
> The parties believe that management and labor should join in a mutual effort to review the relevant scientific research in this area and to facilitate implementation of validated countermeasures that will minimize the likelihood of fatigue while at the same time addressing related quality of life issues.
>
> * * *
>
> III. Work/Rest Committee
>
> A. A Work Rest Committee (the "Committee") shall be established on each carrier within 45 days from the date of these Guidelines.
>
> * * *
>
> IV. Initial – Education and Training Program
>
> 1. Each Committee shall be responsible for developing an education and training program covering all employees represented by the organizations and appropriate carrier/management personnel.
>
> * * *



V. Other Immediate Tasks

Each Committee shall within six (6) months from the date of these Guidelines develop a program, and within nine (9) months of the date of these Guidelines shall implement the initiatives as set forth below in conjunction with and subject to the approval of the designated labor and management representatives on that carrier.

Each Committee may designate local work/rest groups to develop, prepare and facilitate local work/rest initiatives and/or programs under the direction of such Committee. It is recognized that variations in operating and other conditions may well lead to the development of different programs from one region or territory of a carrier to another. . . ..

A. Assigned Work Days/Rest Days

Work schedules consisting of assigned work days and predictable rest days will be made available to extra and pool employees working in unassigned freight service to the extent practicable. The number of assigned work days and rest days should be based on operational feasibility and other appropriate criteria, including, but not limited to, the lengths of the crew district and the mix of assignments which an extra board protects. Employees who are provided regularly assigned rest days pursuant to this Paragraph shall not be required to work on such rest days, but may voluntarily elect to do so, subject to fatigue and rest guidelines to be developed by each Committee.

B. Minimum Undisturbed Rest

An employee working in unassigned pool freight service will be provided 8 hours of undisturbed rest at his home terminal subsequent to completing service and being released from duty. . . ..

C. A.M. Mark-Ups

When employees working in unassigned freight service return to service after being on compensated leave for 72 hours or more, they shall not be considered available for duty earlier than 7:00 a.m. local time on the first day back.

D. Assigned Service

Each Committee shall review the operations of the carrier for the purpose of determining whether greater segments of the operation can be run on an assigned basis, as opposed to unassigned or pool service. Experiments designed to increase the percentage of operations in assigned service shall be encouraged. Each Committee shall make a detailed account of its findings and recommendations for increasing assigned service operations after completing such tasks.

* * *

 

IX. General

The foregoing Guidelines reflect the parties', decision that the way to pursue resolution of fatigue-related problems is through good faith arms-length collective bargaining.

Mr. Charles L. Little, International President of the UTU since 1995, testified that he participated in the arbitration and negotiations which led to the establishment of the National Wage and Rules Panel; and that he attended all meetings of the Panel.

President Little testified that during the discussions which led to the negotiation of the Work/Rest Guidelines the parties addressed fatigue in the context of accidents which had resulted in fatalities on the BNSF and the Union Pacific Railroad Company. President Little testified that the UTU believed "we were talking about availability and absenteeism", in the context of the discussions concerning fatigue. President Little testified that fatigue "accumulates over a period of time", and is exacerbated if a train or engine service employee has to be available "every day of the month".

President Little testified that the negotiators were not able to "come up with a model that fit every carrier";



and thus the parties agreed on the general principles contained in the Work/Rest Guidelines.

Mr. Robert D. Kerley, a UTU Associate General Chairman on the BNSF, testified in support of his declaration, entered in evidence as UTU Exhibit No. 8, that he has attended several meetings with Carrier personnel in which the question of availability and fatigue were discussed. Mr. Kerley testified that at a September 10, 1999 meeting of the BNSF Fatigue Countermeasures Planning Group the parties discussed a computer program developed by Dr. Pooja Dwan which sought to measure the cost, cycle time, at-home time and other pertinent factors to determine if implementing a "Rest Cycle" extra board, as opposed to a conventional rotating extra board, made financial and logistical sense.

Mr. Kerley testified that as the result of the institution of the Availability Policy, which is presently being applied on the BNSF on an "informational basis" only, members of his Organization "cannot tell when they are to go to work". Mr. Kerley testified that in the present context of the large amount of traffic being generated on the BNSF he has "never seen so many hours of service relief




crews being released", and that "even in assigned service, locals and road switchers are not making their schedules on time."

Mr. Kerley testified that train and engine service employees on the BNSF are working so many hours in certain districts that the "only way to get a day off is to lay off".

Mr. Kerley testified that the Availability Policy is "an insult to those who work all the time", and that employees "know when they are tired, fatigued or have a civic or other responsibility to meet".

Mr. Ray Lineweber, the UTU's Director of the Nebraska State Legislative Board and a Member of the Safety Assurance Compliance Program (hereinafter the "SACP"), testified that the SACP was established on the BNSF by the Federal Railroad Administration. Mr. Lineweber testified that the SACP process established on the BNSF in 1996-97 sought to address safety concerns and questions concerning employees' ability to "mark off sick".

Mr. Lineweber testified that he met with BNSF representatives and that he outlined a plan which would address the employees' needs for rest and the Carrier's



needs for moving its trains timely and efficiently; and that at a SACP meeting in Fort Worth, Texas on March 10, 1999 the BNSF apparently introduced a "rough of an availability policy" to the group, which group did not include representatives of the UTU.

Mr. Lineweber testified that when the policy was "floated" to the BNSF SACP System Group, on or about April 27, 1999, it was "voted down" as, in the opinion of the UTU, the policy had "collective bargaining issues in it and may have contributed to fatigue."

The Board next viewed a videotape depicting the activities of the Wage and Rule Panel, with commentary by leading labor and management representatives who are participating in the process. The transcript of the tape was introduced in evidence as UTU Exhibit No. 19.

Mr. Franklin Hickman, who has worked for twenty-one years for the BNSF and one of its predecessor railroads and who is a Local Chairman for the UTU in Wisconsin, testified regarding a work day/rest day innovation he "designed" for train and engine service employees on his district known as "10 and 5". Mr. Hickman testified that this arrangement was placed in effect in May, 1995. Mr. Hickman, who



appeared on the videotape and described the benefits of "10 days on and 5 days off", testified that with the introduction of the "10 and 5" arrangement availability in his district "went up to 92% to 98% depending on the days of the week"; that the Carrier no longer had to "hold trains"; and "the guys get days off". Mr. Hickman testified that the "10 and 5" is, in effect, a "local agreement"; and that the UTU sought to "spread the program", and did so in another part of the state of Wisconsin.

Mr. Hickman testified that, in his opinion, the Availability Policy creates fatigue, and that employees now have to be at work whether they are "tired or not".

Mr. Kerley was recalled and sponsored UTU Exhibit I, a copy of the minutes of the July 22-23, 1999 Fatigue Countermeasures Planning Group meeting. The minutes reflect that a number of subjects were listed as "Action Items" for the September 9-10, 1999 meeting of the group. Among the issues to be considered were "Identify potential roadblocks to 8/10 hour undisturbed rest", "Layoff abuse (and) sharp shooting", "General availability of employees",



"The new Availability Policy" and "Employee availability by location/board".

Mr. M. David Dealy, Vice President of Transportation for the Carrier, testified regarding the Carrier's need to implement the Availability Policy in order to ensure that the BNSF had sufficient manpower to deliver goods on time; and he described the Policy's intended implementation and its design. Mr. Dealy testified that customer demands have risen dramatically "over the weekends in the last few [illegible]rs"; and that during the 1994-98 period the Carrier has experienced "double digit growth every year". Accordingly, Mr. Dealy testified that "supply and demand became critical", and that when train and engine service employees laid off for special events, such as weekend holidays and the "Super Bowl", such layoffs have caused the Carrier to "have to shut down". Mr. Dealy described the Carrier's obligation to meet "just-on-time" delivery schedules.

Mr. Dealy testified that the "issue involves weekend layoffs, and not the majority of our employees".

Mr. Dealy testified that the Carrier has modified the [illegible]ilability Policy on several occasions, since it was

 

first issued, and that all of the modifications have worked to the "benefit" of BNSF's employees./

Mr. Dealy testified that the "14 hour rule" does not adversely effect the employees; and that the objections by the labor unions appear to be caused by a "communications problem".

Mr. John J. Fleps, BNSF's Vice President of Labor Relations, described the 1996 settlements with the BLE and UTU which "called upon" the parties to establish the Work Rest Panels. Mr. Fleps testified that the Panels were to function "on an advisory and non-binding basis". Mr. Fleps stated that the participants on the Panels were to "make recommendations for resolution of issues before or for the next round [of negotiations]".

Mr. Fleps stated that fatigue and safety were "hot" issues for the industry; and that was the inspiration for the negotiation of the Work/Rest Guidelines.

Mr. Fleps stated that the Work/Rest Guidelines were not intended to be a "man for all seasons"; that is, they were not intended to override management's prerogative to develop, issue and implement policies concerning absenteeism.

 

The Carrier submitted an affidavit of Mr. Robert F. Allen, the Chairman of the National Railway Labor Conference and the NCCC, as Carrier Exhibit No. 22. In his affidavit Chairman Allen reviewed the genesis of the Work/Rest Guidelines and stated that pursuant to Articles XI and XIII of the UTU agreement the Panel was to be a "non-binding joint review Panel" set up to "study and exam" certain "unresolved subjects." Chairman Allen observed that "availability or absenteeism" were not listed as among the "unresolved subjects." Chairman Allen observed that the Guidelines provide a process for carriers and the organizations to discuss and resolve issues; but "until and unless the parties agree to a resolution which modifies collective bargaining agreements in a manner restricting existing managerial rights, the carrier continues to enjoy those rights." In his affidavit Chairman Allen wrote that, in his opinion, neither the language nor the purpose of the Guidelines supports the Organizations' position that existing agreements were amended to require that the promulgation or modification of absenteeism or availability policies had to be negotiated with the Organizations.



Mr. John Fitzgerald, a BLE General Chairman who has worked for the BNSF and its predecessors since 1970, testified that in 1979 the Carrier published a policy which restricted layoffs; that he conferenced the matter with the Burlington Northern's Labor Relations Department, and objected to the policy; and that the notice was withdrawn.

Mr. Fitzgerald testified that when the Availability Policy was "floated" in April, 1999 he received a fax copy of the Policy, and raised an issue with the Carrier [illegible]arding the Policy conflicting with the Work/Rest Guidelines.

Mr. John Mullen, a BLE General Chairman who began his employment as an Engineer on the Atchison, Topeka and Santa Fe Railway Company (hereinafter the "Santa Fe"), testified regarding representations by Carrier counsel and witnesses concerning the BLE's allegedly accepting the implementation of prior generations of the Carrier's availability policies. Mr. Mullen testified that when the railroad published an availability policy in 1990 the BLE objected to the policy, and the matter was handled as a minor [illegible]spute. Mr. Mullen testified that when the Carrier published an availability policy in 1996 he objected to the



policy, and "none of [his] people were disciplined" for violating the policy.

Mr. Mullen testified that the BLE "thought we had the issue locked up in the SACP", and that he did not acquiesce to the Policy being implemented. Mr. Mullen testified that the BLE "took our concerns" to Messrs. Fleps and Dealy, and that the BLE "never agreed that it was reasonable to have an engineer work seven nights a week, twelve hours a night with two days off a month".

Mr. Mullen testified that, in his opinion, the present generation of the Availability Policy conflicts with the mileage limitations in the BLE's collective bargaining agreements; and that there is a difference between "miles paid and miles run."

On cross-examination Mr. Mullen testified that he told the Carrier that he "supported their need for a policy", but "not one that was in direct violation of any collective bargaining agreement". Mr. Mullen testified that he provided Carrier management with a list of seven objections to provisions in the Availability Policy, and that only two [illegible]ere addressed.



Mr. Dennis R. Pierce, a Vice General Chairman for the BLE, testified that he worked for the former Chicago, Burlington and Quincy Railroad Company, and that one of the predecessor roads was the Spokane, Portland & Seattle Railway Company (hereinafter the "SP&S"). Mr. Pierce testified that a November 7, 1956 memorandum of agreement between the SP&S and the BLE, BLE Exhibit J, establishing layoff rights is in conflict with the Availability Policy.

Mr. Pierce testified that he was a Local Chairman at Lincoln, Nebraska in 1997 when an availability policy was published by the Carrier; that the BLE "took exception to the policy because the policy did not permit reasonable layoffs; that the parties exchanged correspondence regarding the BLE's challenge to the policy; and that the policy was changed so that employees were not removed from service and those held out of service were made whole. Mr. Pierce testified that the BLE objected to the present Availability Policy when it was first published, and alleged that it was violative of an employee's reasonable right to lay off due to illness.



## Statement of the Issues

The UTU poses the following issues for the Board:

1. Was BNSF proper in the August and September, 1999 unilateral promulgation of its "Availability Policy" covering employees represented by UTU without negotiating with UTU in light of the March 18, 1999 Work/Rest Guidelines/Principles signed by the parties as part of the work of the National Wage and Rules Panel mandated by Article XIII of the 1996 UTU National Agreement?

2. If the answer to Question 1 is in the negative, shall BNSF now be required to suspend such Availability Policy until it reaches agreement with UTU pursuant to the March 18, 1999 Work/Rest Guidelines/Principles?

The BLE poses the following issues for the Board:

1. In light of the provisions of the collective bargaining agreement and practices as to layoffs, mileage limitations, absenteeism and rest, such as, but not limited, to those set forth in Appendix 1 hereto, and the National Work/Rest Agreement in effect on BNSF, did the Carrier have the right to unilaterally impose its conflicting "Availability Policy" on September 1, 1999



ithout engaging in collective bargaining as provided by he Railway Labor Act?

2. Is the Carrier's "Availability Policy" also nvalid on the ground that it conflicts with the forementioned provisions of the collective bargaining greements between BLE and BNSF, which are set forth in ppendix 1 hereto, and the past practices thereunder?

3. Is the Carrier's "Availability Policy" in conflict ith the March 18, 1999 National Work/Rest elines/Principles and, therefore, improperly romulgated and void?

4. May the Board direct the BNSF to cease application of the "Availability Policy"?

The Carrier poses the following issues for the Board:

1. Did the Work/Rest Guidelines/Principles take away BNSF's managerial prerogative to unilaterally regulate attendance through the issuance of the 1999 Availability Policy?

2. Did provisions in collective bargaining agreements identified by BLE bar issuance of the 1999 Availability icy?




Position of the UTU

The UTU maintains that the Carrier should be held to the obligation it undertook in the March 18, 1999 Work/Rest Guidelines/Principles negotiated between the UTU and the BLE on the one hand and the carriers, including the BNSF, represented by the NCCC. The UTU points out that the Work/Rest Guidelines were the product of negotiations conducted pursuant to Article XIII of the 1996 UTU National Agreement. The UTU argues that the Carrier's August 16, 1999 unilateral promulgation of the Availability Policy and BNSF's September 1, 1999 application of the policy to the medical excused absence procedure and its Time Ticket notation that "Additional rest request by Extra Board personnel may result in a layoff" are plainly at odds with the Carrier's obligations under the Work/Rest Guidelines. The UTU asserts that the Carrier's October 13, 1999 "whittled-down" version of the Availability Policy also is at odds with the Work/Rest Guidelines.

The UTU maintains that the Carrier's position that it had the managerial prerogative to promulgate all forms of its Availability Policy is not tenable in light of the Work/Rest Guidelines. The UTU argues that the affidavit of




NCCC Chairman Robert F. Allen, submitted by the Carrier, in which he states that the Work/Rest Guidelines do not bar BNSF's right to promulgate the Availability Policy is contradicted by Mr. Allen's predecessor as Chairman of the NCCC who served a Section 6 Notice on the UTU on October 7, 1998 which sought to "Discontinue rules and practices that permit less than full-time availability of active service". The UTU points out that the NCCC failed to obtain such relief during that round of national negotiations. Accordingly, the UTU contends that neither the BNSF nor the other NCCC carriers have an unfettered managerial prerogative to promulgate a policy such as the one here under consideration.

The UTU argues that, more importantly, the text of the Work/Rest Guidelines provides support for its position that the Carrier's Availability Policy violates that agreement. Specifically, the UTU points out that the document states "The parties believe that these enhanced rest opportunities will address fatigue-related concerns more effectively and <u>should reduce the need for employees to seek rest opportunities by marking off</u>." (Emphasis by the UTU) The UTU further points out that the document states "the




overarching objective of these Guidelines is to achieve meaningful progress in addressing fatigue issues by mutual and cooperative actions; if and to the extent that particular initiatives do not prove effective, it is our mutual intention that the parties work together to devise mutually agreeable corrective actions, rather than rely upon the traditional claim and grievance process." Additionally, the UTU points out that the Work/Rest Guidelines provided that the parties had to develop programs by September 18, 1999 to be implemented December 18, 1999 that would include provisions for "Assigned Work Days/Rest Days" and "Assigned Service". Finally, the UTU points out that Article IX of the Guidelines states "The foregoing Guidelines reflect the parties' decision that the way to pursue resolution of fatigue-related problems is through good-faith arms-length collective bargaining.

The UTU submits that the declaration and testimony of UTU International President Charles L. Little rebuts the affidavit of NCCC Chairman Allen; and that NCCC Chairman Allen's affidavit is also contradicted by the January 28, 1999 minutes of the January 13-14, 1999 Wage/Rule Panel meeting provided to the Panel by National Mediation Board




airperson Magdalena Jacobsen. The UTU points out that in e second paragraph of those minutes it was observed that here is concern that any simple fix on fatigue will srupt substantial parts of the labor agreement . . . ."

The UTU also relies upon the testimony of Mr. Robert Kerley, a UTU Associate General Chairman on the BNSF. e UTU points out that Mr. Kerley testified and stated in s written declaration that at a September 10, 1999 eting of the BNSF Fatigue Countermeasures Planning Group : Pooja Dwan stated that one of the essential criteria in mparing "Rest Cycle" Boards and conventional rotating tra boards was availability of sufficient extra employees protect the needs of the service. (Emphasis by the UTU) e UTU also contends that the Carrier's Availability licy plays havoc with the "10 and 5" agreement reached at uperior, Wisconsin as testified to by Mr. Franklin ickman, the UTU's Local Chairman who participated in the egotiation of the local agreement which established an rrangement of ten days "on" followed by five days "off" or operating employees at Superior, Wisconsin.

The UTU points out that it did not agree with the mplementation of the Availability Policy; that the policy



as not implemented at the request of the UTU's State egislative Director, Mr. Ray Lineweber; and that when the olicy was first "floated" on March 10, 1999 no UTU epresentative was present. The UTU submits that in April, 999 UTU General Chairperson J.D. Fitzgerald telephoned the arrier and stated that the Availability Policy was at odds ith the Work/Rest Guidelines/Principles. The UTU submits hat in May, June, July and August, 1999 UTU epresentatives continued to complain orally and by letter o the Carrier regarding the unilateral promulgation of the vailability Policy, stating that the Policy violated the ork/Rest Guidelines.

The UTU submits that 1999 was the not the first time the UTU complained regarding the attempts of BNSF or its predecessor railroads to unilaterally promulgate availability policies. The UTU points out that General Chairperson J.D. Fitzgerald testified before the Board that when the Burlington Northern Railway Company (hereinafter the "Burlingon") previously sought to implement an availability policy he complained and the Burlington withdrew the policy after learning that the UTU had strike authority. The UTU submits that similar policies sought to



instituted by the BNSF in 1996 and 1997 and by the Santa Fe in 1993 were withdrawn or modified as a result of challenges by the UTU. In any event, the UTU points out that these policies predated the March 18, 1999 Work/Rest Guidelines.

The UTU asserts that the Carrier's only articulated reason for instituting the Availability Policy was its inability to have train and engine service employees mark up on weekends. However, the UTU submits that the Policy is not tailored to address that narrow problem. Rather, the UTU argues that the Availability Policy is broad and complex, and includes the counting of medical absences. The UTU suggests that the desire to implement the Availability Policy may have had more to do with the fact that on the day the Policy was first promulgated a news report indicated that BNSF intended to eliminate 1,000 union jobs.

The UTU maintains that the arbitral precedent cited by the Carrier has no applicability to the instant case, since all of those decisions involved rights of a carrier regarding absenteeism in specific discipline cases. The UTU suggests that the case before Public Law Board 4762 TCU



and Amtrak (Neutral Member Jacob Seidenberg, December 7, 1989) is more analogous to the situation in this case, as PLB 4762 recognized the carrier's right, generally, to regulate smoking in the workplace, but not to totally ban smoking without negotiations. The UTU points out that in the instant case the Carrier has articulated a concern regarding weekend mark offs, but the Policy applies across the board, even to medical absences.

Based upon what it considered to be the clear intent and language of the Work/Rest Guidelines to deal with fatigue-related problems, the UTU maintains that the broadly-drawn, unilaterally-implemented Availability Policy conflicts with those Guidelines.

Accordingly, the UTU requests that the Board find that the BNSF acted improperly in August and September, 1999 when it unilaterally promulgated the Availability Policy applicable to employees represented by the UTU, without negotiating with the UTU in light of the Work/Rest Guidelines/Principles signed by the parties as part of the work of the National Wage and Rules Panel mandated by Article XIII of the 1996 UTU National Agreement.



The UTU requests that the Board direct the BNSF to spend implementation of an Availability Policy until it aches agreement with the UTU pursuant to the March 18, 99 Work/Rest Guidelines/Principles.

sition of the BLE

The BLE submits that the layoff, mileage regulation d a myriad of other contractual provisions represent an haustive program for rest, absenteeism and time off for yees, which provisions were negotiated by the Carrier d the BLE and have become an integral part of the working les and conditions of those employees. The BLE submits hat the Work/Rest Guidelines were adopted by the parties n order to circumvent Congressional and agency involvement n the subjects associated with work/rest cycle; and that hese Guidelines were the product of collective bargaining, nd recognized that the subjects associated with work/rest ere best handled in bargaining negotiations. The BLE oints out that the Work/Rest Guidelines stated and ntended that the programs were to be developed by tiations between the parties according to a schedule. he BLE further points out that Article IX of the



delines indicated that they "reflect the parties' :ision that the way to pursue resolution of fatigue- .ated problems is <u>through good faith, arms-length</u> <u>.lective bargaining</u>." (Emphasis by the BLE)

The BLE submits that BNSF's Availability Policy was mmenced in violation of the Carrier's contractual and ıtutory obligations.

The BLE also argues that the Availability Policy ntravenes the substantive provisions of the collective r ning agreements between the BLE and BNSF and the tional Work/Rest Guidelines. The BLE refers to seven (7) ecific items which are required by the Guidelines to be ntained in the parties' work/rest initiatives and ograms. The BLE enumerates those items as being (1) signed work days/rest days, (2) Minimum undisturbed rest, ) A.M. mark-ups, (4) Assigned service, (5) ansportation, (6) Lodging facilities and (7) Line-ups.

The BLE contends that the Availability Policy clearly iolates the provision of A.M. mark-ups, which reads:

> When employees working in unassigned freight service return to service after being on compensated leave for 72 hours or more, they shall not be considered available for duty earlier than 7:00 a.m. local time on the first day back.



The BLE submits that the Availability Policy conflicts th numerous provisions in the BLE's collective bargaining reement; and argues that although the Carrier has ntinued to modify the Policy, even after the decision of e Federal Court and during the proceedings before the ard, the Policy's basic principles and provisions remain conflict with existing collective bargaining agreement ovisions. Additionally, the BLE points out that any difications to the Policy would remain subject to the er's claimed prerogative to revert to the original licy.

The BLE argues that the Availability Policy violates he Layoff and Leave of Absence Rules. The BLE points out hat engineers may layoff for personal reasons when verbal uthority is obtained and the exigencies of the service ermit. The BLE submits that the rigid application of the ne or two day or 75% requirements contravenes the ermissive nature of the rule. The BLE further points out hat the Burlington/BLE agreement, applicable to the Ft. orth & Denver Railway Company, has no restrictions on any l ff of five days or less; and that on the former hicago, Rock Island & Pacific Railway portion of the Joint



exas Line the agreement permits an unlimited layoff eriod. The BLE also points out that Article 27 of the greement applicable to the Burlington's former SL-SF ivision permits an engineer to layoff for less than 30 lays without reason. The BLE points out that in order to nsure that engineers can exercise these rights each of the ited agreement provisions provides that "The Carrier shall maintain a sufficient number of engineers to permit reasonable layoff privileges and to protect the service including vacations and extended vacancies".

Insofar as mileage regulations are concerned, the BLE contends that the Availability Policy violates the maximum limits on engineers working under contractual mileage regulations. The BLE points out that in 1990, when mileage regulations were increased, the Carrier agreed that "An engineer who accumulates 4,200 miles in his assigned checking period <u>will be allowed to layoff on miles</u>". (Emphasis by the BLE) The BLE asserts that certain engineers have worked in excess of 5,000 miles in a given monthly period; and refers to incidents set forth in its submission when BNSF has cited those individuals for violation of the Availability Policy.



The BLE claims that the Availability Policy violates ther provisions in the parties' collective bargaining greements, such as (1) temporary transfer agreements, hich permit a temporarily transferred engineer to layoff 'our (4) consecutive days each 45 day period, in addition :o other layoff provisions, (2) the 14 hours rest rule at iome terminals, as the exercise of the rule takes away a ›ermissible day under the Availability Policy and (3) the 'foot of the board" rule, to which the Carrier has made a :[illegible]porary accommodation and deleted from the Availability Policy, at this time and subject to further consideration, restrictions upon an engineer's exercise of this right.

The BLE argues that the issue of the work/rest cycle and layoffs for rest as the result of fatigue by engineers is a major safety concern of the U.S. Congress; and points to the fact that there is pending legislation concerning this question and that the National Transportation Safety Board has criticized the Federal Railroad Administration for failing to issue regulations regarding this subject. In light of these circumstances, the BLE submits that the [illegible]rd should look with favor upon the arguments presented in this proceeding by the BLE and the UTU.



The BLE cites two arbitration decisions involving the NSF with each of the Organizations in these proceedings in upport of its position. The BLE submits that in NRAB ward No. 24168 BLE and UP, (Twomey, 1992) it was etermined that when an availability or absenteeism policy onflicts with layoff and/or leave of absence provisions he collective bargaining agreement takes precedence, and he unilateral policy is deemed to be contractually mproper. The BLE contends that the decision of PLB No. 51[illegible], UTU and UP, Award #7 (Benn, 1992) reflects the same rationale; that is, the unilaterally promulgated availability or absenteeism standard does not override the collective bargaining agreement's layoff provisions.

Based upon the foregoing facts and arguments, the BLE submits that its position should be sustained and requests the Board to direct the Carrier to cease and desist from implementing the Availability Policy.

## Position of the Carrier

The Carrier submits that it has the unilateral right to issue, modify and enforce reasonable policies regarding absenteeism and attendance, except to the extent the



ercise of that right conflicts with an obligation(s) der a collective bargaining agreement. The Carrier serts that the right of railroads to regulate attendance rough unilaterally set standards is well-recognized in a st of arbitration decisions in the railroad industry. e Carrier cites several of those decisions, including UTU N&W, PLB No. 5107, Award No. 18 (Euker, 1992) in support this contention.

The Carrier maintains that the BNSF and its edecessors have exercised this right for as long as yone can remember. The Carrier points out that, although e BLE and UTU have, from time to time, complained about he application of various prior attendance requirements, hey have expressly acknowledged BNSF's right to nilaterally issue reasonable attendance policies that do ot conflict with collective bargaining agreements. The arrier contends that, not withstanding the occasional bjection, no arbitrator has ever ruled that BNSF or its redecessor railroads did not retain the managerial right o promulgate attendance requirements. The Carrier asserts the 1999 Availability Policy is merely the latest xercise of that right, and represents only an incremental



ange from the 1997 policy and other prior policies. The rrier points out that the 1999 Availability Policy was veloped over a period of almost a year, and reflects put from union officials as well as BNSF's experience der prior unilaterally-issued policies.

The Carrier argues that the Availability Policy is inently reasonable. The Carrier submits that the Policy quires most train and engine service employees to be ailable at least 75% of the time, calculated separately eekdays and weekends. The Carrier points out that is availability requirement does not include scheduled me off or time off for vacations, approved personal ave, jury duty and other recognized forms of approved ave, so that any layoffs employees take under the vailability Policy are in addition to these other types of ime off. The Carrier further points out that the vailability Policy establishes a procedure whereby an mployee, whose individual circumstances require absences hat would otherwise be in violation of the Availability olicy, can obtain approval for such absences, so that the nces do not count against him/her. The Carrier argues hat the Availability Policy represents no real change in



ability of employees to take time off for legitimate poses, such as their own illness or that of a family ber. The Carrier submits that the Policy is aimed at loyees who abuse the layoff privilege by being essively absent or by repeatedly taking weekends off. Carrier maintains that the Availability Policy balances needs of BNSF's business, which is a 365-day a year, ven day a week, 24-hour a day operation, with reasonable portunities for layoffs.

