# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FT. WORTH DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil Action No. 4:22-cv-052-P<br>) |
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION and BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

# DEFENDANT BROTHERHOOD OF LOCOMOTIVE
# ENGINEERS AND TRAINMEN'S RESPONSE IN OPPOSITION TO
# PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

**INTRODUCTION AND BACKGROUND**……………………………………………………1

**ARGUMENT**…………………………………………………………………………………….2

    **I.  BNSF'S HI VIZ POLICY REPUDIATES AND RENDERS MEANINGLESS MULTIPLE PROVISIONS OF THE PARTIES' EXISTING AGREEMENTS IN VIOLATION OF RLA, AND THUS GIVES RISE TO A MAJOR DISPUTE**……………………………………………………………..........................2

        *A. The Hi Viz Policy Penalizes Union Officials for Laying Off Work for Union Business, Including to Represent Employees, and Restricts Employees in Choice of Representatives in Violation of Existing Agreements*…………………………………..3

        *B. The Hi Viz Policy Repudiates the Parties' Agreement Guaranteeing Employees Reasonable Lay Off Privileges*……………………………………………………...5

        *C.  The Hi Viz Policy Repudiates Agreement Language That Gives Employees 24 Hours to Select a New Assignment When Displaced by a Senior Engineer.…….......6*

        *D.  The Hi Viz Policy Repudiates Employees' Contractual Vacation and Personal Day Rights*....................................................................................................................7

    **II.  BNSF'S HI VIZ POLICY VIOLATES THE *STATUS QUO* REQUIRED TO BE MAINTAINED UNTIL THE PARTIES' AMEND THEIR EXISTING AGREEMENT OR AGREE TO CHANGES IN EMPLOYEES' TERMS AND CONDITIONS OF EMPLOYMENT THROUGH THE RLA'S MANDATORY MAJOR DISPUTE RESOLUTION PROCESS**............................................................8

    **III.  BNSF'S HI VIZ POLICY PRESENTS A MAJOR DISPUTE BECAUSE IT IS ILLEGAL ON ITS FACE UNDER THE FAMILY AND MEDICAL LEAVE ACT (FMLA); THUS, BNSF CANNOT PROVIDE ANY ARGUABLE BASIS FOR THE POLICY UNDER *CONRAIL* BECAUSE IT IS UNLAWFUL**...................................11

**CONCLUSION**..................................................................................................................13

# **TABLE OF AUTHORITIES**

**Cases:**

*Association of Flight Attendants v. Mesa Air Group*,
567 F.3d 1043 (9th Cir. 2009)................................................................................................2, 3

*Air Line Pilots Association, Int'l v. Eastern Air Lines, Inc.*,
869 F.2d. 1518 (D.C. Cir. 1989)................................................................................................2

*Chicago & N.W. Ry. Co. v. United Transp. Union*,
402 U.S. 570 (1971)................................................................................................................10

*Consolidated Rail ("Conrail") v. Railway Labor Executives Ass'n*,
491 U.S. 299 (1989)..................................................................................................................2

*Detroit & Toledo Shore Line Ry. Co. ("Shore Line") v. United Transportation Union*,
396 U.S. 142 (1969)..............................................................................................................2, 9

*Dyer v. Ventra Sandusky, LLC*,
934 F.3d 472 (6th Cir. 2019)..................................................................................................12

*Elgin, Joliet & E. Ry. Co. v. Burley*,
325 U.S. 711 (1945)..................................................................................................................2

*Florida East Coast Ry. v. Bhd. of Locomotive Eng'rs*,
362 F.2d 482 (5th Cir. 1966)..................................................................................................11

*Int'l Ass'n of Machinists v. Transportes Aereos Mercantiles Pan Americandos, S.A.*,
924 F.2d 1005 (11th Cir. 1991)................................................................................................9

**Other Authorities**

WHD Opinion Letter FMLA 2003-4, 2003 WL 25739620 (July 29, 2003)...............................12

1999 FMLA Ltr., 1999 WL 1002428 (January 12, 1999)............................................................12

2018 FMLA Ltr., 2018 WL 4678694 (August 28, 2018).............................................................12

**Statues and Regulations**

45 U.S.C. §§152, First and Seventh....................................................................................1, 9, 10

45 U.S.C. §156.......................................................................................................................1, 10

29 U.S.C. § 2601.........................................................................................................................11

29 U.S.C. § 2615(a)(1)..........................................................................................................11

