**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| BNSF RAILWAY COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-0052-P |
| | § | |
| INTERNATIONAL ASSOCIATION OF | § | |
| SHEET METAL, AIR, RAIL AND | § | |
| TRANSPORTATION WORKERS – | § | |
| TRANSPORTATION DIVISION, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT SMART-TD's RESPONSE AND BRIEF IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND BRIEF IN SUPPORT**

SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214

KEVIN C. BRODAR
General Counsel
Ohio Bar No. 52854
ERIKA DIEHL-GIBBONS
Associate General Counsel
Ohio Bar No. 86424
SMART-TD
24950 Country Club Blvd., Ste. 340
North Olmsted, OH 44070

*Counsel for Defendant International*
*Association of Sheet Metal, Air, Rail and*
*Transportation Workers – Transportation*
*Division ("SMART-TD")*

Dated: January 24, 2022

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................ii

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 1

III.    LEGAL STANDARD .............................................................................................. 5

IV.     SUMMARY OF ARGUMENT ............................................................................... 6

V.      ARGUMENT .......................................................................................................... 8

    A.  BNSF Has Not Established a Likelihood of Success on the Merits ...................... 8

        1.  The Status Quo Provisions under the RLA. ...................................................... 8

        2.  This Matter Does Not Present a Minor Dispute. .............................................. 9

        3.  This Matter Presents and Independent Statutory Dispute. .............................. 12

    B.  BNSF Cannot Carry its Burden to Establish a Substantial Threat of Irreparable Harm as No Strike Threat Exists. .............................................................................. 17

        1.  The Record Establishes that SMART-TD's Conduct Is Not an Imminent Strike Threat. .......... 17

        2.  BNSF Cannot Even Infer any Strike Threat Based on Present and Past Dealings Between the Parties. .......................................................................... 19

    C.  The Balance of Harms and the Public Interest Do Not Support Injunctive Relief. ....................... 20

    D.  BNSF is Not Entitled to Injunctive Relief Due to the Norris-LaGuardia Act's Policy of Limiting Court Intervention in Labor Disputes. ....................................... 21

VI.     CONCLUSION ...................................................................................................... 22

CERTIFICATE OF SERVICE ............................................................................................. 24

I.     **TABLE OF AUTHORITIES**

Page(s)

Cases

*Air Line Pilots Ass'n, Int'l v. O'Neill,*
499 U.S. 65 (1991) ................................................................... 14
*Aircraft Service Int'l, Inc. v. Int'l Bhd. of Teamsters,*
779 F.3d 1069 (9th Cir. 2015) ........................................... 6, 21
*Bailey v. Pregis Innovative Packaging, Inc.,*
600 F.3d 748 (7th Cir. 2010) ................................................ 15
*Bhd. of Ry. Carmen v. Atchison, Topeka & S.F. Ry.,*
894 F.2d 1463 (5th Cir. 1990) ............................................... 14
*Bhd. R.R. Trainmen v. Toledo, P. & W. R.R.,*
321 U.S. 50 (1944) ................................................................ 22
*BNSF Ry. Co. v. Bhd. of Maintenance of Way Employees,*
286 F.3d 803 (5th Cir. 2002) ................................................. 19
*BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers,*
2016 WL 1242627 (N.D. Tex. Mar. 30, 2016) ................... 7, 18
*BNSF v. Am. Train Dispatchers Ass'n,*
2005 WL 1132983 (N.D. Tex. May 12, 2005) ......................... 7
*BNSF v. SMART-TD,*
2021 WL 2695141 ....................................................... 6, 7, 18
*BNSF v. United Transp. Union,*
462 F.Supp.2d 746 (S.D. Texas 2006) ...................... 19, 20, 21
*Burris v. Brazell,*
351 Fed.Appx. 961 (5th Cir.2009) ........................................ 15
*Canal Auth. of the State of Florida v. Callaway,*
489 F.2d 567 (5th Cir.1974) .................................................... 5
*Carpenter v. N.W. Airlines, Inc.,*
2001 WL 1631445, *3 (D. Minn. June 7, 2001) .................... 16
*Chicago & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n,*
908 F.2d 144 (7th Cir. 1990) ........................................... 10, 11
*Chicago & Nw. Ry. Co. v. United Transp. Union,*
402 U.S. 570 (1971) ................................................................. 9
*Clark v. Prichard,*
812 F.2d 991 (5th Cir. 1987) ............................................... 5, 8
*Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n,*
491 U.S. 299 (1989). ............................................................... 9
*Consolidated Rail Corp. v. Bhd. of Maint. of Way Employees,*
847 F.Supp. 1294 (E.D. Pa. 1994) .......................................... 7
*CSX Transp., Inc. v. United Transp. Union,*
879 F.2d 990 (2d Cir. 1989) .................................................. 10
*Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.,*
16 F.3d 832 (7th Cir. 1994) ................................................... 15

*Demyanovich v. Cadon Plating & Coatings, L.L.C.*,
  747 F.3d 419 (6th Cir. 2014) ................................................................. 15

*Dennis Melancon, Inc. v. City of New Orleans*,
  703 F.3d 262 (5th Cir. 2012) ................................................................... 5

*Dyer v. Ventra Sandusky, LLC*,
  934 F.3d 472 (6th Cir. 2019) ............................................................ 15, 16

*Gen. Comm. of Adjustment, United Transp. Union, W. Maryland Ry. Co. v. CSX R.R. Corp.*,
  893 F.2d 584 (3d Cir. 1990) .................................................................. 10

*Harris County, Texas v. Carmax Auto Superstores, Inc.*,
  177 F.3d 306 (5th Cir. 1999) ................................................................. 20

*Hawaiian Airlines, Inc. v. Norris*,
  512 U.S. 246 (1994) ....................................................................... 12, 16

*Indep. Union of Flight Attendants v. Pan Am World Airways*,
  624 F.Supp. 64 (E.D.N.Y. 1985) ........................................................... 21

*Int'l Bhd. of Elec. Workers v. Foust*,
  442 U.S. 42 (1979) ............................................................................. 14

*Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*,
  457 U.S. 702 (1982) ........................................................................... 21

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ............................................................. 5, 21