The Carrier argues that the Organizations' claim that e Policy violates the Work/Rest Guidelines issued on rch 18, 1999 by the National Wage and Rules Panels eated after the 1996 national bargaining is refuted by e documents creating the Panels, as well as the idelines themselves. The Carrier points out that Article III of the May 8, 1996 Arbitration Award involving the ailroads and the UTU and Article XI of the May 31, 1996 ollective bargaining agreement between the railroads and he BLE each expressly provided that each Panel was only to make <u>recommendations</u> for disposing of all unresolved es . . . ." (Emphasis by the Carrier) The Carrier urther points out that the Panel's recommendations were



not [to] be considered final and binding", and that the arties were required only to exert good faith efforts "to tilize those recommendations as a basis for settlement of he issues involved." The Carrier maintains that nothing n either of the documents establishing the Panels even uggests an agreement by the railroads to forego any nspecified existing rights in connection with the list of ague and broad topics designated for the Panels' consideration.

The Carrier points out that the Panels identified 'fatigue" as one issue that could be fruitfully addressed; and that the Organizations and Carriers then developed the Guidelines to establish a process to determine how fatigue would be addressed at each railroad. The Carrier submits that the focus on fatigue was very specific; and that the Guidelines state that their purpose "is twofold. First, to encourage the dissemination of information concerning the science of fatigue and effective countermeasures. Second, to establish within a specified timeframe programs designed to deal with the cause of fatigue in the rail industry and k/rest issues." The Carrier further points out that each carrier signatory to the Guidelines was to establish a



rk Rest Committee in order to develop an education and raining program concerning "the effects of fatigue and ossible corrective measures", and to develop and implement nitiatives regarding eight aspects of employment onsidered to contribute to fatigue, "subject to the pproval of the designated labor and management epresentatives on that carrier."

The BNSF argues that fatigue when an employee is on he job is a different topic than the issue of whether an m oyee can be consistently absent on weekends or other imes. The Carrier asserts that the mere fact that some mployees lay off to rest does not eliminate BNSF's ability o address the broader problem of employees who take xcessive time off for personal or other reasons that have othing to do with rest, or who regularly lay off on eekends, resulting in an insufficient number of employees o staff trains when the need for train and engine service mployees is still great. The Carrier argues that the Organizations cannot point to any specific provision in the Guidelines that was violated by the issuance of the A lability Policy. The Carrier submits that nothing in the Guidelines vitiates or diminishes management rights or



the rights of labor under existing collective bargaining agreements. The Carrier asserts that any recommendations that emerge from the Guidelines would be implemented through collective bargaining. BNSF argues that until or unless a carrier agrees in bargaining to restrictions upon its existing rights to regulate absenteeism, that carrier retains those rights. The Carrier submits that a finding that the Panels' reference to "fatigue" encompasses availability generally and serves as a waiver of the Carrier's longstanding managerial rights to manage attendance would have significant adverse consequences for all railroads that were parties to the Guidelines, not just BNSF.

The Carrier agrees with the UTU that it is premature to consider claims that application of the Policy might violate the terms of some of BNSF's collective bargaining agreements with the Organizations. The Carrier submits that consideration of such claims can only be fairly and fully addressed in the context of the application of the Policy to particular individuals in specific situations. The Carrier suggests, in the event the Board chooses to



ldress BLE's contract claims, that the Board must find ıat those claims have no merit.

The Carrier maintains that, although the BLE ›parently contends that the Availability Policy violates ⁄ery contract provision that contains the word "layoff", ıether the provision has anything to do with the matter ›vered by the Policy, a reading of the actual contract ınguage shows that this is not so.

The Carrier contends that several of the contract r[illegible]isions identified by the BLE do not even remotely ›nflict with the Policy; but deal instead with such ›pics as reporting for duty after layoff, leaves of bsence and filling vacancies, matters the Carrier argues re not addressed by the Policy.

The Carrier further points out that other contract ırovisions claimed by the BLE to be violated by the Policy nvolve aspects of the Policy that appeared in early ⁄ersions but have since been removed from the Policy, such ıs provisions that permit engineers to lay off after :eaching a specified number of miles in a month and that leal with requests to move to the "foot of the board".



The Carrier maintains that the BLE's claims that the ›licy violates agreement provisions that enable engineers › request additional time off to rest at their home ›rminals and that permit layoffs up to four days in ›njunction with a transfer are also without merit. The ›rrier asserts that fatigue-related rest will continue to › permitted under the Policy, which treats tying up for ›st or booking rest at the home terminal as "available ime", and that no employee will be penalized or i...plined for such rest. The Carrier argues that, imilarly, four day layoffs in connection with a transfer ill continue to be permitted.

The Carrier points out that provisions establish that NSF will maintain a sufficient number of engineers to ›ermit "reasonable" lay-off privileges or permit layoffs 'if conditions permit", and that these provisions expressly ›ondition an employee's ability to layoff upon BNSF's ›etermination that the requested lay off is "reasonable" or justified by the needs of the service.

The Carrier contends that many arbitration decisions m... clear that the numerical standards established by the Policy fall well within any *commonsense* definition of the



m reasonableness. The Carrier asserts that the ailability Policy sets the attendance requirement at a vel BNSF has determined to be consistent with the "needs the service" and is "reasonable" by any objective andard. The Carrier argues that these provisions do not eclude BNSF from determining that the "needs of the rvice" require that employees be available to work 75% of e time on weekdays and on weekends that they are heduled to work, and that employees benefit from having [illegible] reasonable standard clearly enunciated in a formal olicy so that they can plan accordingly.

In conclusion, the Carrier maintains that the rganizations' arguments that carriers can no longer xercise the long-held right to regulate availability hrough the issuance of enforceable standards would eriously jeopardize the carriers' ability to manage their usiness in an increasingly competitive transportation arketplace.

Based upon the foregoing facts and arguments, the Carrier submits that the Organizations have failed to meet their burden and demonstrate that the BNSF has lost this fundamental right.



ndings and Opinion

ISF's Management Prerogative

The Carrier has cited a legion of cases which support ts position that management retains certain rights, unless hose rights are specifically waived or modified in the erms of a collective bargaining agreement or as the result f a consistent, long-standing, mutually-recognized past r[illegible]tice. A significant number of those cases have ddressed the employer's right to manage employees' ttendance through the promulgation and implementation of a easonable attendance/availability policy.

This Board recognizes that the BNSF had such a right, nd did not relinquish that right.

The questions of whether the 1999 Availability Policy is a reasonable policy and whether the BNSF's right to promulgate and implement the 1999 Availability Policy has been vitiated or superseded by the Carrier's obligations under the Work/Rest Guidelines/Principles will be addressed i[illegible] a subsequent section of this Opinion.



Nos. 6264 and 6265
BLE and UTU
y Policy Dispute

ter, Spirit and Intent of the Work/Rest Guidelines

It is well-recognized that in grievance arbitration, n a union claims that the employer's interpretation /or application of a policy, rule or contract provision lates a term(s) of the parties' collective bargaining eement, that the arbitrator's first responsibility is to ermine whether there is clear and unambiguous language the contract which supports the union's claim.

he Work/Rest Guidelines represent a broad-based fort by the parties to resolve issues of mutual concern volving the "impact" of work schedules upon the "health, ality of life, and safety on the job" of operating craft ployees represented by the UTU and BLE. The parties have barked upon a multi-faceted effort to find the means to solve these issues, the "fatigue-related problems", rough "good faith arms-length collective bargaining".

However, a thorough review of the language of the rk/Rest Guidelines/Principles does not disclose that the rties agreed that a carrier would be restricted from cing an existing availability/absenteeism policy or om modifying an existing availability/absenteeism policy.



Clearly, there is some merit in the position of the TU and the BLE that the Work/Rest Guidelines contemplated hat the parties would address the question of employee vailability, in the context of train and engine service mployees' need for rest and relief from fatigue; and that esolution of this question would be pursued through egotiations that addressed this mutually-recognized problem".

However, although the parties contemplated that this s...e of rest and fatigue could be resolved through ne...tiations, it is equally clear that the specific anguage of the Work/Rest Guidelines does not speak to any imitation of a carrier's right to publish and implement rules/policies regarding availability and absenteeism.

Accordingly, it is the Board's conclusion that the "letter" of the Work/Rest Guidelines does not support the Organizations' position that the issuance and proposed implementation of the BNSF's 1999 Availability Policy violates the Guidelines.

Insofar as the "intent" of the Work/Rest Guidelines/Principles are concerned, the testimony of UTU P...ident Little was persuasive. This Board found his



timony regarding how the UTU viewed the principles and poses of the Work/Rest Guidelines to be compelling. sident Little testified that the UTU "believed we were king about availability and absenteeism" when the ties addressed the question of fatigue in the context of idents which had occurred on the nation's railroads.

However, there is insufficient evidence in this record persuade the Board that it was the intent of the gotiators for the carriers to limit a carrier's right to ue to implement and/or to modify existing rules ding the availability/absenteeism of operating craft ployees.

In the absence of sufficient evidence that the parties tually intended that the implementation and/or plication of availability policies/rules would be held in eyance until the parties could resolve the question of tigue/rest through "good faith arms-length collective rgaining", this Board is constrained to conclude that ere was no "meeting of the minds" insofar as the plication of availability policies was concerned.

Clearly, however, the Carrier's unilateral publication ntended implementation of its 1999 Availability Policy



egiously violates the "spirit" of the Work/Rest delines/Principles. One merely has to review the timony of the witnesses presented by the Organizations arding their understanding of the purposes of the k/Rest Guidelines and view UTU Exhibit No. 19, the Wage l Rule Panel videotape, to reach the conclusion that SF's proposed implementation of the 1999 Availability icy undermines the high-minded purposes of the otiators of the Work/Rest Guidelines.

In that video presentation, prepared in April, 1999 at about the same time that the BNSF was first making known s intention to issue a new Availability Policy, ternational President Little made the following servation:

> **I think this National Wage and Rule Panel gives us an opportunity to sit down and look at those issues that have never been resolved or new issues that are creating problems in the industry and address them together.**

The evidence before the Board belies any argument that SF made a sufficient effort to "sit down together" with e Organizations and address the issue of availability, an s inextricably linked to the issue of rest/fatigue.



The BNSF has presented substantial evidence in support ' its position that the Carrier is experiencing a serious :oblem in having a sufficient number of train and engine ervice employees available to operate on-time schedules, articularly on weekends. Although it is not clear that he problem is system-wide and could not have been resolved y focusing on "hot spots" on the system.

It is also clear to the Board that the BNSF management id not exercise the type of joint efforts to address the r em, as was contemplated by the "spirit" of the ational Wage and Rule Panel.

The narrator of the videotape made the following bservation:

> Finding resolutions that are acceptable to both Labor and Management often requires field studies or pilot projects. General Chairmen identify areas for pilot projects.

Following that statement by the narrator, BNSF's Vice President of Labor Relations, Mr. Fleps, who is also a nember of this Board, expressed the following opinion:

> Most of these ideas, the things we developed, were the creation of our employees. The projects or models we are most proud of were really designed by our people. And they work. They're different. They entail a lot of change. But that change is for the good. And it takes, I guess, a little faith and a little courage to give them a try.



One can most reasonably assume that Vice President Fleps was speaking of "projects or models" similar to the "10 and 5" arrangement testified to by Local Chairman Hickman. That arrangement was an innovative method of scheduling, intended to address the Carrier's need for the availability of a sufficient number of train and engine service employees.

On the videotape, Local Chairman Hickman made the following statement:

> Before 10-5 our layoff rate was 18% a day. And on payday holiday weekend it went up to 25% plus. Now it's less than 2% any day.

Local Chairman Hickman's endorsement of the innovative method for resolving availability was seconded by BNSF Train Master Gary Anderson and others.

Clearly, the above-quoted excerpts from UTU Exhibit No. 19 conclusively establish that the Carrier violated the "spirit" of the Work/Rest Guidelines and the National Wage and Rules Panel by its unilateral promulgation of the 1999 Availability Policy.



However, as observed above, there is no language in Work/Rest Guidelines that restricts the BNSF from [mod]ifying or issuing an Availability/Absenteeism Policy.

Reasonableness of the Availability Policy

It is well-established that an employer in exercising management rights to publish and enforce rules of [con]duct is obligated to ensure that those rules meet the s[tandard o]f reasonableness.

Ordinarily, in a case of this type, an arbitrator is [fa]ced with a general claim that a policy, such as the one [he]re under consideration, is unreasonable per se, or that [th]e policy has been applied in an unreasonable manner.

That is not the issue before this Board. The issues, articulated by the parties and reproduced at pages 20 [an]d 21 of this Opinion and Award, do not raise the question [of] whether the Policy was unreasonable as published; and, [a]s the Policy has not yet been implemented, there is no [ba]sis for speculating that it will be applied in an [unrea]sonable manner.



Accordingly, this Board will neither make a ruling r issue a finding regarding the reasonableness of the licy.

However, the Board will observe, by way of dicta, that rtain provisions of the Policy have the flavor of reasonableness.

Just one example can be found in the Policy ministration Section. In this Section of the Policy ere is a requirement that after a first violation of the l y, which is to result in a counseling session with the perintendent or his/her designee, an employee must intain a clean record for three years in order to avoid re severe treatment under the BNSF's progressive isciplinary system.

The Chairman of this Board, who has had the pportunity to consider the reasonableness of many policies f this type, is not familiar with any that require such a rotracted cleansing period.

In any event, as observed above, the issue of whether he Policy is unreasonable is not ripe for consideration on t merits.



e BLE's Claim of Conflicting Agreement Provisions

Simply stated, the BLE has raised colorable claims at the Availability Policy, either the version of the licy which BNSF intended to implement effective October 1999 or the modified Policy which BNSF presented to the ard on October 14, 1999, conflicts with several contract ovisions in the BLE's various agreements on different gments of BNSF's merged property.

However, as noted in the Section above in which the ard addressed the reasonableness of the Policy, the sues of whether the Policy conflicts with certain ovisions of the BLE's agreements are not, in this Board's inion, before us on the merits.

Absent any specific cases in controversy, it is the ard's opinion that, at this time, some of the apparently eritorious issues raised by the BLE will have to await usticiable disputes at the time the Carrier implements and hen applies the Policy in matters involving individual mployees.



nclusion

Although the Board has concluded that the BNSF has the ght to promulgate and implement a policy that governs ployees' availability/absenteeism, it is clear, in the ard's opinion, that the implementation of the ailability Policy may, unfortunately, have a long-term gative impact upon the parties' relationship.

The NCCC and the UTU and the BLE worked diligently to n[illegible] common ground to achieve two equally important j[illegible]ctives. The operational requirement to timely meet the rrier's business goals balanced against the need to isure that employees receive adequate rest in order to oid fatigue.

It is also clear that the BNSF expended minimal effort work with responsible Organization representatives to ishion an arrangement which would satisfy both of these itical needs.

The Carrier's traffic has increased dramatically, as estified to by Vice President Dealy. At the same time is increase in traffic has been correlated with eq[illegible]rements by shippers and receivers to have "just in



ime" inventories. So carriers face increasing needs for speed in delivery schedules.

At the same time employees face increased demands upon their off-duty time, in view of social changes which have severely limited the working man's and working woman's opportunity to attend to necessary personal business, much less for them to enjoy any significant leisure or "rest time".

With these two competing social changes, it is this Board's opinion that the parties would have been far better served had they been able to fulfill the principles of cooperation and mutual problem solving espoused by the labor and management spokespersons who "testified" on the videotape, UTU Exhibit No. 19.

While the BNSF's position will be sustained, the Board strongly encourages the parties to find a mutually satisfactory compromise which would address the needs of both the employees and the Carrier.

 

B Nos. 6264 and 6265
[illegible] nd BLE and UTU
a[illegible]ility Policy Dispute
9[illegible]

ward:

1. The Work/Rest Guidelines/Principles did not vitiate BNSF's management prerogative to unilaterally regulate attendance through the issuance of the 1999 Availability Policy.

2. Provisions in existing collective bargaining agreements do not bar BNSF from issuing the 1999 Availability Policy.

This Award was signed this 29th day of October, 1999.

Richard R. Kasher

Richard R. Kasher
Chairman and Neutral Member





## *NSF GUIDELINES FOR TY&E EMPLOYEE ATTENDANCE*

BNSF TY&E employees are key members of our community, and have a gitimate expectation of reasonable opportunity to be off from work. And, along with all her members of our community, BNSF TY&E people share certain responsibilities to e community as a whole. One of these basic responsibilities is to be "full-time" nployees. The company commits that each TY&E employee in unassigned service ılfills his or her responsibility to maintain "full-time" status, in general, by laying off not ore than twenty-five percent of weekdays and weekends in any three month period.

Local members of the BNSF transportation management team are specifically npowered to apply these Guidelines considering special individual circumstances. lanagers should never act in a rigid or "wooden" manner, and in every case should use common sense." Application of these Guidelines also must yield to any conflicting ıbor agreement provision. We also invite and encourage local union leaders to give their ıput in the application of these Guidelines in individual cases, and, generally, to be "part f the process."

BNSF provides for and encourages each employee who knows in advance of a eed to be off to request a pre-approved layoff. An employee may do so up to ninety a[illegible] n advance, and will receive a prompt answer. Once a pre-approved layoff is [illegible]d, the company may not cancel it without the employee's consent.

More specific principles for applying these Guidelines follow:

- Each employee's compliance with the Guidelines' standard of "full-time" employment will be measured on a "rolling" three month basis, to accommodate individual employees' needs to "bunch" days off.
- An employee's continuous fulfillment of the Guidelines' "full-time" standard for any twelve months completely clears his or her record of any previous failure to fulfill the full-time standard.
- The company's basic measurement of full-time status considers all time an employee is not marked off, and also jury duty, bereavement leave, engineer recertification, and layoff union or company business, to be the same as on-duty time.
- Periods of vacation, personal leave, other paid leave not already mentioned here, layoff on miles, and foot of the board are removed from the measurement.
- In every case, local supervisors should consider special circumstances and use common sense in applying the Guidelines.
- We encourage any employee identified as failing to maintain full-time status under these Guidelines to seek the involvement of his/her local chairman. Local managers should also encourage such involvement by local chairmen in order to promote fair and common sense application of the Guidelines.



The purpose of this notice is to remind all TYE employees that under the BNSF Guidelines for TY&E Employee Attendance, TY&E employees in assigned service, like employees in unassigned service, are required to and have the responsibility to be "full-time" employees.

# *BNSF GUIDELINES FOR TY&E EMPLOYEE ATTENDANCE*
# *Effective 2000*

BNSF TY&E employees are key members of our community, and have a legitimate expectation of reasonable opportunity to be off from work. And, along with all other members of our community, BNSF TY&E people share certain responsibilities to the community as a whole. One of these basic responsibilities is to be "full-time" employees. The company commits that each TY&E employee in unassigned service fulfills his or her responsibility to maintain "full-time" status, in general, by laying off not more than twenty-five percent of weekdays and weekends in any three month period.

Local members of the BNSF transportation management team are specifically empowered to apply these Guidelines considering special individual circumstances. Managers should never act in a rigid or "wooden" manner, and in every case should use "common sense." Application of these Guidelines also must yield to any conflicting labor agreement provision. We also invite and encourage local union leaders to give their input in the application of these Guidelines in individual cases, and, generally, to be "part of the process."

BNSF provides for and encourages each employee who knows in advance of a need to be off to request a pre-approved layoff. An employee may do so up to ninety days in advance, and will receive a prompt answer. Once a pre-approved layoff is granted, the company may not cancel it without the employee's consent.

More specific principles for applying these Guidelines follow:

- Each employee's compliance with the Guidelines' standard of "full-time" employment will be measured on a "rolling" three month basis, to accommodate individual employees' needs to "bunch" days off.
- An employee's continuous fulfillment of the Guidelines' "full-time" standard for any twelve months completely clears his or her record of any previous failure to fulfill the full-time standard.
- The company's basic measurement of full-time status considers all time an employee is not marked off, and also jury duty, bereavement leave, engineer recertification, and layoff union or company business, to be the same as on-duty time.
- Periods of vacation, personal leave, other paid leave not already mentioned here, layoff on miles, and foot of the board are removed from the measurement.
- In every case, local supervisors should consider special circumstances and use common sense in applying the Guidelines.
- We encourage any employee identified as failing to maintain full-time status under these Guidelines to seek the involvement of his/her local chairman. Local managers should also encourage such involvement by local chairmen in order to promote fair and common sense application of the Guidelines.

EXHIBIT
C

***BNSF GUIDELINES FOR TY&E EMPLOYEE ATTENDANCE***
***Effective 10-10-06***

BNSF TYE employees are key members of our community, and have a legitimate expectation of reasonable opportunity to be off from work. And, along with all other members of our community, BNSF TYE people share certain responsibilities to the community as a whole. One of these basic responsibilities is to be "full-time" employees. These guidelines cover all TYE employees, in both assigned and unassigned service, and Yardmasters.

Employees in 5-day assigned service should not layoff more than one day each month and employees in 6-day assigned service should not layoff more than two weekdays and one weekend day each month. These layoff thresholds are in addition to regular assigned rest days. Employees in unassigned service, 7-day assigned service, and mixed service should not layoff more than twenty-five percent of weekdays and weekends, measured separately (for employees in mixed service this includes any rest days observed). Note: All layoff thresholds assume the employee remains marked up the entire period; additional time off may reduce the threshold (consult with your supervisor for clarification).

Local members of the BNSF transportation management team are specifically empowered to apply these Guidelines considering all relevant information. Managers should never act in a rigid or "wooden" manner, and in every case should use "common sense." We also invite and encourage local union leaders to give their input in the application of these Guidelines in individual cases, and, generally, to be "part of the process."

BNSF provides for and encourages each employee who knows in advance of a need to be off to request a pre-approved layoff. However, pre-approved does not excuse the employee from complying with attendance requirements. Those types of layoffs that count toward attendance, such as layoff personal, will continue to count toward the employee's attendance record even if preapproved. More specific principles for applying these Guidelines follow:

- Each employee's compliance with the Guidelines' standard of "full-time" employment will be measured on a "rolling" three-month basis, to accommodate individual employees' needs to "bunch" days off.
- Violations during subsequent months will result in an attendance violation if the total days off in the following one or two months exceeds the threshold for the three-month period.
- An employee's continuous fulfillment of the Guidelines' "full-time" standard for any twelve months restarts the employee's progression of discipline for Attendance Guidelines violations. However, attendance violations will not be "cleared" from an employees record.
- The company's basic measurement of full-time status considers events such as jury duty, engineer recertification, foot of board, layoff union or company business, and all other time an employee is not marked off to be the same as on-duty time.
- Periods of vacation, personal leave, layoff miles, etc., are considered as "excluded" time. Excluded events will affect an employee's threshold for allowable off time, but does not count as an attendance layoff. Note that an attendance layoff (such as LOS, LOP, etc.) may not be altered simply because an employee chooses to claim a PLD or single day vacation after the fact.
- We encourage any employee identified as failing to maintain full-time status *under* these Guidelines to seek the involvement of his/her local chairman and to contact his/her supervisor to discuss options available at BNSF (e.g., LOA, MLOA, FMLA, etc).
- Meeting the criteria of the Attendance Guidelines does not necessarily preclude the company from challenging an employee's full-time attendance requirement based on some other reasonable standard.

EXHIBIT
D

Date Submitted: 2/1/2012 6:06:24 PM

The Question You Submitted:

I would like to recieve information on the "low hours" policy that pertains to the TYE sector of BNSF.

Thank you

Answer To Your Question:

Nick,

First of all, thank you for using “Ask LR.” The “Low Performance Process” is actually not a policy at all. While the label might be new, the concept, process and expectations of full-time employment are not. BNSF expects TYE employees to be available for full-time employment.

The large majority of our employees meet this expectation; however, there is a small percentage of TYE employees that maximize their unavailable time by failing to take their notifications, bid excessively without protecting the assignment, time their layoffs to maximize time off and minimize their work opportunities, and maximize layoff events to reduce their available time. By doing so, their behavior impacts the reliability of BNSF’s service, as well as the predictability of line-ups for other employees on the board.

The Low Performance Process focuses on the very lowest performing employees compared to their peer group. No set number of hours applies across the network or event at a specific location. Instead, an employee’s performance is compared to the average number of hours worked by their peers for a given month.

The initial follow-up with employees identified through the Low Performance Process is a coaching and counseling session with a supervisor, which serves as a reminder of the basic expectation of full-time employment. We do apply judgment to each situation based on the individual circumstances identified during the discussion. If the employee does not improve their work performance, however, it will be considered a serious rules violation.

EXHIBIT
E

I hope that answers your question.  If you have more specific questions, I would encourage you to talk with one of your local supervisors.

Thank you again for Asking LR.

Andrea Smith
Director – Labor Relations

PUBLIC LAW BOARD No. 6721

In the Matter of the Arbitration Between:
**BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY**

and

**UNITED TRANSPORTATION UNION**

NMB Case No. 121
**Claim of W. J. Becker**
Level S 30-Day

**STATEMENT OF CLAIM:** Claim on behalf of Engineman W. J. Becker requesting the removal of a level S 30 Day record suspension, removal of the three year probation and payment for any time lost while attending the investigation.

**FINDINGS OF THE BOARD:** The Board finds that the Carrier and Organization are, respectively, Carrier and Organization, and Claimant an employee, within the meaning of the Railway Labor Act, as amended, that this Board is duly constituted and has jurisdiction over the parties, claim and subject matter herein, and that the parties were given due notice of the hearing which was held on December 2, 2011 in Washington, D.C. Claimant was not present at the hearing.

The Carrier and Organization are Parties to a collective bargaining agreement which has been in effect at all times relevant to this dispute, covering the Carrier's employees in the Trainman and Yardman crafts. The Board makes the following additional findings:

In October of 2010, Claimant was assigned as a Conductor on through freights in the Stockton-Bakersfield CA pool. For the last two days of that month, he was assigned as an Engineer on the extra board. At times relevant to the dispute, he had 13 years of service.

Claimant was subject to the Carrier's Attendance Guidelines (also "ATG"), which obligate he and other employees to be available for service on a full-time basis. The Guidelines are intended to help balance work and time off and to distribute needed work across the relevant workforces. The Attendance Guidelines identify thresholds and boundaries for various assignments, below which employees are subject to counseling and progressive discipline. ATGs state that "meeting the [ATG] criteria . . . does not the necessarily preclude the company from challenging an employee's full-time attendance requirement based on some other reasonable standard."

The Carrier came to believe that the Attendance Guidelines were insufficient in their literal application to ensure that all employees were, in fact, carrying their fair share of the work. In its opinion, some employees became adept at "gaming" the system,

EXHIBIT
F

staying within the literal terms of the Attendance Guidelines, but nevertheless making themselves unavailable for service an excessive percentage of times. Accordingly, the Carrier enacted a Low Performance Review Process (also, "LPRP"), aimed, according to its stated purpose, at applying the existing Attendance Guidelines fairly and consistently. The Low Performance Review Process identifies employees who utilize various means, including those not violative of the Attendance Guidelines, to minimize their availability for work opportunities. Such tactics include, by way of example, timing or chaining layoffs.

LPRP involves monthly reviews of each employee in TYE in comparison in the same relevant group (e.g., through freight Conductors in the Stockton-Bakersfield pool; multiple groups pro rata when employees work multiple jobs during the same month). The Process assumes that employees in similar service will work similar numbers of hours. Teams of managers review the information on a centralized basis and identify employees who are deficient in hours, as compared with these relevant peer groups. Employees identified are referred to the employees' supervisors at their home terminals.

Employees so identified are subjected to a coaching and counseling session in which their patterns of attendance are identified, reviewed and compared against other, similar employees. Employees are advised at that time and in a follow-up letter that their performance must improve and, failing improvement, that they will be considered indifferent to duty and subjected to progressive discipline.

Beginning with his work in June of 2010, Claimant was reviewed under LPRP and was found not to have been working comparable hours to his peers. Claimant was coached and counseled on July 19th and advised that improvement was required. Claimant had been assigned the Engineers extra board and was on vacation part of the time, so his time was prorated for comparison purposes. By that standard, comparable employees worked on average 65.9 hours for the month. Claimant worked 33 hours, half as much as his peers. Consistent with LPRP, Claimant was sent a coaching and counseling letter with respect to his June performance.

The Carrier continued to monitor Claimant's performance. Notwithstanding the previous counseling, in October of 2010, when the average hours for comparable employees was 139.3; Claimant worked only 60.6 hours: 43% of the average number of hours for comparable employees. Indeed, between June and October, Claimant's performance got worse. He was the second lowest-performing Stockton employee, the 11th worst out of 1275 California Division

TYE employees. Indeed, for the entire system, Claimant was the 98th worst out of over 16,000 TYE employees, placing him in the bottom two or one percent.