29 C.F.R. § 825.220.............................................................................................................11

## INTRODUCTION AND BACKGROUND

In accordance with the Court's Order (ECF Doc. 18), Defendant Brotherhood of Locomotive Engineers and Trainmen ("BLET" or "Union") submits the following response in opposition to Plaintiff BNSF Railway Company's ("BNSF" or "Carrier") motion for a temporary restraining order (ECF Doc. 6). In its motion, BNSF seeks a temporary restraining order against BLET, as well as against Defendant International Association of Sheet Metal, Air, Rail, and Transportation Workers – Transportation Division ("SMART-TD"), to enjoin a work stoppage that has been authorized by BLET in response to BNSF's pending implementation of a new attendance policy, "Hi Viz". As explained herein, BNSF's Hi Viz policy violates the *status quo*, repudiates various provisions of the parties' agreements, and interferes with employees' right to designate their representatives in violation of Section 2 First and Seventh and Section 6 of the Railway Labor Act ("RLA"). 45 U.S.C. §§152, First and Seventh; 45 U.S.C. §156. Therefore, BNSF is not entitled to any temporary, preliminary or permanent injunctive relief in this matter.

Further, although BNSF asserts "Defendants' threatened use of self-help could begin at any time" (ECF Doc. 6 at 2), prior to filing for the TRO, BNSF counsel was informed by counsel for BLET, both verbally and in writing, that no strike action will commence prior to implementation of the Hi Viz policy, which is scheduled for unilateral implementation by BNSF on February 1, 2022. Thus, the assertion that self-help could begin at any time is utterly false, and the triggering of self-help by the BLET is entirely within the control of BNSF based on it's decision to actually implement of the unlawful Hi Viz policy.

1

## ARGUMENT

I. **BNSF'S HI VIZ POLICY REPUDIATES AND RENDERS MEANINGLESS MULTIPLE PROVISIONS OF THE PARTIES' EXISTING AGREEMENTS IN VIOLATION OF RLA, AND THUS GIVES RISE TO A MAJOR DISPUTE.**

The RLA establishes a dual framework for resolving "major" and "minor" disputes between management and employee representatives. Although the terms "major dispute" and "minor dispute" are not used in the RLA, they figure prominently in RLA jurisprudence. They are "drawn from the vocabulary of rail management and rail labor, as a shorthand method of describing two classes of controversy Congress had distinguished in the RLA." *Consolidated Rail ("Conrail") v. Railway Labor Executives Ass'n*, 491 U.S. 299, 302 (1989). "Major disputes" relate to the formation of a collective agreement or efforts to change the terms of one. *See Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711 (1945); *Detroit & Toledo Shore Line Ry. Co.* ("*Shore Line*") *v. United Transportation Union*, 396 U.S. 142 (1969). They are predicated on RLA Section 2, Seventh, and RLA Section 6. *See Conrail,* 491 U.S. at 302. If a dispute is "major", then either party to the dispute may ask the court to issue an injunction preserving the status quo while the parties remain subject to the RLA's negotiation and mediation procedures. *See Shore Line*, 396 U.S. at 148-49 (1969); *Association of Flight Attendants v. Mesa Air Group*, 567 F.3d 1043, 1047 (9th Cir. 2009); *Air Line Pilots Association, Int'l v. Eastern Air Lines, Inc.*, 869 F.2d. 1518, 1520 (D.C. Cir. 1989).

"Minor disputes" are the second class of RLA controversy regulated by the RLA. A "minor dispute" is one that "contemplates the existence of a collective agreement" and "relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case . . . ." *Elgin*, 325 U.S. at 723 (1945). Minor disputes, therefore, generally result from attempts to enforce existing contractual obligations and rights. *Conrail*, 491 U.S. at 302;

*Mesa Air Group*, 567 F.3d at 1047. Accordingly, "when an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Mesa Air Group*, 567 at 1047, *quoting Conrail*, 491 U.S. at 307.

In the instant case, there is no arguable justification under the parties' agreements that BNSF's Hi Viz policy is permissible because, as detailed below, the policy repudiates and renders meaningless multiple provisions of the parties' existing agreements. Thus, implementation of the Hi Viz policy will trigger a major dispute between the parties. Further, the following areas of repudiation are not all inclusive and the BLET reserves the right to identify other areas of repudiation as it continues to research the impact of the newly announced Hi Viz policy.