*Kansas City S. Ry. v. Bhd. of Loco. Eng'rs & Trainmen*,
  2013 WL 3874513 (W.D. La. July 25, 2013) ......................................... 11

*Norfolk & Western Ry. Co. v. Bhd. of R.R. Signalmen*,
  164 F.3d 847 (4th Cir. 1998) ................................................................. 7

*North Am. Airlines, Inc. v. Int'l Bhd. of Teamsters*,
  2005 WL 646350 (S.D.N.Y. March 21, 2005) ........................................ 7

*Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*,
  692 F.3d 343 (5th Cir. 2012) ................................................................. 5

*Ry. Lab. Executives Ass'n v. Chesapeake W. Ry.*,
  915 F.2d 116 (4th Cir. 1990) ................................................................ 10

*Detroit & T. S. L. R. Co. v. United Transp. Union*,
  396 U.S. 142 (1969) ...................................................................... 9, 10

*Southwest Pilots Ass'n v. Southwest Airlines Co.*,
  2021 WL 4975010 (N.D. Tx. Oct. 26, 2021) ..................................... 11, 12

*Staunch v. Continental Airlines, Inc.*,
  2007 WL 218729 (N.D.Ohio Jan. 26, 2007) ........................................ 16

*Trans World Airlines, Inc. v. Indep. Fed. of Flight Attendants*,
  489 U.S. 426 (1989) ........................................................................... 13

*Wheeling & Lake Erie Ry. Co. v. Bhd. of Loco. Eng'rs & Trainmen*,
  789 F.3d 681 (6th Cir. 2015) .......................................................... 9, 10

*Wightman v. Springfield Terminal Ry. Co.*,
  100 F.3d 228 (1st Cir. 1996) ................................................................ 13

<u>Statutes</u>

29 U.S.C. § 101 ............................................................................... 5, 21
29 U.S.C. § 104(a) ............................................................................. 21

29 U.S.C. § 108 ............................................................................................................ 21

29 U.S.C. § 2615(a)(1) ................................................................................................. 15

29 U.S.C. §§ 2601–2654 ............................................................................................. 12

45 U.S.C. § 151 ......................................................................................................... 1, 2

45 U.S.C. § 152 .......................................................................................... 8, 9, 13, 15

45 U.S.C. § 156 ........................................................................................................ 8, 9

Rules

F.R.C.P. 5 .................................................................................................................... 24

Regulations

29 C.F.R. § 825.220(a)(1) ........................................................................................... 15

29 C.F.R. § 825.220(c) ................................................................................................ 15

Other Authorities

WD Opinion Letter FMLA 2018-1-A ........................................................................... 15

## I.     INTRODUCTION

Defendant the International Association of Sheet Metal, Air, Rail, and Transportation Workers – Transportation Division ("SMART-TD" or the "Union") submits the following as its Response and Brief in Support of its opposition to Plaintiff Burlington Northern Santa Fe Railway Company's ("BNSF") Motion for Temporary Restraining Order. As demonstrated below, BNSF is unable to succeed on the merits. It is therefore unable to meet the standard for the extraordinary remedy of injunctive relief, and its request for a Temporary Restraining Order should be denied.

## II.     FACTUAL BACKGROUND

SMART-TD is the duly authorized "representative" of the employees working in the crafts or classes of Yardmasters and train service employees, including Conductors, employed by BNSF. 45 U.S.C. § 151 Sixth. (Docket Entry ("D.E.") No. 5, BNSF Am. Compl. at ₽ 2). SMART-TD is governed by a Constitution, and has a tripartite structure: the International as the administrative head; semi-autonomous, mid-level bodies known as General Committees of Adjustment ("GCA"), which are responsible for negotiating and enforcing the collective-bargaining agreement ("CBA") with their respective carrier on their respective territories; and locals, where membership is held. (Ferguson Decl. ¶ 2). SMART-TD GCA GO-001 is the subordinate body with jurisdiction over certain predecessor railroads including the former Great Northern line. (*Id.* Decl. ¶ 3). The General Chairperson ("GC") of GCA GO-001 is Joseph M. LaPresta. (*Id.*). SMART-TD GCA GO-009 is the subordinate body with jurisdiction over the former Atchison Topeka & Santa Fe ("AT&SF"). (*Id*). The GC of GCA GO-009 is Scott Swiatek. (*Id.*). SMART-TD GCA GO-009 the subordinate body with jurisdiction over the former Coastlines. (*Id*). The Acting GC of GCA GO-017 is Johnny Martinez. (*Id.*). SMART-TD GCA

1

GO-020 is the subordinate body with jurisdiction over the craft or class of Yardmasters employed by BNSF and its predecessors (*Id*). The GC of GCA GO-020 is Justin Schrock. (*Id.*). SMART-TD GCA GO-341 is the subordinate body with jurisdiction over the former ATSF Coast and Los Angeles Junction. (*Id.*). The GC of GCA GO-341 is Matthew Burkart. (*Id.*). SMART-TD GCA GO-386 is the subordinate body with jurisdiction over the former Great Northern. (*Id,*). The GC of GCA GO-386 is Larry Miller. (*Id.*). SMART-TD GCA GO-393 is the subordinate body with jurisdiction over the former AT&SF Western lines. (*Id,*). The GC of GCA GO-393 is Kevin Kime. (*Id.*).

BNSF is a common carrier by railroad engaged in interstate commerce, and is a "carrier" as defined by the RLA. 45 U.S.C. § 151 First. (D.E. 5, ¶ 3). SMART-TD and BNSF are parties to CBAs on a national and local level that control the terms and conditions of employment. (Ferguson Decl. ¶ 2). SMART-TD and BNSF have been in engaged in in "national handling" since November 1, 2019, to negotiate wages, work rules, and other terms and conditions of employment. (*Id*. ¶ 4). "National handling" is bargaining in the form of a multiemployer and multi-union groups. (*Id*. ¶ 5). The parties have additionally been bargaining on a local level over various matters. (*Id*.). Critical issues in this round of bargaining include quality of life issues, including employee availability for work and sick leave. (*Id*.). Negotiations were initiated by the service of Section 6 Notices, which included various changes to employee availability. (*Id*.). For example, contained within SMART-TD's Section 6 Notice was a proposal to "establish additional rest opportunities and the ability to mark off for family needs, visits to a primary care physician, and emergencies related to quality of life, without penalty;" and "[e]stablish paid sick leave for all train and engine service employees, without censure or discipline." (*Id*., Ex. B,

SMART-TD Sec. 6 at Items 7, 15). The parties have been discussing these matters at the bargaining table. (*Id.*).