Claimant was allowed six 24 hour layoff periods during October. By working the extra board and laying off close to the point where he would be called, Claimant was able to be off almost 19 days, including 12 days in a row during one period. Claimant's position in the Stockton-Bakersfield pool worked 18 starts between October 1 and 27; by timing his layoffs, Claimant worked only six of those starts. The information was provided to Claimant's home terminal Managers on November 15, 2010.

Based on Claimant's LPRP numbers, the Carrier ordered an investigation into his low performance and availability for the month of October 2010. The investigation was held on December 13, 2010. Based on the evidence adduced and following consideration thereof, the Carrier assessed Claimant a Level S 30 Day Record Suspension and three years probation for violation of GCOR Rules 1.13 (Reporting and Complying with Instructions), 1.15 (Duty - Reporting or Absence) and 1.6 (Conduct - Indifference to Duty).

The Organization protested Claimant's suspension, which the Carrier denied on appeal. The Claim was progressed on the property up to and including the highest designated official, but without resolution. The Organization invoked arbitration, and the dispute was referred to the Board for binding resolution.

**POSITIONS OF THE PARTIES: The Carrier** argues that the evidence establishes Claimant's violation of the cited Rules. It points out that the Rules are clear and that Claimant had been instructed as to the unacceptability of the low number of hours he worked, but his performance declined following the corrective efforts. Moreover, contends the Carrier, the evidence establishes that Claimant continued the deliberate pattern laying off in order to avoid work, thereby establishing his indifference to duty. Citing authorities, the Carrier argues that employees who make themselves unavailable are subject to discipline.

The Carrier argues that Claimant's conduct violated several rules, including the obligation under GCOR 1.13 that employees must report to and comply with instructions, under 1.15 which requires employees to report for duty at designated times and places and under 1.6, makes indifference to duty a conduct violation. BNSF asserts that the Organization's multiple arguments constitute attempts to distract the Board from these clear violations.

As to the Organization's argument that the investigation was untimely because it was not held until longer than 30 days following the incident (Rule 50 (a)), the Carrier argues that the time must run from its first knowledge of Claimant's performance, which was necessarily related to his peers. Because of the timing and manner of that comparison, the manual, detailed review of October's data was not completed until November 15th, using reasonable diligence, and was not made available to an officer authorized to convene an investigation until that time. Citing authorities, the Carrier argues that time periods for purposes of investigation must be interpreted reasonably and, by such standard, date from that time, not from when Claimant's absences took place or even when the LPRP teams at headquarters assembled the data. In application of that standard, the investigation held on December 13th was not untimely, it contends.

As to the Organization's argument that "Low Hours" cannot be used as a basis for discipline because the process has not been reduced to writing, the Carrier points out that Low Hours or Low Performance are not new policies, but merely new processes to enforce existing Rules, such as those which require employees to protect their assignments. Indeed, the Carrier maintains that none of the examples cited by the Organization as establishing inconsistencies between existing provisions of the governing Agreement and the Low Performance process are apposite. It asserts that none of the cited provisions address the situations raised in the Low performance Review Process, which address noncompliance with existing rules.

The Carrier rejects the Organization's analysis which assumes that a set number of hours per month can be used to establish an acceptable workload. It contends that such a number merely seeks to establish a bare minimum, which is contrary to the very purpose of the "Low Performance" process. BNSF maintains that Claimant should simply be available to work full-time and, if he did so, the numbers would take care of themselves. Here, where Claimant worked less than half the average number of hours as his peers and got worse, rather than improved, following counseling, the Carrier argues that his violation was well-established, without resort to fixed numbers of hours.

The Carrier also rejests the Organization's argument that the Carrier earlier implemented a system-wide policy to catch a few bad actors and, in the process, punished many good employees and now complains that weeding out the "worst of the worst" is also defective. It protests that the Organization's position is hypocritical, in light of the legitimate objective of ensuring that full-time employees be available full-time.

As to the Organization's argument that Claimant was twice-punished for his June, 2010 work, the Carrier points out that Claimant was not disciplined for his failure to work in June; instead, he signed a Waiver for a Formal Reprimand for ATG violations in the three-month period ending that month, not for Low Performance, for which he received separate, non-disciplinary counseling in July. That, maintains BNSF, is not double jeopardy.

The Carrier argues, in response to Organization arguments, that the Attendance Guidelines are inapplicable to the violations at issue. Instead, maintains the Carrier, Claimant was disciplined for failures identified and uncorrected in the Low Performance Review Process. It contends that he was well-advised of the Carrier's expectations and that his assertions to the contrary are incredible and self-serving.

As to the Organization's assertions that the Carrier should have offered Claimant Alternative Handling, BNSF points out that there is no evidence that Claimant ever requested such treatment. Moreover, argues the Carrier, Alternative Handling was never intended to be applied to violations of GCOR Rule 1.6 involving personal conduct. Moreover, maintains BNSF, the Organization never appealed the lack of Alternative Handling through the steps of the Appeal process. It points, in this regard, to Part II, Article VII governing Alternative Handling, which requires such appeal. It points out that no conference was requested, thereby waiving any such argument. BNSF maintains that, in any event, that access to Alternative Handling required Claimant to admit guilt and accept responsibility, which he clearly did not do. It asserts that the Organization cannot argue Claimant's innocence of the charge and still assert a right to Alternative Handling.

As to the Organization's objections at the local level, the Carrier argues that UTU failed to prove any prejudice from the "inaudible" designations at different parts of the transcript. It also rejects any assertion of collusion or prejudgement between the Conducting Officer and the Carrier advocate at the investigation. Moreover, complains the Carrier, Mr. Costa was unnecessarily and improperly confrontational and disruptive during the investigation. It maintains that the Organization's conduct was merely diversionary from the core issue of Claimant's unacceptable conduct.

The Carrier argues that the evidence proves Claimant's violations of the cited rules. It urges that the discipline be upheld and the Claim denied as without merit.

**The Organization** argues, as an initial matter, that the Carrier failed to conduct its investigation in a timely manner. It points to Rule 50 (a) of the governing Agreement (as amended), which requires that investigations be conducted no later than 30 days following the incident. It maintains that the Carrier had knowledge of the incident no later than November 8, 2010, but that the investigation did not take place until December 13, 2010, more than 30 days. Citing authorities, the Organization argues that no lag time is allowed between when the Carrier receives the knowledge and when it is forwarded to the person appropriate to handle the information. It urges that a sustaining Award is required on that basis.

Without waiver of its position with respect to the untimeliness of the investigation, the Organization argues that the discipline is defective on its merits and must be rescinded. It argues that the concept of "Low Hours" (the same process the Carrier terms "Low Performance") is invalid as violative of several provisions of the governing Agreement, including Article 17 (f) 10, which requires that a Trainman lay off prior to his vacation in order to receive a displacement right upon his return; if the Trainman does not lay off, his job will be declared vacant and placed for bid. UTU protests that the process results in discipline which is arbitrary and subjective, in contrast to the Attendance Guidelines, which are, at the least, objective and measurable.

The Organization argues, in addition, that the Carrier previously punished Grievant for his alleged "Low Hours" violation and that Claimant testified that the Carrier counseled him that compliance with the Attendance Guidelines would relieve him of further liability under the Low Hours policy. It contends that he met the Attendance Guidelines but was disciplined nonetheless.

Further, argues the Organization, the Carrier improperly refused to grant Alternative Handling to Claimant. It asserts that Low Hours is not excluded from such Handling by the Safety Summit or by the Carrier's unilateral changes to that Agreement and that it should have been applied.

Moreover, contends UTU, the Carrier failed to prove that Claimant's conduct violated any Rule.

The Organization protests that if the Carrier wants to solve the problem of employees allegedly avoiding work, it needs to establish boards by agreement with set days off. Indeed, protests the Organization, the "Low Hours" assessment is merely a way for the Carrier to escape its obligations under applicable agreements

because it refuses to staff boards properly and otherwise manage existing manpower.

For each of the foregoing reasons, the Organization urges that the Claim be sustained, Claimant's Record Suspension and probation be rescinded and Claimant paid for any time lost attending the Investigation.

**DISCUSSION AND ANALYSIS:** The Board is persuaded that the Carrier did not violate the requirement of the Agreement to conduct its investigation within 30 days from when the incident occurred. That type of contractual language has generally been interpreted to calculate the time for investigation from the time when an officer with authority to schedule an investigation can review the data and conclude that a rules violation may have occurred. Any other calculation would be unreasonable, as it would trigger the time period for convening an investigation prior to when the appropriate Carrier official would have had actual knowledge of the events giving rise to such investigation.

The Board notes, in this regard, that the underlying purpose of time limit rules is to avoid stale claims and prejudice to the ability of a claimant and/or the Organization to procure evidence while records are available and memories are clear. There is no evidence that conducting the hearing on December 13th for work performed in October resulted in lost records, failed memories or other prejudice to Claimant or the Organization. Indeed, there is no dispute with respect to the evidence of the amount of Claimant's work or with respect to his explanation for his absences.

As to the merits of the dispute, the Board notes that employees who occupy full-time jobs are reasonably expected to be available on a full-time basis, excused from that obligation only in the exercise of contractual authorization, such as leave. Employees who fail that obligation not only encumber a full-time position which they are not supporting, but shift the burden of excess absences on to other employees. The Carrier acts reasonably in establishing processes to measure employee availability and to counsel and discipline full-time employees who fail to be available on a reasonably full-time basis.

The Board has searched the governing Agreement for indication that the Carrier's use of the Low Performance Review Process is violative of provisions of that Agreement, but finds none. The Process is not an independent policy, but is, instead, a means of assessing whether employees have met their obligations to be available for duty. The Attendance Guidelines provide a way to measure that availability, but include a notation that they are not

the exclusive measure of an employee's availability. LPRP is a supplemental process.

The Organization argumes that the Carrier has improperly established a process to measure availability which is not numerically based (as the Attendance Guidelines are) and which is, therefore, arbitrary. UTU's concerns have merit. A process which appears to measure the acceptability of employee attendance solely on the basis of a comparison with the averages for other, similarly-situated employees automatically singles out employees on the bottom of the list, regardless of the acceptability of their attendance on an objective standard. If, as might reasonably be the case, application of the LPRP results in improvement in overall attendance, it would appear that employees at the bottom would still be singled out, even if their attendance is at a level which might be acceptable. There are, for that reason, potential limits on the use of LPRP to establish indifference to duty.

That having been said, Claimant's demonstrated lack of availability for duty cannot be excused on the basis that his performance was at an acceptable level because the averages had improved or that he had improved his performance from the previous counseling. By any standard, Claimant's availability to perform his full time job was far less than full time and far less than acceptable: he was second lowest of 112 employees in his Station, 11th lowest of 1275 employees in his Division and 98th out of over 16,000 employees system-wide. He worked only 43% of the average hours worked by his peers.

There may be a line somewhere that would limit the Carrier's ability to discipline employees for Low Performance, as when average performance would increase and the difference between those averages and the bottom decrease. However, Claimant's hours establish his indifference to duty, which did not improve following counseling and which are not excused or mitigated by either his absolute number of hours worked or the proximity of those hours to the average number of hours worked by his peers.

The Board has reviewed the remaining Organization arguments but finds them to be without merit.

The Board finds Claimant guilty of the charge against him and finds the penalty to have been reasonable. The Award so reflects.

-o-

PLB No. 6721 (BNSF/UTU)
Case No 121 (W. J. Becker)
Page 9

**AWARD:** The Carrier did not untimely hold its investigation. The Carrier met its burdens to prove Claimant guilty of the charge of indifference to duty and to prove his 30 Day Record Suspension to have been an appropriate penalty. The claim is denied.

Dated this 20th day of JAN, 2012

M. David Vaughn,
Neutral Member

Melissa Beasley,
Carrier Member

D. L. Young,
Employee Member

App. 85

AWARD NO. 59
Case No. 59

Organization File No. 10-032
Carrier File No. 72-11-0019D

**PUBLIC LAW BOARD NO. 7092**

| | |
|---|---|
| PARTIES | ) BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN |
| | ) |
| TO | ) |
| | ) |
| DISPUTE | ) BNSF RAILWAY COMPANY |

STATEMENT OF CLAIM:

This is to request that Engineer G. L. Carr's discipline be reversed with pay for all time lost including the day(s) for investigation with restitution of any loss of fringe benefits and that the notation of a Level S – 30-day Record Suspension and 3-year review period be removed from his personal record, including any references to any "operational tests" failures surrounding this incident, resulting from investigation held on February 25, 2011.

FINDINGS:

The Board, upon consideration of the entire record and all of the evidence, finds that the parties are Carrier and Employee within the meaning of the Railway Labor Act, as amended, that this Board is duly constituted by Agreement dated July 23, 2007, this Board has jurisdiction over the dispute involved herein, and that the parties were given due notice of the hearing held.

Claimant began his career with the Carrier on February 23, 1994. During the time period at issue, Claimant was assigned as an engineer in the Memphis, TN to Birmingham, AL pool. The record before the Board establishes that Claimant's attendance, or more accurately his lack thereof, came to the Carrier's attention in August, 2010 when the Transportation Process Specialist team identified him as an engineer who

EXHIBIT
G

consistently performed below average in terms of rendered service hours as compared with those of his Memphis terminal peers. According to undisputed evidence in this record, similarly situated engineers in Pool 301 performed an average of 149.9 hours of service during the month of August, 2010. Claimant worked only 77.5 hours during the same time period, or 52% below the calculated average. The evidence further shows that Claimant ranked 3rd lowest as compared with all Memphis employees, 22nd lowest compared to Springfield Division employees, and 285th lowest as compared with all Carrier employees. After reviewing his work history in more detail, the Carrier ultimately concluded that Claimant was carefully timing his layoffs in order to maximize his time away from work without triggering discipline under the applicable attendance policy.

Claimant was therefore directed to participate in a coaching and counseling session, which was conducted on September 24, 2010. In a follow-up memorandum to Claimant on the same date, the Carrier, in relevant part, instructed him "to manage [his] performance in a way that conforms each month to the performance levels expected of a full-time employee and which does not reveal misconduct and/or indifference to duty," and further advised him that, "Failure to comply with the instructions set forth herein will be considered a Level S violation under PEPA, and a violation of GCOR 1.6 'Conduct' (Indifference to Duty), GCOR 1.13 'Reporting and Complying with Instructions' and GCOR 1.15 'Duty – Reporting or Absence.'"

In January, 2011, Claimant was again identified by the Transportation Process Specialists as an employee whose performance was below average in terms of rendered service hours as compared with other engineers in the relevant Memphis pool. As a

result, Claimant was directed to attend a formal investigation in connection with charges that he had violated the General Code of Operating Rules cited in the September 24, 2010 counseling memorandum. The investigation was held on February 25, 2011, after which Claimant was issued a 30-day record suspension and a 3-year review period. In due course, the Organization presented the instant claim, which the Carrier in turn denied in accordance with applicable grievance provisions in the parties' Collective Bargaining Agreement.

Based upon the evidence of record, the Board concludes that there was substantial evidence to support the charge against Claimant. In reaching this conclusion, we have considered the various arguments raised by the Organization and find that they have no merit. The record clearly shows that Claimant's actual service to the Carrier was far below the applicable average during the month of January, 2011. In point of fact, Claimant's availability to perform service for the Carrier was just 32% of average for engineers in his pool, which was actually worse than the month for which he was previously counseled. We thus find that the Carrier was justified in taking more formal remedial action, particularly because Claimant was expressly warned during counseling on September 24, 2010 that failing to improve his attendance would prompt just such a response.

The Board further notes that the practicability of the "Low Performance" process has already come under review on this property as a construction separate and apart from the Carrier's well-established Policy for Employee Performance Accountability (PEPA). Ruling in favor of the Carrier in Award 121 of PLB 6721, Referee David Vaughn reasoned in pertinent part as follows:

> As to the merits of the dispute, the Board notes that employees who occupy full-time jobs are reasonably expected to be available on a full-time basis, excused from that obligation only in the exercise of contractual authorization, such as leave. Employees who fail that obligation not only encumber a full-time position which they are not supporting but shift the burden of excess absences on to other employees. The Carrier acts reasonably in establishing processes to measure employee availability and to counsel and discipline full-time employees who fail to be available on a reasonably full-time basis…
>
> ***
>
> There may be a line somewhere that would limit the Carrier's ability to discipline employees for Low Performance, as when average performance would increase and the difference between those averages and the bottom decrease. However, Claimant's hours establish his indifference to duty, which did not improve following counseling and which are not excused or mitigated by either his absolute number of hours worked or the proximity of those hours to the average number of hours worked by his peers.

We affirm Referee Vaughn's reasoning on general principle, and also recognize that the discrete circumstances in this case are substantively similar to those he addressed in PLB 6721 Award 121. First, we too agree that it was reasonable for the Carrier to devise a means by which service requirements at a given location could be evaluated in terms of who among the relevant employee group was actually satisfying them. Here, the Carrier demonstrated to the satisfaction of the Board that Claimant had, in fact, become adept at "playing the system" to the extent that he was able to vacate his assignment on a regular basis without triggering discipline under PEPA. In so doing, according to evidence not in dispute, Claimant performed far fewer hours of actual service than other full-time engineers in his Memphis pool. That fact alone placed an unanticipated (and unfair) burden on other members of the pool to support his absences in order to ensure proficiency in the Carrier's operation. Moreover, Claimant continued to collect benefits and accrue seniority as a full-time employee, though he actually performed far less work than similarly situated employees in his work group.

Second, the record demonstrates that Claimant, like his counterpart in *Vaughn*, supra, failed to improve his attendance performance even after being warned during counseling that maintaining his established pattern of absenteeism could, and likely would, result in discipline. Claimant was coached and counseled regarding his service obligations to the Carrier on September 24, 2010, yet mere months later, was right back to his pattern of absenteeism. We therefore find no abuse in the Carrier's exercise of the "Low Performance" process here, or of the subsequent decision to pursue Claimant's obvious indifference to duty through established discipline procedures.

Having said that, the Board also notes that while the Carrier chose to formally document the September 24, 2010 counseling session in Claimant's case, all matters of coaching and counseling need not result in documentation, if indeed it is to constructively function separate and apart from PEPA. In other words, Carrier officials must have the discretion not to issue such confirmation letters when, in the official's judgment, such confirmation is not warranted because of the circumstances of the employee's attendance record. As a practical matter, "coaching and counseling" should be meaningful and helpful, and such sessions do not constitute "phantom" steps in the formal discipline process.

In Claimant's case, we conclude that he ignored the Carrier's unambiguous advice that his performance (in terms of rendered service hours) needed to improve if he intended to avoid being formally disciplined. This record demonstrates that Claimant obviously rejected that advice, and he did so at his own peril. Accordingly, we find that the Level S suspension and review period were in accordance with the Carrier's Policy for Employee Performance Accountability, and we find no basis for modifying them.

PUBLIC LAW BOARD NO. 7092
AWARD NO. 59
PAGE 6

AWARD: Claim denied

Barry E. Simon
Chairman and Neutral Member

Michael D. Priester
Employee Member

Roger A. Boldra
Carrier Member

Dated: May 15, 2012
Arlington Heights, Illinois

App. 91

PUBLIC LAW BOARD NO. 7425

PARTIES ) SMART - TRANSPORTATION DIVISION
TO )
DISPUTE ) BNSF RAILWAY COMPANY

STATEMENT OF CLAIM:

Claim of Bradley Slaughter for removal of censure from his personal record of a Level S 30 Day Record Suspension and pay for all time lost as a result of an investigation held on December 5, 2016. (Organization File No. D303-434-16B; Carrier File No. 55-17-0012)

FINDINGS:

The Board, after hearing upon the whole record and all the evidence, finds that the parties herein are Carrier and Employee within the meaning of the Railway Labor Act, as amended; this Board has jurisdiction over the dispute involved herein; and, the parties were given due notice of hearing thereon.

The Claimant was assessed discipline here on appeal in a Carrier determination that testimony and exhibits brought forth at an investigation held on December 5, 2016 show that for the month of October 2016 the Claimant failed to comply with instructions given to him at a coaching and counseling session, as confirmed by letter of October 15, 2015, that had involved his then low work performance and availability during the month of September 2015 and a need for the Claimant to improve his monthly work performance or be subject to discipline.

As concerns the prior coaching and counseling session, the Carrier submits that during the month of September 2015 the Claimant had only worked 12 starts for a total of 90.5 hours, a circumstance that placed him at just 60% of his total 151.7 hours of work potential for the month of September 2015.

The Carrier says the Claimant again failed to work in a manner comparable to his peers in the month of October 2016 when he worked 10 starts, totaling 97.2 work hours, which was 58% of his 166.5 hours of work potential for the month of October 2016. The Carrier says that this October 2016 work performance shows that the Claimant was basically again working at the same level for which he had been coached and counseled about his low performance work record for September 2015.

The Board has reviewed the Organization's several procedural arguments and finds them to be either without merit or not of sufficient substance to hold that the Claimant had been denied benefit of a fair and impartial investigation.

EXHIBIT
H

It was not unreasonable for the Carrier to have cited the Claimant some 12 months after the September 2015 coach and counseling session for an October 2016 failure to comply with instructions previously given to the Claimant concerning his need to improve his monthly work performance.

As concerns Claimant and Organization argument that time consumed in Computer Based Training, four hours and 42 minutes, should have been a part of time worked, we find no basis of record to hold other than as the Carrier has offered, i..e., training time is considered covered time and subtracts from the total number of days available for service and is treated no different than jury duty time or preapproved personal leave day time.

In regard to Organization argument that the Carrier has not set forth the criteria for determining compliance with the low performance process, the Board will note that it has been recognized in numerous awards that a carrier is not required to publish a precise formula in terms of hours, days, or percentages of time that determines excessive absenteeism, or as concerns this case, a low performance of availability for service. Employees are hired to be full-time workers, and a carrier has a right to expect an employee to work on a regularly scheduled basis. When an employee fails to do so, a carrier is privileged to impose discipline.

On the merits of the dispute, it is evident that testimony of record and exhibits support the charge. It is undisputed that the Claimant had been counseled about a need to maintain an acceptable work record in September 2015. Although the Claimant offered that he had asked a number of questions at that session that he did not feel had been adequately answered, he acknowledged at the investigation that he had not thereafter attempted to contact the Director Administration concerning any questions that need be answered or clarified about his work performance.

The Claimant being shown to have failed to comply with counselling instructions about a need to improve his work performance availability, discipline of a Level S 30-Day Record Suspension and 36 Month Review Period is not found to be harsh or excessive. The claim will be denied.

Award: Claim Denied.

Robert E. Peterson
Chair & Neutral Member

James K. Hurlburt
Carrier Member

Nathan R. MacDonald
Organization Member

Fort Worth, TX
Dated: Dec 7, 2018

**BNSF Guidelines for TYE and Yardmaster Attendance Effective 3-1-11**

BNSF TYE employees and Yardmasters are key members of our community, and have a legitimate expectation of reasonable opportunity to be off from work. And, along with all other members of our community, BNSF TYE employees and Yardmasters share certain responsibilities to the community as a whole. One of these basic responsibilities is to be "full-time" employees.

I. Specific principles for applying these Guidelines follow:

1. Each employee's compliance will be measured on a "rolling" three-month basis to better accommodate periods of intermittent illness. The three-month rolling basis applies regardless if the employee has been in active service for the full three months.
2. Employees in 5-day assigned service have a maximum threshold of one day per month. Employees in 6-day assigned service have a maximum threshold of two weekdays and one weekend day each month.
3. For employees in unassigned and mixed service, there is a maximum threshold of twenty-five percent of weekdays and weekends**,** measured separately. For employees in mixed service this <u>includes</u> any rest days observed (25% less the total of all rest days equals final threshold).
4. All maximum layoff thresholds outlined above assume the employee remains marked up the entire period; additional time off (excluded time) will reduce your threshold (consult with your supervisor or training documents for clarification).
5. Events such as jury duty, engineer recertification, foot of board, layoff union or company business, are counted the same as on duty time; therefore, these events will not affect an employee's threshold and will not count as an attendance layoff.
6. National Guard, Drill, Training, State Emergencies will also count the same as on duty time; however, employees must provide their supervisor a copy of their orders for this time to be counted as available.
7. Periods of vacation, personal leave, medical leave, time on the bump board, etc., are considered as "excluded" time for the purpose of determining the maximum threshold. Excluded events will affect an employee's threshold, but do not count as an attendance layoff.
8. Attendance layoffs such as LOS, LOP, FEM, etc., may not be altered at a later date simply because an employee chooses to claim a PLD or single day vacation after the fact.
9. Any layoff touching a weekend day will be considered a weekend day, with a 30" grace period (except in the case of assigned yard jobs in which the start of the assignment drives the determination of weekend vs. weekday).
10. Following discipline for a period, violations in subsequent months will result in an attendance violation if the total days off in the following one or two months exceeds the maximum threshold for the three-month period.

EXHIBIT
I

11. We encourage any employee identified as failing to maintain full-time status under these Guidelines to seek the involvement of his/her local chairman and to contact his/her supervisor to discuss options available at BNSF (e.g., LOA, MLOA, FMLA, etc.).
12. Meeting the criteria of the lay off thresholds under the Attendance Guidelines does not preclude the company from challenging an employee's full-time status requirement based on some other reasonable standard.

Local members of the BNSF transportation management team are specifically empowered to apply these Guidelines considering all relevant information. Managers should never act in a rigid or "wooden" manner, and in every case should use "common sense." We also invite and encourage local union leaders to give their input in the application of these Guidelines in individual cases, and, generally, to be "part of the process."

BNSF provides for and encourages each employee who knows in advance of a need to be off to request a pre-approved layoff. However, pre-approved does not excuse the employee from complying with attendance requirements. Those types of layoffs that count toward attendance, such as layoff personal, will continue to count toward the employee's attendance record even if pre-approved.

II. Discipline handling (including progression and the applicable review period) for Attendance Guidelines violations follows:

**A. Progression**

When an employee violates TYE Attendance Guidelines the following discipline matrix applies:

| **Attendance Guideline Record** | **Result** |
|---|---|
| First violation | Formal Reprimand |
| Second violation | 10 day record suspension |
| Third violation | 20 day record suspension |
| Fourth violation | Employee may be dismissed |

In addition to the discipline matrix above, dismissal may occur if an employee has either (1) three active Attendance Guidelines violations and an active Level S violation, or (2) five rule violations of any kind in a 12-month period (which may include any combination of Standard, Serious and Attendance Guidelines violations).

**B. Review Period**

The TYE Attendance Guidelines review period is an “active” review period and <u>requires an employee work a period of time which exceeds a complete 12 month period without another Attendance Guidelines discipline incident</u> before the prior

Attendance Guideline violation is considered "inactive". However, attendance violations will not be "cleared" from and employee's record

**Example**: Assume an employee commits an Attendance Guidelines violation for the three month rolling period of January, February, and March *2010* and receives a formal reprimand. If the employee commits an Attendance Guidelines violation for the three month rolling period of January, February, March *2011*, he/she *did not work a period of time which exceeded a complete 12 month period* under the Attendance Guidelines policy. As a result, the formal reprimand of January, February, March *2010* remains "active". As such, the discipline to be assessed for the January, February, March *2011* Attendance Guidelines violation *would be a 10-day record suspension*.

By contrast, in the example above, assume that the second Attendance Guidelines violation occurred not in January, February, March 2011, but rather in the three month rolling period of *February, March, April, 2011*. Under this scenario, the employee *did work a period of time which exceeded a complete 12 month period* without an Attendance Guidelines violation, and as a result, the formal reprimand of January, February, March *2010* is now "inactive". As such, the proper discipline to be assessed for the February, March, April 2011 violation *would a formal reprimand*.

**BNSF Guidelines for TYE and Yardmaster Attendance**
**Effective September 1, 2012**

BNSF TYE employees and Yardmasters are key members of our community, and have a legitimate expectation of reasonable opportunity to be off from work. And, along with all other members of our community, BNSF TYE employees and Yardmasters share certain responsibilities to the community as a whole. One of these basic responsibilities is to be "full-time" employees.