> A.   *The Hi Viz Policy Penalizes Union Officials for Laying Off Work for Union Business, Including to Represent Employees, and Restricts Employees in Choice of Representatives in Violation of Existing Agreements.*

In at least two agreements between the parties, Union officials are expressly permitted to lay off work (*i.e.*, to remove themselves from availability to operate a working trip) in order to attend union meetings, to represent employees in disciplinary investigations, and to meet with Carrier officials to discuss claims and grievances. BLET submits the Hi Viz policy, which penalizes Union officials for laying off in such situations, repudiates those agreements.

In the first such agreement dated November 24, 2003, "a duly-elected local chairman, acting local chairman, local president or local secretary-treasurer of the Brotherhood of Locomotive Engineers" is permitted to "lay[] off to attend a bona-fide union meeting, represent an employe in a formal investigation, or meet with Carrier official(s) on items such as discussing time claims, grievances, and/or related schedule matters . . . ." (BLET Ex. 1) This agreement goes on

3

in Section 1.2 to expressly provide, "In the application of the foregoing a union officer laying off for the purposes stipulated will not be considered as laying off or missing a call." (Id.) The second agreement, dated January 1, 1972, in Rule 64 provides substantially similar lay off rights for Union officials and likewise provides, "In the application of the foregoing, a Local Chairman laying off for the purposes stipulated will not be considered as laying off or missing a call . . . ." (BLET Ex. 2)

Despite the unambiguous language of these agreements that prohibit BNSF from considering a Union official who removes himself from availability for an assignment for the stipulated purposes as "laying off," the Hi Viz policy does treat Union officials in such situations as being absent from work and denies such Union officials Good Attendance Credits when exercising their contractual right to lay off for union business or to represent employees. This penalty that is applied to Union officials for exercising their contractual right is clearly intended to and will have the effect of restricting Union officials from laying off to conduct Union business or to represent members because doing so places their own continued employment in jeopardy. By penalizing Union officials in such circumstances, BNSF's Hi Viz policy renders the contractual right to lay off for Union business and to represent employees previously possessed by Union officials in these agreements illusory and effectively repudiates the agreements.

Further, multiple agreements between the parties expressly grant employees the right to select the representative of their choice in formal disciplinary investigations that may be scheduled by the Carrier. For example, in the January 1, 1972 agreement referenced above, Rule 50(c) expressly permits employees to "obtain a representative or representatives of his choice, if desired." (BLET Ex. 2) In an agreement dated February 1, 1947, in Section C. it states, "At the investigation the employe may present witnesses in his behalf and *may be assisted by his*

4

*committeeman or an employ of his choice.*" (BLET Ex. 3) (emphasis added). In an agreement dated March 1, 1981, Rule 50(A) states, employees "may arrange for representatives of their choice to assist them in the investigation." (BLET Ex. 4). And, in an agreement dated July 1, 2005, Article 29 makes multiple references to an Engineer employee being represented by "an Engineer of his choice," which has historically and nearly universally been a Union official. (BLET Ex. 5)

By applying the Hi Viz policy to Union officials and penalizing them for laying off to represent members in disciplinary investigations, BNSF has effectively repudiated employees' contractual right to their choice of a Union official representative because, as explained above, such Union officials will be unable to provide such representation where their own continued employment becomes as risk. Thus, the Hi Viz policy not only repudiated Union officials' right to lay off to represent employees, but also the employees' concomitant contractual right to the representative of their choice. Thus, implementation of the Hi Viz policy constitutes a major dispute that, if implemented, permits BLET to resort to its own self-help in response.

   B. *The Hi Viz Policy Repudiates the Parties' Agreement Guaranteeing Employees Reasonable Lay Off Privileges.*

In an agreement dated April 4, 1994, dealing with Engineer extra board assignments, in Section 1(a), the parties expressly agreed that "[t]he Carrier shall maintain a sufficient number of engineers to permit reasonable lay off privileges and to protect the service including vacations and other extended vacancies." (BLET Ex. 6) Obviously, "reasonable lay off privileges" are tied to attendance and the policies implemented by the Carrier related to such. Thus, in order for any given attendance policy to be consistent with the parties' April 4, 1994 agreement, it must not be so restrictive or harsh so as to deny employees reasonable lay off privileges. The draconian Hi Viz policy, however, does just that and any arguments that the Hi Viz policy permits reasonable lay off privileges is obviously insubstantial.