Despite these matters being in active negotiation, on January 4, 2022, the GCs were notified via zoom that BNSF intended to present its new High Visibility ("Hi Viz") attendance policy the following day, with BNSF refusing to answer any questions posed by the GCs.[1] (*Id.* ¶ 6, Ex. C). On January 10, 2022, BNSF officially announced its intentions to implement its "Hi Viz" Policy effective February 1, 2022. (*Id.*). Under this new policy, employees begin with 30 points, which are then deducted based on certain enumerated unavailability events, including fatigue, sickness, and family emergency. (*Id.*). The policy then provides for "good attendance credits," where an employee is awarded four points for any 14-day period in which they work without an "unavailable" event. (*Id.*). If an employee is absent from work because of federally protected leave under the Family Medical Leave Act ("FMLA") or off on union business, s/he is not eligible for any good attendance credit for that 14-day period. (*Id.*).

On January 11, 2022, the SMART-TD General Chairpersons representing employees on BNSF objected to the Carrier's unilateral action, writing to the SMART Transportation Division President Jeremy Ferguson for assistance. (*Id.* ¶ 7, Ex. D). SMART-TD's process for requesting SMART International assistance on disputes is set forth in Article 21B, Section 91 of the SMART Constitution. (*Id.* ¶ 7, Ex. E). That Section has several steps and provides, in pertinent part, that where the GCs are unable to resolve a particular dispute with a carrier, they may request the assistance of the President Transportation Division to progress the matter to a

---

[1] However, BN did state that no information would be distributed to the employees and local union officers until all the GCs questions and concerns were answered. (*Id.* ¶ 6). Despite such representations, on January 6, 2022, various BNSF General Managers began holding zoom meetings directly with SMART-TD Local Chairpersons, wherein the General Managers provided the LCs with more information that had been provided to the GCs. (*Id.* ¶ 6).

conclusion. (*Id.*). If the matter cannot be resolved, and the GCs wish to request self-help, the Constitution provides that any strike action must be authorized by a two-thirds (2/3) vote of the members of the GCAs. (*Id.*). Further, "[I]n the event that the President Transportation Division or their representative and the General Committee are unable to reach a satisfactory adjustment of the matter, the President Transportation Division may recommend to the [SMART] General President who may order a strike on all or any portion of the company involved." (*Id.*).

By letter dated January 12, 2022, President Ferguson responded to the GCs, stating in pertinent part that the GCs were permitted to conduct a polling of their members as noted above. Said letter further cautioned that "the approval of this proposition by a General Committee, as outlined above, does not constitute imminent authority to engage in any strike action, as additional steps must be taken under the governing provisions of the SMART Constitution, **and must be handled in accordance with the Railway Labor Act**, as amended." (*Id*. ¶ 7, Ex. F). (emphasis added).

BNSF filed the instant Complaint on January 13, 2022, in the Northern District of Texas, Dallas Division, which was subsequently amended on January 17, 2022. (D.E. 1, Compl.; D.E. 5, Am. Compl.). BNSF sought assurances from the GCs that they viewed the dispute as "minor" under the RLA and would not strike. (*Id*. ¶ 8). When the GCs declined to do so, as is their right, BNSF filed the present Motion for Temporary Restraining Order on January 18, 2022. (D.E. 6, 7).[2] BNSF asserted that it was concerned that a strike would occur imminently due to rumors

---

[2] The same day, Judge Lynn ordered BNSF to show cause why the lawsuit was filed in the Dallas Division. (D.E. 10). BNSF filed its response to the order to show cause on January 19, 2022, asserting in part that a 1999 decision on BNSF's availability policy was heard in the Dallas Division and that any strike would impact its operations under the jurisdiction of that Division. (D.E. 12, 13). The very next day, the case was transferred to the Fort Worth Division and subsequently reassigned to the Honorable Judge Pittman.

they had heard. (D.E. 7 at 7). The Union assured BNSF that no action, even if any were to be taken, would not happen prior to February 1. (Ferguson Decl. ¶ 8). Nevertheless, BNSF filed for an immediate TRO.

### III.   <u>LEGAL STANDARD</u>

In order to succeed in obtaining the injunctive relief requested here, a movant must establish: (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir.1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974) (en banc). Such injunctive relief is "an extraordinary remedy that 'should not be granted unless the party seeking it has clearly carried the burden of persuasion <u>on all four elements</u>.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (emphasis added) (citing *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012)); *see also Janvey v. Alguire*, 647 F.3d 585, 592 (5th Cir. 2011) (in order to obtain a prohibitive injunction which bars a party from acting, a <u>stringent standard</u> is applied). For our purposes here, BNSF must establish: (1) that it is likely to succeed in its claim that the present dispute is a minor dispute; (2) there is a substantial threat of a strike or other job action that would irreparably harm BNSF; (3) the harm to BNSF outweighs the harm to Defendant SMART-TD; and (4) an injunction preventing the strike would not disserve public interest.

In addition to this "strenuous standard," the Norris LaGuardia Act ("NLGA") greatly diminishes the jurisdiction of a court to issue an injunction in a labor dispute. 29 U.S.C. § 101.

A narrow exception exists under the RLA only in "situations in which an injunction is the <u>only</u> remedy that can safeguard a right that the RLA grants." *Aircraft Service Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1073 (9th Cir. 2015). As explained in more detail below, BNSF's claims fail to meet this narrow exception, and its request for an injunction should be denied.

## IV.   <u>SUMMARY OF ARGUMENT</u>

In support of its request for injunctive relief, BNSF places particular emphasis on the argument that "[t]he threshold issue is not who is right or wrong about the merits of the parties' dispute over the Hi Viz policy, but only whether this dispute should be classified as 'major' or 'minor' under the Railway Labor Act ("RLA"). (D.E. No. 7 at 1). BNSF contends that the present dispute is properly classified as minor under the RLA, is not an RLA statutory dispute, and is not one of interference with union representation. (*Id*. at 13-19). BNSF further argues that it would suffer harm from a strike, the balance of which weighs in favor of granting the relief it seeks, and that such relief would be in the public interest. (*Id*. at 20-21).