I. Specific principles for applying these Guidelines follow:

1. Each employee's compliance will be measured on a "rolling" three-month basis to better accommodate periods of intermittent illness. Each month is calculated independently and then combined to determine the threshold for the three-month period. The three-month rolling basis applies regardless if the employee has been in active service for the full three months.
2. Employees in 5-day assigned service (includes 05/02 extra boards) have a maximum threshold of one day per month. Employees in 6-day assigned service have a maximum threshold of two weekdays and one weekend day each month; however, employees in 6-day assignments that work five days a week with one RSIA day and one rest day have a maximum threshold of one day per month.
3. Employees in Yardmaster service have a maximum threshold of one day per month.
4. For employees in unassigned and mixed service, there is a maximum threshold of twenty-five percent of weekdays and weekends**,** measured separately. For employees in mixed service this <u>includes</u> any rest days observed (25% less the total of <u>all</u> rest days equals final threshold).
5. Note: for rest cycle agreements, time off over and above rest days is covered in the agreement; however, employees in a rest cycle for a partial month will be considered in mixed service for that month, covered by these guidelines.
6. All maximum layoff thresholds outlined above assume the employee remains marked up the entire period; additional time off (excluded time) will reduce your threshold (consult with your supervisor or training documents for clarification).
7. Events such as jury duty, engineer recertification, foot of board, layoff union or company business, are counted the same as on duty time; therefore, these events will not affect an employee's threshold and will not count as an attendance layoff.
8. National Guard, Drill, Training, State Emergencies will also count the same as on duty time; however, employees will need to provide their supervisor a copy of their orders or LES for this time to be counted as available.
9. Time away from work such as periods of vacation, personal leave, medical leave, time on the bump board, furlough board, or work/retention board, etc., are considered as "excluded" time for the purpose of determining the maximum threshold. Excluded events will affect an employee's threshold, but do not count as an attendance layoff. (Exception: employees on the bump board who fail to take notification that are subject to call based on their last inbound assignment will be charged attendance layoffs when failure to take notification is 10 hours or greater.)
10. Attendance layoffs such as LOS, LOP, FEM, SIF, etc., may not be altered at a later date simply because an employee chooses to claim a PLD or single day vacation after the fact.
11. Any layoff touching a weekend day will be considered a weekend day, with a 30" grace period (except in the case of jobs with assigned start times in which the start of the assignment drives the determination of weekend vs. weekday). As a result, an employee may be charged with three weekend days for a given week.

EXHIBIT
J

12. Any layoff period from 0-25 hours is considered as one unavailable day (except for five and six day assigned service which is based on the number of starts missed – each start is an unavailable day).
13. Working a portion of a calendar day does not negate a layoff period that begins or ends on that day from counting as an unavailable day for the purpose of attendance.
14. Failure to comply with the single tie-up process will be treated as an unavailable day.
15. Following discipline for a period, violations in subsequent months will result in an attendance violation if the total days off in the following one or two months exceeds the maximum threshold for the three-month period.
16. We encourage any employee identified as failing to maintain full-time status under these Guidelines to seek the involvement of his/her local chairman and to contact his/her supervisor to discuss options available at BNSF (e.g., Leave of Absence, MLOA, FMLA, etc.).
17. Meeting the criteria of the lay off thresholds under the Attendance Guidelines does not preclude the company from challenging an employee's full-time status requirement based on some other reasonable standard.

The TYE Attendance Guidelines Training Manual is available on the LR Web-site. Under “Attendance” select “Policy, Layoff Codes, Training.” Along with other important information, the manual outlines time off for assignments that are not mentioned specifically in the attendance guidelines.

Local members of the BNSF transportation management team are specifically empowered to apply these Guidelines considering all relevant information. Managers should never act in a rigid or "wooden" manner, and in every case should use "common sense." We also invite and encourage local union leaders to give their input in the application of these Guidelines in individual cases, and, generally, to be "part of the process."

BNSF provides for and encourages each employee who knows in advance of a need to be off to request a pre-approved layoff. However, pre-approved does not excuse the employee from complying with attendance requirements. Those types of layoffs that count toward attendance, such as layoff personal, will continue to count toward the employee's attendance record even if pre-approved.

II. Discipline handling (including progression and the applicable review period) for Attendance Guidelines violations follows:

**A. Progression**

When an employee violates TYE Attendance Guidelines the following discipline matrix applies:

| **Attendance Guideline Record** | **Result** |
|---|---|
| First violation | Formal Reprimand |
| Second violation | 10 day record suspension |
| Third violation | 20 day record suspension |
| Fourth violation | Employee may be dismissed |

In addition to the discipline matrix above, dismissal may occur if an employee has either (1) three active Attendance Guidelines violations and an active Level S violation, or (2) five rule violations of any kind in a 12-month period (which may include any combination of Standard, Serious and Attendance Guidelines violations).

**B. Review Period**

The TYE Attendance Guidelines review period is an "active" review period and requires an employee work a period of time which exceeds a complete 12 month period without another Attendance Guidelines discipline incident before the prior Attendance Guideline violation is considered "inactive". However, attendance violations will not be "cleared" from an employee's record

> **Example**: Assume an employee commits an Attendance Guidelines violation for the three month rolling period of January, February, and March *2011* and receives a formal reprimand. If the employee commits an Attendance Guidelines violation for the three month rolling period of January, February, March *2012*, he/she *did not work a period of time which exceeded a complete 12 month period* under the Attendance Guidelines policy. As a result, the formal reprimand of January, February, March *2011* remains "active." As such, the discipline to be assessed for the January, February, March *2012* Attendance Guidelines violation *would be a 10-day record suspension*.
>
> By contrast, in the example above, assume that the second Attendance Guidelines violation occurred not in January, February, March 2012, but rather in the three month rolling period of *February, March, April, 2012*. Under this scenario, the employee *did work a period of time which exceeded a complete 12 month period* without an Attendance Guidelines violation, and as a result, the formal reprimand of January, February, March *2011* is now "inactive". As such, the proper discipline to be assessed for the February, March, April 2012 violation *would a formal reprimand*.

DADPPRN2 01/17/22 PRDG
FTWORTH TX ****** Post ****** 08:03:05CT
B158351

---

July 29, 2015

BNSF Railway Co.
ALL DIVISIONS

SYSTEM GENERAL NOTICE No. 94

TO ALL CONCERNED,

SUBJECT: Former CBQ-Waiting Turn

Effective August 1st, 2015

System General Notice No. 93 in cancelled.

BNSF re-implemented "waiting turn" for unassigned through-freight conductors working on former CBQ properties. That change occurred on July 1, 2015.

In connection with that change, BNSF is implementing a system-wide change in application of the Attendance Guidelines. In order to properly account for time during which a TYE employee is not subject to call, and is therefore unavailable for service; BNSF will amend how we categorize any time spent following a mark-up from layoff where immediate reassignment to a working board does not occur. This change will take effect on August 1, 2015.

All time spent "waiting turn" will be accounted for as follows:

* Unavailable time - If "waiting turn" time was preceded by an "unavailable" time layoff/event (i.e., LOS, LOP, SIF, FEM, etc.) then the subsequent time spent "waiting turn" will be counted as unavailable time for purposes of ATG application.

* Excluded time - If "waiting turn" time was preceded by an "excluded" time layoff/event (i.e., PLD, VAC, FML, etc.) then the subsequent time spent "waiting turn" will be counted as excluded time for purpose of ATG application.

* Available time - If "waiting turn" time was preceded by a layoff/event counted the same as on duty time (i.e. LCB, UNB, LET, RUL, etc.), or preceded by a "working off turn" event, no change to current handling will occur.

* This change will not affect employees working under ATSF Coastlines BLET Agreements.

* This change will not affect employees in assigned service (i.e., assigned on duty time/rest days)

Example 1:

EXHIBIT
K

Employee Smith lays off sick on 8/2/15 at 0800 hours and marks up on 8/3/15 at 0759. Employee Smith's turn is out of town, so upon markup, he/she is placed into "waiting turn" status. On 8/3/15 at 2300, Employee Smith's turn ties up at the home terminal, and Employee Smith is moved from "waiting turn" status and placed back on his/her pool turn.

Total unavailability time for purposes of the ATG will be 39 hours and therefore will count as 2 days of unavailability for Employee Smith.

Example 2:

Employee Smith lays off for a single day of vacation on 8/2/15 at 0900 and marks up on 8/3/15 at 0859. Employee Smith's turn is out of town, so upon markup, he/she is placed into "waiting turn" status. On 8/3/15 at 1700, Employee Smith's turn ties up at the home terminal, and Employee Smith is moved from "waiting turn" status and placed back on his/her pool turn.

Total excluded time for purposes of the ATG will be 32 hours.

NOTE: Employees working under Coastlines BLET Agreements will not be affected by the changes described in Examples 1 & 2.

Example 3:

Employee Smith is used off of his/her pool turn on 8/2/15 at 0700 to work yard service. Employee Smith ties up on 8/2/15 at 1500. Employee Smith's turn is out of town, so upon tie-up, he/she is placed into "waiting turn" status. On 8/3/15 at 0200, Employee Smith's turn ties up at the home terminal, and Employee Smith is moved from "waiting turn" status and placed back on his/her pool turn.

Employee Smith will be treated as available for the entire time with no ATG implications.

If you have any questions regarding the above changes, please utilize Ask LR and/or refer to the Attendance Guidelines Training Manual which can be found here:

http://bnsfweb.bnsf.com/departments/laborrelations/pdf/attend_guide_training.pdf

GENERAL NOTICE(S) IN EFFECT

| 1,3,12,37,46,48,53,61,64,69-70,73,76,78,80-81,87,90-92,94 |
|---|



**MATTHEW J. IGOE**
Vice President
Transportation

**BNSF Railway Company**
2500 Lou Menk Drive
Fort Worth, Texas 76131
Phone: 817-352-1550
Matthew.Igoe@bnsf.com

November 2019

Subject: Holiday Lay-Offs

Dear Fellow Employee,

As members of the BNSF community, we all share an obligation to each other to fulfill basic conditions of employment.

BNSF has a responsibility to provide our customers reliable service, even on the holidays. Frequent or pattern use of layoffs on holidays impacts the service we provide our customers, and affects the performance of your work group.

We noticed that you have been unavailable for work on 7 or more of the past 13 holidays.

Be advised, BNSF monitors patterns of behavior that could demonstrate that you are not meeting expectations of full time employment concerning your holiday layoffs.

Sincerely,

*Matthew J. Igoe*
*Vice President Transportation*

EXHIBIT
L

**BNSF Guidelines for TYE and Yardmaster Attendance**
**Effective January 11, 2021**

BNSF TYE employees and Yardmasters are key members of our community, and have a legitimate expectation of reasonable opportunity to be off from work. And, along with all other members of our community, BNSF TYE employees and Yardmasters share certain responsibilities to the community as a whole. One of these basic responsibilities is to be "full- time" employees.

I. Specific principles for applying these Guidelines follow:

1. Each employee's compliance will be measured on a "rolling" three-month basis to better accommodate periods of intermittent illness. Each month is calculated independently and then combined to determine the threshold for the three-month period. The three-month rolling basis applies regardless if the employee has been in active service for the full three months.
2. Employees in 5-day assigned service (includes 05/02 extra boards) have a maximum threshold of one day per month. Employees in 6-day assigned service have a maximum threshold of two weekdays and one weekend day each month; however, employees in 6-day assignments that work five days a week with one RSIA day and one rest day have a maximum threshold of one day per month.
3. Employees in Yardmaster service have a maximum threshold of one day per month.
4. For employees in unassigned and mixed service, there is a maximum threshold of twenty-five percent of weekdays and weekends**,** measured separately. For employees in mixed service this <u>includes</u> any rest days observed (25% less the total of <u>all</u> rest days equals final threshold).
5. Note: for rest cycle agreements, time off over and above rest days is covered in the agreement; however, employees in a rest cycle for a partial month will be considered in mixed service for that month, covered by these guidelines.
6. All maximum layoff thresholds outlined above assume the employee remains marked up the entire period; additional time off (excluded time) will reduce your threshold (consult with your supervisor or training documents for clarification).
7. Events such as jury duty, engineer recertification, foot of board, layoff union or company business, are counted the same as on duty time; therefore, these events will not affect an employee's threshold and will not count as an attendance layoff.
8. National Guard, Drill, Training, State Emergencies will also count the same as on duty time; however, employees will need to provide their supervisor a copy of their orders or LES for this time to be counted as available.
9. Time away from work such as periods of vacation, personal leave, medical leave, time on the bump board, furlough board, or work/retention board, etc., are considered as "excluded" time for the purpose of determining the maximum threshold. Excluded events will affect an employee's threshold, but do not count as an attendance layoff. (Exception: employees on the bump board who fail to take notification that are subject to call based on their last inbound assignment will be charged attendance layoffs when failure to take notification is 10 hours or greater.)
10. Attendance layoffs such as LOS, LOP, FEM, SIF, etc., may not be altered at a later date simply because an employee chooses to claim a PLD or single day vacation after the fact.
11. Any layoff touching a weekend day will be considered a weekend day, with a 30" grace period (except in the case of jobs with assigned start times in which the start of the assignment drives the determination of weekend vs. weekday). As a result, an employee may be charged with three weekend days for a given week.



12. Any layoff period from 0-25 hours is considered as one unavailable day (except for five and six day assigned service which is based on the number of starts missed – each start is an unavailable day).
13. Working a portion of a calendar day does not negate a layoff period that begins or ends on that day from counting as an unavailable day for the purpose of attendance.
14. Failure to comply with the single tie-up process will be treated as an unavailable day.
15. Following discipline for a period, violations in subsequent months will result in an attendance violation if the total days off in the following one or two months exceeds the maximum threshold for the three-month period.
16. We encourage any employee identified as failing to maintain full-time status under these Guidelines to seek the involvement of his/her local chairman and to contact his/her supervisor to discuss options available at BNSF (e.g., Leave of Absence, MLOA, FMLA, etc.).
17. Meeting the criteria of the lay off thresholds under the Attendance Guidelines does not preclude the company from challenging an employee's full-time status requirement based on some other reasonable standard.

The TYE Attendance Guidelines Training Manual is available on the LR Website. Under "Employee Performance Expectations" select "Attendance Guidelines and Information" and then "TY&E Attendance Guidelines Training Manual". Along with other important information, the manual outlines time off for assignments that are not mentioned specifically in the attendance guidelines.

Local members of the BNSF transportation management team are specifically empowered to apply these Guidelines considering all relevant information. Managers should never act in a rigid or "wooden" manner, and in every case should use "common sense." We also invite and encourage local union leaders to give their input in the application of these Guidelines in individual cases, and, generally, to be "part of the process."

BNSF provides for and encourages each employee who knows in advance of a need to be off to request a pre-approved layoff. However, pre-approved does not excuse the employee from complying with attendance requirements. Those types of layoffs that count toward attendance, such as layoff personal, will continue to count toward the employee's attendance record even if pre-approved.

II. Discipline handling (including progression and the applicable review period) for Attendance Guidelines violations follows:

**A. Progression**

When an employee violates TYE Attendance Guidelines the following discipline matrix applies. In accordance with BNSF's Policy for Employee Performance Accountability, where the Attendance Guidelines provide for an imposition of a Suspension, a supervisor has the discretion to impose an Actual or Record Suspension.

| **Attendance Guideline Record** | **Result** |
|---|---|
| First violation | 10 day suspension |
| Second violation | 20 day suspension |
| Third violation | Employee may be dismissed |

In addition to the discipline matrix above, dismissal may occur if an employee has either (1) two active Attendance Guidelines violations and an active Level S violation, or (2) five rule violations of any kind in a 12-month period (which may include any combination of Standard, Serious and Attendance Guidelines violations).

**B. Review Period**

The TYE Attendance Guidelines review period is an "active" review period and requires an employee work a period of time which exceeds a complete 12-month period without another Attendance Guidelines discipline incident before the prior Attendance Guideline violation is considered "inactive". However, attendance violations will not be "cleared" from an employee's record

> **Example**: Assume an employee commits an Attendance Guidelines violation for the three month rolling period of February, March, and April *2021* and receives a 10-day suspension. If the employee commits an Attendance Guidelines violation for the three month rolling period of February, March, April 2022, he/she *did not work a period of time which exceeded a complete 12-month period* under the Attendance Guidelines policy. As a result, the 10-day suspension of February, March, April *2021* remains "active." As such, the discipline to be assessed for the February, March, April *2022* Attendance Guidelines violation *would be a 20-day suspension*.
>
> By contrast, in the example above, assume that the second Attendance Guidelines violation occurred not in February, March, April 2022, but rather in the three month rolling period of *March, April, May, 2022*. Under this scenario, the employee *did work a period of time which exceeded a complete 12-month period* without an Attendance Guidelines violation, and as a result, the 10-day suspension of February, March, April *2021* is now "inactive". As such, the proper discipline to be assessed for the March, April, May 2022 violation *would be a 10-day suspension*.

# In the Matter of Arbitration

## Issue: Vacation Allocation

United Transportation Union

vs

Burlington Northern Santa Fe
Railway Company

Award Issued: July 1, 2005

Edward L. Suntrup
Arbitrator & Chair, Arbitration Committee

EXHIBIT
N

JUL 06 2005

In the Matter of Arbitration

| | | |
|---|---|---|
| United Transportation Union | ) | |
| | ) | |
| vs | ) | Issue: Vacation Allocation |
| | ) | |
| Burlington Northern Santa Fe | ) | |
| Railway Company | ) | |

Appearances

For the Union

| | | |
|---|---|---|
| J. D. Fitzgerald | - | General Chairman, General Committee No. GO-386 |
| Don Allard | - | Local Chairman, Minot, North Dakota |
| Darrell Howard | - | Local Chairman, Whitefish, Montana |

For the Company

| | | |
|---|---|---|
| Randy Luther | - | General Director, Labor Relations |
| K. L. Parton | - | Director, Labor Relations |
| Kelly Duryea | - | General Director, Train handling, Montana Division |
| Ray Inhofer | - | Crew Manager, Montana Division |

Introduction

On April 25, 2005 the parties to this case signed an arbitration agreement in order to resolve a dispute dealing with the allocation of vacation days at one location in the Carrier's Montana Division. The instant arbitrator was chosen by the parties to arbitrate this case. An arbitration hearing was held on May 16, 2005 at the company's corporate offices of its labor relations' department in Fort Worth, Texas.

The Issue for Arbitration

The parties agreed upon a statement of the question before the arbitrator when they

framed it as an Attachment "A" to the arbitration agreement. That Attachment "A" states the following:

> Under the prevailing past practice on the property, availability and agreement provisions, are (the) Carrier's vacation allocation numbers proper and reasonable?[1]

In its arguments before the arbitrator, and in its Brief, the company's representative provides a slightly different version of a statement of the issue, apparently upon further reflection after the arbitration agreement was signed. A review of the company's version of the issue does not persuade the arbitrator that it changes in any way the task before the arbitrator in this case. The vacation allocation dispute at stake here is not a company-wide problem albeit a ruling issued here may indeed be viewed by the parties as having company-wide precedent since it will represent an interpretation of language of the vacation agreement which applies to all members of the craft on this Carrier's property. In re-stating the issue at the arbitration hearing the company's representative just put Attachment "A" in context by assigning the vacation day allocation dispute in this case to a given time and place.[2] That having been said there is no need to cite it here for the record.

---

[1]See Arbitration Agreement between (the) Burlington Northern Santa Fe Railway and (the) United Transportation Union, April 25, 2005. This Agreement was signed by John Fitzgerald of the UTU and Kem Parton of the BNSF.

[2]That location is the Glasgow, Montana (road) terminal. There are other terminals within the jurisdiction of UTU General Committee GO-386 that also encountered vacation day allocation problems between the parties in 2005. But those issues were resolved at these terminals. These included a terminal at Havre, Montana and two terminals at Denver, Colorado.

## Agreement Provisions

On April 29, 1949 a vacation agreement was signed between a coalition of railroads in the U.S. and a number of different labor unions. The railroads in the industry, party to that original agreement, and the various labor unions themselves also party to that agreement, have undergone considerable re-organization since that time because of merger activities on both sides. But the vacation agreement as framed in 1949 has been passed down and its provisions dealing with this fringe benefit continue to apply to the parties to this case in 2005. At issue here is the interpretation of Section 6 of the Vacation Agreement.[3] This provision, cited here in pertinent part for the record, states the following.

Section 6

> Vacations shall be taken between January 1st and December 31st: however, it is recognized that the exigencies of the service create practical difficulties in providing vacations in all instances. Due regard, consistent with the requirements of the service, shall be given to the preference of the employee in his seniority order in the class of service in which engaged when granting vacations. Representatives of the carriers and of the employees will cooperate in arranging vacations periods, administering vacations and releasing employees when requirements of the service will permit...[4]

There is a provision in Article VIII, Section 2 of the national agreement of August

---

[3]UTU Exhibit 4 & BNSF Exhibit 1. Also Synthesis of the Operating Vacation Agreement, revised December, 1997 which does not change the language of Section 6 of the 1949 Agreement. Henceforth, and for the sake of brevity, when both sides provide the same document as an exhibit for the record the arbitrator will reference either one side or the other and not both.

[4]The balance of this Section of the Vacation Agreement deals with how and when employees who are on vacation will be paid and so on and is not an issue in this case.

20, 2002 between the National Carriers' Conference Committee (NCCC), to which this Carrier is a party, and the UTU calling for a continuation of a national wage and rules' panel to "...obtain and share information, analyze problems and develop options to deal with issues of common concern...".[5] One of the issues of common concern listed under this Article VIII is "vacation scheduling".[6] The findings of such a panel are not binding but recommendations by the panel are supposed to be used as a the "...basis for settlement of the issues involved...". This panel has not yet provided recommendations on vacation scheduling.[7] Had it done so there is a good possibility that the instant arbitration case would not exist.[8]

According to the UTU there are also provisions in the parties' crew consist agreement that have application to this case. These are found in Article III, Section 1 (a)

---

[5]Pursuant to Arbitration Board No. 559 Award (May, 1996).

[6]UTU Exhibits 6-2 & 15-1 inter alia.

[7]As the general chairman of general committee GO-386 put it in a letter to the Carrier in November of 2004: "...(a)s such, (this) issue is status quo until resolved by the Wage and Rules' panel or (by) negotiations...". UTU Exhibit 6-1.

[8]In the interim there are a number of arbitration Awards going back to 1990 and 1993 which are used by the Carrier in this case as precedent in arguing its position. Despite that, and since the record before this forum can stand on its own merits, there is sufficient evidence here to treat the instant case as sui generis. Further, without having to totally subscribe to the arguments by the UTU on those two earlier Awards, this forum can yet be appreciative of the logic of those arguments which state that if the Carrier was so convinced of the precedential value of those earlier Awards, issued on a different Carrier involving a different union, in 1990 (which conclusion guides that of the Award of 1993) then why did the Carrier agree, in 1992, that there was need for a wage and rules' panel to study and issue recommendations on the issue of vacation scheduling?

of the UTU-BNSF Crew Consist Agreement effective May 20, 1993.[9] The pertinent provisions of that agreement, cited by the UTU, are entered here for the record.

> Article III, Section 1 (a)
>
> Except as provided in paragraph (c) of this section, separate guaranteed conductor and brakemen extra boards will protect all extra road service requirements. Guaranteed yard extra will protect all extra year service requirements. This agreement is intended to permit the establishment of combination road/yard extra boards where such boards are not presently permitted. The Carrier shall maintain a sufficient number of employees to permit reasonable lay-off privileges and to protect the service including vacations and other extended vacancies.

## Background

In 1996 the general chairman and the assistant general chairman of UTU general committee of adjustment GO-386 signed, along with the assistant vice president of labor relations of the company, a letter of understanding to both supplement, and to replace, it appears as far as can be determined from the letter, the language found in Section 6 of the 1949 Vacation Agreement. This 1996 letter is cited here, in pertinent part, for the record.

> November 20, 1996 Letter of Understanding
>
> This refers to the allocations of vacations for the upcoming 1997 vacation year. It was agreed that for Local Chairperson(s) who do not choose to schedule vacations in accordance with guidelines provided in the 1949 National Vacation Agreement the scheduling of vacations would be accomplished as follows:
>
> > 1. In order to determine the maximum number of employees the Carrier will be required to allow...to schedule for vacation in any given week, separate by crafts (conductors, trainmen, and yardmen) where applicable, each

---

[9]UTU Exhibit 17. In his Brief the union representative also cites an older Crew Consist Agreement between the parties dated 1980. The exact status of that older Agreement has not been clarified for this forum.

location responsible for preparing vacation schedules will determine the total number of weeks of vacation due each separate craft, which number will be divided by 52. This number will then be increased by 25%. After application of the percentage factor, any fraction will be rounded off to the next higher whole number. The local supervisor and Local Chairperson(s) can mutually agree to a greater or lesser number, depending upon service requirements during a particular period.

2. An employee will be assigned a vacation in the craft in which he performed the preponderance of service for the first ten (10) months of the previous year or by set date as decided by the Local Chairperson(s) in accordance with current vacation agreement on property.

3. In addition to the number of Trainmen assigned vacation in accordance with the above, two (2) additional Trainmen will be allowed to be assigned vacation during the last week of the calendar year. However, the designated Carrier Officer and the Local Chairperson(s) may agree to allow more Trainmen to be assigned vacation during the Christmas week based on the manpower availability and the needs of the service.

The above will become the manner in which vacations will be scheduled for 1997. The parties will meet during the month of September, 1997. If the parties agree that this method of scheduling vacations is appropriate and successful, the provisions of this letter of understanding will be put into Agreement form.

The letter, signed in Albuquerque, New Mexico on November 20, 1996 had, as is evident from reading it, four defining characteristics.[10] First of all, the letter addressed only the one substantive issue of allocation of vacations. Secondly, it stated that it applied to the calendar year: 1997. Thirdly, the letter stated that local chairpersons who did not choose to schedule vacations in accordance with the guidelines provided in the 1949 Vacation Agreement could follow those found of the 1996 letter. And lastly; the 1996 letter stated that if the parties found that experience under this letter to be "appropriate

[10]UTU Exhibit 5.

and successful" then it would be put into "agreement form" and, apparently, assume the status of a long term local agreement. The rest of the letter deals with details related to formulae for allocating vacation days if the local chairpersons so chose in lieu of following the provisions of Section 6 of the National Vacation Agreement.

According to the UTU there was not a problem prior to 1997 with vacation allocation days on those points on this Carrier's property under the jurisdiction of general committee GO-386. The allocations had always been made by applying the language found in Section 6 of the 1949 Vacation Agreement. Vacation allocation days were handled on the local level between local representatives of the UTU and local management. According to the UTU, the "...Local Chairmen and the Local Carrier Officials would review the number of employees in the various crafts, conductor, brakemen and yardmen, and the number of weeks of vacation to be assigned. Based on the specific location, traffic and weeks involved, the two (2) parties invariably reached a mutual understanding on how many employees in each of the various crafts could take vacation in any calendar week...". According to the UTU, the local union and management representatives had "...intimate knowledge (of)...traffic patterns for their territories as well as other conditions that would have to be considered in determining the weekly allocation numbers...". These other variables (conditions) included the weather, seasonal traffic, spring breaks, hunting seasons and family concerns.

After the 1996 letter of understanding was signed the procedures outlined in that letter were used for 1997 and as far as can be determined they continued to be used up

through 2000 in scheduling vacation allocation days albeit the parties never exercised the option of "...officially extending..." the 1996 letter as the provisions of the letter itself provided.

The problems started in 2001, according to the union, and deteriorated after that point. It became more and more difficult for the local representatives to come to a meeting of minds on vacation allocation numbers. Delays set in, vacation schedules were subsequently posted later, and the general chairman of GO-386 became more and more involved in the process. Concurrently, the UTU intimates that the decision-making process dealing with vacation allocation days started to become more centralized and "...more control in developing allocation numbers was vested in Carrier officials located in either Fort Worth, Texas or Topeka, Kansas..." and the "...formula(s) used in 1997 - 2000 and/or consideration of local conditions gave way to a centralized determination by Carrier officials to essentially straight-line vacation (allocations)...".[11] More to the point, according to the union, from 2001 through 2004 Glasgow, Montana vacation numbers were increasingly dictated by central management of the company. It was this increasing divergence between former local control, and the centralizing of decision-making about vacation allocation days, culminating in 2005, which set the scene for the instant arbitration case.

---

[11]Although this ought to be pretty self-evident definitions of certain recurring phrases in this case are provided by the union which are cited here in order to avoid any misunderstandings. "Vacation allocation" is defined as the "number of employees allowed to take vacation in each calendar week", and "straight line allocations" means that the "same number of employees (are) allocated vacation for each calendar week" (Union Brief @ p. 3).

## Discussion

Although there were continuing problems in late 2004 at a number of locations on the system with vacation allocations which included Denver, Colorado, and Havre and Glasgow, Montana as noted earlier, the instant case centers on Glasgow at which location the Carrier had, according to the UTU, for the prior preceding years "...reduced the number of allocated vacation slots in each successive year...".[12] From the very beginning one of the arguments by the general chairman has been that in drawing up its "final offer" for vacation allocations for 2005 at Glasgow the Carrier neglected to take into consideration that 23 new conductors would graduate at Glasgow in January and February of 2005, none of whom would be eligible for vacation in 2005, and that some employees who were assigned to extra boards and who were qualified engineers never worked as conductors or brakemen. The thrust of these arguments is that because of decisions by management on the allocation of forces it was not able to accommodate the requests for given vacation slots by regularly assigned employees at Glasgow.

The Carrier does not deny that procedures related to the scheduling of vacations had become more centralized in 2001 and thereafter. Put in its most succinct form one Carrier officer involved in this case states to the union that the Carrier "...is not bound by any past practice of scheduling vacations..." on the system.[13] As a corollary the Carrier

[12]UTU Exhibit 7.1.