While the BLET is still in the process of analyzing the full impact that the Hi Viz policy will have on employees' ability to lay off without placing their employment in jeopardy, the change in the number of days employees in 7-day a week, un-assigned service[1] may be off in any given year from the prior policy is outrageous, shocks the conscience and in no way can be considered to allow maintenance of reasonable lay off privileges. This is because employees in 7-day a week, un-assigned service prior to implementation of the Hi Viz policy are permitted to lay off or be absent, outside of contractual paid leave (e.g., vacation or personal days), up to 24 weekend days and 60 weekday days per year. Once the Hi Viz policy is put into effect, however, by the BLET's calculation, those same employees will be reduced to be permitted to be off only 7 weekend days and 15 weekday days per year without placing their employment in jeopardy. This unilateral reduction in days that an employee may lay off from a potential 84 days (24 weekend plus 60 weekday) to a mere 22 days under the Hi Viz policy is what shocks the conscience and utterly repudiates such employees' contractual right to reasonable lay off privileges.

Thus, once again, implementation of the Hi Viz policy constitutes a major dispute that, if implemented, permits BLET to resort to its own self-help in response.

> C. *The Hi Viz Policy Repudiates Agreement Language That Gives Employees 24 Hours to Select a New Assignment When Displaced by a Senior Engineer.*

In an agreement dated June 24, 2007, BLET and BNSF agreed to the following language regarding an employee being displaced, also known as bumped, from an assignment by a more senior employee:

> I. An engineer displaced from a run or assignment by a senior engineer or whose assignment is reduced or abolished as part of a board adjustment in accordance with schedule rules and/or agreements will have displacement rights to any

---

[1] Employees in 7-day a week, un-assigned service are scheduled 7-days a week, 24-hours per day unless they have laid off or are on paid leave.

> assignment/board on which he holds active engineer's seniority. This displacement must be exercised within 24 hours of notification of displacement. In the event displacement is not exercised within 24 hours, such engineer will be required to displace the junior engineer working at the location. For those engineers who are displaced while off for any reason, the notification process will begin upon markup and they must also place within 24 hours of notification.

(BLET Ex. 7) This contract language gives an employee who is displaced up to 24 hours to select a new assignment and, if no new assignment is selected in that 24 hours, the employee then bumps the most junior engineer at the location as a default.

The new Hi Viz policy, however, penalizes an employee if he does not select a new assignment in less than 2 hours by breaking an employee's ability to earn Good Attendance Credit and resetting the 14-day period in which to earn such credits. Thus, the intended effect of this portion of the Hi Viz policy, which penalizes employees who exercise their contractual entitlement to wait up to 24 hours to select a new assignment or to just default to a new assignment after 24 hours, is to render the above referenced language illusory and effective repudiates it. To be clear, by penalizing employees for utilizing existing contractual entitlements with regard to selecting a displacement assignment, BNSF has altered existing terms and conditions of employment as embodied in the displacement language and repudiated the language. Thus, once again, implementation of the Hi Viz policy constitutes a major dispute that, if implemented, permits BLET to resort to its own self-help in response.

    D.    *The Hi Viz Policy repudiates Employees' Contractual Vacation and Personal Day Rights.*

The 1947 National Agreement between BLET and the involved rail Carriers (including BNSF) grant employees vacation rights based upon years of service. The 1947 National Agreement has been modified by subsequent National Agreements as well as by the 2007 on property agreements between BLET and BNSF. (BLET Ex. 7) Insofar as BNSF engineers in un-

7

assigned/on call basis service are concerned, pre-approved vacation days and Personal Leave Days have a fixed start time, even though the involved employees do not have fixed on duty/call times. As a result, the involved engineers are routinely called in the hours preceding their fixed time to start their contractually provided vacation and personal leave time for round trips out of town that could exceed 24-48 hours.

In application, the policy violates the employees' right to contractually granted vacation time by assessing disciplinary action to those who by no choice of their own must reject a call to work in order to access their agreed to vacation absence. Taking that additional unpaid leave under the new Hi Viz policy will now trigger the application of either a reduction in points, or the inability to earn points back, thus impeding employees' right to access contractually provided paid leave, in effect repudiating employees' contractual right to vacation in some instances. Thus, this also constitutes a major dispute permitting BLET to resort to its own self-help in response.