All of these arguments however omit the critical fact that BNSF's new policy changes the working conditions in effect during the ongoing bargaining, bargaining which concerned these very same topics. Further, such ignores that the policy changes interfere with rights afforded under federal law, including the RLA's rights to union representation and the FMLA.

Moreover, the burden is on BNSF to establish the actual threat of an imminent strike to obtain a TRO.[3] Indeed, BNSF entirely glosses over the requirement that there be a "substantial threat" of a strike actually occurring imminently. *Id.* It is well-settled that injunctive relief is

---

[3] Furthermore, BNSF neglects to mention that it unsuccessfully requested this very same relief before this very same court just ten months ago. *BNSF v. SMART-TD*, 2021 WL 2695141 (finding BNSF failed to establish a substantial threat of immediate threat of strike to warrant injunctive relief).

wholly inappropriate where, as here, there is no <u>immediate</u> threat of a strike. *Id.*; *see also BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division*, 2016 WL 1242627 (N.D. Tex. Mar. 30, 2016) (J. Lynn); *Norfolk & Western Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998) (no injunction where there is no imminent threat of a strike and while a strike would harm the railroad, the focus of the inquiry must be whether a strike was imminent); *BNSF v. Am. Train Dispatchers Ass'n*, 2005 WL 1132983 at *9 (N.D. Tex. May 12, 2005) (no injunction warranted where no threat of strike exists); *see also Consolidated Rail Corp. v. Bhd. of Maint. of Way Employees*, 847 F.Supp. 1294, 1295-96 (E.D. Pa. 1994); *North Am. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 2005 WL 646350 at *14-16 (S.D.N.Y. March 21, 2005). SMART-TD has stated that no action would be taken prior to February 1, and there may not be any action taken even then. (Ferguson Decl. ¶ 8). There is nothing in the record to suggest or hint SMART-TD will engage in any self-help prior to February 1, if even then. Indeed, SMART-TD has provided assurances to that effect, nor has it exhausted the necessary steps under the process required under the Constitution for any strike action to be authorized or to occur. (*Id.*). Both the SMART-TD President and the SMART General President must approve of any self-help activity after review of the entire situation.   Not only does BNSF completely fail in setting forth any basis that a strike threat exists, this very same argument has been put forth by BNSF time and again only to meet with failure, including before this Court. *See, e.g., BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division*, No. 4:21-cv-00432-P, 2021 WL 2695141 (N.D. Tex. Mar. 19, 2021) ("*BNSF v. SMART-TD*") (J. Pittman) (finding BNSF failed to establish a substantial threat of immediate threat of strike to warrant injunctive relief); *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers – Transportation*

*Division*, 2016 WL 1242627 (N.D. Tex. Mar. 30, 2016). Because BNSF has not shown it is likely to succeed on the merits and because there is no imminent strike threat, BNSF's requested TRO should be denied.

## V.      ARGUMENT

### A.  BNSF Has Not Established a Likelihood of Success on the Merits.

To obtain injunctive relief, BNSF must establish a substantial likelihood of success on the merits. *Prichard, supra*. Here, BNSF argues that the present dispute is minor because of its "implied right to manage employee attendance, as evidenced by past practice," along with its "reserved management rights." (D.E. 7 at 13-15). Neither argument has any merit under the unique facts presented here, where it is BNSF who upset the status quo and where the employees are taking leave protected by federal law.

#### 1.   The Status Quo Provisions under the RLA.

The RLA's purposeful directive bars a carrier from unilaterally altering the existing employment conditions or the terms of the bargained-for agreement. 45 U.S.C. § 152 First, Seventh. Any change can <u>only</u> be accomplished through the required process of Section 6. 45 U.S.C. § 156. Despite such, BNSF here has altered the wages and terms and conditions of employment without engaging in any negotiations. Such unilateral change violates the Act and should itself be enjoined.

Section 2, First which, as noted above, "has been described as the 'heart' of the RLA," provides:

> It <u>shall be the duty of all carriers</u>, their officers, agents, and employees to exert every reasonable effort <u>to make and maintain agreements concerning rates of pay, rules, and working conditions</u>, and to settle all disputes, whether arising out of the application of such agreements or otherwise …

45 U.S.C. § 152, First (emphasis added). Section 2, Seventh provides:

8

<u>No carrier</u>, its officers or agents <u>shall change the rates of pay, rules or working conditions</u> of its employees as a class as embodied in agreements **except** in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 152 Seventh (emphasis added). These provisions command that the Carrier <u>must</u> maintain current working conditions, and that unilateral changes to those conditions are prohibited absent engaging in the required bargaining process set forth in Section 6. 45 U.S.C. § 156 ("<u>In every case</u> where such notice of intended changes has been given … rates of pay, rules, or working conditions <u>shall not be altered by the carrier until the controversy has been finally acted upon</u> … .) (emphasis added).

Collectively, these provisions constitute the status quo provisions of the Act, and may be enforced by the issuance of a status quo preliminary injunction against a carrier without the necessity of showing irreparable harm. *See Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303 (1989) ("*Conrail*") ("[T]he district courts have subject matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury."); *see also Detroit & T. S. L. R. Co. v. United Transp. Union*, 396 U.S. 142, 156-57 (1969) ("*Shore Line*") (citing Section 2 Seventh, 45 U.S.C. § 152 Seventh); *Chicago & Nw.,* 402 U.S. 570 (citing Section 2 First, 45 U.S.C. § 152 First); *Wheeling & Lake Erie Ry. Co. v. Bhd. of Loco. Eng'rs & Trainmen*, 789 F.3d 681, 691 (6th Cir. 2015) ("*W&LE*"). Where a carrier violates the status quo, as BNSF has done here, the conditions that existed prior to the violation must be restored *Shore Line,* 396 U.S. at 156-57; *W&LE*, 789 F.3d at 69.