[13]UTU Exhibit 11-1.

argues that it has endeavored to reduce high allocations during peak business time periods. The Carrier also argues that what it does at one location in terms of vacation scheduling is not only determined by the level of business and manning requirements at that location but that there are interlocking issues to be taken into consideration with other locations. The Carrier views this as a side-effect of more centralized planning which it intimates is its right under Section 6 of the 1949 Vacation Agreement. According to the Carrier, it has also been guided by precedent found in a number of arbitration Awards issued off the Union Pacific in 1990 and 1993, respectively.[14]

As a factual matter the UTU and the Carrier were not able to agree upon the vacation allocation numbers for 2005 at Glasgow, Montana. Proposals proffered by each side was rejected by the other.[15] A tentative vacation allocation schedule was drawn up by the parties which was to be used at Glasgow "pending arbitration". That schedule is outlined in UTU's Brief to the arbitrator.[16] Other arguments and issues pertinent to this case, in addition to those cited here, will be addressed by the arbitrator in the Findings of

---

[14]BNSF Exhibits 2 & 3. See BLE vs UP ,Award 1 (1990: LaRocco) & BLE vs UP Award 1 (1993: LaRocco).

[15]UTU Exhibits 1 & 2.

[16]UTU Submission @ pp. 8-10. Also BNSF Submission @ p. 2. wherein the Director states the following: "...the Carrier locked the allocations at what it considered to be a reasonable distribution based both on business needs and the stated preferences of the employees' assigned to that roster. The Organization required its members to schedule their vacations within this framework on the condition that the matter could be arbitrated and adjustments made if a neutral party decided in favor of the Organization...". The Carrier does not say this was its last final offer for 2005, but the UTU does. See UTU Submission @ p. 14 wherein the General Chairman states: "...the General Chairman agreed (to) the last final offer made by BNSF for vacation allocation number would be utilized with the understanding that the dispute would be expeditiously arbitrated...".

this Award which follow.

## Findings

This is a contract interpretation case. The moving party is the union. The union must bear the burden of proof, therefore, in accordance with substantial evidence criteria, that the company's 2005 vacation allocation numbers on its Glasgow, Montana UTU roster which are before the arbitrator under title of "...allocation numbers utilized pending arbitration..." are improper and unreasonable.[17] For arbitral purposes substantial evidence has been defined as such "...relevant evidence as a reasonable mind might accept as adequate to support a conclusion...".[18]

A review of the records shows that the 1996 letter of understanding was applied to the 1997 vacation allocation requests apparently with some success. According to the union, the procedures outlined in that letter were applied on the local level at Glasgow, Montana up through 2000. But there is no evidence that the parties to the agreement ever met in "...the month of September, 1997..." to convert that 1996 letter of understanding into a long-term labor agreement, as noted. For whatever reasons, to which this arbitrator is not privy, the provision directing the parties to meet in order to address the status of the 1996 letter was never implemented. The union does not deny this. Since this is so the

---

[17]"...The burden of proof for a claim rests with the party filing the claim..." NRAB Third Division 25575. Also Second Division 5526, 6054; Fourth Division 3379, 3482; Public Law Board 3696, Award 1 inter alia.

[18]See Consol. Ed. Co. vs Labor Board 305 U.S. 197, 229. Also NRAB Second Division 6419, 7492 8130; Public Law Board 7512, Award 4 inter alia.

1996 letter is moot as evidence in this case. It has been moot as a contractual matter since the first day of 1998. The 1996 letter can provide no guidance in resolving the merits of the case here before the arbitrator. What that letter does do, however, is provide some background information about how the instant case came up before the arbitrator in the first place. As far as the record is concerned, the 1996 letter was the first tentative step taken by the parties toward a more centralized approach to decision-making about the allocation of vacation days. It was the first step in an arrangement which ended up being applied in 2001 and thereafter with respect to allocation of vacation days at various points on the Carrier's property, including Glasgow, Montana.

The general chairman of the UTU writes, in 2005, that "...for decades the determination of how many employees could be on vacation during any given calendar week was made by mutual agreement and compromise by the local employee representatives and the local Carrier officials...". According to the union this was generally what happened up through 2000 but then things changed and decisions by the company about vacation allocation days started to be made in Fort Worth and Topeka. This might well be true. But there can also be no doubt, however, that the decision-making process related to allocation of vacation days started to take on a slightly different decision-making flavor on this Carrier's property earlier than 2001. This is witnessed by the 1996 letter of memorandum itself because it was not signed by local union and management officials. It was signed by a general chairman (and an assistant general chairman) of the general committee and by an assistant vice president of the railroad.

These are not local officials. Decision-making with respect to the allocation of vacation days started to be kicked upstairs in the authority structures of the two sides some four years before 2001. Agreed, the 1996 letter did state, albeit signed by high-ups, that the guidelines in that letter applied to local chairpersons who were give the option not to "...choose to schedule vacations in accordance with the guidelines provided in the 1949 Agreement...". So while the content of the letter kept the decision-making on the local level, albeit signed by higher-ups, it formally also did something else of considerable importance. It relieved local level union representatives from following the guidelines of the 1949 Vacation Agreement. But it did so in a very specific way. It gave them reprieve for only one year. Given this fact, as well as the fact that nothing was done after 1996 with the letter by either side, perhaps the surprising thing is that exceptions to the 1949 Vacation Agreement were continued for another three years after 1997. As noted, the 1996 letter was never turned into an enduring local agreement.

So the company and general committee of adjustment GO-386 were not only technically, but contractually back to Section 6 of the 1949 Agreement in 1998 and thereafter and so were local labor and management irrespective of what was factually happening from 1997 through 2000 on the local level at each different location on the system.

Obviously if there had been no problems surfacing at the company's locations under the jurisdiction of general committee GO-386 in the first place, over these "decades" described by the general chairman in 2005, then there would have been no

need for what turned out to be an aborted attempt in 1996 to provide local level people with authority to by-pass the provisions of Section 6 of the 1949 Vacation Agreement in the first place. The general chairman of the committee argues in his Submission before the arbitrator that he became increasingly involved in settling vacation day allocation issues after 2000. That could be. But as noted, he was already involved in doing that in 1996. And the very fact that he was becoming involved, and the reasons for this involvement, pointed to increased centralization of decision-making with respect to the vacation allocation question. The issue, of course, is how all this jibed with the contractual language found in Section 6 of the 1949 Vacation Agreement.

Since the information of record in this case, provided by both sides, shows that decisions about vacation allocation were becoming more centralized from the company's point of view it is obvious that the company started to place more emphasis on central planning factors in applying Section 6 of the Vacation Agreement such as seasonal traffic, rather than what might be called local factors. According to the union these local factors included what organizational theorists would call exogenous variables such as the weather, spring breaks and the timing of hunting seasons, all of which were considerations that had been used by local labor and management in the past in posting vacation schedules.

Is one approach (using centralized decision-making variables) or the other (using local exogenous variables) a more reasonable application of the language of Section 6 of the Vacation Agreement which speaks of the "...exigencies of the service..." and

decisions about vacation allocation days which are "...consistent with the requirements of the service..."? After all, the question posed to the arbitrator in this case is whether the way the company calculated the 2005 vacation allocation roster at Glasgow, Montana, as opposed to that proposed by the union, is the more reasonable in view of the language of Section 6 of the Vacation Agreement.

In either event, what is clear is that the language of Section 6 of the Vacation Agreement, as it currently stands, applies to all seniority districts on this property and it applies to all locations in those districts unless there are local agreements to the contrary which this arbitrator has not been apprised of in this case.

There are reams of arbitral precedent supporting the view that labor arbitrators' function in this industry is to interpret contractual language "...as written...".[19] Obviously, most of the company's seniority districts and locations in those districts represented by this union, for whatever reason, have been able to come to a meeting of minds in applying the language of Section 6 of the 1949 Vacation Agreement in a manner whereby both the company and the employees who are members of the craft here have been, if not optimally, one can assume minimally or sufficiently, accommodated. The general chairman states in his arguments before the arbitrator that he worked hard in getting that

---

[19]For an arbitrator in this industry to do otherwise would represent a misuse of jurisdictional authority "...which is limited to the interpretation of collective bargaining contracts 'as written'...". NRAB Fourth Division 4645; also Third Division 6695, 21459, 21697, 23135; Special Board of Adjustment 951 Award 408 inter alia. As early as 1968 First Division 21459 ruled that "...this Division limits its authority to (the) 'interpretation and application" of agreements "as written" which is a principle universally applicable to all arbitral forums in the industry...".

done in certain other locations in Montana and in Colorado under the jurisdiction of the committee where there were differences of view on the allocation issue and he undoubtedly had considerable success. At least the general chairman found a workable solution which is what skilled negotiators on either side of a union-management equation are supposed to do if they are good at their metier. But the general chairman was not successful at Glascow, Montana. The union's members of this location appear to be of a different mind-set. One way of looking at the issue in this case is whether that mind-set is consistent with a proper interpretation of Section 6 of the 1949 Vacation Agreement or not?

The use of prior experience, or "...prevailing past practice...", in interpreting the language of Section 6 of the Vacation Agreement on this property is a consideration that cannot be taken lightly by the arbitrator in this case. On this point, prior practice in and of itself cannot be a substitute for clear and unambiguous language of contract. Prior practice can serve to guide an arbitrator with respect to the meaning of the intent of the language of contract if the latter falls under the aegis of ambiguous language. A review of the language used by the parties in framing their intent in the Vacation Agreement fails to persuade the arbitrator that this language is ambiguous or unclear. The straightforward task here, therefore, is to interpret the language as written. Prior practice at Glasgow, whatever it might have been, must bow to the logical requirements of this language as written. Section 6 of the Vacation Agreement explicitly states that "...exigencies of the service..." might create "...practical difficulties in providing vacations in all instances...".

It is not possible to misconstrue the clear meaning of this language. It means that not all employees will get the vacation slots they might wish depending on the "...exigencies of the service...". Arbitrators are not permitted to give obscure and arcane meanings to language which is clear and distinct. In his argument before this tribunal the general chairman argues that the Carrier violated Section 6 of the Vacation Agreement by failing to follow historic past practices by not considering "...pertinent conditions and needs of the employees...". Pertinent conditions apparently refer to such exogenous factors, as noted earlier, such as the weather, spring breaks and the timing of hunting seasons. That such conditions be translated into employees's needs under title of individual self-interest is not surprising. But Section 6 explicitly states that employees' views of their needs might not always be honored which could result in "practical difficulties" for the employees. Everyone involved in this case knows exactly what all this means. It means a UTU represented employee at Glasgow might not always get the vacation slot they want. And the language of Section 6 says that this might be the case in a straightforward way.

There is nothing in Section 6 of the 1949 Vacation Agreement which explicitly addresses "pertinent conditions" and "needs of employees" per se although once again there can be no doubt that these have been, and are, considerations taken under advisement by both sides in allocating vacations both over the years and at the present time on this railroad. This is true because Section 6 also states that both sides "...will cooperate..." in setting up vacation schedules. If both sides have been able to come to a meeting of minds on how to apply the spirit, if not every detail, of the language of a

provision such as Section 6 that is totally appropriate. And when they are successful they do not need an arbitrator to issue rulings on exactly what the language of Section 6 of the Vacation Agreement, "...as written..." means.

The general chairman argues before the arbitrator that some locations under his jurisdiction are cause for concern over this vacation question. But the fact of the matter is that there are locations on this Carrier where members of this craft under the leadership of the general chairman have been able to work out arrangements whereby the "...exigencies of the service..." and whatever other local, exogenous concerns the roster members have, are sufficiently in sync to provide minimal satisfaction to all concerned.[20] But this has not happened at Glasgow, Montana. Exactly why that is so is not completely clear from the record in this case. But it does appear that the members of the craft at this location may have a view of the privileges associated with seniority which cannot be

---

[20]Arbitrators have historically interpreted union contracts, with considerable success, under "minimilistic" principles particularly in conjunction with clear-cut data found on seniority rosters. For example, claims filed by employees who bump in accordance with seniority but who are refused a bump by employers on grounds that they are not qualified to do the job, which go to arbitration, will be sustained by arbitrators if there is sufficient evidence that the employee filing the claim is minimally qualified to do the job to which he or she bumped. In the instant case, which represents a reverse scenario, the employer is obliged to do no more, under the language of Section 6 of the Vacation Agreement , than to minimally grant vacation choices in accordance with the "exigencies of service" while absolutely respecting seniority rights of members of the roster. The employees at Glasgow appear to want "optimal" or "maximal" application of their vacation rights under Section 6. The company only has to oblige them, as a pure contractual matter, "minimally". The union argues that: "...the degradation of vacation allocations had the effect of reversing the expected and anticipated access by members to preferred vacation weeks based upon their respective proportionate gain in seniority". There is nothing in Section 6 of the Vacation Agreement that optimally guarantees "...such expected and anticipated access...to preferred vacation weeks..." albeit the Carrier has a minimal requirement to try and accommodate these employees on basis of their seniority. The record in this case warrants conclusion that such minimums have been met at all locations in 2005 on the system for UTU seniority rosters and locations. Whether such minimum has been met at Glasgow, Montana or not is why this arbitration case exists.

contractually accommodated by the language of Section 6 of the Vacation Agreement if the language of that provision is applied stricto dicto. In his arguments the general chairman places particular emphasis on expectations associated with "...proportionate gain(s) in seniority...". Since this case is about Glasgow, Montana he must be talking about the employees there.

Seniority does bring with it a cornucopia of benefits under a union contract. Anyone who has ever studied the logic and structure of union contracts knows that seniority is not something in and of itself but is the prime mover and driver of an array of benefits as a hub is to the spokes of a wheel. That this is so stems from the basic philosophical notion that tenure on the job brings benefits to the job holder both as a proprietary matter, as well as a reward for serving the employer long and faithfully. All good employers also know that as a practical and economic matter, a seasoned and experienced employee with more than less seniority is a commodity to be both prized and safeguarded. But the correlations between employees' seniority rights, and an employer's management rights, contractually, practically and economically, have always implied a balancing act in union-management relations in order to keep an enterprise running smoothly and effectively. Seniority rights do not exist in a vacuum. They take on substance and content in accordance with the language of contract. Section 6 of the Vacation Agreement does state that employees will be "...given preference..." in "...seniority order in class of service..." when the employer is "...granting vacations...". But Section 6 also goes on to state that the seniority preference will be applied with

"...due regard, consistent with the requirements of service...". Seniority provides an employees a guaranteed place in the queue, all other things cited in the foregoing being considered. It does no more. And it does no less.

As a final matter, the union argues that the 1993 Crew Consist Agreement provides support here for its contention that the company is violating Section 6 of the 1949 Vacation Agreement by the 2005 vacation schedule it has agreed to in 2005 at Glasgow, "pending arbitration". A review of the language of Article III, Section 1 (a) of the Crew Consist Agreement fails to persuade the arbitrator that this argument has merit. Article III of that Agreement states that the company shall "...maintain a sufficient number of employees to permit reasonable lay-off privileges and to protect the service including vacations...". This language does not say that the company is required to keep the extra boards at staff levels to permit vacation schedules for regularly assigned employees if such requested schedules are not consistent with the exigencies of service.

A review of the full record in this case shows, in resume, that the arguments by the UTU are based on what it views as flawed company policy related to the hiring, training, and assigning of employees; on application of provisions from the Crew Consist Agreement which it argues control the meaning and application of Section 6 of the 1949 Vacation Agreement; on the priority of local custom off the various railroad properties now part of the BNSF system; on certain optimal privileges that the members of the craft believe are associated with seniority; and on the flawed application of the language of Section 6 of the 1949 Vacation Agreement under title of increasing centralization of

decision-making by the Carrier which is now using a straight-line method approach for vacation assignments.

Upon each of these points, within the context of the preceding discussion in these Findings, the arbitrator concludes as follows.

Nothing in the language of Section 6 of the 1949 Vacation Agreement warrants conclusion that the Carrier must share hiring, training and employee assignment decision-making with the union in order to optimize vacation time choices by employees working at Glasgow, Montana. Section 6 does say that the Carrier will cooperate with the union "...in arranging vacation periods..." but the language does not support the conclusion that this means also that the Carrier will cooperate with the union in arranging the workforce. These conclusions are not novel. Under a union-management format an employer keeps control of all areas of decision-making not given away in contract. Nothing in the language of Section 6 takes away from the Carrier its managerial prerogatives to run the railroad according to standard managerial principles, including those related to staffing. .

Nor does the language of the Crew Consist Agreement infringe on this managerial right as this relates to vacations. In its arguments on this contractual matter the union focuses on the language of Article III, Section 1 (a) of the 1993 Crew Consist Agreement without concurrently coordinating the interpretation of that language with the language of Section 6 of the 1949 Vacation Agreement which states, once again, that there could be " practical difficulties in providing vacations in all instances...". If the Crew Consist Agreement is interpreted in the manner requested here by the union those "...practical

difficulties..." would disappear and be eliminated. If they are eliminated then the language found in Section 6 which speaks of practical difficulties would become, in effect, meaningless. The arbitrator is in no position to conclude that the parties to the 1949 Vacation Agreement engaged in a meaningless exercise in framing the language to that Agreement.

Nextly, seniority does bring with it benefits under labor agreements as observed earlier in more detail and such benefits are invariably spelled out in language of contract. Section 6 of the 1949 Vacation Agreement honors the principle of seniority with respect to vacation scheduling but it does not state that seniority alone guarantees any member of the craft at Glasgow, Montana their first vacation choice. This forum can appreciate that different locations associated with prior railroads as corporate entities may have had traditions of interpreting Section 6 of the 1949 Vacation Agreement differently as the general chairman argues. But this amounts to no more than local work cultures and if the parties were happy with those arrangements the permissiveness of the Railway Labor Act, under which all labor agreements in this industry are negotiated, permitted such arrangements. When mergers take place those prior work arrangements are always subject to adjustment as former railroads are integrated into larger and expanded corporate entities. Resistance to such changes are often enough handled by third party binding intervention wherein arbitrators are required, as has already been noted, to provide stricto dicto interpretations in accordance with the language of labor agreements "...as

written....". That is exactly what is happening in the instant case.

Finally, the arbitrator has closely studied the union's argument dealing with allegations that the Carrier used a straight-line method in allocating vacation schedules in 2005 in Glasgow, Montana. Without applying specific statistical tests to the differences between the Carrier's first proposal for 2005 at Glasgow with what it ended up agreeing to "...pending arbitration...", which is still not what the union wanted at that location, it does appear that the original proposal by the BNSF for 2005, had it been accepted in toto by the union, might have approximated what the union calls a straight line method. While, as noted, there is nothing in Section 6 of the 1949 Vacation Agreement which does not permit the BNSF to go to a more centralized system of decision-making in making proposals for vacation schedules, at the same time it does not unilaterally permit the Carrier to simply impose just any vacation schedule on the employees since Section 6 explicitly states that both sides "...will cooperate in arranging vacation periods...". A review of the schedule currently in place at Glasgow, Montana "...pending arbitration..." shows that it is the obvious result of compromises of the type that are required by both the spirit and intent of Section 6 of the Vacation Agreement and that it does take into consideration both central planning considerations as well as local variables bound to the

Glasgow employees's seniority rights.[21]

Ruling

The Ruling is in accordance with the Findings. The union has insufficiently borne its burden of proof as moving party in this case in accordance with evidentiary standards normally used and applied in forums such as the instant one. The Question before the arbitrator is answered in the affirmative. The vacation allocation to be finally posted for the balance of 2005 at Glasgow, Montana shall be the Plan cited by the UTU in its Brief to the arbitrator @ pp. 8-10 which for the 2005 calendar year, at least, appears to be what the Carrier has characterized as a "...reasonable distribution based both on business needs and the stated preferences of the employees assigned to that roster...", which the UTU has characterized as the BNSF's last final offer, and which both sides have characterized as the vacation allocation numbers to be utilized at Glasgow, Montana in 2005 "pending arbitration". The roster for 2006 and beyond shall be established under Section 6 of the 1949 Vacation Agreement in accordance with the rationale and conclusions outlined in this Award until and unless Section 6 is amended, result of actions by the national wage and rules panel under Article VIII, Section 2 of the August 20, 2002 national agreement,

[21]For the arbitrator to rule here that the use of a straight line method to calculate vacation scheduling is, by definition, a violation of Section 6 would serve no practical purpose since the parties could argue interminably whether a given proposed schedule is the result of the use of such method or not. More useful, using what actually happened at Glasgow in 2005 as a model, are the negotiations which ended up with a vacation schedule like the one "pending arbitration" whereby one side or the other, or both, engaged in movement from their original proposal. Given the language of Section 6 of the Vacation Agreement such negotiations are required. Given that same language they are not required on the local level as the Ruling in this case states.

and/or unless the Vacation Agreement is amended by negotiations between the parties.

Section 6 of the 1949 Vacation Agreement requires the parties to negotiate vacation schedules (the parties "...will cooperate in arranging vacation periods..."), but there is nothing in the language of Section 6 that requires that such be done only on the local level by the BNSF or the UTU albeit local level concerns by employees ought to be reasonably accomodated in accordance with "...the requirements of service...".

Award

The Award is in accordance with the Ruling. Implementation of this Award shall on the date of receipt of the Award by the parties. The Board and the arbitrator hold jurisdiction over this Award until it is implemented.

Edward L. Suntrup, Arbitrator & Chair

Randy Luther, Carrier Member
General Director
Labor Relations, BNSF

Dissent attached

J. D. Fitzgerald, Employee Member
General Chairman
UTU General Committee GO-386

Dated: July 1, 2005

# DISSENT TO ARBITRATION AWARD BETWEEN UNITED TRANSPORTATION UNION GO-386 AND BNSF AS RENDERED BY EDWARD L. SUNTRUP

In review of the findings and order of the Arbitral decision handed down by Arbitrator Edward L. Suntrup, the Employee Member must respectfully dissent from that finding and order.

While Arbitrator Suntrup relies upon the express language of the Vacation Agreement, Section 6, he has, as well, compartmentalized the applicable schedule of Agreements, which includes the 1949 Vacation Agreement (as amended) and the 1993 Crew Consist Agreement. Those Agreements, as well as the other components that make up the "Schedule", cannot be applied as if each were in a vacuum.

The various agreements compliment and influence each other as well as influencing the application of each other. The neutral has chosen not to consider pertinent and presented portions of the Crew Consist Agreement that require BNSF to properly staff the respective extra lists.

Further, the Arbitrator has chosen to disregard the historic practices and handling, choosing, to compartmentalize and segregate the language of Section Six of the Vacation Agreement. While the Crew Consist and Vacation Agreements were negotiated separately, as were many portions of the collective schedule, the historic practice and application of the Vacation Agreement should most certainly have been given consideration and acknowledgement in rendering the decision.

Based upon the narrow view as expressed in the decision the undersigned must dissent to that decision.

Respectfully,

J.D. Fitzgerald, General Chairman
UTU General Committee 386

AWARD NO. 1
Case No. 1

PUBLIC LAW BOARD NO. 2991

PARTIES ) UNITED TRANSPORTATION UNION
TO )
DISPUTE ) DETROIT, TOLEDO AND IRONTON RAILROAD COMPANY

STATEMENT OF CLAIM:

"Claim in favor of Brakeman D. Scott for all time lost (ten (10) days' suspension plus day of investigation) and restoration of loss of any fringe benefits. Moreover that his record be cleared of the following charge: '...for his responsibility for violation of Rule O of the Rules and Regulations of the Operating Department in that he performed service for this Carrier 11 days out of 70 between January 8, 1979 and April 10, 1979.'"

FINDINGS:

This Board, upon consideration of the entire record and all of the evidence finds that the parties are Carrier and Employee within the meaning of the Railway Labor Act, as amended, and that this Board has jurisdiction over the dispute involved herein.

This dispute arises out of Carrier's imposition of a 10-day disciplinary suspension against Claimant as a result of alleged excessive absenteeism, it being charged by Carrier that Claimant, in violation of Rule "O" of the Rules and Regulations of the Operating Department, had performed service for Carrier on but 11 of 70 days between the period January 8, 1979 and April 10, 1979.

Rule "O" reads:

> "Employes must make the Company's service their primary business, attending to their duties during prescribed hours, residing wherever required, and obeying instructions from the proper authority in matters pertaining to their respective branches of the service. They must not absent themselves from duty, exchange duties with, or substitute others in their place, without proper authority, nor engage in other business without permission.
>
> Acts of hostility, disloyalty, or disregard for the Company's interest, will be sufficient cause for dismissal."

It is Carrier's position in this dispute that formal investigation into the matter of Claimant's service shows there is sufficient evidence of record to support the conclusion that Claimant is guilty as charged. In particular, Carrier points to the fact that when questioned concerning having performed service on only 11 days during the period at issue, Claimant stated he was under the care of a doctor, but acknowledged that he had not been under such doctor's care

EXHIBIT
O

on all the days he had been off from work. Carrier argues that this number of days represented 26 different dates, that is absences not attributed to sickness, vacation, or rest days. It maintains that number of absences was "clearly excessive and more than sufficient to justify the charge."

Carrier also cites as pertinent to its contentions, and in defense of arguments advanced by Petitioner that Claimant was sick on all the dates, that Claimant had likewise acknowledged at the hearing that he had not requested a leave of absence account sickness, nor had he applied to the Railroad Retirement Board for sickness benefits. Carrier states the significance of its argument is neither a leave of absence account sickness nor sickness benefits are granted unless an employee furnishes a physician's statement to document a period of illness.

As concerns an argument made in appeal by Petitioner that Carrier cannot properly assess discipline in the instant case on the basis Claimant was absent with permission, Carrier argues that employee requests to mark off from service are accomplished through direct contact with a crew dispatcher, who permit employees to mark off based upon their knowledge of then existing service requirements, but not upon their knowledge of an individual employee's overall record of total absences. The Carrier maintains that the crew dispatcher's function is that of recording the availability and non-availability of employees, recording mark offs and mark ups, and filling assignment vacancies in an impersonal manner. The Carrier contends that while it may or may not be factual that a crew dispatcher to whom Claimant marked off did not take exception to Claimant requesting he be marked off, or ask him the reasons therefor, such does not in any way restrict or preclude investigation and/or a disciplinary assessment for excessive absenteeism in an abuse of the mark off privilege and in violation of Rule "O". In this reagard, Carrier submits that it has assessed discipline for excessive absenteeism in identical circumstances involving other employees. Further, that as Claimant's attendance had been unacceptable for a period of time preceding that at issue here, that warnings had been conveyed to him on several occasions by supervisory personnel.

In further support of its position, Carrier directs attention to Awards of Public Law Board No. 2315, involving not only the parties to this dispute, but likewise the same Claimant as we have here in the case before this Board. That Board upheld Carrier's right to require an employee who had marked off sick to obtain a doctor's release upon returning to duty. Interestingly, in one claim,

Claimant had marked off sick at 5:30 a.m. and wanted to mark up at 2:15 p.m. the same date without the doctor's release that he had been told would be necessary when he first marked off sick. Three other cases in that same docket of cases concerned Claimant's continuing attempts on three succeeding days to mark up without the required doctor's release. More importantly, Carrier directs attention to Award No. 7 of Public Law Board No. 2549, involving the parties to this dispute, but a different Claimant. The Carrier cites the Award as having upheld Carrier's right to dismiss an employee for excessive absenteeism in violation of Rule "O" under what it asserts were "identical circumstances" to those present in the instant dispute. Carrier urges that this Award be treated as precedential and controlling, maintaining that Petitioner "is doing no more than 'shopping' for a more favorable award." Further, Carrier says that by its arguments to this Board Petitioner "is in effect condoning absences and seeking the Board's adoption of its position and theory so as to place the Carrier in a posture whereby excessive absence can never be the subject of discipline."

Petitioner contends that imposition of discipline in the instant dispute is unjustified; that Claimant had permission to be off from work (a matter the Board will more fully review herein). Petitioner also states, and the record supports, that in calculating Claimant's "absenteeism" Carrier had apparently included in the charge assigned days of rest. The Petitioner makes the further, but unsubstantiated assertion, the calculation included days Claimant's assignments were cancelled for lack of work and holidays. Petitioner also alleges, but without support as to the total number of days cited, that Claimant was under the direct care of both a dentist and a doctor for 46 days. In this regard, the record as presented shows that during the period at issue Claimant had taken a 15-day vacation, and that while on vacation he had seven teeth extracted. The record also shows, according to a physician's statement introduced at the hearing by Claimant, that he was "hospitalized and totally disabled from 3-17-79 thru 4-4-79 and under [a doctor's] care during this time." The doctor's statement notwithstanding, Claimant's work record as introduced in Carrier's presentation to this Board shows Claimant had performed service for the Carrier on April 3, 1979, or one day before the end of the 19-day period he was reportedly totally disabled.