**II.     BNSF'S HI VIZ POLICY VIOLATES THE *STATUS QUO* REQUIRED TO BE MAINTAINED UNTIL THE PARTIES' AMEND THEIR EXISTING AGREEMENTS OR AGREE TO CHANGES IN EMPLOYEES' TERMS AND CONDITIONS OF EMPLOYMENT THROUGH THE RLA'S MANDATORY MAJOR DISPUTE RESOLUTION PROCESS.**

Congress enacted the RLA with the following stated purposes:

> (1) To avoid any interruption of commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon the freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions.

45 U.S.C. § 151a. These purposes are facilitated by an elaborate statutory scheme designed to encourage negotiation and mediation rather than conflict resulting in the interruption of interstate

commerce. Essential to this scheme is the duty to bargain in good faith. The duty to bargain in good faith is codified in Section 2 First of the statute, 45 U.S.C. § 152 First. Section 2, First, provides:

> It shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements, or otherwise, in order to avoid any interruption of commerce or to the operation of any carrier growing out of a dispute between the carrier and the employees thereof.

The Supreme Court has held that RLA Section 2 First, together with other provisions of the statute, "form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day 'cooling-off' period." *Shore Line,* 396 U.S. at 152. The RLA's status quo requirement "is central to its design." *Id.* at 150 (1969).

In *Shore Line*, the Supreme Court held that that the RLA's status quo requirement obligates both carriers and unions to maintain not only the working conditions contained in an existing collective bargaining agreement, but also "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153. The Court noted that "[c]learly these conditions need not be covered in an existing agreement." *Id*. The rationale for this holding is that if management is permitted to resort to self-help before exhaustion of the Act's negotiation and mediation procedures, "the union cannot be expected to hold back its own economic weapons, including the strike." *Id*. at 155; *see also Int'l Ass'n of Machinists v. Transportes Aereos Mercantiles Pan Americandos, S.A. ("IAM v. TAMPA")*, 924 F.2d 1005, 1008 (11th Cir. 1991) (noting that, "[i]n addition, 'unilateral changes made while the employees' representative is seeking to bargain … interfere with the normal course of negotiations by weakening the union's bargaining position,'" *quoting* A. Cox, *The Duty to Bargain in Good Faith*, 71 Harv. L. Rev. 1401,

1423 (1958)). Thus, RLA Section 2 First "was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 576-577 (1971).

Furthermore, RLA Sections 6 and 2 Seventh provide additional context and substance to the Act's bargaining process and status quo requirement.[2] The status quo provisions in RLA Sections 2 Seventh and Section 6 command that a carrier must maintain current working conditions, and that unilateral changes in those conditions are prohibited absent engaging in the required bargaining process.

Turning the instant case, BLET and BNSF have been engaged in bargaining under Section 6 of the RLA for over two years. With respect to BNSF's new Hi Viz policy, Section I, above, details the various and non-exhaustive ways that the policy unlawful violates the *status quo*,

---

[2] Section 6 of the RLA, 45 U.S.C. § 156, provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended changes has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been fully acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

Section 2, Seventh of the RLA, 45 U.S.C. § 152, Seventh, provides:

> No carrier, its officers or agents shall change the rates of pay, rules or working conditions of its employees as a class as embodied in agreements except in the manner prescribed such agreements or in section 156 of this title.

10

repudiates the parties' existing agreements, and unilaterally changes employees' terms and conditions of employment outside of the RLA' major dispute procedures. The unilateral changing of working conditions in this manner is a direct violation of the RLA's requirement to "make and maintain agreements." 45 U.S.C. § 152, First; *see also Florida East Coast Ry. v. Bhd. of Locomotive Eng'rs*, 362 F.2d 482, 483 (5th Cir. 1966) (holding that until railroad complies with "major" dispute process there can be no change in working conditions). The fact of the matter is that BNSF must bargain over changes if it wants to change employees' working conditions as it will do through imposition of the Hi Viz policy. *Id.* at 483 (until railroad complies with "major" dispute process there can be no change in working conditions). Accordingly, BNSF should not be permitted to evade its obligations under the RLA until the mandatory Section 6 process has been satisfied. And, should BNSF procced with implementing its Hi Viz policy, then BLET must be permitted to resort to its own elf-help in kind.

### III. BNSF'S HI VIZ POLICY PRESENTS A MAJOR DISPUTE BECAUSE IT IS ILLEGAL ON ITS FACE UNDER THE FAMILY AND MEDICAL LEAVE ACT (FMLA); THUS, BNSF CANNOT PROVIDE ANY ARGUABLE BASIS FOR THE POLICY UNDER *CONRAIL* BECAUSE IT IS UNLAWFUL.

The Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, prohibits employers from "interfering with, restraining, or denying" an employee's exercise of FMLA rights. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(a)(1). It also prohibits employers from "discriminating or retaliating against an employee … for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Employers, therefore, cannot consider "FMLA leave as a negative factor in employment actions" and must provide an employee who takes FMLA leave with the same benefits that "an employee on leave without pay would otherwise be entitled to [receive]." *Id*. Similarly, "FMLA leave [cannot] be counted under no-fault attendance policies," meaning employees cannot accrue points for taking FMLA leave under a no-fault attendance policy. *Id*.;

11

*see also* WHD Opinion Letter FMLA2003-4, 2003 WL 25739620 (July 29, 2003). "'[N]o-fault' attendance policies [] do not necessarily violate the FMLA as long as points are not assessed for employees who are absent due to any FMLA qualifying reason." WHD Opinion Letter FMLA2003-4, 2003 WL 25739620, at *1.

However, when a no-fault policy like BNSF's Hi Viz policy provides for a set period of specified attendance that removes attendance points but restarts the period from scratch if the employee misses work due to an FMLA absence, the policy is unlawful. *See Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472 (6th Cir. 2019). In *Dyer*, the Sixth Circuit confronted a no-fault attendance policy that provided for a thirty-day threshold of good attendance for the employee to earn a reduction in previous absence attendance points that are counted for discipline. The employer reset the thirty-day "clock" every time there was an intervening absence. The policy provided that use of FMLA would reset the clock, just like any other absence. The court held that this type of policy impermissibly failed to freeze benefits, such as the period of earned good attendance, prior to the FMLA leave. Thus, it unlawfully discouraged workers for taking FMLA and was unlawful. The court cited two separate opinion letters from the U.S. Department of Labor (DOL) from 1999 and 2018 that held that no-fault attendance with accrual toward point reduction must, at the very least, be frozen during FMLA leave. The DOL opined that an employer's FMLA obligation to restore an employee to the same or equivalent position includes the obligation to restore the number of days accrued toward absentee point reduction. *See* 1999 FMLA Ltr., 1999 WL 1002428, at *2 (January 12, 1999) ("If the employee had 45 days without a recordable [absence] at the time the unpaid FMLA leave commenced, the employer would be obligated to restore the employee to this number of days credited without an [absence])." *See also* 2018 FMLA Ltr., 2018 WL 4678694, at *2 (August 28, 2018).

In the present case, the Hi Viz policy likewise provides for a set period of good attendance that will cause a reduction in disciplinary points. In this case, that is 14 days of uninterrupted attendance rather than thirty under *Dyer*. On its face, the Hi Viz policy restarts the clock during the 14-day period if FMLA is taken. That is, the progress earned under the 14-day period for point reduction is not frozen, but rather is forfeited upon return from the FMLA leave. Hence, the Hi Viz policy is identical to the unlawful policy under *Dyer*, and unilateral implementation of the illegal policy cannot be used as grounds to restrain BLET from resorting to self-help. Thus, BNSF is not entitled to a TRO restraining BLET from resorting to self-help in response to the unlawful Hi Viz policy.

## **CONCLUSION**

Accordingly, for all the foregoing reasons set forth herein, the BLET respectfully requests that the Court deny Plaintiff's motion for a temporary restraining order.

Dated: January 24, 2022

Respectfully submitted,

/s/ Rod Tanner
Rod Tanner
Texas State Bar No. 19637500
Tanner and Associates, PC
6300 Ridglea Place, Suite 407
Fort Worth, Texas 76116-5706
Ph: 817.377.8833
Fax: 817.377.1136
rtanner@rodtannerlaw.com

James Petroff (Ohio Reg. 42476)
Joshua D. McInerney (Ohio Reg. 84355)
**WENTZ, MCINERNEY,
PEIFER & PETROFF, LLC**
3311 Bear Point Circle
Powell, OH 43065
Phone: (614) 756-5566
jpetroff@lawforlabor.com
jmcinerney@lawforlabor.com
*Counsel for Defendant BLET*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2022, I electronically filed the foregoing document(s) with the Clerk of the Court using the ECF System, which will provide electronic notice and copies of such filing of the to the parties.

/s/ *Rod Tanner*