### 2.   *This Matter Does Not Present a Minor Dispute.*

The standard for determining whether a dispute is major or minor is well-settled. "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor

if the action is arguably justified by the terms of the parties' collective-bargaining-agreement." *Conrail*, 491 U.S. at 307. "Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id*. "[A] major dispute is a dispute to which section 6 procedures are applicable – a dispute kicked off by the filing of a notice of desire to modify an existing collective bargaining agreement. *Chicago & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990).

Here, the Parties are currently involved in collective bargaining negotiations where employee availability and work schedules are a hotly debated topic. Of note, BNSF, through its bargaining representative the National Carrier Conference Committee, has put forth a proposal in its Section 6 notice wherein it has called for "better and more predictable work schedules" to "enhance employee quality of life." (Ferguson Decl. ¶ 5, Ex. A). Anticipating this argument, BNSF asserts that even if the parties are bargaining over future attendance rules, it at least arguably has the right under current agreements to implement new attendance standards or policies. (D.E. 7 at 20). Such an argument misses the point and requirement of the status quo provision. Once § 6 Notices are exchanged, the working conditions as they exist cannot be changed until the process has been completed. *Shore Line*, 396 U.S. 142; *W&LE*, 789 F.3d at 691. Here, BNSF has done just that. The out-of-Circuit decisions relied upon by BNSF are inapposite here, particularly where the majority of which dealt with railroad's rights where they were selling or transferring their own rail lines. *Ry. Lab. Executives Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116 (4th Cir. 1990) (finding dispute over sale of rail line to be a minor dispute); *Gen. Comm. of Adjustment, United Transp. Union, W. Maryland Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584 (3d Cir. 1990) (same); *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990 (2d Cir. 1989) (same).

10

To the extent that BNSF falls back on an implied rights argument, such is akin to the managerial prerogative arguments that carriers have unsuccessfully advanced in the past. The "managerial prerogative" generally refers to the idea that railroads may modify working conditions as they please in the absence of a restriction negotiated by the union. *Kansas City S. Ry. v. Bhd. of Loco. Eng'rs & Trainmen* ("*KCS v. BLET*"), No. CIV.A. 13-838, 2013 WL 3874513, *2 (W.D. La. July 25, 2013).[4] Courts have rejected similar arguments where they do not "lie at the core of entrepreneurial control of the business, such as selling a rail line or setting executive compensation unilaterally." *KCS v. BLET*, 2013 WL 3874513, *2 n.1 (citing *Chicago & Nw. Transp. Co. v. Ry. Labor Exec. Ass'n*, 908 F.2d 144, 152 (7th Cir. 1990) ("*C&NW v. RLEA*") ("A matter of prerogative is one the carrier is not required to bargain over and therefore is unlikely to surrender in bargaining, though nothing in the Act forbids it to do so. If there has been no waiver of prerogative in the collective bargaining agreement, then the union cannot insist that the carrier bargain over prerogative matters, such as executive perks, recapitalization, rates charged shippers, and other matters that are only indirectly—though often vitally—related to the status of the workers represented by the union."). As in *KCS v. BLET*, BNSF's actions here would indeed change terms and conditions of employment, and thus do not fall within the core of entrepreneurial control of the business. As such, it is subject to the required bargaining process.

This is particularly true where, as here, the CBAs are devoid of a broad-based management rights clause seen in *Southwest Pilots Ass'n v. Southwest Airlines Co.*, No. 3:21-cv-02065-M, 2021 WL 4975010 (N.D. Tx. Oct. 26, 2021), a case relied by BNSF for its position

---

[4] While the court in *KCS v. BLET* ultimately found the carrier's installation of inward facing cameras to be minor based on the railroad's arguable position that the parties' implied agreements concerning monitoring allowed the installation of the cameras, it rejected arguments of managerial prerogative. 2013 WL 3874513 at *2, 5.

here. (Dkt. No. 7 at 5, 16). (Ferguson Decl. ¶ 4). In *Southwest,* the District Court for Northern District of Texas recently reviewed an airline's mandatory vaccine policy and related changes. In that case, Southwest had negotiated a broad "Management Rights" clause and contended that its policies were arguably justified by the broad management rights clause contained in the parties' CBA. *Id.* at *9. In finding that the airline had met its relatively light burden that the dispute was minor, the court noted in pertinent part:

> The CBA has a broad purpose under § 1(A), namely to "provide for the operation of the Company under methods which will further, to the fullest extent possible, the safety of air transportation, the efficiency of operation and the continuation of employment of all pilots under safe and reasonable working conditions and proper compensation." CBA § 1(A) (App. 52). The CBA further vests in Southwest, under the Management Rights provision, the ability to "manage and direct the work force" and employees covered by the CBA "shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement," and that are issued with sufficient notice under the CBA. CBA § 1(O) (App. 63). Thus, under the CBA, the pilots agreed to be governed by Southwest regulations that may issue in the future, so long as they do not conflict with the CBA. … Moreover, on the facts currently before the Court, the Vaccine Policy does not include a termination provision, and thus does not conflict with the CBA's discipline and termination provisions.

*Id.* at *9. However, the CBAs here are devoid of any such management rights provision. (Ferguson Decl. ¶ 4). Therefore, BNSF is not permitted to unilaterally impose this policy without bargaining.

### 3. *This Matter Presents and Independent Statutory Dispute.*

However, in addition to major and minor disputes, parties can also raise independent statutory disputes over a carrier's violation other provisions of the RLA and other federal statutes. *See, e.g., Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994). The Hi Viz policy on its face discriminates against individuals who are union officers unavailable for their railroad work when off on union business and those who take leave under the Family and Medical Leave

Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–2654. While the policy does not deduct points for such leave, unlike military leave and leave for company business, it prohibits employees from crediting points back. (Ferguson Decl. ¶ 6, Ex. C). In addition, union officers and those on FMLA leave are penalized an extra two or three points if they are unavailable the day before or after such protected leave. (*Id.*). Such violates the RLA and FMLA.