As concerns Claimant being off with permission, Petitioner asserts that when employees such as Claimant desire to be off, they call in and ask to be "marked

off", and that such requests are either granted or denied contingent upon the number of extra employees that are available. Thus, Petitioner states the propriety of Carrier's actions in disciplining Claimant hinges itself on the following questions:

"1. At what point in time does an employee's marking off become excessive?

2. May the Carrier investigate employees and issue discipline for marking off excessively while other employees are permitted to mark off even more excessively without penalty?

3. May the Carrier discipline an employee without first giving him a fair and impartial investigation?

4. May Claimants be held responsible for not performing service on days that their assignments did not work because of assigned days off and of days the jobs were otherwise cancelled?

5. Should Claimants be held responsible for not performing service on assigned work days of their assignments in view of the fact that THEY WERE GIVEN PERMISSION TO MARK OFF?"

In arguments it advances as support for a desired Answer to its Question 1, Petitioner makes reference to provisions of the applicable Agreement rule which stipulates employee trials shall be scheduled to begin within fifteen days from the date of Carrier's first knowledge of those matters which are the subject of the charge, or the charge shall become null and void. Petitioner contends that as Carrier was not specific as to which days Claimant marked off excessively within the time frame provided by this rule, that any discipline is improper. It also submits (without conceding that an employee can be held responsible for not performing service when they are given permission to mark off, or without any further elaboration) that "the Board must determine at what point marking off becomes excessive."

With respect to its Question 2, Petitioner submits that the Carrier must apply all rules to each employee in a like manner and without discrimination. It states that records will show that many other employees marked off more excessively than Claimant but were never charged with a rule violation. It does not name those employees.

In regard to Question 3, and Claimant's right to a fair and impartial investigation, Petitioner maintains that to sustain the Carrier's action, this Board must

find that the Carrier:

"1. Conducted the investigation hearing in a fair and impartial manner affording the claimants all rights of which they are entitled.

2. Provide all creditable witnesses who have knowledge of the facts under investigation.

3. After citing the rule(s) claimants are alleged to have violated, the Carrier may then determine guilt only after substantial (indicated guilt of claimant) evidence is introduced by testimony of claimants and/or creditable witnesses.

4. Has not abused managerial discretion or acted in an arbitrary, capricious or discriminatory manner."

In connection with its above statement, Petitioner alleges Carrier has attempted to place Claimant in a "Catch-22" situation, one in which it asserts an employee can never be sure if he is subjecting himself to discipline by marking off even when his actions are "with the express approval of the Carrier." As concerns an alleged denial of due process, Petitioner submits there were no witnesses present at the hearing; no evidence or testimony was introduced of wrong doing on the part of Claimant; no documentation or records were produced; and there was no admission of guilt by Claimant, but rather a denial of guilt by Claimant. Petitioner further asserts that the only "information" contained in the transcript of investigation which could be used by the Carrier to derive any implication of guilt by Claimant is what it terms, "an affirmative statement by the Hearing Officer" relative to Carrier records indicating that between the dates in question Claimant had only performed service on a certain number of days. In short, Petitioner contends Carrier acted in an arbitrary, capricious and discriminatory manner in the handling of Claimant's investigation and the assessment of discipline.

The Petitioner did not expound upon a desired Answer to its previously stated Question 4, and it did not offer in evidence support for its contention that on certain dates Claimant's assignment did not work because the jobs were cancelled.

As to Question 5, Petitioner again states that the essence of its case is that Carrier acquiesced in Claimant's absences or gave Claimant permission to be absent because its crew dispatchers allowed Claimant to mark off. In this connection, Petitioner states that numerous tribunals have "invariably held that a

Carrier has the right to deny employees permission to mark off as long as that discretion is not abused [and] when a Carrier gives an employee permission to mark off, they cannot properly discipline them for such absences."

As concerns the Carrier's citation of Award No. 7 of Public Law Board No. 2549 being a precedent or controlling Award in resolution of a dispute of a like nature, Petitioner states that Award "is palpably erroneous and should be given no consideration." It directs attention to the dissent it filed to that Award.

Finally, as concerns Claimant being in violation of Rule "O", Petitioner offers a rather extensive examination of that Rule in support of its position that Claimant's absences were not violative of that Rule, again placing particular emphasis upon Claimant having been allowed to mark off with what it terms the approval of "proper authority."

In consideration of the positions advanced by the parties it is first necessary this Board direct its attention to a further argument advanced by the Carrier at the Board's oral hearing of the dispute, that is, its contention Petitioner has included in its presentation to the Board certain arguments which had not previously been handled on the property. In this regard, examination of the record shows that at an initial appeals hearing following the assessment of discipline after the formal investigation, Petitioner had stated:

> "The transcript of the investigation will be my appeal. This contemplates that the 10 days be removed from his record and he be paid for attending the investigation and all time lost."

A somewhat like position was apparently taken at the final, or highest appeals level. A letter of final denial of the case on the property, written under date of January 23, 1981, by Carrier's Manager Labor Relations to Petitioner reads:

> "We have reviewed the transcripts of the investigation and appeal and comments presented at our appeal discussion.
>
> The record substantiates Brakeman Scott's excessive absenteeism during the period charged. His contentions that a portion of such period should be excused because of alleged medical difficulties is unacceptable. Even if such statements were credited, his remaining absenteeism is more than sufficient to justify the charge and the suspension assessed.
>
> Consistent with the principles confirmed by Award No. 7 of Public Law Board No. 2549, Mr. Scott was properly disciplined and his ten (10) day suspension will not be disturbed.
>
> Your appeal is declined."

In the light of the Carrier's protest, and the Board's careful review of the documented handling of this case on the property, we are compelled to find that certain of Carrier's contentions do in fact support dismissal of a number of Petitioner's arguments. We do not find, for example, that the conduct of Claimant's hearing was challenged in the manner here set forth by Petitioner in an endeavor to have this Board sustain the claim on a basis Claimant had been denied a fair and impartial hearing. We find no protest having been raised relative to Carrier not calling any witnesses. There is also no objection on the record to the matter of Claimant's work record being introduced into the hearing record by the hearing officer. Nor is any assertion to be found that Claimant was being cited for absenteeism in a discriminatory manner. Thus we are obliged to dismiss that line of arguments which had not been previously advanced on the property as groundless, for even if Petitioner's contentions regarding due process were valid, which we do not find them be in any event, this Board has no authority to go beyond the record as developed and made on the property.

The above findings notwithstanding, we will state for the record that as concerns there being no witnesses present at the hearing, it is our opinion that under the circumstances of record there was no need for witnesses to have been present. Had there been a need or demand to clarify the data upon which the charge was premised, or had there been a challenge as to the accuracy of the data, then certainly it would have been necessary and appropriate for those responsible for records keeping to have been called as witnesses. However, absent a showing there was such a need, we believe the work record as introduced spoke for itself. The introduction of the work record, albeit by the hearing officer, also represented, contrary to Petitioner's contentions, documentation or evidence of Claimant's alleged wrong doing. We will also state that even if the records were to show that Carrier was checking up on the Claimant's attendance more precisely than on other employees that this, in itself, does not support the conclusion Carrier was acting unfairly toward Claimant if, in fact, Carrier had adequate reason to want to review Claimant's absences. After all, the purpose of the investigation was to review Claimant's record of attendance. The disciplinary penalty had not been assessed until after the Carrier had completed its investigation.

The record does show, however, that Petitioner had challenged at the hearing Carrier having gone back more than 15 days from April 10 (the last

date covered by the charge) to hold Claimant accountable for a violation of Rule "O". It asserts this was in violation of Memorandum No. 9; that Carrier could not go back more than fifteen days from it's first knowledge of Claimant's absences. As concerns this contention, it is the Board's opinion that Carrier may properly go beyond the referenced 15-day time constraint in establishing a reasonable time frame within which to measure alleged excessive absenteeism. In this same connection, as concerns a further complaint by Petitioner that it is necessary each specific date of absence be set forth in a trial notice, it is this Board's opinion that a reference to a specified period of time is generally sufficient to apprise an employee of the nature and the parameters of a charge of excessive absenteeism. Here, for example, after being duly notified, both Claimant and his representative appeared at the hearing prepared to defend Claimant against the charge, even to the extent of having at hand for presentation both dentist and doctor attestations relative to Claimant having been under their care on certain dates covered by the charge. It is thus evident that they had no expressed difficulty in understanding the specifics of the charge and the information needed to prepare a defense.

As concerns Petitioner's assertions and inferences as to Claimant not being in violation of Rule "O" since the transcript of investigation does not show he had admitted guilt to the charge, we do not find this to be a substantive argument. Few employees ever do admit guilt at a hearing. We also fail to comprehend the basis for Petitioner's conclusion that Claimant had expressly denied guilt. Certainly, his response that he was under a doctor's care for a portion of the time cannot be treated as an outright denial of guilt. We also do not believe, as Petitioner has stated, that a finding of guilt "could only be based on the answers given by Mr. Scott...and only then if those answers constituted a confession of 'guilt'." Nor do we find, as Petitioner urges, that the question of guilt revolves around but a statement by the hearing officer as to what the Claimant's work record shows and a question to Claimant as to whether he had a reason for only performing service on 11 of 70 days. The entire transcript, all questions and answers, must be considered as part of any determination, be it by the Carrier, Claimant, the Organization, or this Board.

In regard to Petitioner's protests about Carrier including days of sickness as a part of the charge against Claimant, it is this Board's opinion that Carrier had a right to investigate the basis or reason for Claimant's absences for <u>all</u> days

he had not reported for work. Actually, under certain circumstances it has been held under some arbitration awards that an employee whose genuinely poor health requires excessive absences may be terminated from employment, let alone suspended from service. As stated in one such arbitration award outside this industry:

> "At some point the employer must be able to terminate the services of an employee who is unable to work more than part time, for whatever reason. Efficiency and the ability to compete can hardly be maintained if employees cannot be depended upon to report for work with reasonable regularity. Other arbitrators have so found, and this Arbitrator has upheld terminations in several appropriate cases involving frequent and extended absences due to illness."
> (48 LA 615, 618 - Arbitrator Edwin R. Teple)

And, in the words of another arbitrator:

> "[Grievant's] attendance record is extremely bad. I am satisfied that a great deal of his absence has been due to illness, but no Company is obligated to retain in its employ a man who is prone to illness and accidents that he is compelled to be absent as much as [Grievant] has been. [W]hile genuine illness justifies occasional absences, where an employee is so habitually ill or suffering from injury as to make his services of no value to the Company, the Company is under no obligation to retain him. No Plant can operate profitably unless it can count upon fairly regular attendance of employees. Any situation which results in or tends toward unprofitable operations is against the best interest of not only the Company but of the employees themselves. Employees who attend regularly have their prospects of profitable employment jeopardized by such conditions."
> (9 LA 145 - Arbitrator Whitley P. McCoy)

In this industry, in National Railroad Adjustment Board Award No. 8564 of the Second Division (Referee Vernon), it was held:

> "They argue he can only be charged with being absent without permission. They argue that under Rule 23 the only absences that can count against claimant are those for which he did not have permission. We disagree. It is common and acceptable, unless expressly prohibited by the contract, for a carrier to charge an employee with excessive absences even where some of those absences are excused such as absences due to illness. A carrier in general has the right to expect reasonably regular attendance by its employees. A carrier is not obligated to keep in its employment an employee who cannot effectively work more than part time."

In Award No. 6 of Public Law Board No. 2565 (Referee McMurray), the dismissal of an employee charged with "excessive absenteeism" was upheld, the employee having been charged with being absent 11 days alleged sickness, two days personal business, and 13 days no report, for a total of 26 days during a 90-day period of time, and an additional charge that he had thereafter been absent with no report for another 28 days. In its Findings the Board held:

> "Clearly a Carrier could not condone such a record and operate in an efficient manner..."

As concerns the number of days Claimant was sick in relation to the total number of days he was absent from work, although it is not possible to fix the time of onset of his dental or physical problems, a reasonable assumption is that Claimant's dental problems were disabling for about seven days. However, at the time he was on vacation, and vacation days were not included as a part of the charge. In any event, the record shows he was first examined by his dentist one week after he had last performed service for the Carrier. Then, it was a week later that he had seven teeth extracted. It was seven days after the extractions that he returned to the dentist to have sutures removed. As concerns a separate reported sickness, a physician's note states Claimant was "hospitalized and totally disabled" for the period March 17, 1979 through April 4, 1979. There is nothing in the record to support the contention Claimant had visited or been treated by either his dentist or his doctor prior to or after the above stated periods of time. It would therefore have to be assumed that he was able to work on the dates not covered by the two reports. Further, if indeed Claimant's physical problems were impacting upon an ability to work, it was incumbent upon him to have submitted to Carrier a request for a leave of absence. His failure to request a leave or to produce added documentation as to the reasons he was off militates against the Board absolving Claimant from responsibility on the basis an inability to work was occasioned by a temporary or extenuating physical impairment.

Addressing the Petitioner's comments that "the Board must determine at what point marking off becomes excessive," it is our considered opinion that absent agreed upon or recognized guidelines, the particular facts and circumstances of each given case dictate establishment of such point. A determination must take into account such factors as the number of absences, the reasons for

the absences, the amount of time involved, the burden such absences place on the carrier and fellow employees, the prospects as to future absences, the extent and circumstances to which the absences were excused, previous warnings or discipline directed to improvement in atteandance at work, etc. It is difficult to establish a fixed or generally accepted rule of thumb as to precisely when the "excessive" absence point is reached. In Third Division, NRAB, Award No. 22297 (Referee Yagoda) two days absence without permission was held to be excessive. In Second Division, NRAB, Award No. 6706 (Referee Dolnick) it was held the following constituted excessive absenteeism:

> "Claimant was absent 28 days out of about 80 scheduled working days in less than four months, or about 35% of the time. That is excessive absenteeism under any acceptable definition. Even if he was excused on half of the days, his absence record of 17.5% is also excessive."

In at least one instance that this Board is aware of, AMTRAK, in a well-established company policy and practice, has determined that "excessive absenteeism" is five or more unexcused periods of lost time in a one-month period of time. Under this AMTRAK policy, its employees who are found to be excessively absent are subject to progressive disciplinary penalties, with a verbal warning being given for a first offense and with dismissal from service being called for as concerns a fifth offense of excessive absenteeism. In the instant case, the Carrier has no such expressed policy, and apparently, as do the majority of Carriers, considers each case on its own merit, as this Board is likewise doing in its review of the total record.

Now, as to whether Claimant was placed in a "Catch-22" situation, subjecting himself to discipline by marking off with the express approval of the crew dispatchers, and then being held accountable by the Carrier for his absences. It is well settled that a Carrier has the right to make reasonable rules in the furtherance of the orderly and efficient conduct of its business, so long as such rules are not inconsistent with or in violation of the collectively bargained agreements it has entered into with labor organizations. In this connection, it is obvious that Carrier has a right to make reasonable rules and regulations regarding employee attendance at work. That there may have been considerable laxity by previous supervisors in the enforcement of proper rules governing such a matter cannot be considered to mean or imply that Carrier had given up an inherent managerial responsibility, and that it was prohibited from instituting

changes in the application and enforcement of rules and to take steps to hold employees accountable for absences from work. Even absent explicit or implied rules and regulations on the subject, it has many times been held that an employee has an obligation to report for work with a high degree of regularity. It can hardly be said, therefore, because a more liberal or tolerant past policy had permitted one to mark off with great frequency, that this represents justifiable grounds for continued absences from work where, as here, there was an announced change in policy and sufficient warning of an intent to monitor mark offs as an element of absenteeism had been made known to Claimant.

Accordingly, after giving due consideration to the above as well as to all the facts and circumstances of record, this Board is not persuaded that Carrier acted in an unreasonable and unjustified manner in taking disciplinary action against Claimant in an effort to place him on further notice that it will no longer tolerate excessive absences from work, be they related to mark offs or to other reasons. In reaching this conclusion the Board has carefully considered the role of the crew dispatchers in handling requests of employees to mark off. We do not find, however, under the facts as related to this dispute, that by reason of the crew dispatchers consenting to allow Claimant to mark off at his personal request that Claimant had been caught unaware or that he had been placed in an untenable situation. There was no entrapment. He had been duly warned about his absences, but apparently elected to disregard such warnings. He did so at his peril. Undoubtedly, Carrier could have ordered its crew dispatchers to have denied Claimant the privilege of marking off, and absenting himself from work. No doubt such action by the Carrier would have forced a showdown and a dispute of another nature. However, it is apparent from reading the record that Carrier did not want to handle the situation in that manner. Instead, it elected to make a good faith effort to continue a policy and practice whereby employees who do regularly report for work are accorded <u>reasonable</u> opportunities to mark off from work. As the Carrier had the right to make this determination in an exercise of usual managerial functions, this Board is not constrained to hold Carrier has acted in an arbitrary or capricious manner. Moreover, since we have the same issue, the same parties, the same controlling rules, and much the same it appears by the way of arguments being advanced by the parties on but a new incident, we believe it only proper that the doctrine of stare decisis should prevail. We shall therefore stand by the

decision in Award No. 7 of Public Law Board No. 2549 as the conclusion reached by that Board is reflective of our own views concerning the issue in dispute. We will not unsettle what is already established, principally, that Carrier may properly hold its employees accountable for exececssive abuse of the mark off privilege or what might otherwise be termed excessive absenteeism.

AWARD:

Claim denied.

Robert E. Peterson, Chairman
and Neutral Member

D. E. Bates, Carrier Member

J. R. Wells, Jr., Organization Member

Dissent Attached

Detroit, MI
~~October~~ May 15, 1983

PUBLIC LAW BOARD 2991

UNITED TRANSPORTATION UNION

vs

DETROIT, TOLEDO AND IRONTON RAILROAD COMPANY

EMPLOYEES DISSENT - AWARDS 1, 2, 3, 4, 5, and 6

Each of the cases involved in Awards 1 - 6 are identical in principal and this dissent will serve to express the employees feelings on each of the six awards.

Since its inception, the NRAB and Public Law Boards have consistently ruled that an employee charged with a rule violation should receive a fair and impartial investigation at which time evidence should be presented which supports a finding of guilt before discipline can be properly administrated.

In each of the cases involved in Awards 1 - 6, the Carrier failed on all accounts and the Neutral disregarded his responsibility when he vindicated the Carrier's failure by issuing Awards 1 - 6.

There are many failures on the part of the Carrier in their handling of the cases leading to Awards 1 - 6 as well as the Neutral's rationalization in these awards, but for the sake of brevity the Employees will cover only the most important failures in this dissent.

The Investigation Transcripts will disclose that in each of these investigations only three people attended. Those three people were: (1) The Hearing Officer, (2) The Claimant and (3) The Claimant's Representative.

There were no witnesses present. There was no documentation or records produced. There was no evidence or testimony of wrong doing on the part of claimants introduced. There was no admission of guilt by claimants and in fact claimants denied guilt.

What then was used by the Carrier and UPHELD BY THE NEUTRAL IN AWARDS 1 - 6 to find claimants guilty of a rule violation and to issue a finding of guilt?

A through review of each of the transcripts will reveal the following:

Case No. 1 --- Only two questions pertinent to the charges were asked. The first question was not really a question but was a statement by the Hearing Officer introducing evidence. The second question was a question asking claimant of his familiarity of the rule which he was charged of violating.

Case No. 2 --- Only two questions pertinent to the charges were asked and they were the same as described for case no. 1 above.

Case No. 3 --- The same proceedures were followed in this case as was followed in Cases 1 and 2. For the record let us look at the only evidence introduced by the Carrier which was introduced by the Hearing Officer. This evidence was introduced in the form of a question, as follows:

> Q. Mr Toth, do you take exception to the Carrier's record indicating you only worked 12 days out of 65?

The above was the only "so called" evidence presented by the Carrier and it was introduced by the Hearing Officer

in the form of a question. In each of these investigations the Carrier followed the same pattern.

Case No. 4 --- Carrier followed the same pattern.

Case No. 5 --- Carrier followed the same pattern.

Case No. 6 --- Carrier followed the same pattern.

When we examine each of the transcripts we find that not only did Claimants fail to receive a fair an impartial investigation but also that no evidence of guilt of a rule violation was presented nor did Claimants answer any question in a manner which could be considered as an indication of guilt to a rule violation.

Since the Carrier asked only two pertinent questions in each of these investigations and one of these questions referred only to claimants familiarity of the rule which he was charged of violating, the finding of guilt must have been based on the other question. In each case the other question was similar to that referred to in Case No. 3 above. That question was introduced by the Hearing Officer and consisted of a statement of fact of the Carrier's records, which, incidentally, were never introduced.

Anyone can promptly observe that those questions referred to are not questions at all but are affirmative statements by the Hearing Officers, which violates the principles of due process. As it turns out, these affirmative statements by the Hearing Officers, are the only possible information contained in the Investigation Transcripts which could have been used by the Carrier and the Neutral Member of Public Law Board 2991 to derive any implication of guilt by Claimants.

Where were the witnesses and/or documentation of facts or records? None were produced. Only the self serving affirmative statement of the Hearing Officer was introduced and in each case even that statement was disputed by Claimants.

As for as the Merits of the case in Awards 1 - 6 --- are concerned, the Organization finds Awards 1 - 6 particularly odious. Although neither the Carrier nor the Neutral were specific as to which portion of Rule "O", that in their opinion, Claimants violated, an analysis of Rule "O" finds the following as the only portion which pertains to an employee absenting himself from duty.

Rule "O" -----"They must not absent themselves from duty, exchange duties with, or substitute others in their place, WITHOUT PROPER AUTHORITY, nor engage in other business without permission."

Did claimants absent themselves from duty WITHOUT PROPER AUTHORITY? NO. Claimants did absent themselves from duty but they did so WITH PERMISSION AND APPROVAL OF THE PROPER AUTHORITY.

How then did Claimants violate Rule "O". The answer is simple. CLAIMANTS DID NOT VIOLATE RULE "O".

Finally, the Neutral attempts to justify the Carrier's actions by himself introducing Awards from outside the Railroad industry which denied petitioners. These awards were introduced by the Neutral and not the Carrier. They were from outside the Railroad industry. They quoted no rules or practices and in fact the Neutral only quoted a single paragraph from the findings. Not one of these quotes indicated that the employee was OFF WITH THE PERMISSION OF THE PROPER AUTHORITY as was true in the cases before this Board.

The Carrier introduced only one Award from the Railroad industry which was on point. That Award was issued by a new Neutral serving on only his second Public Law Board ( his first consisting of only five cases). The Neutral accepted this Award as being controlling.

By contrast, the employees introduced several Awards from the Railroad industry, issued by Neutrals with many, many years of experience (such as Preston Moore, David Brown, and Arthur T. Van Wart) which were exactly on point.

We will quote from Award No. 70 of Public Law Board No. 2289 with Arthur T. Van Wart serving as Chairman.

> "The Board further notes that Carrier at all times has control of lay offs. A mark off requires permission. Carrier cannot falsely plead that layoffs are "excessive" if in fact it has control over such layoffs and permits thereof. If men chose to mark off "sick" and such is not true then such mark off was fraudulently gained and they do so at their peril. What constitutes an excessive mark off is a fact best known to Carrier. However, if "mark offs" be excessive then such is because such mark offs took place with permission of Carrier. Carrier cannot shift its responsibility to control "mark offs" of regular men in light of its still existing commitment to the extra man by reason of its bulletin."

The above is directly on point with the cases in Awards 1 - 6.

THIS NEUTRAL DID NOT EVEN COMMENT ON THE MANY "ON POINT" AWARDS INTRODUCED BY THE ORGANIZATION.

The members of this Board and hopefully the members of all such Boards are:

> Firstly, interested in and are earnestly working toward a correct and proper interpretation (application)

of the Agreement Rules involved in each dispute on which a decision is rendered, and -

Secondly, that such decisions may be uniform. This will settle disputes rather than individual claims and/or grievances. Such action will greatly reduce disputes between the carriers and employees and lead to better and more stable labor relations.

Lastly, after all that has been said before, it is an inescapable fact that Claimants, the same as many other employees on this Railroad, marked off WITH PERMISSION AND APPROVAL OF THE PROPER AUTHORITY. By doing so they VIOLATED NO RULES. It was inexcusable for the Carrier to give Claimants permission and approval to be off and then charge Claimants with excessive absenteeism, followed by an improper Investigation and then issue discipline. To apply discipline equally could well result in a shut-down of the Railroad due to a lack of employees.

It is incomprehensible that any NEUTRAL (?) could review the facts of this case as presented at the Board hearing and to then sanction the Carrier's action by issuing Awards 1 -6.

THE EMPLOYEES DISSENT.

J. R. Wells

J. R. Wells
Employee Member, Board 2991

Belleville, Mi.
May 11, 1983

NATIONAL RAILROAD ADJUSTMENT BOARD

THIRD DIVISION

Award Number 24998
Docket Number MS-25208

Paul C. Carter, Referee

PARTIES TO DISPUTE: (Richard Fetzer
(
(Illinois Central Gulf Railroad Company

STATEMENT OF CLAIM: "This is to serve notice, as required by the rules of the National Railroad Adjustment Board, or our intention to file an ex parte submission on May 6, 1983 covering an unadjusted dispute between former employee, Richard Fetzer, and the Illinois Central Gulf Railroad involving the question of whether termination of Mr. Fetzer was the proper disciplinary action taken for his alleged violation of ICG Operating Rules E and H and Train Dispatcher's Rule 3. Specifically, Mr. Fetzer was charged with failing to report information concerning the derailment of an ICG train on September 28, 1982."

OPINION OF BOARD: The record shows that in the early morning of September 28, 1982, Illinois Central Gulf dispatch train GS-2 was moving northbound from Geismar, Louisiana, via Baton Rouge, to St. Louis, Missouri, with 84 loaded cars and 17 empties, pulled by three diesel locomotives. While proceeding through the town of Livingston, Louisiana, at about 40 miles per hour, the 16th through 58th cars derailed at about 5:05 A.M. 27 of the derailed cars contained hazardous commodities. Fires broke out among the derailed cars, and shortly thereafter explosions took place. 14 homes were destroyed or made uninhabitable by the explosions and fires, and about 3,000 residents were evacuated from their homes. The derailment and damage received wide media coverage.

Numerous Federal and State agencies, in addition to the railroad, were involved in containing the fires, explosions and contamination, and investigating the cause of the accident. While devoting all necessary resources to dealing with the derailment, the Carrier began its own investigation of the cause of the accident. Members of the train crew were questioned by Company officials and other agencies, as were numerous other persons, company employes and non-employes. Eventually the direct cause of the derailment was found to be a broken center pin on an empty gondola car, which permitted the rear truck and wheel assembly to come out from under the car and derail over a recently broken joint in the track. A following tank car ran over the truck and wheel assembly, and numerous following cars derailed and turned over. Other aspects, such as alleged alcohol consumption by crew members, the presence of unauthorized personnel in the locomotive cab, alleged excessive speed of the train, and a worn air hose connection were thoroughly investigated.

On October 11, 1982, railroad clerk Janet Byrd, of the Baton Rouge area, admitted to railroad officials that she was on the locomotive from Baton Rouge to Livingston and at the controls of the locomotives when the derailment occurred. Shortly thereafter, the company received information that clerk Byrd had telephoned certain train dispatchers in Chicago shortly after the accident and told them about her presence on the locomotive when the derailment occurred.