With regard to the violation of the RLA, the policy implicates Sections 2 Third and Fourth. 45 U.S.C. § 152, Third, Fourth. Section 2, Third, states, in pertinent part: "Representatives ... shall be designated by the respective parties <u>without interference, influence, or coercion</u> by either party over the designation of representatives by the other; and <u>neither party shall</u> in any way <u>interfere with, influence, or coerce the other in its choice of representatives</u>."  45 U.S.C. § 152, Third (emphasis added).  Section 2 Fourth, states, in pertinent part:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. … No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, … or to influence or coerce employees in an effort to induce the them to join or remain or not to join or remain members of any labor organization.

45 U.S.C. § 152, Fourth. While federal courts' jurisdiction may be limited post-certification, *Trans World Airlines, Inc. v. Indep. Fed. of Flight Attendants*, 489 U.S. 426, 440 (1989), it is not absolutely foreclosed. The court will intervene where, as here, "the aggrieved union has no other remedy to enforce the statutory commands which Congress had written into the [RLA].'" *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 234 (1st Cir. 1996) (citing *TWA,* 489 U.S. at 440). In *Wightman*, the First Circuit noted that intervention is appropriate "upon demonstration of carrier conduct reflecting anti-union animus, an attempt to interfere with

13

employee choice of collective bargaining representative, discrimination, or coercion," and "when a carrier commits acts of intimidation that cannot be remedied by administrative means, or commits a fundamental attack on the collective bargaining process or makes a direct attempt to destroy a union." *Wightman*, 100 F.3d at 234. Notably, this is not a direct dealing case, nor is there a contract interpretation question at issue here, as in *Bhd. of Ry. Carmen v. Atchison, Topeka & S.F. Ry.*, 894 F.2d 1463, 1467 (5th Cir. 1990) (finding resolution of dispute over whether railroad could offer voluntary resignation program turned on interpretation of the contractual agreements between the parties and was therefore "minor"). While SMART-TD has not yet had the opportunity to file an Answer and Counterclaim, as it has not yet even been served with this lawsuit, SMART-TD will likely allege that BNSF's efforts were designed to interfere and undermine SMART-TD's representation of its members.

Moreover, and quite critically, this Hi Viz policy interferes with the ability of the union to carry out its legal obligation to represent its membership. *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 46-47 (1979) (noting a union has a duty of fair representation); *see also Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65 (1991). Once a BNSF issues a Notice of Investigation to an employee for an alleged rules violation, it will set an on-property hearing date usually within 10 days. (Ferguson Decl. ¶ 6). This requires the Local Chairperson ("LC") to mark off (*i.e.*, take leave for union business) to attend the hearing and represent the member. (*Id.*). The LC is penalized for this mark off, even though it was not their choice, but was at the insistence of BNSF. Similarly, the LC may have to mark off to attend to the various appeal meetings as the grievance is progressed up. (*Id.*). This places an LC in the untenable position of facing discipline for fulfilling their required legal obligation. As such, this impairs the union's ability to carry out

14

its legal duty of representation, and makes it impossible to retain or attract officers to perform necessary work. Such oppressive policy cannot stand.

Indeed, as a practical matter, it is BNSF who controls when the investigations and meetings take place, which must be attended by SMART-TD representatives. (*Id.*). Moreover, in the rollout itself, BNSF circumvented the GCs, instead talking directly with the LCs to push its Hi Viz policy. (*Id.*). Such is an attempt to interfere with the union's choice of representative, in violation of Sections 2 Third and Fourth, 45 U.S.C. 152 Third, Fourth. Taken as a whole, these actions absolutely "strike a fundamental blow to union or employer activity and the collective bargaining process itself.'" *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 F.3d 832, 841 (7th Cir. 1994). At a minimum, such undercuts BNSF's likelihood of success on the merits.

Furthermore, it has been held that the taking FMLA leave as a negative factor in employment actions constitutes interference for purposes of the FMLA.[5] *Demyanovich*, 747 F.3d at 475-76; *see also Bailey v. Pregis Innovative Packaging, Inc.*, 600 F.3d 748-750-51 (7th Cir. 2010) ("[W]iping a point off the absenteeism slate is indeed an employment benefit."). Such is consistent with the U.S. Department of Labor's guidance and supporting case law. *See* WHD Opinion Letter FMLA 2018-1-A; *Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472 (6th Cir. 2019).

---

[5] The FMLA prohibits employers from "interfering with, restraining, or denying" an employee's exercise of FMLA rights, 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(a)(1); and from "discriminating or retaliating against an employee… for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). To prevail on an FMLA interference claim, a plaintiff must establish that (1) he was an eligible employee as defined under the FMLA; (2) his employer was a covered employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave the employer notice of his intention to take FMLA leave; and (5) his employer denied FMLA benefits to which he was entitled. *Burris v. Brazell,* 351 Fed.Appx. 961, 963 (5th Cir.2009); *see also Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014).

In *Dyer*, the Sixth Circuit held that the district court's grant of summary judgment to a company was improper because:

> A jury could find that [the company's] no-fault point-reduction scheme interfered with [the plaintiff's] right to take FMLA leave and be restored to an equivalent position with equivalent benefits and other terms and conditions of employment upon return to work. Restarting the 30-day period for eliminating one attendance demerit for intermittent FMLA leave punishes the employee for taking that leave, even though the FMLA leave itself does not count toward the 11-point limit. A jury could find that, by not resetting Dyer's 30-day perfect attendance clock after he returned to work after taking FMLA leave, Ventra Sandusky failed to restore his accrued employment benefits as required by the FMLA. What's more, even if Ventra Sandusky could avoid liability by showing that equivalent leave statuses similarly reset the 30-day clock, there is a dispute of material fact regarding whether it treats unpaid forms of military leave and union leave the same.

As noted above, BNSF's policy dictates that employees will begin with 30 points, which are then deducted in amounts ranging from two points to 25 points depending upon the reason for the absence and day of the week, culminating in discipline when those points reach a certain threshold. (Ferguson Decl., Ex. C). BNSF will then add back four points for any 14-day period in which the employee has not been absent for any reason other than training, working light duty, company business, or on military leave. (*Id.*). By punishing employees who use FMLA leave, and further by treating employees off FMLA differently than those on military leave, BNSF's policy has likely violated the FMLA.