EXHIBIT
P

*The record shows that on September 28, 1982, Claimant (Petitioner) was on duty as a train dispatcher until 7:59 A.M. On October 2, 1982, he was informed by another train dispatcher of Byrd's involvement. Claimant contends that knowing of Byrd's reputation of unreliability and tendency to lie, he did not believe the story and forgot about it. On October 20, 1982, Carrier's Director of Police and Special Services had an interview with Claimant. During the interview, Claimant stated that two or three days after the derailment another train dispatcher told him about her conversation with Janet Byrd, who had told the other dispatcher that she (Byrd) was at the controls of the train when the derailment occurred, and that later there was a conversation between Claimant and Byrd about Byrd's involvement, and that on the same day he discussed Byrd's call with other train dispatchers. In the statement given to Carrier's Director of Police and Special Services, the following transpired:*

> *"Q. Do you feel that you should have discussed this matter with any of your supervisors?*
>
> *A. No I don't because I did not believe the story to begin with and I felt that I was doing the right thing. I am not going to go repeating lies."*

*Claimant was suspended from service on October 20, 1982, and on October 21, 1982, was given notice by Carrier's General Superintendent to attend a formal investigation on October 22:*

> *"... for the purpose of determining the facts and your responsibility, if any, in connection with information you had concerning the circumstances involving derailment of Train GS-2 at or near Livingston at approximately 5:05 a.m., September 28, 1982; also to determine if the facts known by you that were under investigation were reported promptly; in addition, to determine if you concealed these facts concerning this incident."*

*By agreement the investigation was postponed and conducted on November 2, 1982, a transcript of which has been made part of the record. The Claimant appeared at the investigation scheduled for November 2, 1982, accompanied by his father, a retired Carrier dispatcher, and also an attorney. Over strong protest, the attorney was not permitted to participate in the investigation as Claimant's representative, or to remain in the hearing room. His father was permitted to represent him.*

*It is well settled that a Claimant's right to representation in an on-property disciplinary hearing arises only from the provisions of the collective bargaining agreement. See Carle vs. Conrail, U.S.D.C., Southern District of New York (February 9, 1977) 94 LRRM 2719; Edwards vs. St. Louis-San Francisco R.R., 361 F. 2d, 946, 954, 62 LRRM 2300, 2305-06 (7th Cir. 1966); and Broady vs. Illinois Central R. Co. 191 F. 2d 73 (7th Circuit 1951) cert. denied 342 U.S. 897, 72 S. Ct. 231, 96 L.Ed. 672 (1951). See also Third Division Awards Nos. 15676, 21228, 18352, Fourth Division Award No. 3134.*

*The collective bargaining agreement is silent, and the Petitioner so agrees, concerning the right of representation in on-property disciplinary hearings. It has been stated repeatedly by awards of all Divisions of the National Railroad Adjustment Board that Carrier's managerial rights are restricted only to the extent that they are limited by the collective bargaining agreement. In Third Division Award No. 10950, it was stated:*

"We thus proceed to a consideration of the claim on its merits. At the outset the Employes advance the novel argument that Carrier has not pointed to any rule or group of rules which permit the action taken by the Carrier in this case. It is sufficient answer to say that the burden is not on the Carrier to show that its action is authorized by some provision of the Agreement. Rather the burden is upon the complaining employes to show that the action taken violates some part of the Agreement. ****"

In Fourth Division Award 733 it was held:

"... Consequently, in all matters that have not been limited by agreement, the Carrier's authority remains unrestricted."

In Second Division Award 3630:

"It is a fundamental principle of the employer-employe relation that the determination of the manner of conducting the business is vested in the employer except as its power of decision has been surrendered by agreement or is limited by law. Contractual surrender in whole or in part of such basic attribute of the managerial function should appear in clear and unmistakable language."

In Second Division Award 8352:

"... The terms of a collective bargaining agreement do not establish an employer's rights, they limit them."

In the absence of a contractual provision permitting outside representatives to attend on-property disciplinary hearings, the Carrier was free to restrict the representation as was done. In the absence of an agreement rule on the subject, this Board cannot find a violation of the Agreement. The Carrier points out that under its policy, Claimant had three options: to be represented by an officer of the Union; to be represented by a fellow dispatcher; or to represent himself.

As to the merits of the dispute, Rule 3 of Rules for Train Dispatchers reads:

"Rules for Train Dispatchers

Rule 3. They must be familiar with all rules, special instructions, bulletin orders, bulletin notices and general orders governing the portion of the railroad they are dispatching and promptly report any violation thereof.

They must also promptly report any irregularities, neglect of duty, disobedience or apparent incompetence of which they have knowledge, defects in engines, cars, tracks, signal and related equipment or failure of trains to move at usual speed and other unusual occurrences must be recorded and promptly reported."

"Operating Rules

Rule E. Employees must assist each other in complying with the rules and special instructions. Any violation of rules or special instructions must be reported to their immediate supervisor."

"Rule H. Dishonesty, desertion from duty, insubordination, willful neglect, gross carelessness, making false reports or statements, concealing facts concerning matters under investigation, immoral character or serious violation of the law, are prohibited.

Employes are forbidden to make unauthorized charges for service performed in line of duty."

In the investigation, the statement that Claimant had given to Carrier's Director of Police and Special Services, on October 20, 1982, was read and admitted without protest. Claimant admitted that on September 30 or October 1, 1982, he discussed the Byrd incident with other dispatchers; that he had a conversation with Byrd on Wednesday night or Thursday morning, the 14th, and admitted that he did not inform his supervisors of the information he had received about Byrd, even though he did discuss it with other dispatchers.

On November 11, 1982, Claimant was notified of his dismissal from the service for violation of Train Dispatchers' Rule 3, and Operating Rules E and H, heretofore quoted. There was substantial evidence in support of the charge and to justify dismissal. The Claimant most certainly should have passed on to his supervisors any information that he had received involving the serious derailment. Whether he believed the information is immaterial. As it eventually turned out, the information that he had received was correct. Claimant's action in not reporting the information to his supervisors amounted to disloyalty to the Carrier. Any case involving disloyalty has always been considered extremely serious, justifying dismissal. See N.R.L.B. vs. Local Union No. 1229, I.B.E.W. (364 U.S. 464); also Third Division Awards Nos. 18363, 19811, 10930, 15932, 24761 and 24766.

The argument raised on behalf of Claimant that the rules involved provide no penalty for violation, simply is not persuasive. The Carrier has a right to issue such rules as it sees fit for the government of its employes, except to the extent limited by Agreement, and has the right to expect such rules to be complied with. The complaint is also made that Rule H is ambiguous in defining what constitutes "information" and what "concealing" means. We think that anyone qualified for the responsible position of train dispatcher knows, or at least should know the meaning of "information" and "concealing" as used in the rule.

For the reasons stated herein, the claim will be denied.

The record also shows that Claimant was dismissed for another offense, handled under a separate investigation, which case was not timely appealed on the property. This in itself would be proper grounds for dismissal of our present dispute (MS-25208), but in view of the serious issues involved, we have decided the case on its merits.

FINDINGS: The Third Division of the Adjustment Board, upon the whole record and all the evidence, finds and holds:

That the parties waived oral hearing;

That the Carrier and the Employes involved in this dispute are respectively Carrier and Employes within the meaning of the Railway Labor Act, as approved June 21, 1934;

That this Division of the Adjustment Board has jurisdiction over the dispute involved herein; and

That the Agreement was not violated.

A W A R D

Claim denied.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of Third Division

ATTEST: Nancy J. Dever - Executive Secretary

Dted at Chicago, Illinois, this 26th day of September 1984.

NATIONAL RAILROAD ADJUSTMENT BOARD

THIRD DIVISION

Award Number 23133
Docket Number SG-22852

Martin F. Scheinman, Referee

PARTIES TO DISPUTE: (Brotherhood of Railroad Signalmen
(
(Southern Railway Company

STATEMENT OF CLAIM: "Claim of the General Committee of the Brotherhood of Railroad Signalmen on the Southern Railway Company et al.:

In behalf of System Signal Gang #1: Foreman R. L. Price; Leading Signalman J. G. Taylor; Signalmen L. B. Mills, J. E. Hidel, S. M. Brown and R. J. Burchfield; Assistant Signalmen R. W. Wiley and M. A. Ellery; for thirty (30) hours overtime each because they were not allowed to work December 10, 11 and 12, 1977, when Carrier arbitrarily changed their work period while on the same project." (General Chairman file: SR-17. Carrier file: SG-302)

OPINION OF BOARD: Pursuant to Rule 9 of the applicable Signalman's Agreement the normal work week for employes assigned to Signal System Gangs consists of four 10-hour days. During Fall, 1977, the work schedule of System Signal Gang #1 consisted of eight ten-hour days with six days off. This variance from the normal work week was properly established by Carrier with the concurrence of the majority of the employes in the gang pursuant to Rule 9(b)(1).

Effective December 6th, 1977, Carrier required the employes to revert back to the normal work week. This change from an eight day work period to a four day work period was without concurrence of the Organization or the majority of the employes in the gang.

The Organization's central argument is that Carrier's action violated the Rule 9 of the Agreement. It claims that once an alternative work period is established Carrier may not change the work period of the System Gang unless requested in writing to do so by the General Chairman. In the Organization's view, any changes after work periods have been agreed to whether they be to the normal work week or to any other of the options listed in Rule 9, can only be done upon written notice from the General Chairman.

EXHIBIT
Q

Carrier, on the other hand, insists that the change in work period was proper. It asserts that there is nothing in the Agreement restricting it from reverting to the normal work week.

Resolution of the issue raised here requires an interpretation of Rule 9. It states:

> "Rule 9. (1) Except as provided in paragraph (b) hereof, the normal work week of employees assigned to System Signal Gangs shall consist of four 10 hour days.
>
> (b) At Carrier's option, with concurrence of a majority of employees assigned to the System Signal Gang involved, off days for employees of a System Signal Gang will be accumulated according to one of the following choices while working at a given work project.
>
> (1) A fourteen day work period consisting of ten working days of eight hours each and four days off, or eight working days of ten hours each and six off days.
>
> (2) A twenty-one day work period consisting of fifteen working days of eight hours each and six off days, or twelve working days of ten hours each and nine days off.
>
> (3) A twenty-eight day work period consisting of twenty working days of eight hours each and eight days off, or sixteen working days of ten hours each and twelve days off.
>
> Thereafter, any change in the selection of the work period by the employees while at such given work project shall only be made by written notice from the General Chairman. The Carrier shall not be put to any additional expense because of a change in the work periods; however, the Carrier will make whole any employee who, when the gang first commences operation, or an employee first accepts assignment to a position on the System Signal Gang, is required to observe off days without having an opportunity to perform services on all of the working days in the work period."

The first paragraph of Rule 9 establishes the normal work week: "four 10 hour days". Paragraph (b) states that Carrier, with the concurrence of the employes in the Gang, may provide for the accumulation of off days. 9(b)(1) - 9(b)(3) sets forth the possible alternate work periods - fourteen days, twenty-one days or twenty-eight days.

The final paragraph of Rule 9 addresses the issue of how the employes might secure a change from one of the alternate work periods selected. While at the same work location any change on the selection of the work period by the employes requires written notice by the General Chairman. That is, unlike establishing an alternate work period which required the concurrence of the majority of employes in the gang, a change from such alternate period requires the General Chairman's involvement.. The employes in the gang may not on their own petition the Carrier for a change. Only the General Chairman may speak for the employes.

Thus, the last paragraph of Rule 9 addresses changes from the alternate work period sought by the employes. It does not, in any way, address the situation here - Carrier wanting a change from an alternate work period.

In sum, Rule 9 cannot be construed as preventing or limiting Carrier from changing from an alternate work period. Neither the language of Rule 9 or any other language in the System Agreement can be interpreted to preclude a change to the normal work week initiated by Carrier.

Given the absence of any specific restriction, Carrier was free, under well established labor relations principles, to implement the change back to the normal work week. The Organization's agreement was not required. After all, it is axiomatic that Carrier retains all managerial prerogatives not relinquished by the Rules Agreements. See Awards 8218, 14869, 16458, 19596. Therefore, we will deny the claim in its entirety.

FINDINGS: The Third Division of the Adjustment Board, after giving the parties to this dispute due notice of hearing thereon, and upon the whole record and all the evidence, finds and holds:

That the Carrier and the Employes involved in this dispute are respectively Carrier and Employes within the meaning of the Railway Labor Act, as approved June 21, 1934;

That this Division of the Adjustment Board has jurisdiction over the dispute involved herein; and

That the Agreement was not violated.

A W A R D

Claim denied.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of Third Division

ATTEST: A.W. Paulos
Executive Secretary

Dated at Chicago, Illinois, this 15th day of January 1981.





SALVATORE MACEDONIO
*Assistant Vice President*
*Labor Relations*

**BNSF RAILWAY COMPANY**
P.O. Box 961030
Ft. Worth, Texas 76161-0030

2600 Lou Menk Drive
Ft. Worth, Texas 76131-2830
Phone (817) 352-2502
Fax (817) 352-7319
E-mail sam.macedonio@bnsf.com

January 17, 2022

Mr. Dennis R. Pierce
BLET National President
7061 East Pleasant Valley Road
Independence, Ohio 444131

**VIA ELECTRONIC MAIL**

Re: Re: Hi-Viz Attendance Policy Offer of Arbitration

Mr. Pierce,

I have reviewed the recent correspondence from your organization regarding the new Hi-Viz attendance policy, as well as the public statements published by the unions about this matter. As you might expect, we disagree that this matter involves a "unilateral change" or "major dispute," and instead believe that it is a straightforward minor dispute subject to the routine procedures for resolution under Section 3 of the Railway Labor Act. To avoid any doubt, please note that BNSF stands ready to arbitrate, in the normal course, any claims filed in connection with the Hi-Viz attendance policy. If you would like to discuss further, please let me know.

Sincerely,

Salvatore Macedonio

Cc: Rob Karov, BNSF Vice President Labor Relations
David Pryor, BNSF Senior General Attorney
Rob Cunningham, BLET General Chairperson
Troy Martin, BLET General Chairperson
Kent Psota, BLET General Chairperson
Jeff Thurman, BLET General Chairperson

EXHIBIT
R



SALVATORE MACEDONIO
*Assistant Vice President*
*Labor Relations*

**BNSF RAILWAY COMPANY**
P.O. Box 961030
Ft. Worth, Texas 76161-0030

2600 Lou Menk Drive
Ft. Worth, Texas 76131-2830
Phone (817) 352-2502
Fax (817) 352-7319
E-mail sam.macedonio@bnsf.com

January 17, 2022

Mr. Jeremy Ferguson
SMART-TD President
24950 Country Club Blvd Ste 340
North Olmsted, Ohio 44070-5333

**VIA ELECTRONIC MAIL**

Re: Hi-Viz Attendance Policy Offer of Arbitration

Mr. Ferguson,

I have reviewed the recent correspondence from your organization regarding the new Hi-Viz attendance policy, as well as the public statements published by the unions about this matter. As you might expect, we disagree that this matter involves a "unilateral change" or "major dispute," and instead believe that it is a straightforward minor dispute subject to the routine procedures for resolution under Section 3 of the Railway Labor Act. To avoid any doubt, please note that BNSF stands ready to arbitrate, in the normal course, any claims filed in connection with the Hi-Viz attendance policy. If you would like to discuss further, please let me know.

Sincerely,

Salvatore Macedonio

Cc: Rob Karov, BNSF Vice President Labor Relations
David Pryor, BNSF Senior General Attorney
Scott Swiatek, SMART-TD General Chairperson
J. Mike LaPresta, SMART-TD General Chairperson
Johnny Martinez, Jr., SMART-TD General Chairperson
Justin Schrock, SMART-TD General Chairperson
Matthew Burkart, SMART-TD General Chairperson
Larry Miller, SMART-TD General Chairperson

EXHIBIT
S

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION,<br><br>BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-83-M |

**DECLARATION OF SALVATORE MACEDONIO**

I, Salvatore Macedonio, hereby declare as follows:

1. I submit this declaration based on my personal knowledge and documents that BNSF Railway Company ("BNSF") maintains in the regular course of business. The purpose of this Declaration is to support BNSF's motion for a preliminary injunction filed in the above-captioned matter.

2. I am currently employed as Assistant Vice President, Labor Relations at BNSF. I have held this position for the past three years. I am responsible for managing all aspects of labor relations with the Unions that represent BNSF's "operating" employees, *i.e.*, the conductors and engineers who crew the trains. That includes engaging in collective bargaining as well as managing arbitrations and other aspects of dispute resolution. I also assist with

EXHIBIT
2

drafting employee policies and implementing policies and procedures concerning employee conduct, discipline, and attendance.

3. I am familiar with the details of the current dispute between BNSF and the Unions over BNSF's implementation of the Hi Viz Attendance Policy. I have been involved in communicating the attendance policy and responding to objections raised by the Unions and our employees.

4. For over twenty years, BNSF has unilaterally imposed attendance policies without bargaining with the Unions. In many cases, we did so without objection from the Unions. To the extent the Unions have objected to previous changes in attendance policies, those objections have been resolved through arbitration pursuant to Section 3 of the Railway Labor Act.

5. The specifics of BNSF's long practice of implementing, modifying, and enforcing attendance standards are addressed in detail in the declaration of my colleague Andrea Smith. I have personally been involved in several instances of modifying attendance standards (and related disciplinary procedures). My experience primarily has involved the Attendance Guidelines (ATG), which BNSF unilaterally adopted in 2000 (replacing an earlier attendance policy). The ATG is supplemented by related but separate processes, policies and guidelines, such as the "low performance" process, which provides that even if an employee is technically in compliance with the ATG, he or she can still be subject to discipline if the employee's "starts" are extraordinarily low compared to their peers. We have modified the ATG and these related attendance processes, policies and guidelines several times during my tenure at BNSF, and in each case have done so unilaterally.

6. For example, in 2019, BNSF added a new attendance standard for high-impact days when it is particularly difficult to staff trains. An employee could be in compliance with the

ATG and the related low performance process, but if they laid off on a majority of the 14 identified high-impact days—when employee availability has historically been very low and affects our ability to staff train trains across the network—the employee could still be subject to progressive discipline. BNSF implemented that attendance standard unilaterally.

7. Another recent example of unilateral changes in attendance management is our handling of "4/2 work/rest pools," which are groups of employees that staff trains on a rotating basis with defined work and rest days. We created a new handling for these pools which restricted layoffs (i.e. employee absences) to 2 weekdays and 1 weekend day per month, with further restrictions on laying off in conjunction with an assigned rest day. We did so unilaterally and without formal claims from the Unions.

8. On January 10, 2022, BNSF announced a new attendance program—the Hi Viz program—to replace the ATG, effective February 1, 2022. The Hi Viz policy is intended to replace the patchwork of unilaterally imposed policies and processes discussed above with one comprehensive attendance program. In other words, Hi Viz is not so much a change to current attendance standards as it is a codification and restatement of our existing standards. Employees are not being asked to work more (or conversely, take less time off) than in the past. Rather, we are simply making the various attendance rules more transparent and easy to apply.

9. Over the years, numerous employees have expressed that, under the ATG, it was often difficult to know when exactly they would exceed the ATG "threshold" and thus be potentially subject to discipline. They also complained that it was difficult or impossible to project how much they would be working in future months, which further increased the uncertainty as to whether or when an employee might be subject to discipline.

10.      As a result, BNSF developed Hi Viz—an attendance program assigning varying "points" to different types of absences (weekday, weekend, high impact day, a missed call, etc.) and triggering progressive discipline if an employee's points go to zero.  The program is "Hi Viz" because it has a dashboard where employees can easily check their current point total and see how particular events increased or decreased that total.  In addition, the Hi Viz policy uses a point system to address all of the different types of attendance policies (i.e., low performance standards, high-impact days) under one program.

11.      Under Hi Viz, employees start with 30 points and are subject to point deductions based on types of service and the day the event began.  Unavailable time is measured in 24-hour increments.  Each time an employee exhausts his or her points—each time the employee's balance reaches or falls below zero—the employee is subject to discipline and the point total is reset to 15.  The progression of discipline is the same as under the previous attendance policy—i.e., employees are subject to a 10-day suspension, 20-day suspension, and then dismissal.  If an employee remains discipline free for 24 months under Hi Viz, then the discipline progression is reset.  Following such a reset, the discipline issued for an infraction would accordingly be a 10-day suspension.  Ex. A.

12.      Hi Viz expands and refines a fundamental concept embedded in both ATG and hi impact: assigning different values to absences based on historical levels of availability. ATG assigns more "value" to unavailability on a weekend day versus a weekday. High impact assigns more "value" to unavailability on one of the 14 listed days, versus the rest of the calendar year.

13.      Under Hi Viz, an employee is awarded a Good Attendance Credit—adding four points to the employee's total—for any 14-day period the employee is available for work (with

limited exceptions). The Good Attendance Credit was not available under the ATG or other previous policies.

14. In response to BNSF's announcement of the new attendance program, the Unions have taken the position that the railroad is engaged in a so-called "unilateral change" of agreements in violation of Section 2 Seventh of the RLA, which the Unions refer to as a "major dispute." The Unions have various objections, which they have set forth in letters requesting strike authority. *See* Ex. B and Ex. C.

15. There is no merit to their objections. For example, the Unions claim that Hi Viz hurts local union officers because those officers must, from time to time, layoff for "union business," such as representing employees at investigations. However, under the Hi Viz policy, BNSF does not treat time marked off for union business any differently than it treated such time under the ATG—employees do not lose points when they are unavailable due to legitimate union business. Union officers who are, for example, laying off to assist in their co-workers' disciplinary hearings are not penalized in any way for doing so.

16. To be sure, the Hi Viz policy does incorporate the Good Attendance Credit described above, which employees cannot earn unless they have a 14-day period without an unavailable event. The Unions argue that local officers' need to layoff for union business could preclude them from having 14-day periods without unavailable events, and thus make it more difficult for them to earn back points via the Good Attendance Credit. But in this respect, unavailability due to union business is treated the same as virtually all other forms of legitimate leave, including personal leave, vacations, and FMLA. Employees are not penalized for using any of these forms of leave; they just don't earn credits when they do so. (The only exceptions are limited to military leave and work-related leaves such as time off for engineer training.)

Moreover, there is, once again, no practical difference in this respect between Hi Viz and the ATG. The ATG had no good attendance credit at all, and so local officers have not lost some mechanism that they once had for remedying attendance problems.

17. Accordingly, the claim that local officers might or could be subject to discipline under Hi Viz is entirely speculative. BNSF tested the application of Hi Viz on this point by examining the five highest "union business" users in 2021, individuals whose layoffs for union business ranged from 155 to 250 days. If Hi Viz had been applied to them, none would have exhausted their points (and three of them would still have a perfect 30 points). Ex. D. The Unions cannot point to a single local officer who would have been treated worse under Hi Viz than under ATG.

18. Furthermore, and in any event, Hi Viz and ATG both incorporate another safeguard on this point. Under ATG, BNSF routinely exercised discretion to avoid disciplining local union officers who would otherwise have been deemed to be in violation of the attendance policy. That remains the case under Hi Viz. If an employee who frequently engages in union business uses all of his or her 30 points and is precluded from earning points back via the Good Attendance Credit solely by his or her exercise of legitimate union business layoffs, BNSF retains discretion to not assess penalties.

19. Aside from arguing that the Hi Viz policy will negatively affect local union officers, BLET also claims the policy "stands to take away any ability by the employees to avoid working fatigued when they are routinely called without warning due to the complete lack of reliable train lineups, thus creating the potential for an even more unsafe railroad operation." Ex. E.

20. That is not accurate, for several reasons. First and foremost, the Hi Viz policy is fully compliant with the Railroad Safety Improvement Act ("RSIA"). The RSIA sets very specific rest standards for railroad workers (including daily, weekly and monthly limits on hours of service) and BNSF complies with all of them. The Hi Viz policy does not purport to alter any of these standards.

21. Beyond the RSIA, at least 41 train-service pools have earned rest or predictive work schedules. Earned rest and predictive work schedules are ones in which employees have more notice about when they will need to work and can accordingly better ensure they are rested when they need to report for duty. In bargaining discussions with the Unions, BNSF has regularly offered to implement more earned rest schedules, but the Unions have generally said no.

22. Moreover, and in any event, the Unions' complaints about "fatigue" are not supported by the data. The vast majority of train service employees do not work anywhere near the hours of service limits set by the RSIA. There is no proof that employees are routinely required to work when fatigued due to the requirements of service.

23. On January 11, 2022, SMART TD's BNSF General Chairmen formally asked their President, Jeremy Ferguson, to authorize strike authority over the February 1 implementation of Hi Viz. Ex. B.

24. On January 12, 2022, BLET President Dennis Pierce directed his BNSF General Chairmen to poll their memberships to "withdraw service" (that is, strike) over the February 1 implementation of Hi Viz. Ex. E.

25. On information and belief, the Unions have or will soon vote to authorize self-help in response to the requests outlined above. Once a strike is authorized, the Unions' practice in these circumstances has been to initiate a strike without warning.

26. A strike could occur at any time prior to or after implementation of the new attendance program on February 1, 2022. Indeed, BNSF has been hearing credible information about self-help activity (such as a sick-out or slowdown) starting as early as January 26. This is, no doubt, in direct response to the Unions' unprecedented action in publicly calling for strike authority. In all of my years of experience in railroad labor relations, I have never before seen such an effort to foment employee anger and encourage use of self-help in response to a dispute over the extent of the railroad's contractual rights to manage attendance. By publicly calling for strike authority, the Unions have created a real risk of immediate illegal activity, and have a responsibility to put a stop to the problem they have created.

27. A strike (or form of self-help such as a slowdown or sickout) by the Unions would threaten to inflict massive, immediate, and irreparable harm on BNSF and the members of the public that depend on safe and effective rail transportation.

28. BNSF is the nation's largest freight railroad by number of cars moved annually. It has more than 30,000 employees and operates over more than 30,000 miles of track, in twenty-eight different states, including Texas. BNSF serves thousands of industrial and commercial customers, dozens of whom have no other access to rail transportation, and provides a crucial link between a number of country's other major freight carriers, which in turn transport cargo throughout the United States and into Canada and Mexico. Any disruption of BNSF's operations would therefore have a serious impact on interstate and international commerce.

29. BNSF interchanges with all of the other Class I freight railroads in the United States. Together, BNSF and these other major railroads move millions of cars containing freight that is vital to the national economy and the health and safety of the American public. The Department of Homeland Security has declared that this freight rail network is a "critical infrastructure," which is defined as "assets, systems, and networks, whether physical or virtual, so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, public health or safety, or any combination thereof." *See* 42 U.S.C. § 5195c(e).

30. BNSF's system relies on constant and timely movement of trains. Accordingly, sudden disruptions resulting from lack of crews have devastating consequences. Delays resulting from disruptions at isolated points on the BNSF network will quickly ripple across the entire system, causing increasing congestion, missed connections, delays in delivery of freight as required by shippers and their contracts with the railroads, and other disruptions that can take days or weeks to remedy. As a result, BNSF will be deprived of its revenues, tracks, and facilities, and will be unable to fulfill its "common carrier" obligations.

31. Because BNSF provides transportation services rather than tangible products, it has no way to generate a surplus inventory to carry it through the period of service disruptions threatened by the Unions' conduct. The lost opportunities for BNSF are, therefore, truly irreparable. In addition, significant delays in shipments undermine BNSF's relationships with its customers, causing a loss of goodwill that may never be repaired, as future traffic moves to other modes of transportation.

32. In addition, because BNSF interchanges with the other major freight railroads, disruptions at certain points on BNSF's system will impact the other railroads, causing further

delays and disruptions across the country in both freight and passenger rail. Congestion and delays on BNSF's lines directly affect, for example, commuter rail traffic in and around Chicago. Such delays also impact Amtrak.

33. The ripple effects of delays in BNSF's network also cause substantial and irreparable harm to its customers and the public at large. Many manufacturers served by BNSF rely on "just-in-time" delivery of parts and supplies, and so would be forced to idle their plants if service is disrupted. If there is a disruption in BNSF's services, power plants across the country would quickly run low on coal, risking disruption of electrical service to millions of people. The same is true with respect to city water suppliers that depend on timely delivery by rail of chemicals for water treatment.

34. The supply chain in the United States is already strained. Even a short term shutdown of the BNSF rail network in the next few weeks would risk significant disruption in delivery of consumer goods, food, and fuel for millions of Americans.

35. Moreover, rail is the safest form of surface transportation. With respect to fatalities, railroads are roughly 8 times safer than trucking measured on a ton-mile-moved basis. And with respect to serious hazardous-material releases, a truck is roughly five times more likely to be involved in such an incident on a ton-mile-moved basis. To the extent this dispute causes service disruptions and shippers shift some portion of rail traffic to truck alternatives, public safety would decrease based on such changes in the mode of transportation.

36. Accordingly, the threatened disruptions risk interference with the nationwide transportation in interstate commerce of freight and personnel essential to the public health and safety, and the nation's economic health, thereby inflicting irreparable harm on BNSF, its

employees, shippers and commuters, other railroads and their employees and shippers, and the public generally.

37. In short, a strike by the Unions would irreparably injure both the carrier and its employees, as well as the public generally, by interfering with the interstate commerce of passengers, mail, military personnel and material, food, fuel, and other freight and personnel essential to the public health and safety.

38. Because of the scope of BNSF's operations, even a partial or temporary shutdown would have a drastic impact on large segments of the public and the national economy. Thus, any strike or other self-help has the potential to interfere with the nationwide transportation in interstate and international commerce.

39. Whereas allowing the Unions to engage in self-help could and would irreparably harm BNSF and others, granting the injunctive relief requested would not injure them. It would simply require the Unions to arbitrate this dispute, as the RLA mandates.

40. For all of these reasons, BNSF needs immediate judicial relief to stop self-help activity pending a hearing on the merits of this case.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 18, 2022.

Salvatore Macedonio
Assistant V.P., Labor Relations

**Effective February 1, 2022**

BNSF System General Notice No. 46 (TY&E Failure to Take Notification) 156 (TYE Earned Rest), 208 (Guidelines for TYE and Yardmaster Attendance) and 223 (TY&E Time Off) are canceled.