To the extent that BNSF contends that any FMLA claims are precluded by the RLA and that this dispute presents a "minor dispute," such ignores that the Supreme Court has long held that claims to enforce rights "independent of" the collective-bargaining agreement are not preempted. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994); *see also Carpenter v. N.W. Airlines, Inc.*, CIV.00-2490 ADM/AJB, 2001 WL 1631445 (D. Minn. June 7, 2001) (denying airline's motion to dismiss discrimination case in part because "where there is a statutory basis for the claim, the 'major/minor dispute' analysis becomes irrelevant"). Indeed,

courts have routinely rejected arguments that FMLA claims are preempted by the RLA. *See, e.g.,*
*Staunch v. Continental Airlines, Inc.,* No. 1:06–CV–1011, 2007 WL 218729, *5 (N.D.Ohio Jan.
26, 2007) ("Staunch's FMLA claim arises under a federal law that exists independent of
Continental's collective bargaining agreement. By asserting an FMLA claim in her amended
complaint, Staunch seeks to enforce a federal statutory right, not a contractual right embodied in
the collective bargaining agreement. The Court can resolve Staunch's claim through a federal
statute and without any reference to the collective bargaining agreement. Consequently, the RLA
does not preempt Staunch's FMLA claim in this Court.")

### B. BNSF Cannot Carry its Burden to Establish a Substantial Threat of Irreparable Harm as No Strike Threat Exists.

The present record before this Court, as well as the history between the parties,
demonstrates that there is no imminent strike threat warranting injunctive relief.  BNSF cannot
establish that there is a strike threat that would result in irreparable harm. SMART-TD has made
clear that no strike, if any, would occur prior to February 1, and the various required steps under
the Union's Constitution to authorize and to allow self-help have not been completed. (Ferguson
Decl. ¶¶ 7-8). As BNSF cannot establish a substantial threat of immediate irreparable harm, its
request for injunctive relief must be denied.

### 1. The Record Establishes that SMART-TD's Conduct Is Not an Imminent Strike Threat.

In its Brief, BNSF argues that the present dispute is a minor dispute, the balance of harms
weighs in its favor, and that the public interest is best served by injunctive relief. (D.E. 7).
BNSF's argument is misplaced. The critical issue that must take precedence here is whether
there is an actual <u>imminent</u> strike threat. Without that, the Carrier's other arguments are a nullity.
Accordingly, what BNSF must address, and wholly fails to address, is the <u>substantial threat</u> of
irreparable harm. BNSF wants an immediate TRO based on rumors from "social media" that

some action may take place any day. Other than unnamed individuals posting comments, there is

no evidence that there has been any union action taken to engage in any immediate self-help.

The evaluation process regarding whether self-help is justified and appropriate under the RLA

and SMART's Constitution is still ongoing. Other than the polling of the GCA members, no

further action has been taken. As noted, there are several steps in this process of which BN is

well aware.

Just last year, this Court rightly denied BNSF's requested TRO, finding that BNSF has

failed to carry its burden to establish there is an immediate threat of a strike such that would

warrant the requested relief. *BNSF v. SMART-TD,* 2021 WL 2695141; *see also BNSF Ry. Co. v.*

*Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division*,

2016 WL 1242627, *3 (N.D. Tex. Mar. 30, 2016) (J. Lynn) (denying BNSF's request for an anti-

strike TRO against SMART-TD where "[t]he record [did] not establish an immediate threat of a

strike," and noting SMART-TD GCs do not have the authority to call strikes).

These cases are instructive for the present situation. In support of its claim that a strike is

imminent by SMART-TD, BNSF relies upon a letter sent by the GCs requesting International

assistance and strike authority to the Transportation Division President, and certain "social

media" chatter coming from unnamed individuals. When asked about a potential strike, despite

no obligation, SMART-TD provided assurances to BNSF that no strike, if any, would occur prior

to February 1. Indeed, the process to make any determination with regard to self-help has not

even been completed. These remaining steps are critical. BN's reliance on unidentified social

media chatter does not present a basis to impose a TRO. As such, there is no imminent threat of a

strike to warrant injunctive relief. As the cases provide, the necessary bar to clear for injunctive

relief is exceedingly high, which BNSF fails to meet here. Accordingly, the motion for a TRO should be denied.

### 2. BNSF Cannot Even Infer any Strike Threat Based on Present and Past Dealings Between the Parties.

Further evidence that SMART-TD poses no imminent threat to strike arises again from past litigation between the parties. In *BNSF v. United Transportation Union*, 462 F.Supp.2d 746 (S.D. Texas 2006) ("*BNSF v. UTU*"), the plaintiff railroads[6] sought an injunction that would require UTU, SMART-TD's predecessor, to provide 72-hour notice in advance of any strike it undertook. There, the railroads' request for injunctive relief was based on an alleged "UTU… policy of engaging in unlawful strikes…" and that the "current acrimonious round of bargaining presents a threat of a strike…" *Id.* at 759. While in that case the parties were engaged in Section 2 First bargaining, the court's findings regarding the history of strikes conducted by UTU, now SMART-TD, is particularly instructive.

In support of their argument for an injunction, the railroads cited to a Fifth Circuit opinion granting a similar injunction in favor of BNSF against another rail union, the Brotherhood of Maintenance of Way Employees ("BMWE"), which required the BMWE to provide ten-day notice in advance of a strike due to BMWE's practice of engaging in a high number of unlawful strikes. *Id.* at 763 (citing *BNSF Ry. Co. v. Bhd. of Maintenance of Way Employees*, 286 F.3d 803 (5th Cir. 2002)). In rejecting the railroads' argument, however, the court noted the Fifth Circuit found such an injunction was warranted against BMWE because BMWE had engaged in "*eighteen* incidents against *one* carrier [BNSF]… over the past *nine*

---

[6] The plaintiff railroads were BNSF, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern Railway Company, and Union Pacific Railroad Company. *Id.* at 743.

years." 462 F.Supp.2d at 763 (emphasis in original). The court explained that there was no such continuing risk of strike with regard to the UTU. Accordingly, the court found that such a history did not amount to any type of ongoing policy that was a threat to commerce and denied the railroads' request. *Id*. Accordingly, in addition to the fact that communications between the parties do not amount to an imminent strike threat, there can also be no inference that such a threat exists. Therefore, BNSF's Motion for a TRO should be denied.