**********************************************

**BNSF Hi-Viz Guidelines for TYE and Yardmasters**

Hi-Viz Guidelines is a tally system that:

- Sets a clear standard for full-time employment
- Allows employees to easily, accurately, and contemporaneously determine where they stand in comparison to BNSF's attendance standard
- Provides employees with an opportunity to improve their standing through regular/steady attendance

**1. Assessment of Points**

Subject to the Point Schedule below, employees begin with 30 points and points are deducted for various incidents of non-attendance including both full and/or partial day absences.

a) Point deductions are determined based on the type of service the employee is in at the time of the unavailable event.

b) Unavailable time is associated with the day the event began.

c) Unavailable time is measured in 24-hour increments.

d) High Impact Day (HID) point values apply if:

  - For unassigned service: The unavailable event occurs on the day of the HID, or the unavailable event occurs prior to the HID and employee is not marked up by 0600 on the HID.
  - For assigned service: The employee misses their assigned shift on the HID.

e) Any unavailable event that immediately (not separated by a work event) precedes or follows a VAC, PLD, UNB, SRS, FML, CLD event will be charged an additional 2 points for Unassigned Service and an additional 3 points for Assigned Service regardless of day of week. This is referred to a Conjunction Penalty.

EXHIBIT
A

- EMC/LOC/NOS are the exception; they will continue to be charged according to Point Schedule

f) Handling results each time the employee exhausts their points.

g) Each employee has electronic access to their point record.

- Any addition or deduction in points is reflected in this record.

**Point Schedule**

| Incident | Unassigned Service Point Value | | | | Assigned Service Point Value | |
|---|---|---|---|---|---|---|
| | M-TH | FR-SA | SU | HID | MO-SU | HID |
| NOS (No Show) | -20 | -20 | -20 | -25 | -20 | -25 |
| EMC (Missed Call) / LOC (Layoff on Call) | -15 | -15 | -15 | -20 | -15 | -20 |
| Unavailable Event | -2 | -4 | -3 | -7 | -7 | -10 |

Unavailable Events include: **LOS** (Sick), **LOP** (Personal Business), **SIF** (Sickness in Family), **FEM** (Family Emergency), **LOF** (Fatigue), **LXU** (Failure to take Notification), **LFT** (Failure to Tie Up), **LOA** (Layoff Active Board / Away Terminal or After Start of Shift), **LOD** (Layoff Dressed & Ready to Work)

**2. Good Attendance Credits**

a) An employee is awarded a Good Attendance Credit – worth 4 points – for any 14-day period they work without an unavailable event and in which they are not otherwise absent from work. Example: An employee remains available between March 1 and March 14, they will receive a Good Attendance Credit on March 15. If they continue to remain available between March 15 through March 28, they would earn another credit on March 29.

b) Good Attendance Credits are earned for any 14-day period if the employee:

i. Has no Unavailable events, NOS, EMC, or LOC.

ii. Has not otherwise been absent for any reason, apart from:
Training/Rules (CBT/RUL/LAH/ERC/DRT/CRN)
LET (Engineer Training)
LIT (working lite Duty)
Company business (LCB)
Military Leave/NGD with supporting LES and/or orders

iii. Has no absences/leave other than those listed in 2.b.ii (e.g. does not have DIF, FML/PFM, FUR, LAM, LOJ, MED, MEV, LOI, HFS, LAB, R79, PLD, SUA/SUT, UNB, VAC, etc.).

iv. Has no bump board time > 2 hours after taking notification.

c) An employee's point total cannot be greater than 30.

**3. Discipline (10-day, 20-day and Dismissal)**

a) The first 2 times an employee exhausts their points (balance reaches or falls below zero), they are subject to discipline.

b) The third time an employee exhausts their points, they are subject to Dismissal.

c) Following 10-day and 20-day discipline, the employee's point total will be reset at 15.

d) If an employee remains Hi-Viz discipline free for 24 months, then Hi-Viz progression is reset. Therefore, the next infraction will be a 10-day suspension.

e) Maintaining a positive point balance does not preclude the company from challenging an employee's full-time status requirement based on another reasonable standard.

**4. Initial Placement in Discipline Process**

Employees with active discipline for BNSF Attendance Guidelines at the time of the cut-over to the new Hi-Viz Guidelines will be considered to have already received the equivalent Discipline Step.

Hi-Viz Guidelines are not intended to assess points for use of any legally protected leaves such as FMLA (Family and Medical Leave Act) or other leave of absences that are properly certified and/or documented. But as noted above, there are only 6 types of absence that allow for the good attendance credit referenced in Section 2 above.

BNSF leadership should consider all relevant information when using the Guidelines. In every case, they should apply the Guidelines with consistency and common sense.

**NOTE: Being unaware of your point total is not an excuse for exhausting your points.**

**TYE Time Off**

*************************************************************

Table of Contents

A. Laying Off on Call
B. Emergency Lay Off
C. Bereavement Leave and DIF Layoff Codes
D. Pre-Approved Lay Off System
E. Lay Off Process for Military Personnel
F. Jury Duty
G. Lay Off Fatigue
H. Lay Off/Mark Up for Outlying Assignments
I. High-Impact Days
J. Failure to Take Notification

=============================================================

**A. Laying Off on Call**

Employees MUST NOT lay off on call. For employees in planner-activated pools, a layoff while on the active board will be considered as laying off on call.

=============================================================

**B. Emergency Lay Off**

Lay off code “FEM,” Family Emergency, is defined as a lay off code for an emergency involving an employee or their family. An “emergency” under this code is an unforeseen circumstance that requires immediate action and is of such seriousness and magnitude that the employee must immediately absent themself from duty and no other layoff code governs the situation, e.g. DIF, LOS, SIF, etc. Employees must use the layoff code that most appropriately describes the reason for the absence and may not use “FEM” as an excuse to be absent from duty for reasons other than those that can accurately be described as an emergency. Use of code “FEM” will be closely monitored.

Once granted authorization for layoff code “FEM,” the employee must contact their supervisor within 24 hours to provide reason for the FEM. Misuse will result in corrective action against the offender and review of the code “FEM” as an unrestricted emergency code.

=============================================================



**C. Bereavement Leave and DIF Layoff Codes**

Train, yard and engine employees who unfortunately suffer the loss of a family member covered by Bereavement Pay agreements can use the layoff code DIF (Death in Family) in the Workforce System to mark off. Employees will be automatically marked up from DIF at the expiration of the approved time off.

Family members who are covered by all the Bereavement Pay agreements include brother, sister, parent, child (including a legally adopted child), spouse and spouse's parents. Based on the location and craft of the employee's current assignment, additional family members covered may include grandchildren, half and stepbrothers, sisters and stepchildren. Refer to the agreement covering the employee's area or visit the Labor Relations' website under the TYE Payroll Services link.

The Bereavement Pay agreements provide for 3-day's pay at the agreed to pay rate. The employee need not have stood for work on 1 or more of the days to receive payment, and all 3 days qualified for bereavement pay will not count as an absence under the Hi-Viz Guidelines.

Employees claiming bereavement leave should use CA Code 05 on a special claim and send the obituary notice with the special claim ticket number to TYE Payroll Services via email at FINDLTYEBereavementPay@BNSF.com or fax to 785-676-5186 or 8-676-5186.

BNSF understands a person may lose a family member not covered by the Bereavement Pay agreements. The DIF code should not be used in these cases, but the code FEM (Family Emergency) is available for immediate layoffs. Documentation must be maintained that explains the absence in the event the employee is required to provide the information to their supervisor. The supervisor may also help schedule additional time off through use of alternate codes such as LOP (Layoff Personal), PLD (Personal Leave Day), or a Leave of Absence if applicable.

Employees who lay off DIF, but do not send the supporting documentation to TYE Payroll Services will be considered unavailable for duty and handled in accordance with the Hi-Viz Guidelines.

==============================================================

**D. Pre-Approved Lay Off System**

The following enhancements have been made to the pre-approved lay off system. The supervisor should be contacted if there are any questions.

- In the 30-day period between day 90 and day 60, BNSF will accept and hold all requests for PLD and SDV only. On the 60th day prior to the layoff date TSS will distribute the allocation of days according to seniority.

- Requests 60 days in advance and less, employees can be approved for up to four unpaid personal days (identified by layoff code LOP). Employees are still able to request all of their PLD and SDV days. When calculating LOP days, any portion of a calendar day is considered one day.

- Once approved, individuals can move an LOP, SDV, or PLD up or back one calendar day. The employee can request this change of start day within 48 hours of requested start time.

- Employees may request a single day of vacation or a personal leave day between 60 and 90 days in advance of the day it would be taken. For example, on September 8, an employee could request a day off that he/she plans to take November 7. The employee will be able to check if the request has been approved 60 days in advance or at 0001 September 9. Employees can request as many vacation or personal leave days they have currently available to them.

Bidding process and sliding process

Employees can enter a pre-approval layoff request for a single day or multiple days. If a multiple day request is entered, the request cannot be submitted until the whole request is within the request window. None of the days will be considered for approval until the entire request is within the approval window as the program will not address (approve/deny) until of the last calendar day of the multi-day request.

Employees desiring high demand days off are encouraged to enter their requests one day at a time so that each day will be considered as it reaches the approval date. For example, an employee makes a three-day request for PLD. All 3 days have to be within the 90-day window before the request can be entered into the system.

At 60 days prior to day one of the request, the first day of the request will not be considered for approval because portions of a three-day request cannot be approved. All 3 days of the request must be within the 60-day window for any of it to be considered Entering single days at a time eliminates the possibility of an allocation being full before a multiple day request will be taken into consideration.

Assigned employees cannot slide their requests as they already have assigned rest days. The slide function was designed for unassigned service where start times are not known in advance.

==============================================================

**E. Lay Off Process for Military Personnel**

Two distinct lay off codes have been established which apply to military service. It is important to use the appropriate lay off code to distinguish between these two types of military service, as these codes ultimately drive benefit and pay eligibility.

**NGD** = This code should be used only for National Guard, Drill, Training or State Emergencies.

Note: NGD leaves greater than 10 days must be covered by a leave of absence.

**MLV** = This code should be used for all other military service including:
Global War on Terror (Operation Iraqi Freedom, Operation Noble Eagle and Operation Enduring Freedom), enlistment into the military, or any other military service or training (other than National Guard).

Note: Military leaves greater than 10 days must be covered by a leave of absence.

<u>Benefit Coverage</u>

Employees who wish to retain coverage under the BNSF program while on leave will continue to pay the monthly contribution. Contribution will be taken out of any make whole payments received from BNSF while on leave. Otherwise, these contributions are required to be caught up upon return.

<u>Compensation</u>

Employees should send paperwork supporting Military Pay claims and any questions regarding pay for Military leaves to FINDLTYEMilitary@BNSF.com.

Note: Employees who wish to earn Good Attendance Credit must submit their LES or training documentation no later than 60 calendar days after their return to work from leave.

==============================================================

**F. Jury Duty**

BNSF and the Labor Organizations representing BNSF employees support employees summoned to perform their civic duties in the form of Jury Duty by providing negotiated agreements for compensation for time lost to employees who are summoned for Jury Duty. The collective bargaining agreements will govern any dispute as to compensation for Jury Duty. However, the following guidelines are provided to minimize such disputes and provide for

prompt and proper payment of valid Jury Duty claims. In the event of a dispute, BNSF and the appropriate Labor Organization will work to resolve the matter.

Employees instructed to report for Jury Duty at a specific date and time are authorized to mark off for Jury Duty to make sure they are rested and available for Jury Duty. They are also expected to make an effort to perform their normal duties whenever reasonably possible.

Employees subject to certain call-in or "stand by" notification procedures used by some courts will remain marked up except in circumstances where protecting service will obviously jeopardize such notification.

If there are questions about the ability to protect service, the employee should consult with a designated supervisor before marking off and jointly set up a strategy to ensure compliance with the court's instructions and to protect their assignment when reasonably possible.

Employees will be expected to mark up immediately upon release from the courts or, if on call, immediately after receiving notification they will not have to report to the court.

To validate qualification and provide the proper documentation with the claim:

Qualifies for Jury Duty Lost Wages:

- Reporting at a specific location and time for jury selection and/or Jury Duty when an actual loss of wages occurs.

- Reporting for Jury Duty conflicts with the employee's ability to obtain rest under the Hours of Service Act before or after the Jury Duty. Booking additional rest does not apply to Jury Duty.

- Extra board personnel who mark off for 24 hours or less will receive the equivalent of a day's guarantee if the trip missed is not completed prior to the mark up.

Does Not Qualify for Jury Duty Lost Wages:

- Jury Duty that occurs on a rest day or other periods of scheduled or unscheduled time off when no loss of wages occurs.

- Layoffs when courts are not in session. Examples include weekends and major holidays.

- Any days over the 60-day maximum. The Agreements provide for a maximum of 60 days in any calendar year.

- Failure to follow supervisor's recommendations for protecting service or reporting at the court without specific instructions to do so.

Supporting Documentation for Jury Duty Claims:

- The following information must be included on the Jury Duty claim:
  - Date(s) scheduled for Jury Duty
  - Location
  - Time scheduled to report
  - Time released for each day
  - Lost trip information.

- The following documents should be sent to TYE Payroll Services via email at FINDLTYEJuryDutyPay@BNSF.com or fax to 785-676-5186 or 8-676-5186.
  - A copy of the Jury Duty notice
  - The Court's reporting instructions.
  - A copy of the Court receipt for amount paid while performing Jury Duty which will be deducted from the lost wage payment. Note: If payment is delayed or there is no payment for that day from the Court, authorization must be obtained from the supervisor for payment of lost wages.

=================================================================

**G. Lay Off Fatigue (LOF)**

BNSF wants to ensure that everyone is rested and prepared to work safely. Employees who are fatigued as a result of working numerous trips in a row or working consecutive long trips can use the LOF to take 24 hours off for rest. The LOF code may not be used for any other purpose and employees who misuse the LOF code will be subject to discipline under the Policy for Employee Performance Accountability. For example, this code may not be used to extend rest days, vacation, or other layoffs. An LOF counts as an unavailable day under the Hi-Viz Guidelines.

=================================================================

**H. Lay Off/Mark Up for Outlying Assignments**

Following a layoff, employees assigned to outlying positions must mark-up prior to the tie-up of their regular assignment in order to release the extra board employee covering their position. If an assigned employee fails to mark-up prior the tie-up of their regular assignment, the extra



board employee will be held to protect the assignment's next tour of duty and the regular employee will be charged an unavailable day (LOP) under the Hi-Viz Guidelines. This does not apply going into the rest days of the assignment.

Example: Employee Smith fails to mark-up from a one-day sick layoff prior to the tie-up of their assignment and, as a result, ends up missing two days of their assignment. Employee Smith will be charged points for two assigned days under the Hi-Viz Guidelines.

==============================================================

**I. High-Impact Days**

BNSF has the responsibility to provide our customers with reliable service every day, including High-Impact Days. High-Impact Days are days that have historically reflected higher train crew absenteeism and more missed opportunities to meet customer expectations. Those days are currently identified as: New Year's Day, Super Bowl Sunday, Easter Sunday, Mother's Day, Memorial Day, Father's Day, Independence Day, Labor Day, Halloween, Thanksgiving Day, Day after Thanksgiving, Christmas Eve, Christmas Day, and New Year's Eve.

==============================================================

**J. Failure to Take Notification**

An employee is required to accept notification when their assignment has changed (displaced, forced, cut, awarded a successful bid, etc.). Employees then afforded their bump board time based on the applicable CBA. An employee who has not accepted notification upon first attempt will be placed in an LXX status until notification is accepted.

- Employees whose **last inbound assignment upon tie up** was "other than assigned service," the employee will have 10 hours to accept notification for all future bid/bump events which occur prior to their next work event. Employees who do not accept notification within 10 hours will have all time pending notification for that event count as unavailable time, and points will be deducted using Unassigned Service Point Value.

    - 0 to 10 hours - no exception
    - >10 hours - points will be deducted according to the Hi-Viz Guidelines

- Employees in assigned service that are bumped or cut from their assignment while on duty are considered "other than assigned service" upon tie up.

- Being on a rest day does not exempt an employee from accepting change notification of an assignment.



Example: an employee out-bounds on an assigned 05/02-yard job; however, the employee is bumped while on duty, takes notification upon tie up and is placed on the bump board. The employee's inbound status is “other than assigned service” account being placed on the bump board.

Example of pending notification: An extra board employee is “rested” and available for call at 1300. Upon the employee becoming rested, the Crew Office attempts to notify employee of a displacement (bump) at 1301. The employee does not respond to the notification. The Crew Office continues to attempt notification every 2 hours. If the employee has not taken notification by 2301, the Hi-Viz system will recognize this employee as having more than 10 hours of avoiding notification and mark the employee with an unavailability event. The crew office will continue to attempt notification to this employee and the attendance system will continue to account for time in which the employee has made themself unavailable.

# Brotherhood of Locomotive Engineers and Trainmen

Rob Cunningham
Chairman

Jeremy McFather
Vice Chairman

Bart Jones
Secretary/Treasurer

101 N. Beverly
Crowley, Texas 76036

PH: 817-426-9003
Fax: 817-259-2468

---

January 10, 2022

Dennis Pierce
BLET National President
7061 East Pleasant Valley Road
Independence, Ohio 44131

Re: BNSF Attendance policy- request for strike authority

Dear Brother Pierce,

I am writing today with a request for strike authority due to the BNSF rolling out a unilateral attendance policy that conflicts with our collectively bargained agreements. We have attempted on multiple occasions to negotiate an attendance policy along with scheduled time off for our members. BNSF has rejected every offer to negotiate attendance with the organizations.

Attached to this letter you will find the new points based "Hi-Viz" attendance policy along with the questions and answers provided to the employees on BNSF. I will outline a few of the items that I feel reach the level of a major dispute.

BNSF new "Hi-Viz" attendance policy is a points-based system. Each employee begins with thirty (30) points. The employees can earn no more than thirty (30) points. If an employee lays off for illness, he/she has their thirty (30) points reduced by a certain amount as outlined in the policy. An employee must stay marked up and working for fourteen (14) consecutive days to earn back "good attendance credits" for the period. Here is where we run into real problems.

If a Local Chairman has to layoff to represent a member, meet with management or any form of union business, it eliminates his ability to earn "good attendance credits" for the current 14-day period. The same applies to an employee called to Jury Duty, Death in Family (bereavement leave), vacation, personal leave days, Family and Medical Leave time just to mention a few. They have even decided to break the consecutive days to earn points back for laying off to get a COVID vaccine (MEV).

EXHIBIT
B

While BNSF does not intend to reduce points for paid leave events it certainly keeps an employee from earning back any points. BNSF new policy also penalizes an employee who uses a single day of

vacation or a personal leave day if it is tied to a layoff event such as layoff sick. Below is from the FAQ document issued by BNSF:

**Is there a penalty point charge for layoffs connected to a VAC, PLD, UNB, FML, SRS, or CLD?**
*Yes, any unavailable time that immediately (not separated by a work event) precedes or follows a VAC, PLD, UNB, SRS, FML, CLD event will be charged an additional 2 points for Unassigned Service and an additional 3 points for Assigned Service regardless of day of week. This is referred to as a conjunction penalty.*
*EMC/LOC/NOS are the exception; they will continue to be charged according to Point Schedule.*

Many of our members make attempts to take paid time off when ill or when the need to be away from work arises. Many times, the allocation, which has been reduced to as minimum, is full and the employee can only get one of the two days approved. Because of illness or whatever the case, the employee must layoff one day attached to the paid leave day. He/she will be penalized extra points because a layoff is tied to the paid day. The policy refers to these days as a “conjunction penalty”.

On the former ATSF property we have agreements to cover absences such as Jury Duty, Bereavement Leave, Union Business. BNSF’s policy states it will not reduce points for these layoffs, but the employees are still penalized because their ability to earn points is halted. For instance, if an employee falls ill for three (3) days during the week (Mon, Tue, Wed) he/she will have a point reduction of six (6) points. Same employee remains marked up for 11 days but receives a notice to attend Jury Duty on that Monday. Because Jury Duty requires the employee to layoff, he/she will reset the process of earning points. This employee is being penalized for doing his/her civic duty. This is far from reasonable.

Our membership will also suffer because the local union officers who represent them will not be able to use the UNB layoff without repercussion. With the amount of discipline our representatives are handling, not to mention meeting with the Carrier to settle other grievances, the local committee of adjustment positions will not be palatable for those who lack seniority to have scheduled time off and must layoff to get rest. On the former ATSF we have three (3) different agreements for union business layoffs.

These agreements allows the acting local chairman, secretary treasurer and the president to use the union business layoff and to hold their turn first out allowing them to go to work at the conclusion of the union business. BNSF will penalize these individuals for conducting union business by restricting their ability to earn points.

Brother Pierce, I ask for your help in this matter. BNSF continues to squeeze the workforce to unprecedented levels. They are stepping all over the CBA at every turn. Our members carried this railroad on their backs for the past two years and this is the thank you they get. Clearly, BNSF is not listening to either organization or its members. Again, I am asking for permission to pull our

membership from service until such time as BNSF comes to the table with serious intent to negotiate attendance and predictable time off.

I thank you for any help you or our other National officers can provide. If there is any other information I can provide, please do not hesitate to ask.

Yours truly,

Rob Cunningham
Chairman

Encls. Hi-Viz Attedance policy
Hi-Viz Attendance Policy FAQ

Cc: E.L. Pruitt, First Vice President (via email)
S.J. Bruno, National Secretary-Treasurer (via email)
M.D. Priester, National Vice President (via email)



SHEET METAL | AIR | RAIL | TRANSPORTATION
SMART

General Committees of Adjustment
BNSF Railway Company

January 11, 2022

Jeremy Ferguson
President
SMART-Transportation Division
24950 Country Club Blvd Ste 340
North Olmsted OH 44070-5333

**Re: Strike Authority – BNSF Attendance Guidelines Policy**

Brother Ferguson,

The undersigned General Chairpersons herein request your office authorize strike authority for members under our jurisdiction as a result of BNSF issuing a new Attendance Guidelines Policy "Hi-Viz".

All of us have, for multiple years, attempted to negotiate attendance and time off. BNSF has turned down every offer from SMART-TD to negotiate an agreement outlining our members' attendance requirements.

The New "Hi-Viz" attendance policy slated to take effect on February 1, 2022, is a unilateral attempt by BNSF to modify attendance. We believe this to be in direct violation with the Section 6 Notices and current National Negotiations.

This policy, and particularly its formulation at this point in time when active National Negotiations are taking place is likely in conflict with the RLA and the National Handling process.

Thank you in advance for any assistance/guidance you can provide regarding this issue. Do not hesitate to contact any of us if you require additional information.

Fraternally,

J. M. LaPresta
General Chairperson GO-001

Scott Swiatek
General Chairperson GO-009

Sign For
Johnny P. Martinez, Jr.
Acting General Chairperson GO-017

Justin Schrock
General Chairperson GO-020

Matthew Burkart
General Chairperson GO-341

Larry Miller
General Chairperson GO-386

EXHIBIT
C

# Top/Middle/Low UNB usage Random Employees

| EMP | Starts | Strts/ Mnth | Hours | Hrs/ Mnth | Hrs/ LCB | UNB / Days | ATG/ Disc |
|---|---|---|---|---|---|---|---|
| SR Doyle | 98 | 602 | 780 | 65 | 24 | **250** | N |
| LW Meyers | 76 | 7 | 602 | 55 | 0 | **170** | N |
| TR Martin | 68 | 7 | 682 | 55 | 552 | **163** | N |
| EL Hart | 65 | 6 | 645 | 58 | 129 | **160** | N |
| JC Boone | 92 | 7 | 985 | 82 | 448 | **155** | N |
| NS Bragg | 133 | 11 | 1275 | 106 | 104 | **71.3** | N |
| T Griffitt | 110 | 9 | 1038 | 85 | 272 | **70** | N |
| AJ McAfee | 214 | 18 | 1954 | 163 | 32 | **69.6** | N |
| TA Baker | 119 | 10 | 1254 | 104 | 232 | **69.3** | N |
| M Obresley | 157 | 13 | 1375 | 114 | 88 | **69.1** | N |
| KE Hoffman | 115 | 10 | 1063 | 86 | 144 | **10.7** | N |
| LB Johnson | 131 | 11 | 1277 | 106 | 144 | **10.7** | N |
| DJ Oian | 253 | 21 | 1564 | 130 | 0 | **10.7** | N |
| JM Nichols | 163 | 13 | 1384 | 116 | 384 | **10.6** | N |
| WB Smith | 200 | 17 | 1955 | 163 | 0 | **10.6** | Y |

- Top 5 usage and random grab of middle and low UNB usage for 15 pulls
- 1 of 15 had ATG discipline in 2021
- Significant hours worked spread.
- Many also involved in LCB layoff events
- Calendars follow

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

NATIONAL DIVISION
7061 East Pleasant Valley Road
Independence, Ohio 44131

DENNIS R. PIERCE
National President

Phone: 216. 241.2630
Fax: 216.241.6516
www.ble-t.org

**VIA ELECTRONIC MAIL**

January 12, 2022

Mr. M. R. Cunningham
Chairman, BNSF–ATSF GCA, BLET
101 N. Beverly
Crowley, TX 76036

Mr. T. R. Martin
Chairman, BNSF–C&S/CRI&P/FWD GCA
2012 Carson Ave.
La Junta, CO 81050

Mr. K. J. Psota
Chairman, BNSF/MRL GCA, BLET
215 West Oak, Suite 500
Fort Collins, CO 80521

Mr. J. L. Thurman
Chairman, BNSF–SLSF GCA, BLET
P. O. Box 118587
Carrollton, TX 75011

Re: Request for Strike Authority

Dear Sirs and Brothers:

This responds to your letters pertaining to the above-referenced subject, which were received by my office on January 12, 2022. Your letters advise my office of the BNSF's new "Hi-Viz" attendance policy. Each letter provides a detailed explanation of how the Carrier's new attendance policy repudiates numerous collectively bargained agreements currently in place on each former property. I have also received dozens of communications from BLET members sharing their views on the proposed policy.

I share your concerns and those of the BLET membership. This latest attempt by BNSF to force a policy on its employees can only be described as the worst and most egregious attendance policy ever adopted by any rail carrier. It repudiates direct and clear contract language, and in application, will force BLET members to make additional trips without regard for their medical condition while we struggle to come out of a pandemic. It also stands to take away any ability by the employees to avoid working fatigued when they are routinely called without warning due to the complete lack of reliable train lineups, thus creating the potential for an even more unsafe railroad operation. So called "forced overtime" in an industry where safety is so critical not only repudiates our agreements, it stands to enact irreparable harm on hundreds of full time employees whose non workplace obligations prevent them from being at work every day of their life.

Accordingly, and in response to each of your requests to poll the membership on the question of withdrawing from service, permission is hereby granted, and you are authorized to mail ballots to

EXHIBIT
E



your membership, or to your Local Chairmen where applicable. Our internal rules must be followed to accomplish the poll, which is to be conducted in accordance with the provisions of Section 17 – General Committee Rules ("GCR") of the BLET Bylaws. As a general matter, GCR Section 17(a) requires that strike votes be conducted among the active members employed on the road, system or portion thereof that will be affected by a strike; in this case, per your joint request, the strike vote would cover the entire BNSF system. Accordingly, if you are directly polling your membership, in order to participate in the strike vote, a member: (1) must be employed by BNSF; (2) have locomotive engineer seniority and not be a Company Officer; and (3) be an active member (*i.e.*, either working or in one of the National Division Rules Section 29(h) statuses).

Alternatively, GCR Section 17(b) states that "[i]n cases where the best interests of the BLET would be jeopardized by the delay incident to the circulation of a referendum strike ballot, the general chairman may vote the GCA by the most convenient means available in lieu of the circulation of a referendum to the membership, provided that consent to do so has already been obtained from the active membership by a referendum vote or adopted by the GCA while in session." In a GCR Section 17(b) vote, only those Local Chairman having jurisdiction over BNSF assignments may participate.

I am enclosing herewith the ballot forms that are to be used when conducting the strike vote. Please note that a strike vote conducted pursuant to GCR Section 17(a) requires a majority of voting members to be approved, whereas a vote conducted pursuant to GCR Section 17(b) requires a two-thirds vote of the members of the GCA (*i.e.*, the Local Chairmen). Therefore, be sure the correct ballot is used for the type of strike vote you will conduct.

Lastly, a strike ballot must be signed by the member in order to be counted. Please stress this fact in your cover letter to the membership or to your Local Chairmen. Also, keep in mind that approval by the membership or the GCA does not, in and of itself, convey strike authority. Rather, GCR Section 17(c) prescribes that—after membership/GCA approval— the general chairman, with the concurrence of the National President, shall have authority to set a strike date and withdraw the engineers or trainmen of the road, system, or portion thereof from service.

With warmest personal regards, I remain

Fraternally yours,

National President

encls. (2)

cc: E. L. Pruitt, First Vice President (w/o encls.)
S. J. Bruno, National Secretary-Treasurer (w/o encls.)
M. D. Priester, Vice President (w/encls.)