### C.  The Balance of Harms and the Public Interest Do Not Support Injunctive Relief.

BNSF must additionally establish that "the injury to [it]… outweigh[s] the threatened injury to the defendant" and that the injunctive relief is in the public interest. *Harris County, Texas v. Carmax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999). BNSF argues that the balance of harms weighs in favor of granting an injunction and that such would further be in the public interest because the financial harm to BNSF through the loss of revenue including disruptions to the national rail network. (D.E. 7 at 20-21).

This argument has no merit as it is built on the false premise that there is an actual imminent strike threat. Therefore, there is no current harm to BNSF. Additionally, the actual harm that would arise from granting BNSF's request to enjoin a non-existent strike would be the railroads clogging the court system with emergency requests for injunctive relief on similar wanting pretexts, asking courts to place themselves in the middle of run-of-the-mill disputes that arise nearly daily between unions and railroads across the country, as is evident by BNSF's continued willingness to rush to the courthouse with these cases time and time again.

Further, SMART-TD's refusal to automatically acquiesce to BNSF's position is consistent with strong advocacy on behalf of its members, and granting BNSF injunctive relief would violate a union's right to disagree with carriers, undermining the RLA and the

mechanisms it provides for the handling of disagreements. The Court in *BNSF v. UTU* was clear that "[w]hile [it] agrees that UTU has strongly advocated for its members during this round of bargaining and that such advocacy at times has been hostile, the Railway Labor Act does not forbid strong advocacy so long as the parties are still attempting to ameliorate their differences." 462 F.Supp.2d at 762 (citing *Indep. Union of Flight Attendants v. Pan Am World Airways*, 624 F.Supp. 64, 66 n.1 (E.D.N.Y. 1985)). Further, the court noted that the "[p]arties are required to 'exert every effort… in order to avoid any interruption to commerce,' but such a requirement is not automatically infringed every time a union drives a hard bargain." *Id.* at 765. The parties are entitled to take positions, which may be quite opposite, and are free to do so to grab the attention of the other party. If this Court were to grant injunctive relief , such would run counter to the decisions permitting unions to strongly advocate for their members, and allow railroads to obtain injunctive relief simply because a union expresses disagreement with a carrier's actions. As neither the balance of the harms nor the public interest factors weigh in favor of BNSF, its request for a TRO should be denied.

### D.  BNSF is Not Entitled to Injunctive Relief Due to the Norris-LaGuardia Act's Policy of Limiting Court Intervention in Labor Disputes.

Under the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 *et. seq.*, federal courts are divested of jurisdiction to "issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of [the NLGA]." *Aircraft Service Int'l, Inc.*, 779 F.3d at 1073 ("The Norris-LaGuardia Act was enacted to 'tak[e] the federal courts out of the labor injunction business.'") (quoting *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982)).  Section 4 of the NLGA provides, in pertinent part, "in any case involving or growing out of any labor dispute," federal courts are prohibited from issuing an injunction to prohibit any person from "[c]easing or

21

refusing to perform any work." 29 U.S.C. § 104(a).  Further, Section 8 provides, in pertinent part, that "[n]o restraining order or injunctive relief shall be granted to any complainant ... who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. It has long been held that a carrier must establish that it made every reasonable effort to settle the dispute before seeking an injunction. *Bhd. R.R. Trainmen v. Toledo, P. & W. R.R.¸* 321 U.S. 50, 56-57 (1944) ("If a complainant has failed ... to make every reasonable effort to settle the dispute, he is forbidden relief.").

It is undisputed that this matter is a "labor dispute" within the meaning of the NLGA, and that BNSF has done nothing here to settle the dispute.  It set out to dictate the terms of its policy, ignoring any attempt to deal with the GCs on terms and conditions of employment by bargaining. Its late in the day attempt to coerce SMART-TD to arbitration after refusing any attempts to discuss the attendance policy with the GCs is an afterthought with no meaning or substance. Further, BNSF has failed to establish that the present situation meets the NLGA's narrow exception that injunctive relief is appropriate as the only remedy that can safeguard a right that the RLA grants. *See Burlington N. R.R., supra.* It only would permit the type of court intervention that the NLGA was enacted to limit. Therefore, BNSF is not entitled to injunctive relief.

## VI.   <u>CONCLUSION</u>

For the aforementioned reasons, SMART-TD respectfully requests that the Court deny BNSF's motion for temporary injunctive relief.

Dated: January 24, 2022

Respectfully Submitted:

 _/s/ Sanford R. Denison_
SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

KEVIN C. BRODAR
General Counsel
Ohio Bar No. 52854
ERIKA A. DIEHL-GIBBONS*
Associate General Counsel
Ohio Bar No. 86424
SMART-TD
24950 Country Club Blvd., Ste. 340
North Olmsted, OH 44070
Tel:  (216) 228-9400
Fax: (216) 228-0937
Email: kbrodar@smart-union.org
Email: ediehl@smart-union.org

*Counsel for Defendant International
Association of Sheet Metal, Air, Rail and
Transportation Workers – Transportation
Division ("SMART-TD")*

* Application for Admission
  *Pro Hac Vice* Forthcoming

23

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 24th day of January, 2022, a true and correct copy of the foregoing document was served on counsel for all parties of record listed below by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

David M. Pryor
BNSF Railway Co.
2500 Lou Menk Dr.
AOB-3
Fort Worth, TX 76131-2828
Tele: 817-352-2286
Fax: 817-352-2399
Email: david.pryor@bnsf.com

Donald J. Munro
Jones Day
51 Louisiana Ave NW
Washington, DC 20001-2113
Tele: 202-879-3939
Fax: 202-626-1700
Email: dmunro@jonesday.com

Russell D. Cawyer
Taylor J. Winn
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102-3194
Tele: 817-332-2500
Fax: 817-878-9280
Email: russell.cawyer@kellyhart.com
Email: taylor.win@kellyhart.com

Rod Tanner
Tanner and Associates, PC
6300 Ridglea Place, Suite 407
Fort Worth, Texas 76116-5706
Tele: 817-377-8833
Fax: 817-377-1136
Email: rtanner@rodtannerlaw.com

   */s/ Sanford R. Denison*   
SANFORD R. DENISON