IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-0052-P |
| | § | |
| INTERNATIONAL ASSOCIATION OF | § | |
| SHEET METAL, AIR, RAIL AND | § | |
| TRANSPORTATION WORKERS – | § | |
| TRANSPORTATION DIVISION, | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF JEREMY FERGUSON

I, Jeremy Ferguson pursuant to 28 U.S.C. § 1746 declare the following facts are true and correct:

1.      I am currently President of the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD"), formerly the United Transportation Union ("UTU"), and have served in various officer positions since 1995. I was elected as Local Legislative Representative in 1995, Local Chairperson in 1996, and Secretary to the General Committee of Adjustment ("GCA"), which I served from January 2008 through September 30, 2008. I was then elected to GCA Vice Chairperson and served in that capacity from January 1, 2012 through February 28, 2014. I was elevated to International Vice President ("VP") effective March 1, 2014, and was elected to that position where I served as VP until September 30, 2019. I was elected as President of SMART-TD, and took office effective October 1, 2019.

2.      SMART-TD is the duly authorized representative for the purposes of the Railway Labor Act ("RLA" or "the Act") of the crafts or classes of Yardmasters and train service employees, including Conductors, employed by BNSF, and is a "representative" as defined by the RLA, 45 U.S.C. § 151 Sixth. SMART-TD is governed by a Constitution, and has a tripartite structure: the International as the administrative head; semi-autonomous, mid-level bodies known as GCAs, which are responsible for negotiating and enforcing the collective-bargaining agreement ("CBA") with their respective carrier on their respective territories; and locals, where membership is held.

3.      SMART-TD GCA GO-001 is the subordinate body with jurisdiction over certain predecessor railroads including the former Great Northern line. The General Chairperson ("GC") of GCA GO-001 is Joseph M. LaPresta. SMART-TD GCA GO-009 is the subordinate body with jurisdiction over the former Atchison Topeka & Santa Fe ("AT&SF"). The GC of GCA GO-009 is Scott Swiatek. SMART-TD GCA GO-009 is the subordinate body with jurisdiction over the former Santa Fe Coastlines. The Acting GC of GCA GO-017 is Johnny Martinez. SMART-TD GCA GO-020 is the subordinate body with jurisdiction over the former ATSF Coast and Los Angeles Junction. The GC of GCA GO-020 is Justin Schrock. SMART-TD GCA GO-341 is the subordinate body with jurisdiction over the craft or class of Yardmasters employed by BNSF and its predecessors. The GC of GCA GO-341 is Matthew Burkart. SMART-TD GCA GO-386 is the subordinate body with jurisdiction over the former Great Northern. The GC of GCA GO-386 is Larry Miller. SMART-TD GCA GO-393 is the subordinate body with jurisdiction over the former AT&SF Western lines. The GC of GCA GO-393 is Kevin Kime.

4.      SMART-TD and BNSF are parties to CBAs on a national and local level that control the terms and conditions of employment of the employees represented by SMART-TD. Those CBAs do not contain a broad-based management rights clause.

5.      On November 1, 2019, BNSF through the National Carriers Conference Committee ("NCCC") in national handling (*i.e.* bargaining on a multi-carrier and multi-union basis), served a Section 6 notice on me as Transportation Division President proposing changes to the parties' CBAs. A true and correct copy of the NCCC's Section 6 Notice is attached hereto as Exhibit A. The parties have additionally been bargaining on a local level over various matters. Critical issues in this round of bargaining include quality of life issues, including employee availability for work and sick leave. Contained within NCCC's Section 6 Notice was a proposal wherein it has called for "better and more predictable work schedules" to "enhance employee quality of life." Contained within SMART-TD's Section 6 Notice was a proposal to "establish additional rest opportunities and the ability to mark off for family needs, visits to a primary care physician, and emergencies related to quality of life, without penalty;" and "[e]stablish paid sick leave for all train and engine service employees, without censure or discipline." A true and correct copy of SMART-TD's Section 6 Notice is attached hereto as Exhibit B. Since the parties served their Section 6 Notices, they have been discussing these matters at the bargaining table, but no resolution has been reached.

6.      Despite these matters being in active negotiation, it is my understanding that on January 4, 2022, the GCs were notified via zoom invitation that BNSF intended to present its new High Visibility ("Hi Viz") attendance policy the following day, with BNSF refusing to answer any questions posed by the GCs. While BNSF indicated that no information would be distributed to the employees and local union officers until all the GCs questions and concerns

were answered, on January 6, 2022, various BNSF General Managers began holding zoom meetings directly with SMART-TD Local Chairpersons ("LCs"), wherein the General Managers provided the LCs with more information that had been provided to the GCs. On January 10, 2022, BNSF officially announced its intentions to implement its "Hi Viz" Policy effective February 1, 2022. A true and correct copy of BNSF's High Viz policy is attached hereto as Exhibit C. Under this new policy, employees begin with 30 points, which are then deducted based on certain enumerated unavailability events, including fatigue, sickness, and family emergency. The policy then provides for "good attendance credits," where an employee is awarded four points for any 14-day period in which they work without an "unavailable" event. An "unavailable" event is an absence from work for any reason other than training, working light duty, company business, or on military leave. If an employee is absent from work because of federally protected leave under the Family Medical Leave Act ("FMLA") or off on union business, s/he is not eligible for any good attendance credit for that 14-day period. In addition, union officers and those on FMLA leave are penalized an extra two or three points if they are unavailable the day before or after such protected leave. This policy interferes with the Union's ability to carry out its representative function. Once a BNSF issues a Notice of Investigation to an employee for an alleged rules violation, it will set an on-property hearing date which is usually within 10 days. This requires the LC to mark off (*i.e.*, take leave) to attend the hearing and represent the member. In addition, the LC may have to mark off to attend to the various appeal meetings as the grievance is progressed up.

7. On January 11, 2022, the SMART-TD General Chairpersons representing employees on BNSF objected to the Carrier's unilateral action, writing to me as the SMART Transportation Division President for assistance. A true and correct copy of that letter is attached

as Exhibit D. SMART-TD's process for requesting SMART International assistance on disputes is set forth in Article 21B, Section 91 of the SMART Constitution. That Section has several steps and provides, in pertinent part, that where the GCs are unable to resolve a particular dispute with a carrier, they may request the assistance of the President Transportation Division to progress the matter to a conclusion. If the matter cannot be resolved, and the GCs wish to request self-help, the Constitution provides that any strike action must be authorized by a two-thirds (2/3) vote of the members of the GCAs. It further provides that: "[I]n the event that the President Transportation Division or their representative and the General Committee are unable to reach a satisfactory adjustment of the matter, the President Transportation Division may recommend to the [SMART] General President who may order a strike on all or any portion of the company involved." A true and correct copy of Article 21B, Section 91 of the SMART Constitution is attached hereto as Exhibit E. By letter dated January 12, 2022, I responded to the GCs, stating in pertinent part that they were permitted to conduct a polling of their members. Said letter further cautioned that "the approval of this proposition by a General Committee, as outlined above, does not constitute imminent authority to engage in any strike action, as additional steps must be taken under the governing provisions of the SMART Constitution, and must be handled in accordance with the Railway Labor Act, as amended." A true and correct copy of that letter is attached hereto as Exhibit F.

8.     It is my understanding that BNSF filed a Complaint for declaratory and injunctive relief, and sought assurances from the GCs that they viewed the dispute as "minor" under the RLA and would not strike. BNSF asserted that it was concerned that a strike would occur imminently due to rumors they had heard. The various steps required under the Union's Constitution to authorize and to allow self-help have not been completed. The GCs and I

declined to provide any assurances, but did make clear that no strike, if any, would occur prior to February 1, the date of implementation.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge.

Executed this 24th day of January, 2022.

_____
Jeremy Ferguson

# NATIONAL RAILWAY LABOR CONFERENCE

251 – 18th STREET, SOUTH, SUITE 750, ARLINGTON, VA  22202 / TELEPHONE: 571-336-7600 FAX: 571-336-7605

BRENDAN M. BRANON
Chairman

JEFFREY F. RODGERS
Vice Chairman

MATT HOLT
Director of Labor Relations

November 1, 2019

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Mr. Jeremy Ferguson
President, Transportation Division
International Association of Sheet Metal, Air,
Rail and Transportation Workers (SMART-TD)
24950 Country Club Blvd, Suite 340
North Olmsted, Ohio 44070

Dear Mr. Ferguson:

The rail freight carriers represented by the National Carriers' Conference Committee (NCCC) for the 2020 wage, rules and benefits round of collective bargaining intend to bargain on a concerted national basis with respect to their employees represented by your organization, as has been the case generally in all past bargaining rounds since the 1930's. Those carriers have authorized NCCC representation by duly executed powers of attorney and are listed in Attachment A hereto. That list will be supplemented from time to time as additional carriers authorize representation by the NCCC in national handling with respect to your organization.

Attachment B comprises a notice served nationally on your organization on behalf of these carriers pursuant to Section 6 of the Railway Labor Act. It is served upon you as the national representative of your organization and the carriers propose it be handled nationally and concurrently with any Section 6 proposals that may be served by your organization.

We believe that national handling represents the best opportunity for your organization and the freight railroads to manage our way to and through the next round of collective bargaining in a manner that serves the mutual interests of our respective constituents and their separate interests as well.

Under Section 6, the parties are required to conduct an initial conference. Please contact me so that we can schedule a date and time to meet.

Yours very truly,

Brendan M. Branon

Brendan M. Branon

Attachments

cc:      All NCCC-represented carriers

Ex. A

**ATTACHMENT A**

**CARRIERS REPRESENTED BY THE NATIONAL CARRIERS' CONFERENCE COMMITTEE WITH RESPECT TO
INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS, TRANSPORTATION DIVISION**

Alameda Belt Line
Alton & Southern Railway Company
The Belt Railway Company of Chicago
Bessemer and Lake Erie Railroad Company d.b.a. C.N.
BNSF Railway Company
Central California Traction Company
Consolidated Rail Corporation
CSX Transportation, Inc. - 1
      Baltimore & Ohio Railroad Company (Former)
      Baltimore & Ohio Chicago Terminal Railroad Company (Former)
      Chesapeake & Ohio Railway Company (Former)
      Chicago & Eastern Illinois Railroad Company (Former)
      Clinchfield Railroad Company (Former)
      Consolidated Rail Corporation (Former)
      Toledo Terminal Railroad Company (Former)
      Monon Railroad Company (Former)
      Pere Marquette Railroad Company (Former)
      Seaboard Coast Line Railroad Company (Former)
      Western Maryland Railroad Company (Former)
      Richmond Fredericksburg & Potomac Railroad Company (Former)
      Gainesville Midland Railroad Company (Former)
Grand Trunk Western Railroad Company d.b.a. C.N.
Illinois Central Railroad Company and Chicago, Central & Pacific Railroad Company d.b.a. C.N.
Indiana Harbor Belt Railroad Company
The Kansas City Southern Railway Company
      Kansas City Southern Railway
      Louisiana and Arkansas Railway
      MidSouth Rail Corporation
      Gateway Western Railway
      SouthRail Corporation
      Tenn. Rail Corporation
      Joint Agency
Longview Switching Company
Los Angeles Junction Railway Company
New Orleans Public Belt Railroad Corporation - 2
Norfolk & Portsmouth Belt Line Railroad Company
Norfolk Southern Railway Company

**ATTACHMENT A**
**SMART-TD**
Page 2

       The Alabama Great Southern Railroad Company
       Central of Georgia Railroad Company
       The Cincinnati, New Orleans & Texas Pacific Railway Co.
       Georgia Southern and Florida Railway Company
       Tennessee, Alabama and Georgia Railway Company
       Tennessee Railway Company
Northeast Illinois Regional Commuter Railroad Corporation (METRA) - 1
Northern Indiana Commuter Transportation District – 1
Palmetto Railways
Port Terminal Railroad Association
Terminal Railroad Association of St. Louis - 1
Texas City Terminal Railway Company
Union Pacific Railroad Company
Wichita Terminal Association
Winston-Salem Southbound Railway Company
Wisconsin Central Ltd. d.b.a. C.N.

* * * * * *

**Notes:**

      1    -    Health & Welfare only
      2    -    Wages and Health & Welfare only

**ATTACHMENT A**

**CARRIERS REPRESENTED BY NATIONAL CARRIERS' CONFERENCE
COMMITTEE WITH RESPECT TO
YARDMASTERS DEPARTMENT - INTERNATIONAL ASSOCIATION OF SHEET
METAL, AIR, RAIL AND TRANSPORTATION WORKERS, TRANSPORTATION
DIVISION**

Alton & Southern Railway Company - 3
BNSF Railway Company
Consolidated Rail Corporation
Consolidated Rail Corporation (Mechanical Foremen) - 1
CSX Transportation, Inc. – 2
       Seaboard Coast Line Railroad Company (Former)
       Baltimore & Ohio Railroad Company (Former)
       Chesapeake & Ohio, Louisville & Nashville, Clinchfield, Nashville, Chattanooga
       St. Louis, and Monon Railroad Companies
       Conrail Northern Lines
Grand Trunk Western Railroad Company d.b.a. C.N.
Illinois Central Railroad Company d.b.a. C.N.
Indiana Harbor Belt Railroad Company
The Kansas City Southern Railway Company
       Kansas City Southern Railway
       Joint Agency
Longview Switching Company - 3
New Orleans Public Belt Railroad Corporation - 3
Norfolk & Portsmouth Belt Line Railroad Company
Norfolk Southern Railway Company
       The Alabama Great Southern Railroad Company
       Central of Georgia Railroad Company
       The Cincinnati, New Orleans & Texas Pacific Railway Co.
       Georgia Southern and Florida Railway Company
       Tennessee, Alabama and Georgia Railway Company
       Tennessee Railway Company
Northeast Illinois Regional Commuter Railroad Corporation (METRA) – 2
Portland Terminal Railroad Company
Port Terminal Railroad Association
Terminal Railroad Association of St. Louis
Texas City Terminal Railway Company
Wisconsin Central Ltd. d.b.a. C.N.
Wisconsin Central Ltd. as successor to Elgin, Joliet and Eastern Railway d.b.a. C.N.
Wisconsin Central Ltd. as successor to Duluth, Missabe & Iron Range Railway d.b.a. C.N.

\*   \*   \*   \*   \*   \*

**ATTACHMENT A**
**SMART-TD (Y)**
Page 2

**Notes:**

     1     -     Wages & Rules and Health & Welfare only

     2     -     Health & Welfare and Supplemental Sickness only

     3     -     Wages, Health & Welfare and Supplemental Sickness only

The American railroad industry has survived for more than a century because of its ability to adapt and innovate in the face of unrelenting challenges. The industry has persisted through economic downturns, wars, fierce competition, and periods of crushing regulation by investing in and implementing new technologies, operating procedures, and business lines. Workplace changes resulting from these advances have not always been embraced at the bargaining table, but those changes have ultimately benefitted railroads, our people, and the industries and communities we serve. We have been able to provide, even in the face of these systemic changes, amongst the very best pay and benefits of any jobs in our economy. And the industry has done this while building and operating a vibrant transportation system that is the backbone of our economy and an extremely safe and environmentally-friendly means of shipping freight.

We move forward at the bargaining table today with previously unfathomable technologies now proven and scalable in ways that can make our system better and safer. Drones, ultrasound, smart sensors, software advancements, big data – these technologies and others, led by the implementation of Positive Train Control ("PTC"), are the modern-day fuel of America's freight rail network. Together with our strong cultures, these technologies are delivering the safest era ever for U.S. railroads. To secure a future that is even safer, the railroad industry believes we must embrace these new technologies and work together to implement them.

Many current economic forecasts call for long-term increases in freight demand, and the opportunity exists to win a greater share of the growing global marketplace for freight. Yet railroads must overcome unrelenting pressure from customers and powerful economic forces to price our services to the market – not to our costs – to retain our current traffic levels and capture new business. Significant challenges to our success include the decline of coal, advancements in

trucking, the increasing long-term exposure of our manufacturing and agriculture sectors to global competition, the continued shift towards a services-oriented economy, changes in customer supply chain strategies that require faster and more reliable scheduled service, and renewed threats of increased regulation. Entrenching ourselves in outdated approaches and failing to fully utilize new technologies will diminish our ability to resist these pressures and forces.

This industry has typically lagged behind the rest of the industrial world in adapting workplace practices to new technologies. This approach has only delayed and limited the available options to respond when changes must occur. To meet our challenges head on, we must modernize all aspects of our business, including the terms and conditions of employment. In particular, certain work rules – across all crafts – have not been updated at the national bargaining table for decades. These anachronistic provisions fail to account for modern technology and impede rather than support the timely delivery of freight. Some of these rules also degrade rather than enhance employee quality of life. Reform can and should result in safer workplaces, better and more predictable schedules, greater access to technology, and a wider range of jobs with less travel. Securing a future with leading pay, benefits and healthcare can and will remain part of this employment model if we succeed in meeting these challenges.

Perhaps the most glaring example of our need for modernization concerns the size and makeup of train crews. In order to take full advantage of new investments in modern technology, reduce human error and better align operational costs with other industries, railroads propose to redeploy conductors from the cab of the locomotive to ground-based positions on territories where PTC or equivalent technologies are enabled. Redeploying employees to ground-based positions in these territories will safely and more efficiently meet the industry's operational and

service requirements while providing those employees with higher quality-of-life jobs that allow more employees to spend their nights at home after shifts rather than at hotels.[1]

We also need to continue the process of modernizing the health and welfare benefit plans that cover our people and retirees. The plans continue to have an outdated design, including the lack of any tiered employee monthly contributions for spouses and dependents, as well as the lack of a mechanism for annual adjustments to employee cost-sharing to keep pace with increasing health care costs. As a consequence, the plans remain extraordinarily rich when compared to employer-sponsored health benefits typically offered to the American workforce. The richness of the plans fosters an environment within which covered employees and their dependents are not sufficiently engaged in managing their healthcare choices. This lack of engagement leads to poor health decisions and overutilization of health services. As a result, we are not producing good health outcomes and behaviors while still facing health care expenditures that are well outside the mainstream.

Modernizing our agreements is critical to the railroad industry's long-term ability to compete and provide job security. We cannot ignore external competitive pressures and carry on as if past financial performance is simply guaranteed in the future. The security and prosperity of the entire railroad community depends on our continued ability to innovate, adapt, and manage our labor costs in a responsible, measured manner. It is in our long-term interest – labor and management alike – to continue to work together toward a future of stable employment, leading pay and benefits, and safe, efficient service.

---

[1] The railroads maintain that this proposal is subject to bargaining on a multi-carrier basis. However, without prejudice to that position, the railroads do not insist on multi-carrier handling of this proposal, and instead are, by this Notice, inviting SMART-TD to voluntarily address crew consist on multi-carrier basis, without prejudice to any position that the union may wish to take in the future regarding this issue. This proposal is also without prejudice to any similar or identical proposal that any participating railroad may raise in individual or local bargaining.

The railroads' bargaining proposals – which are based on the foregoing principles – include the following:

**1.        Wages and Compensation**

Adjust wages and/or other compensation to achieve a fair and competitive labor cost structure that reflects the economic conditions of the railroads and (1) accounts for the history of prior wage increases that have resulted in compensation that is significantly above average for comparable positions, and (2) better corresponds to pay levels of positions of comparable skills in other industries. Align compensation elements with work actually performed, and modify any existing incentive compensation arrangements, where applicable, to better align pay with the needs and goals of railroad operations. Any wage and compensation adjustments shall be effective only upon the date of signing of a new agreement. In other words, such adjustments will not be back-dated or be calculated retroactively from the amendable date of current agreements.

Moreover, in the event that SMART-TD declines to negotiate over crew consist on a multi-carrier basis or the parties are unable to agree on changes in crew consist, the railroads propose an adjustment to compensation, apart from and/or in lieu of the adjustments proposed above, to reduce pay in any circumstance in which a train is required by any labor agreement to operate with more personnel than would be assigned by the railroad based on operational needs alone.

**2.        Health and Welfare**

The railroads seek to modernize the health care plans' design and administrative practices and make available resources to enable covered employees and their dependents to better engage in their own healthcare decisions. Specifically:

- Increase member cost-sharing to establish an actuarial value that reflects the mainstream

health plan design.

- Introduce a tiered employee monthly contribution structure and add surcharges for working spouse enrollment and tobacco use.

- Implement a mechanism to maintain the agreed-upon actuarial value and total cost-share split in the future (i.e., annual "indexing" or elimination of fixed co-pays).

- Adopt all pharmacy management rules and programs to ensure appropriate medications are being prescribed.

- Reconfigure the medical vendor network to utilize networks with favorable provider discounts and overall cost of care.

- Offer digital health programs to improve member engagement in health care decisions, increase use of value-add programs, and to help members manage chronic health conditions.

- Establish additional direct relationships with centers of excellence to ensure members have the best care available for serious and complex conditions.

- Amend ERMA to mirror the active plan design for pharmacy benefits and to require monthly retiree contributions.

- Require additional payments from employees to account for any delayed implementation of plan changes agreed to by other unions.

**3.     Work Rules**

The prior two national bargaining rounds have concluded without any major changes to work rules, and some work rules have not been updated at the national bargaining table for decades. In this round, the railroads are seeking changes to rules that restrict flexibility, impede efficiency, degrade the industry's ability to compete, and no longer reflect mainstream standards.

While the railroads' proposed work rule reforms cover all crafts, the impact of those proposals may vary by craft and include the following:

- Updating provisions that restrict management discretion over the assignment of work or that continue to allow for antiquated methods of distribution of work assignments or that are inconsistent with the need to support 24/7 operations. Additional discretion in these areas would add flexibility over which crafts (as well as employees with certain qualifications within a craft) may perform work in various circumstances, when such work may be assigned and performed, the duration of time the work may be performed, and the circumstances under which work rules may be relaxed to meet customer demands. Likewise, modernizing assignment procedures – including through use of electronic bidding – will provide benefits for both carriers and employees.

- Simplifying carrier agreements, consolidating multiple legacy railroad contracts within the same workgroup, reducing methods of payment calculation, and accelerating when certain operational changes may be implemented. By simplifying these provisions, railroads will bring these aspects of existing agreements into greater alignment with mainstream business practices and eliminate or revise outdated, unnecessary, and/or overly complex agreement language, pay systems, and notice rules.

- Eliminating or revising other work rules that inhibit efficient operations and modernizing outdated agreement terms to correspond to current standards in American transportation industries, including relaxing arbitrary geographical limits on work performed by train crews, allowing for greater flexibility to timely deploy well-trained teams to critical projects, and sunsetting excessive forms and lengths of furlough protections not enjoyed elsewhere in U.S. industries.

**4.      General Contract Reform**

6

In addition to the foregoing proposals, make all necessary changes in contracts, rules and practices to improve operational efficiency and productivity, simplify and streamline existing contracts and contract language, facilitate the gradual elimination of redundant or unnecessary positions, reduce time paid but not worked, enhance safety, enable expanded use of technology, and otherwise reflect the competitive and financial needs of the industry as well as the mutual interest of the carriers and their employees in responsible, stable, enduring, and fair rules, rates of pay, and working conditions.

**5.      Duration and Moratoriums**

Provide for agreement of sufficient duration to facilitate labor stability and predictability. In addition, in the event that subsequent legislative or regulatory changes prevent the carriers from obtaining – or deprive the carriers of the benefits of – any newly negotiated rights, the parties shall, notwithstanding any existing moratoriums, reach agreement – through negotiation or, if necessary, binding arbitration – on alternative contract terms providing the same relative economic value to each party.

Adopt moratorium similar to that contained in the last national settlement. Replace any extant moratorium in local agreements with single, consolidated moratorium.

*      *      *      *

The carriers reserve the right to amend or modify these proposals and/or to make additional proposals to the extent permitted by law.

**SMART TRANSPORTATION DIVISION ATTACHMENT "A"**

**November 20, 2019**

Except as otherwise provided herein, effective January 1, 2020, the existing rules, agreements, interpretations or practices, however established, shall be amended to provide as follows:

## ITEM 1 – SERVICE SCALE

(a) Completely and permanently eliminate service scale/entry rates where such service scale exists.

(b) Permanently restore dual arbitrary payments which were eliminated by the October 31, 1985, National Agreement.

## ITEM 2 – WAGES

(a) Provide a series of General Wage Increases (GWIs) to become effective January 1, 2020, and every six (6) months thereafter, which shall be applied to all components, including but not limited to arbitraries, differentials, miscellaneous rates, special allowances, daily, weekly, and monthly guarantees based upon hourly or daily rates of pay, including those expressed in terms of miles, and overmiles.

(b) Require carriers to pay retroactive pay, if necessary, to January 1, 2020. In addition, all retroactive wage adjustments will be made by separate check to the employee within thirty (30) days of ratification of the agreement.

(c) An itemized statement detailing each employee's retroactive wage adjustment calculations will be provided to affected employees at the time of payment.

(d) Provide for Cost-of Living Adjustments, (COLAs) in addition to GWIs, every six (6) months.

(e) Signing bonus of five thousand dollars ($5,000.00) to be paid within thirty (30) days of ratification of the agreement.

(f) Annual year-end bonus/profit sharing/stock options, to be paid by December 1 of each calendar year.

## ITEM 3 – EMPLOYEE CERTIFICATION AND MAKE-WHOLE PAYMENT

(a) Increase the daily compensation for service requiring certification to twenty dollars, ($20.00) subject to all future GWIs and/or COLAs.

(b) Provide payment for all time lost and expenses incurred in connection with any required periodic qualification or re-certification exams including, but not limited to, required regulatory documents (passports, enhanced drivers' license, TWIC card, etc.), written examinations, re-qualification rides, physicals, sleep studies, hearing tests, vision acuity tests, and any other examinations required by the carrier or statute.

(c) Certification pay to be paid to all employees holding such certification, regardless of the craft in which service is performed.

(d) Hazard pay equal to 10% of total earnings per tour of duty for operating a Key Train or High Threat Urban Area train.

Ex. B

## ITEM 4 – TECHNOLOGY

(a) Technology compensation of twenty-five dollars ($25.00) per day for required utilization of all in-cab and handheld reporting devices, subject to all future GWIs and/or COLAs.

## ITEM 5 – SHIFT AND WEEKEND DIFFERENTIAL

(a) Provide additional compensation for employees performing service or deadheading in all classes of road, yard, and passenger service on nights, weekends, or holidays.

(b) Such pay differentials shall be subject to all future GWIs and COLAs.

## ITEM 6 – RSIA

(a) Employees will be made-whole for pay purposes up to 276 hours and/or any limbo time when held in due to RSIA.

(b) Employees observing federally mandated rest periods in accordance with monthly service or consecutive day limitations will not be considered unavailable for any reason.

## ITEM 7 – FATIGUE ABATEMENT

(a) Establish additional rest opportunities and the ability to mark off for family needs, visits to a primary care physician, and emergencies related to quality of life, without penalty.

(b) Require the carriers to provide accurate train line-ups for more predictability of on-duty time.

(c) Require the carriers to provide a ten (10) hour advance call time to all employees working in unassigned service.

## ITEM 8 – TRAINING

(a) Amend the pertinent provisions of the 1972 Manning Agreement to provide for the same basis of pay applicable to any craft represented by the SMART-TD on the assignment on which they are training, unless otherwise provided for at a higher rate of pay.

(b) Any required qualification, re-qualification, and/or familiarization trips will be compensated as if the employee was performing service in any craft represented by the SMART-TD on the assignment, unless otherwise provided for at a higher rate of pay.

(c) Each employee assigned to a crew utilized by the carrier to provide training, instruction, familiarization trips, or similar mentoring in connection with their regular or extra board assignment shall be provided payment in the amount of four (4) hours at the applicable rate, in addition to all earnings of the assignment.

(d) Establish a rule to require all training to be performed by a conductor mentor or peer trainer designated by the Organization, where such rule does not exist.

(e) Establish a voluntary bid system to allow employees to request selection for engineer training.

(f) Eliminate the pertinent provisions of Article 13, Section 3, Paragraph 1, of the 1985 National Agreement, which contemplate fitness and other qualifications being equal.

## ITEM 9 – OVERTIME

(a) Provide compensation at the overtime rate after eight (8) hours on-duty for assignments with a mileage component, regardless of miles run and without reduction in pay for all miles run.

(b) Provide overtime to all employees after twelve (12) hours on-duty for freight service runs exceeding 195 miles.

(c) Provide overtime to all employees in regular assigned service exceeding five (5) days per week, where rules do not currently provide for such overtime payment.

(d) Provide overtime to all employees for service performed on assigned rest days, where rules do not currently provide for such overtime payment.

(e) Include all service in operating crafts for overtime qualifying purposes.

## ITEM 10 – MEAL PERIODS, MEAL ALLOWANCES, AND HELD-AWAY PAY

(a) Allow a rate equal to the IRS rate for all away from home meals per calendar day (currently $66.00).

(b) Employees shall continue to be compensated until they receive a room at the away-from-home terminal lodging facility.

(c) Held-away pay will begin at the expiration of required legal rest, and will be paid continuously until the return train departs the away-from-home terminal, or if deadheaded, until the conveyance by which deadheaded departs the away-from-home terminal.

(d) Increase yard meal period from twenty (20) minutes to one (1) hour with no reduction in pay. Such meal period must begin after four-and-one-half (4 ½) hours on-duty, and be completed before six (6) hours on-duty. If such meal period is not granted as outlined herein, the employee will be allowed an additional day's pay at the rate of the assignment.

(e) Establish a standard for eating facilities for yard and other assigned crews.

(f) Increase ID meal allowance on freight runs to twelve dollars and fifty cents, ($12.50) subject to all future GWIs and COLAs.

## ITEM 11 – REMOTE CONTROL COMPENSATION

(a) Increase RCO pay from forty-six (46) minutes to three (3) hours.

(b) Provide eight (8) hours of pay for conversion of remote control to conventional operation.

## ITEM 12 – 401K PLAN

(a) Establish an employer-contribution 401k Plan, with matching employee contributions. This 401k Plan shall be in addition to any other plan currently available.

(b) The fees associated with this plan will be the responsibility of the carriers.

## ITEM 13 – VACATIONS

(a) Reduce the number of years necessary to qualify for a vacation and increase the total number of vacation weeks, as follows:

- One (1) year of service provides two (2) weeks.
- Five (5) years of service provides three (3) weeks.
- Ten (10) years of service provides four (4) weeks.
- Fifteen (15) years of service provides five (5) weeks.
- Twenty (20) years of service provides six (6) weeks.
- Twenty-five (25) years of service provides seven (7) weeks.

(b) Allow up to three (3) weeks of floating vacation per year.

(c) Allow all vacation weeks to be taken in single day increments.

(d) Provide guaranteed availability of pre-arranged compensated time off.

(e) Permit employees to split all week-long vacation periods to which he/she is entitled.

(f) Increase the number of days credited towards vacation qualifications for days on an extra list and performing no service.

(g) Increase the number of days absent or unable to perform service due to an on-duty injury.

(h) Allow credit towards vacation qualifications for days absent from and unable to perform  service  due  to an off-duty illness or injury.

(i) Allow credit towards vacation qualifications for each day required to observe federally mandated rest periods in accordance with monthly service or consecutive day limitations.

(j) Employees who do not accrue the required days for full vacation entitlement shall have vacation entitlement pro-rated, based on actual qualifying days accrued in the previous calendar year.

(k) Recognize that compensated service days of employees transferring to train and engine service crafts from non-train and engine service crafts will be used in determining previous year qualifying days and accumulated qualifying days.

(l) Employees absent during the vacation bid period due to an approved leave of absence, disciplinary reinstatement, or military leave, will be allowed to, upon return to service, bid any vacation earned in accordance with the National Vacation Agreement.

## ITEM 14 – HOLIDAYS AND PERSONAL LEAVE DAYS

(a) Increase the number of paid holidays to include Martin Luther King's birthday, Mother's Day, Father's Day, Halloween, and Veteran's Day.

(b)  Pay time and one-half to employees who are not currently covered under the National Holiday Rule for working on a holiday.

(c)  Holiday pay for all assignments not currently covered under the National Agreement.

(d)  Change the allotment of personal leave days to match the number of paid holidays. The employee may choose to either receive paid compensation for the holiday or waive holiday pay in lieu of an accrued personal day.

(e)  Allow unused personal leave days to be carried over to the subsequent calendar year without reduction in rate.

## ITEM 15 – SICK LEAVE

(a)  Establish paid sick leave for all train and engine service employees, without censure or discipline.

## ITEM 16 – TRAUMA LEAVE AND MATERNITY LEAVE

(a)  Provide for compensated trauma leave equal to 60% of employee's salary, and counseling, if requested.

(b)  Employees will have the option to take up to three (3) out of six (6) weeks of paid maternity leave. This would apply to both parents.

## ITEM 17 – OFF-TRACK VEHCILE AGREEMENT

(a)  Amend the off-track vehicle agreement to provide for full reimbursement of lost wages.

(b)  Provide employees adequate uninsured and underinsured motorist/driver protection.

## ITEM 18 – BEREAVEMENT LEAVE

(a)  Provide improvements in compensation and number of allowable days off for bereavement leave, to be taken within thirty (30) days from the date of death.

(b)  Expand the persons for whom such leave and compensation will be allowed to include domestic partners, step-parents, step-siblings, step-children, grandchildren, grandparents, and spouse's grandparents.

## ITEM 19 – LOCOMOTIVE STANDARDS

(a)  Establish standards for the collection and use of any information or data captured by a recording device on a locomotive.

(b)  Provide uniform locomotive cab standards including, but not limited to: climate control, cleanliness, seating and cab equipment, and other such appropriate facilities to facilitate safe and efficient operations.

(c)  Require carriers to provide air ride or other suitable shock-absorbing seats on all locomotives.

(d)  Require carriers to provide functional air conditioning on all lead locomotives.

(e) Require carriers to provide a working microwave on locomotives used in through freight service.

(f) Require carriers to provide a working hot plate on locomotives used in through freight service.

(g) Require carriers to provide a working coffee maker on locomotives used in through freight service.

(h) Require carriers to provide a functioning toilet on all occupied locomotives used in yard or road service.

(i) Establish a National Locomotive Cab Committee.


## ITEM 20 – JURY DUTY

(a) Provide that employees will be made-whole for all time lost as a result of being summoned for jury duty.


## ITEM 21 – LODGING

(a) Carrier-provided lodging, including meal allowances, for employees forced to a permanent vacancy more than 30 miles from their home terminal.

(b) Establish minimum standards for away-from-home terminal lodging facilities and twenty-four (24) hour dining facilities, and provide suitable transportation to and from dining facilities.

(c) Provide reverse lodging to employees, where applicable.

(d) Provide individual lockers for all employees at away from home terminal/lodging facilities.


## ITEM 22 – DEADHEADING

(a) All deadheads to be paid at a basic day or trip rate, whichever is greater in all classes of service.

(b) Eliminate two-tier pre/post 85 pay for deadheads.

(c) Wait time pay on minute-by-minute basis for all time in excess of thirty (30) minutes spent waiting on carrier-provided transportation (paid in addition to regular service).

(d) Provide that train crews will not be deadheaded via locomotives.


## ITEM 23 – EMPLOYMENT AND FURLOUGHS

(a) Eliminate Article XII of the 1985 UTU National Agreement in its entirety.

(b) Provide carrier-subsidized vocational training for all furloughed employees.

(c) Establish a rule requiring all railroads signatory to the National Agreement to give first employment consideration to qualified conductors who are furloughed from other signatory railroads. (If an individual is furloughed, he/she would be able to put their name on a list to be given first consideration for employment on other railroads.)

(d) Guarantee a minimum of sixty (60) days of work and/or compensation for employees who are furloughed and called to return to work.

(e) Employees holding train service seniority will be the first source of supply for establishing Yardmaster seniority. Such positions will be filled by the senior represented employee making application solely on a voluntary basis.


## ITEM 24 – PERSONAL PROTECTIVE EQUIPMENT

(a) Require carriers to provide all personal protective equipment.


## ITEM 25 – NEW HIRE PROCESS

(a) A SMART-TD designated officer will attend and contribute input for all crafts represented by such Organization during the carriers' hiring process.

(b) Require carriers to provide a quarterly report of the total number of assignments/positions by terminal or district.

(c) Require carriers to provide a monthly non-dues paying report to the General Chairperson(s).


**Savings Clause** – The above Notices, or any of them, or any part of them, shall not apply on any property where they are already in effect, or where more beneficial provisions are already in effect.

## SMART TRANSPORTATION DIVISION YARDMASTER ISSUES
### (In addition to those listed above)

## ITEM 26 – WAGES

(a) Provide a series of General Wage Increases (GWIs) to become effective January 1, 2020, and every six (6) months thereafter, which shall be applied to all components, including but not limited to arbitraries, differentials, miscellaneous rates, special allowances, daily, weekly, and monthly guarantees based upon hourly or daily rates of pay, including those expressed in terms of miles, and overmiles.

(b) Require carriers to pay retroactive pay, if necessary, to January 1, 2020. In addition, all retroactive wage adjustments will be made by separate check to the employee within thirty (30) days of ratification of the agreement.

(c) An itemized statement detailing each employee's retroactive wage adjustment calculations will be provided to affected employees at the time of payment.

(d) Provide for Cost-of Living Adjustments, (COLAs) in addition to GWIs, every six (6) months.

(e) Signing bonus of five thousand dollars ($5,000.00) to be paid within thirty (30) days of ratification of the agreement.

(f) Annual year-end bonus/profit sharing/stock options, to be paid by December 1 of each calendar year.

## ITEM 27 – YARDMASTER PROTECTION (SCOPE)

(a) The term "Yardmaster" as used in this agreement shall be construed to mean Yardmasters of all grades, including relief and extra, except footboard Yardmasters.

(b) Yardmasters will have the exclusive right to instruct and supervise all train and engine service crews, regardless of carrier nomenclature or class of service, while they occupy other than main line trackage within their respective districts

(c) The duties and responsibilities of Yardmasters shall include: supervision over employees directly engaged in the switching, blocking, classifying and handling of cars, trains and duties directly incidental thereto that are required of the Yardmaster in a territory as designated by the carrier and such other duties as assigned.

(d) Yardmaster work cannot be transferred, consolidated, combined or centralized to any location outside the terminal, regardless of seniority districts, unless a demonstrative decline in volumes of cars in/out and a reduction of crews supervised to one (1) crew regardless of class of service. When Yardmaster work is transferred outside of the location, it will be done in accordance with the provisions of New York Dock. An incumbent on a position transferred and those that may fall out at the bottom will be automatically certified as adversely affected.

(e) Other properly authorized representatives of the Company may, incidental to their other duties, perform duties performed by Yardmasters so long as such performance does not result in the elimination of a Yardmaster's position.

## ITEM 28 – EXTRA BOARDS

(a) Establish and maintain a guaranteed extra boards at all terminals where there are regular assigned Yardmasters.

(b) Guaranteed extra board Yardmasters will have two (2) assigned rest days designated by the carrier. Rest days do not need to be consecutive, however, the carrier will make every attempt to do so.

## ITEM 29 – YARDMASTER VACATIONS

(a) Reduce the number of years necessary to qualify for a vacation and increase the total number of vacation weeks, as follows:

- One (1) year of service provides two (2) weeks.
- Five (5) years of service provides three (3) weeks.
- Ten (10) years of service provides four (4) weeks.
- Fifteen (15) years of service provides five (5) weeks.
- Twenty (20) years of service provides six (6) weeks.
- Twenty-five (25) years of service provides seven (7) weeks.

(b) Apply 1/52 pay or a basic day (whichever is greater) to fall in line with the other crafts.

(c) Recognize that compensated service days of employees transferring to Yardmaster service from all non-Yardmaster crafts will be used in determining previous year qualifying days and accumulated qualifying days.

(d) Allow all vacation weeks to be taken in single day increments.

(e) Employees who do not accrue the required days for full vacation entitlement shall have vacation entitlement pro-rated, based on actual qualifying days accrued in the previous calendar year.

## ITEM 30 – YARDMASTER PERSONAL LEAVE DAYS

(a) Change the allotment of personal leave days to match the number of paid holidays. Yardmasters may choose to either receive paid compensation for the holiday or waive holiday pay in lieu of an accrued personal day.

(b) Allow Yardmasters to carryover any unused personal leave days to the subsequent calendar year.

## ITEM 31 – MEAL ALLOWANCE

(a) Provide Yardmasters an automatic arbitrary payment of one (1) hour of straight time, added to their daily wage, in lieu of taking their allotted meal period.

## ITEM 32 – DISPLACEMENTS

(a) Regular assigned Yardmasters that are displaced will bump a junior Yardmaster (per Applicable Agreement) where their seniority allows, or be placed on an unassigned extra board, and be allowed to flow back to his/her previous craft (if allowed by agreement) and will be required to protect all vacant Yardmaster positions.

## ITEM 33 – YARDMASTER JOB ABOLISHMENTS

(a) Require a time study of at least ten (10) days prior to the abolishment of Yardmaster positions. The General Chairperson or his/her designee, along with a duly authorized company official, will be present during such time study period.

(b) Yardmasters shall be allowed a one-time system transfer if his/her terminal is shut down and there is no Yardmaster work being performed.  The affected Yardmaster shall be placed at the bottom of the seniority roster.

## ITEM 34 – TRAINING ALLOWANCE

(a) Yardmasters will be compensated four (4) hours straight time pay while training any new Yardmaster, or when providing remedial training for Yardmasters.

(b) Yardmasters will be compensated at their daily rate when familiarizing at a different location with a minimum of forty-five (45) starts.

(c) Yardmasters who have not worked at a location for one (1) year will be afforded a minimum of forty-five (45) starts in order to refamiliarize at the new location. Additional compensated training shall be allowed as needed.

## ITEM 35 – SICK LEAVE

(a) Amend the Yardmaster Supplemental Sickness Plan to provide benefit payments beginning the first day of sickness.

(b) Amend the Yardmaster Supplemental Sickness Plan to allow yardmasters who are on a military or government pension to be entitled to full Yardmaster sickness benefits when off due to illness or sickness with Trustmark Insurance.

(c) Establish two (2) paid sick leave days per month for all Yardmaster employees, without censure or discipline.

## ITEM 36 – LIFE INSURANCE

(a) Increase the benefit under the Yardmasters' supplemental life insurance Policy to fifty thousand dollars ($50,000.00) for active employees, and twenty thousand dollars ($20,000.00) for retirees.

## ITEM 37 – SUPERVISION OF REMOTE CONTROL

(a) Yardmasters supervising crews that operate remote controlled equipment will be compensated an additional arbitrary payment of one (1) hour at straight time pay.

## ITEM 38 – BEREAVEMENT LEAVE

(a) Provide improvements in compensation and number of allowable days off for bereavement leave.

(b) Expand the persons for whom such leave and compensation will be allowed to include domestic partners, step-parents, step-siblings, step-children, grandchildren, grandparents, and spouse's grandparents.

**ITEM 39 – HOLIDAYS**

    (a) Increase the number of paid holidays to include Martin Luther King's birthday, Mother's Day, Father's Day, Halloween, and Veteran's Day.

    (b) Pay time and one-half to employees who are not currently covered under the National Holiday Rule for working on a holiday.

    (c) Holiday pay for all assignments not currently covered under the National Agreement.

**ITEM 40 – MATERNITY LEAVE**

    (a) Yardmasters will have the option to take up to three (3) out of six (6) weeks of paid maternity leave. This would apply to both parents.

**ITEM 41 – YARDMASTER TURNOVER TIME**

    (a) Increase turnover time to a guaranteed minimum of thirty (30) minutes.

**ITEM 42 – 401K PLAN**

    (a) Establish an employer-contribution 401k Plan, with matching employee contributions of ten percent (10%). This 401k Plan shall be in addition to any other plan currently available.

    (b) The fees associated with this plan will be the responsibility of the carrier.

**ITEM 43 – SERVICE SCALE**

    (a) Eliminate all rate progression when promoted to Yardmaster.

**ITEM 44 – UNASSIGNED YARDMASTERS**

    (a) Unassigned Yardmasters with insufficient seniority to hold a regularly assigned Yardmaster position will be established only after a guaranteed extra board Yardmaster position is established.

**ITEM 45 – YARDMASTER PROTECTION**

    (a) Yardmasters will remain at their respective location should they be forced to control another yard location.

**ITEM 46 – SHIFT AND WEEKEND DIFFERENTIAL**

    (a) Provide weekend differential payment for Yardmasters working 1st shift.

    (b) Provide differential payment for all Yardmasters working 2nd shift.

    (c) Provide differential payment for all Yardmasters working 3rd shift.

(d) Such pay differentials shall be subject to all future GWIs and/or COLAs.

## ITEM 47 – JURY DUTY

(a) Provide that Yardmasters will be made-whole for all time lost as a result of being called for jury duty.

## ITEM 48 – TECHNOLOGY

(a) Provide technology payment for any current and future responsibilities that involve the use of handheld reporting devices or camera monitoring devices to perform Yardmaster duties at remote locations.

## ITEM 49 – NEW HIRE PROCESS

(a) An officer designated by the Organization will attend and contribute input for all crafts represented by such Organization during the carriers' hiring process.

**Savings Clause** – The above Notices, or any of them, or any part of them, shall not apply on any property where they are already in effect, or where more beneficial provisions are already in effect.

**SMART TRANSPORTATION DIVISION ATTACHMENT "B"**
**HEALTH & WELFARE**

**November 20, 2019**

**The NRC/UTU Health and Welfare Plan (GA-690100) and**
**The Railroad Employees National Health and Welfare Plan (GA-23000)**

## ELIGIBILITY

(1)     Provide extended benefit coverage to eligible dependents for one full calendar year following the death of a covered employee.

(2)     Provide extended coverage to furloughed employees for twelve (12) months following the month in which such employees last rendered compensated service or received vacation pay, provided the employer has transmitted at least three (3) monthly payments to the Plan on behalf of such employees prior to furlough. During such 12-month period, the furloughed employee shall be reported under "active" employee status.

(3)     Provide full Plan coverage to an employee who is suspended or dismissed from service, and to his eligible dependents, until final disposition of the matter under the Railway Labor Act. Until such final disposition, the employee shall be reported under "active" employee status.

(4)     Provide full Plan coverage to an employee who becomes disabled, and his dependents, until such time as the employee and/or spouse become eligible for Medicare and child dependents reach age 26.

(5)     Eliminate the seven (7) calendar days per month eligibility requirement (the so-called "7-day rule") for benefit coverage under the health and welfare, dental and vision plans.

(6)     Dependents of employees on active military status will be provided full coverage for the length of a standard tour of duty plus 6 months.

(7)     Extend full coverage to step-grandchildren residing with an employee, and any other children placed with the employee by court order or related to the employee by blood and/or marriage.

## AUTISM SPECTRUM DISORDERS

(1)     Provide services for Autism Spectrum Disorders without regard to age where benefits don't already exist.

(2)     The Plan shall provide coverage for the diagnosis of autism spectrum disorders and for the treatment of autism spectrum disorders to the extent that the assessment, diagnosis and treatment of autism spectrum disorders are not already covered by the Plan.

(3)     Treatment for autism spectrum disorders shall include, but is not limited to, the care prescribed, provided, or ordered for an individual diagnosed with an autism spectrum disorder by (a): a physician licensed to practice medicine, or (b): a certified, registered, or licensed health care professional with expertise in treating effects of autism spectrum disorders. Such coverage shall include but is not limited to: Applied Behavior Analysis Therapy, Speech Therapy, Social

Skills Therapy, Occupational Therapy, and Physical Therapy, Psychological, Psychiatric, and Pharmaceutical Care, and Diagnosis and Assessments.

(4)     Coverage for autism shall not be subject to any maximum benefits, nor subject to any limits on the number of visits to a service provider.

## PRESCRIPTION DRUG BENEFIT

(1)     Prescription drug co-pays shall be as follows:

>       Retail:
>       Generic - $0
>       Brand Name Formulary - $5
>       Brand Name Non-formulary - $10
>
>       Mail Order:
>       Generic - $0
>       Brand Name Formulary - $10
>       Brand Name Non-formulary - $20

(2)     Increase the day's supply of medication at retail pharmacies to 30 days.

(3)     Eliminate dosage/quantity restriction limits where they exist for medications/therapy when the FDA has ruled the medication/therapy is appropriate for one or more medical conditions.

## COORDINATION OF BENEFITS

(1)  Modify the Coordination of Benefits provisions to eliminate the so-called 'non-duplication' provisions and allow reimbursement up to 100% of allowable charges.

(2)  Modify the in-network benefits to eliminate copays, deductibles and coinsurance for two married railroad employees and their eligible dependents to allow reimbursement at 100% of allowable charges.

## REASONABLE AND CUSTOMARY DETERMINATIONS

(1)     Increase the threshold for R&C determinations to the 95th percentile of data selected by the Plan.

## HEARING BENEFITS

(1)     Provide an annual hearing benefit of $4,000 for each covered person.

## BIRTH CONTROL/REVERSAL

(1)     Provide coverage to males under the Plan for voluntary sterilization and/or reversal.

**EMPLOYEE CONTRIBUTIONS**

(1)     Eliminate all employee cost-sharing contributions.

**EMPLOYEE OPT-OUTS**

(1)  Increase payments to employees who opt-out of Plan coverage to $250 per month.

**DEPENDENT PREGNANCY**

(1)     Provide full coverage for pregnancies of female dependent children where benefits don't already exist.

(2)     Provide full coverage for new born children of female dependent children through age two (2) where benefits don't already exist.

**SPEECH THERAPY**

(1)     Provide services to restore or improve speech for employees and all eligible dependents without regard to age where benefits don't already exist.

**HOSPICE BENEFITS**

(1)     Increase the hospice benefits to reasonable and customary charges for each course of care.

**REPATRIATION INSURANCE**

(1)     Provide medical evacuation and repatriation insurance to cover 100% of the cost for the transportation or a participant and or dependent(s) via air or ground ambulance from any location more than 100 miles from their home or from a foreign country to their home location or a medical facility within 30 miles thereof.  Such coverage shall include bed-to-bed service; the cost of a medical escort; travel costs for dependent spouse and/or children; repatriation of mortal remains, including all transportation, logistical and legal arrangements in connection therewith; transportation of baggage and/or belongings back to the home of the participant/dependent; legal services arising in connection with medical situations.

**HEALTH RISK ASSESSMENT INCENTIVE**

(1)     Establish an incentive payment of $300 for the completion of a Health Risk Assessment as well as the completion of the corresponding bio metric screenings by an employee or dependent age 18 or over.

## MANAGED MEDICAL CARE PROGRAM (MMCP)

(1)     Reduce all existing co-payments under MMCP by $5 per visit, including emergency room visits.

(2)     Reduce the in-network deductibles to $100/individual and $300/family.

(3)     Reduce annual in-network, out-of-pocket maximums to $500/individual and $1,000/family.

(4)     Provide out-of-network coverage where benefits don't already exist for: Immunizations and well-person physical benefits without annual caps to include annual routine physical exams, (including diagnostic testing and immunizations); well-woman visits (including breast examination and/or mammogram, pelvic examination and pap smear); child preventive care given in connection with routine pediatric care, (including immunizations for children as recommended by CDC). • Annual prostate cancer screening at no cost to the participant.

(5)     Eliminate the non-notification penalty under the Care Coordination/Medical Management Program for out-of-network services where required.

(6)     Provide for a combined annual patient maximum of $500 cap for copays for chiropractic and physical therapy services.

(7)     If a participant's primary care physician, treating specialist or other provider, or preferred hospital or facility, terminates network participation due to a contract cancellation with the insurance company providing coverage to the participant, allow the participant to elect coverage under one of the other insurance carrier(s) in that market anytime during the year.

## COMPREHENSIVE HEALTH CARE BENEFIT (CHCB)

(1)     Provide 90/10 co-insurance under the CHCB plan.

(2)     Reduce the annual deductibles to $100/individual and $300/family.

(3)     Reduce annual out-of-pocket maximums to $1,000/individual and $2,000/ family.

(4)     Provide annual prostate cancer screening at no cost to the participant.

(5)     Eliminate the non-notification penalty under the Care Coordination/Medical Management Program.

(6)     Provide for a combined annual patient maximum of $500 coinsurance for chiropractic and physical therapy services.

## MANAGED MENTAL HEALTH AND SUBSTANCE ABUSE BENEFIT (MHSA)

(1)     Reduce all in-network outpatient co-payments under MHSA for those under MMCP.

(2)     Eliminate the non-notification penalty for out-of-network services.

**LIFE/AD&D INSURANCE**

(1)     Increase Active Employee Life Insurance to $50,000.

(2)     Increase Retired Employee Life Insurance to $20,000.

(3)     AD&D - increase coverage to the following:

**TABLE OF COVERED LOSSES AND BENEFIT AMOUNTS**

| COVERED LOSSES | BENEFIT AMOUNTS |
|---|---|
| Life | $50,000 |
| A hand* | $8,000 |
| A foot* | $8,000 |
| Sight of an eye | $8,000 |
| Loss of more than one of the above in any one accident | $16,000 |
| Paralyzation | $25,000 |

Loss of sight of an eye means that the eye is entirely blind and that no sight can be restored in that eye.
Loss of a hand means that all of the hand is cut-off at/or above the wrist.
Loss of a foot means that all of the foot is cut-off at/or above the ankle.
*Loss of a hand or foot shall also include the loss of use of a hand or foot even if the limb is still intact.
Paralyzation means the loss of use of the extremities of the body as a result of an accident, such as, but not limited to paraplegia, quadriplegia, or hemiplegia occurring from a traumatic brain injury.
Not more than $50,000 will be paid for all covered losses caused by all injuries which are sustained in one accident.

**RAILROAD EMPLOYEES NATIONAL DENTAL PLAN (GP12000-A)**

**Eligibility**

(1)     Provide full Plan benefits to new employees and eligible dependents on the first day of the month following the month in which such employees render compensated service.

(2)     Provide full Plan benefits to dependents on the same basis as those under the medical Plans, including but not limited to age 26, without regard to marital status, residence, or full-time student status.

(3)     Provide full Plan coverage to an employee and eligible dependent that is suspended or dismissed from service until final disposition under the Railway Labor Act.

(4)     Extend dental coverage for retirees and their eligible dependents until the employee reaches age 65 or becomes eligible for Medicare, whichever is the latter.

**Benefits**

(1)     Eliminate the annual deductible.

(2)     Increase the annual maximum to $4,000.

(3)     Increase Type B coverage to 100%.

(4)     Increase Type C coverage to 75%.

(5)     Increase orthodontia benefit to 75% with a maximum of $4,000.

(6)     Provide orthodontia coverage to all employees and covered dependents regardless of age.

(7)     Eliminate the alternate treatment provisions of the Plan.

## RAILROAD EMPLOYEES NATIONAL VISION PLAN

**Network**

(1)     Provide full Plan benefits to new employees and eligible dependents on the first day of the month following the month in which such employees render compensated service.

(2)     Provide full Plan benefits to dependents on the same basis as those under the medical Plans, including but not limited to age 26, without regard to marital status, residence, or full-time student status.

**In-Network Benefits**

(1)     Increase the frame allowance to $250 per calendar year.

(2)     Provide full coverage for the following options:

Scratch Coating

UV Protection

Anti-Reflective Coating

Photochromic Lenses

Progressive Lenses

(3)     Increase the allowance for contact lenses to $250 per calendar year.

(4)     Provide full coverage for corrective eye surgery, including but not limited to laser eye surgery, to correct vision in one or both eyes.

(5)     Eliminate lens exclusions for oversized lenses.

## HOSPITAL ASSOCIATIONS

(1)    Amend the "Dues Offset Formula" to provide that Hospital Association dues offsets will be increased by the same percentage that Plan costs increase for a given year. Thereafter, adjustments, if any, shall be made annually on January 1st of each subsequent year.

(2)    The so-called pick-up and/or runout liability fees for any employees (or dependents, if applicable) transferring from Hospital Association Railroads to Non-Hospital Association Railroads and/or transferred from Non-Hospital Association Railroads to Hospital Association Railroads will be borne by the Railroads.

(3)    Disabled or Retired Hospital Association members whose coverage is disrupted for any reason other than non-payment of Association dues will be allowed to enroll in the Railroad Employees National Early Retirement Major Medical Benefit Plan (GA-46000) without penalty provided they would have met the eligibility requirements at the time they retired.

(4)    Treat Dependent Spouses covered as Employees under a Hospital Association Plan the same as two married railroad employees covered under the Plan who are not covered under a Hospital Association Plan.

(5)    Allow for coordination of benefits for employees and eligible dependents between the Hospital Association and the National Plan to provide for annual family deductibles and out-of-pocket amounts not to exceed those amounts agreed to under the National Agreement.

## NATIONAL HEALTH LEGISLATION

(1)    In the event that further national health legislation should be enacted, benefits provided under The Railroad Employees National Health and Welfare Plan, The Railroad Employees National Early Retirement Major Medical Benefit Plan, The Railroad Employees National Dental Plan and The Railroad Employees National Vision Plan with respect to a type of expense which is a covered expense under such legislation will be integrated so as to avoid duplication, and the parties will agree upon the disposition of any resulting savings.

(2)    Should national health legislation repeal or eliminate any health care coverage or individuals provided under the Plan, such coverage and individuals will continue to be covered without regard to national legislation.

## GENERAL

(1)    The JPC shall be joint policyholders and will jointly participate in the selection of the insurance company or companies or other administrators required to administer all benefit Plans covering employees subject to this Agreement, shall jointly determine the plan benefits needed to meet the changing needs of the employees and otherwise jointly administer all of the Plans' activities. The Joint Plan Committee shall oversee and administer the Railroad Employees National Health and Welfare Plan, the Railroad Employees National Early Retirement Major Medical Benefit Plan, the Railroad Employees National Dental Plan, the Railroad Employees National Vision Care Plan, the various plans established to provide supplemental sickness benefits to

covered employees and any and all plans which may hereafter be developed or introduced to provide health and welfare benefits to active and retired employees and their eligible dependents.

(2)     Eliminate the exclusion of benefits for treatment by a family member who is otherwise a qualified provider, from any and all plans containing such exclusion.

**BNSF RAILWAY**

**Effective February 1, 2022**

BNSF System General Notice No. 46 (TY&E Failure to Take Notification) 156 (TYE Earned Rest), 208 (Guidelines for TYE and Yardmaster Attendance) and 223 (TY&E Time Off) are canceled.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**BNSF Hi-Viz Guidelines for TYE and Yardmasters**

Hi-Viz Guidelines is a tally system that:

- Sets a clear standard for full-time employment

- Allows employees to easily, accurately, and contemporaneously determine where they stand in comparison to BNSF's attendance standard

- Provides employees with an opportunity to improve their standing through regular/steady attendance

**1. Assessment of Points**

Subject to the Point Schedule below, employees begin with 30 points and points are deducted for various incidents of non-attendance including both full and/or partial day absences.

a) Point deductions are determined based on the type of service the employee is in at the time of the unavailable event.

b) Unavailable time is associated with the day the event began.

c) Unavailable time is measured in 24-hour increments.

d) High Impact Day (HID) point values apply if:

- For unassigned service: The unavailable event occurs on the day of the HID, or the unavailable event occurs prior to the HID and employee is not marked up by 0600 on the HID.
- For assigned service: The employee misses their assigned shift on the HID.

e) Any unavailable event that immediately (not separated by a work event) precedes or follows a VAC, PLD, UNB, SRS, FML, CLD event will be charged an additional 2 points for Unassigned Service and an additional 3 points for Assigned Service regardless of day of week. This is referred to a Conjunction Penalty.

Ex. C[1]



- EMC/LOC/NOS are the exception; they will continue to be charged according to Point Schedule

f) Handling results each time the employee exhausts their points.

g) Each employee has electronic access to their point record.

- Any addition or deduction in points is reflected in this record.

**Point Schedule**

| Incident | Unassigned Service | | | | Assigned Service | |
|---|---|---|---|---|---|---|
| | Point Value | | | | Point Value | |
| | M-TH | FR-SA | SU | HID | MO-SU | HID |
| NOS (No Show) | -20 | -20 | -20 | -25 | -20 | -25 |
| EMC (Missed Call) / LOC (Layoff on Call) | -15 | -15 | -15 | -20 | -15 | -20 |
| Unavailable Event | -2 | -4 | -3 | -7 | -7 | -10 |

Unavailable Events include: **LOS** (Sick), **LOP** (Personal Business), **SIF** (Sickness in Family),
FEM (Family Emergency), LOF (Fatigue), **LXU** (Failure to take Notification), **LFT** (Failure to Tie Up),
**LOA** (Layoff Active Board / Away Terminal or After Start of Shift), LOD (Layoff Dressed & Ready to Work)

**2. Good Attendance Credits**

a) An employee is awarded a Good Attendance Credit – worth **4 points** – for any 14-day period they work without an unavailable event and in which they are not otherwise absent from work. Example: An employee remains available between March 1 and March 14, they will receive a Good Attendance Credit on March 15. If they continue to remain available between March 15 through March 28, they would earn another credit on March 29.

b) Good Attendance Credits are earned for any 14-day period if the employee:

    i. Has no Unavailable events, NOS, EMC, or LOC.

    ii. Has not otherwise been absent for any reason, apart from:
    Training/Rules (CBT/RUL/LAH/ERC/DRT/CRN)
    LET (Engineer Training)
    LIT (working lite Duty)
    Company business (LCB)
    Military Leave/NGD with supporting LES and/or orders

2

**BNSF RAILWAY**

 iii. Has no absences/leave other than those listed in 2.b.ii
   (e.g. does not have DIF, FML/PFM, FUR, LAM, LOJ, MED, MEV, LOI, HFS, LAB, R79,
   PLD, SUA/SUT, UNB, VAC, etc.).

 iv. Has no bump board time > 2 hours after taking notification.

c) An employee's point total cannot be greater than 30.

**3. Discipline (10-day, 20-day and Dismissal)**

a) The first 2 times an employee exhausts their points (balance reaches or falls below zero), they are subject to discipline.

b) The third time an employee exhausts their points, they are subject to Dismissal.

c) Following 10-day and 20-day discipline, the employee's point total will be reset at 15.

d) If an employee remains Hi-Viz discipline free for 24 months, then Hi-Viz progression is reset. Therefore, the next infraction will be a 10-day suspension.

e) Maintaining a positive point balance does not preclude the company from challenging an employee's full-time status requirement based on another reasonable standard.

**4. Initial Placement in Discipline Process**

Employees with active discipline for BNSF Attendance Guidelines at the time of the cut-over to the new Hi-Viz Guidelines will be considered to have already received the equivalent Discipline Step.

Hi-Viz Guidelines are not intended to assess points for use of any legally protected leaves such as FMLA (Family and Medical Leave Act) or other leave of absences that are properly certified and/or documented. But as noted above, there are only 6 types of absence that allow for the good attendance credit referenced in Section 2 above.

BNSF leadership should consider all relevant information when using the Guidelines. In every case, they should apply the Guidelines with consistency and common sense.

**NOTE: Being unaware of your point total is not an excuse for exhausting your points.**

3

**Hi-Viz Attendance Program**
**System General Notice**

**TYE Time Off**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Table of Contents
A. Laying Off on Call
B. Emergency Lay Off
C. Bereavement Leave and DIF Layoff Codes
D. Pre-Approved Lay Off System
E. Lay Off Process for Military Personnel
F. Jury Duty
G. Lay Off Fatigue
H. Lay Off/Mark Up for Outlying Assignments
I. High-Impact Days
J. Failure to Take Notification

===============================================================

**A. Laying Off on Call**

Employees MUST NOT lay off on call. For employees in planner-activated pools, a layoff while on the active board will be considered as laying off on call.

===============================================================

**B. Emergency Lay Off**

Lay off code "FEM," Family Emergency, is defined as a lay off code for an emergency involving an employee or their family. An "emergency" under this code is an unforeseen circumstance that requires immediate action and is of such seriousness and magnitude that the employee must immediately absent themself from duty and no other layoff code governs the situation, e.g. DIF, LOS, SIF, etc. Employees must use the layoff code that most appropriately describes the reason for the absence and may not use "FEM" as an excuse to be absent from duty for reasons other than those that can accurately be described as an emergency. Use of code "FEM" will be closely monitored.

Once granted authorization for layoff code "FEM," the employee must contact their supervisor within 24 hours to provide reason for the FEM. Misuse will result in corrective action against the offender and review of the code "FEM" as an unrestricted emergency code.

===============================================================

## C. Bereavement Leave and DIF Layoff Codes

Train, yard and engine employees who unfortunately suffer the loss of a family member covered by Bereavement Pay agreements can use the layoff code DIF (Death in Family) in the Workforce System to mark off. Employees will be automatically marked up from DIF at the expiration of the approved time off.

Family members who are covered by all the Bereavement Pay agreements include brother, sister, parent, child (including a legally adopted child), spouse and spouse's parents. Based on the location and craft of the employee's current assignment, additional family members covered may include grandchildren, half and stepbrothers, sisters and stepchildren. Refer to the agreement covering the employee's area or visit the Labor Relations' website under the TYE Payroll Services link.

The Bereavement Pay agreements provide for 3-day's pay at the agreed to pay rate. The employee need not have stood for work on 1 or more of the days to receive payment, and all 3 days qualified for bereavement pay will not count as an absence under the Hi-Viz Guidelines.

Employees claiming bereavement leave should use CA Code 05 on a special claim and send the obituary notice with the special claim ticket number to TYE Payroll Services via email at FINDLTYEBereavementPay@BNSF.com or fax to 785-676-5186 or 8-676-5186.

BNSF understands a person may lose a family member not covered by the Bereavement Pay agreements. The DIF code should not be used in these cases, but the code FEM (Family Emergency) is available for immediate layoffs. Documentation must be maintained that explains the absence in the event the employee is required to provide the information to their supervisor. The supervisor may also help schedule additional time off through use of alternate codes such as LOP (Layoff Personal), PLD (Personal Leave Day), or a Leave of Absence if applicable.

Employees who lay off DIF, but do not send the supporting documentation to TYE Payroll Services will be considered unavailable for duty and handled in accordance with the Hi-Viz Guidelines.

================================================================

## D. Pre-Approved Lay Off System

The following enhancements have been made to the pre-approved lay off system. The supervisor should be contacted if there are any questions.

- In the 30-day period between day 90 and day 60, BNSF will accept and hold all requests for PLD and SDV only. On the 60th day prior to the layoff date TSS will distribute the allocation of days according to seniority.

- Requests 60 days in advance and less, employees can be approved for up to four unpaid personal days (identified by layoff code LOP). Employees are still able to request all of their PLD and SDV days. When calculating LOP days, any portion of a calendar day is considered one day.

- Once approved, individuals can move an LOP, SDV, or PLD up or back one calendar day. The employee can request this change of start day within 48 hours of requested start time.

- There is a monthly process for supervisors, crew managers and local chairmen to review availability and set allocation for upcoming advance allocation periods

- Employees may request a single day of vacation or a personal leave day between 60 and 90 days in advance of the day it would be taken. For example, on September 8, an employee could request a day off that he/she plans to take November 7. The employee will be able to check if the request has been approved 60 days in advance or at 0001 September 9. Employees can request as many vacation or personal leave days they have currently available to them.

Bidding process and sliding process

Employees can enter a pre-approval layoff request for a single day or multiple days. If a multiple day request is entered, the request cannot be submitted until the whole request is within the request window. None of the days will be considered for approval until the entire request is within the approval window as the program will not address (approve/deny) until the last calendar day of the multi-day request.

Employees desiring high demand days off are encouraged to enter their requests one day at a time so that each day will be considered as it reaches the approval date. For example, an employee makes a three-day request for PLD. All 3 days have to be within the 90-day window before the request can be entered into the system.

At 60 days prior to day one of the request, the first day of the request will not be considered for approval because portions of a three-day request cannot be approved. All 3 days of the request must be within the 60-day window for any of it to be considered Entering single days at a time eliminates the possibility of an allocation being full before a multiple day request will be taken into consideration.

Assigned employees cannot slide their requests as they already have assigned rest days. The slide function was designed for unassigned service where start times are not known in advance.

===============================================================

### E. Lay Off Process for Military Personnel

Two distinct lay off codes have been established which apply to military service. It is important to use the appropriate lay off code to distinguish between these two types of military service, as these codes ultimately drive benefit and pay eligibility.

**NGD** = This code should be used only for National Guard, Drill, Training or State Emergencies.

Note: NGD leaves greater than 10 days must be covered by a leave of absence.

**MLV** = This code should be used for all other military service including:
Global War on Terror (Operation Iraqi Freedom, Operation Noble Eagle and Operation Enduring Freedom), enlistment into the military, or any other military service or training (other than National Guard).

Note: Military leaves greater than 10 days must be covered by a leave of absence.

Benefit Coverage

Employees who wish to retain coverage under the BNSF program while on leave will continue to pay the monthly contribution. Contribution will be taken out of any make whole payments received from BNSF while on leave. Otherwise, these contributions are required to be caught up upon return.

Compensation

Employees should send paperwork supporting Military Pay claims and any questions regarding pay for Military leaves to FINDLTYEMilitary@BNSF.com.

Note: Employees who wish to earn Good Attendance Credit must submit their LES or training documentation no later than 60 calendar days after their return to work from leave.

===============================================================

### F. Jury Duty

BNSF and the Labor Organizations representing BNSF employees support employees summoned to perform their civic duties in the form of Jury Duty by providing negotiated

7



agreements for compensation for time lost to employees who are summoned for Jury Duty. The collective bargaining agreements will govern any dispute as to compensation for Jury Duty. However, the following guidelines are provided to minimize such disputes and provide for prompt and proper payment of valid Jury Duty claims. In the event of a dispute, BNSF and the appropriate Labor Organization will work to resolve the matter.

Employees instructed to report for Jury Duty at a specific date and time are authorized to mark off for Jury Duty to make sure they are rested and available for Jury Duty. They are also expected to make an effort to perform their normal duties whenever reasonably possible.

Employees subject to certain call-in or "stand by" notification procedures used by some courts will remain marked up except in circumstances where protecting service will obviously jeopardize such notification.

If there are questions about the ability to protect service, the employee should consult with a designated supervisor before marking off and jointly set up a strategy to ensure compliance with the court's instructions and to protect their assignment when reasonably possible.

Employees will be expected to mark up immediately upon release from the courts or, if on call, immediately after receiving notification they will not have to report to the court.

To validate qualification and provide the proper documentation with the claim:

Qualifies for Jury Duty Lost Wages:

- Reporting at a specific location and time for jury selection and/or Jury Duty when an actual loss of wages occurs.

- Reporting for Jury Duty conflicts with the employee's ability to obtain rest under the Hours of Service Act before or after the Jury Duty. Booking additional rest does not apply to Jury Duty.

- Extra board personnel who mark off for 24 hours or less will receive the equivalent of a day's guarantee if the trip missed is not completed prior to the mark up.

Does Not Qualify for Jury Duty Lost Wages:

- Jury Duty that occurs on a rest day or other periods of scheduled or unscheduled time off when no loss of wages occurs.

- Layoffs when courts are not in session. Examples include weekends and major holidays.

8

**RAILWAY**

- Any days over the 60-day maximum. The Agreements provide for a maximum of 60 days in any calendar year.

- Failure to follow supervisor's recommendations for protecting service or reporting at the court without specific instructions to do so.

Supporting Documentation for Jury Duty Claims:

- The following information must be included on the Jury Duty claim:

  - Date(s) scheduled for Jury Duty
  - Location
  - Time scheduled to report
  - Time released for each day
  - Lost trip information.

- The following documents should be sent to TYE Payroll Services via email at FINDLTYEJuryDutyPay@BNSF.com or fax to 785-676-5186 or 8-676-5186.

  - A copy of the Jury Duty notice
  - The Court's reporting instructions.
  - A copy of the Court receipt for amount paid while performing Jury Duty which will be deducted from the lost wage payment. Note: If payment is delayed or there is no payment for that day from the Court, authorization must be obtained from the supervisor for payment of lost wages.

========================================================================

### G. Lay Off Fatigue (LOF)

BNSF wants to ensure that everyone is rested and prepared to work safely. Employees who are fatigued as a result of working numerous trips in a row or working consecutive long trips can use the LOF to take 24 hours off for rest. The LOF code may not be used for any other purpose and employees who misuse the LOF code will be subject to discipline under the Policy for Employee Performance Accountability. For example, this code may not be used to extend rest days, vacation, or other layoffs. An LOF counts as an unavailable day under the Hi-Viz Guidelines.

========================================================================

**H. Lay Off/Mark Up for Outlying Assignments**

Following a layoff, employees assigned to outlying positions must mark-up prior to the tie-up of their regular assignment in order to release the extra board employee covering their position. If an assigned employee fails to mark-up prior the tie-up of their regular assignment, the extra board employee will be held to protect the assignment's next tour of duty and the regular employee will be charged an unavailable day (LOP) under the Hi-Viz Guidelines. This does not apply going into the rest days of the assignment.

Example: Employee Smith fails to mark-up from a one-day sick layoff prior to the tie-up of their assignment and, as a result, ends up missing two days of their assignment. Employee Smith will be charged points for two assigned days under the Hi-Viz Guidelines.

===================================================================

**I. High-Impact Days**

BNSF has the responsibility to provide our customers with reliable service every day, including High-Impact Days.  High-Impact Days are days that have historically reflected higher train crew absenteeism and more missed opportunities to meet customer expectations. Those days are currently identified as: New Year's Day, Super Bowl Sunday, Easter Sunday, Mother's Day, Memorial Day, Father's Day, Independence Day, Labor Day, Halloween, Thanksgiving Day, Day after Thanksgiving, Christmas Eve, Christmas Day, and New Year's Eve.

===================================================================

**J. Failure to Take Notification**

An employee is required to accept notification when their assignment has changed (displaced, forced, cut, awarded a successful bid, etc.). Employees then afforded their bump board time based on the applicable CBA. An employee who has not accepted notification upon first attempt will be placed in an LXX status until notification is accepted.

- Employees whose **last inbound assignment upon tie up** was "other than assigned service," the employee will have 10 hours to accept notification for all future bid/bump events which occur prior to their next work event. Employees who do not accept notification within 10 hours will have all time pending notification for that event count as unavailable time, and points will be deducted using Unassigned Service Point Value.

  ○ 0 to 10 hours - no exception
  ○ >10 hours - points will be deducted according to the Hi-Viz Guidelines

- Employees in assigned service that are bumped or cut from their assignment while on duty are considered "other than assigned service" upon tie up.

- Being on a rest day does not exempt an employee from accepting change notification of an assignment.

Example: an employee out-bounds on an assigned 05/02-yard job; however, the employee is bumped while on duty, takes notification upon tie up and is placed on the bump board. The employee's inbound status is "other than assigned service" account being placed on the bump board.

Example of pending notification: An extra board employee is "rested" and available for call at 1300. Upon the employee becoming rested, the Crew Office attempts to notify employee of a displacement (bump) at 1301. The employee does not respond to the notification. The Crew Office continues to attempt notification every 2 hours. If the employee has not taken notification by 2301, the Hi-Viz system will recognize this employee as having more than 10 hours of avoiding notification and mark the employee with an unavailability event. The crew office will continue to attempt notification to this employee and the attendance system will continue to account for time in which the employee has made themself unavailable.

**If I am working in unassigned service and I work, inbound, and then LOS on the same day, do I still get charged for the LOS even though I worked that day?**
*Yes, a LOS results in a point deduction regardless of whether you worked within the same day.*

**If I lay off on a Thursday and mark back up late on a Friday will I be deducted points for both days?**
*Layoff are charged based on the day the layoff begins (in this case – Thursday). If the layoff exceeds 24 hours, then a new charge begins for the next 24-hour period and so on. So, if your layoff is less than 24 hours you are only charged for a Thursday layoff. However, if the layoff is 40 hours, then you are charged for both Thursday and Friday.*

**Is there a penalty point charge for layoffs connected to a VAC, PLD, UNB, FML, SRS, or CLD?**
*Yes, any unavailable time that immediately (not separated by a work event) precedes or follows a VAC, PLD, UNB, SRS, FML, CLD event will be charged an additional 2 points for Unassigned Service and an additional 3 points for Assigned Service regardless of day of week. This is referred to as a conjunction penalty.*
*EMC/LOC/NOS are the exception; they will continue to be charged according to Point Schedule.*

**If I LOS on both sides of a vacation day, do I get a penalty point deduction twice?**
*Yes, you lose points for the LOS prior to and the LOS after. And because the layoff is in conjunction with a vacation day, there is a penalty point deduction.*

*Example: LOS on Monday, Vacation on Tuesday, LOS on Wednesday. In this example, you would be charged a total of 8 points if you are in unassigned service (2 points for each LOS, and an addition 2 penalty points for each LOS) and 20 points if you are working in assigned service (10 total points for each LOS – the initial 7 plus the penalty points).*

**I am in a 4/2 pool. Will I still get charged points for my rest days if I layoff following them?**
*No, the only charge is the for the layoff itself.*

**If I Smart Rest, and then layoff, will I be charged the penalty point deduction?**
*Yes, layoffs following Smart Rest are charged the higher "penalty" point value.*

**How many points will I be charged if I change assignments mid-month?**
*Points are driven by your assignment at the time of the layoff. Bump board is considered unassigned service, so if you layoff while on the bump board, your layoff is charged as an unassigned layoff.*

**Why are the point values different from unassigned and assigned service?**
*Point values are based on the employee's access to rest days/times.*

**If I get sick at work and go home will I be charged points and if so, how much?**
*LOA (Layoff Active Board/Away Terminal or After Start of Shift) is considered an unavailable event and is charged according to the Hi-Viz Guidelines.*

## GOOD ATTENDANCE CREDIT

**Is the only way to get more points to go a full 14 days without a layoff event?**
*Yes, you earn a Good Attendance Credit for any 14-day period you work without an unavailable event and in which you're not otherwise absent from work.*

**Do I earn Good Attendance Credit if I am on a long term medical or furlough leave? What about if I am on suspension or HFS?**
*None of these statuses would allow you to earn Good Attendance Credit. You can only earn points back if you are marked up and available to work.*

**What about the 16 calendar days thing? Do I still need to be marked up and available a certain amount of time each month to keep my points?**
*Regardless of the amount of time you are marked up and available, points for unavailable time are charged the same. However, by remaining available for 14 consecutive days you are eligible for a Good Attendance Credit.*

**Can you accumulate more than 30 points?**
*No, points are capped at 30.*

**How does the consecutive 14-days work to earn the Good Attendance Credit?**
*Let's share some examples: If an employee remains available between March 1 and March 14, they will receive a Good Attendance Credit on March 15. If they continue to remain available between March 15 through March 28, they would earn another credit on March 29.*

*Now, if an employee has an unavailable event on March 30, and then comes back to work on April 2, the 14-day period restarts on April 3. They would be eligible to earn a Good Attendance Credit on April 17 if they remained available for the consecutive 14 days.*

*Say an employee lays off sick on April 6, their 14-day period would restart on April 7. But then they take a vacation day on April 10, their new 14-day period restarts on April 11.*

## FML

**Does Union Business (UNB) and/or FML layoff restrict me from earning a Good Attendance Credit?**
*Yes, both UNB and FML preclude you from earning a Good Attendance Credit.*

**Can I change a previous layoff to FML to avoid getting charged points?**
*If you show that your intention was to use FML, and for whatever reason you were unable, that day can be converted to FML after that fact. Please be sure to include comments with your layoff indicating you intended to use of FML and communicate the issue with your supervisor as soon as possible.*

**What if I apply for FMLA, use it provisionally, and then my application is ultimately denied; will those provisional FML layoffs be changed to LOP?**
*Yes. If your FMLA application is denied, then any FML layoffs used during the provisional approval period are converted to LOP and points are charged accordingly.*

**SMART**

General Committees of Adjustment
BNSF Railway Company

January 11, 2022

Jeremy Ferguson
President
SMART-Transportation Division
24950 Country Club Blvd Ste 340
North Olmsted OH  44070-5333

**Re:    Strike Authority – BNSF Attendance Guidelines Policy**

Brother Ferguson,

The undersigned General Chairpersons herein request your office authorize strike authority for members under our jurisdiction as a result of BNSF issuing a new Attendance Guidelines Policy "Hi-Viz".

All of us have, for multiple years, attempted to negotiate attendance and time off. BNSF has turned down every offer from SMART-TD to negotiate an agreement outlining our members' attendance requirements.

The New "Hi-Viz" attendance policy slated to take effect on February 1, 2022, is a unilateral attempt by BNSF to modify attendance. We believe this to be in direct violation with the Section 6 Notices and current National Negotiations.

This policy, and particularly its formulation at this point in time when active National Negotiations are taking place is likely in conflict with the RLA and the National Handling process.

Thank you in advance for any assistance/guidance you can provide regarding this issue. Do not hesitate to contact any of us if you require additional information.

Fraternally,

J. M. LaPresta
General Chairperson GO-001

Scott Swiatek
General Chairperson GO-009

Johnny P. Martinez, Jr.
Acting General Chairperson GO-017

Justin Schrock
General Chairperson GO-020

Matthew Burkart
General Chairperson GO-341

Larry Miller
General Chairperson GO-386

Ex. D

Mr. Jeremy Ferguson
Page 2
January 11, 2022

Kevin Kime
General Chairperson GO-393

Roy Davis
General Chairperson GO-577

Tony McAdams
General Chairperson GO-JTD



SHEET METAL | AIR | RAIL | TRANSPORTATION

**FOCUS** ON THE **FUTURE**



# Constitution
# and Ritual

REVISED AND AMENDED BY THE AUTHORITY OF THE

## 2ND SMART GENERAL CONVENTION

HELD IN LAS VEGAS, NEVADA | AUGUST 12-16, 2019

Ex. E

INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS

AND AFFILIATED LOCAL UNIONS, STATE, DISTRICT, PROVINCIAL AND REGIONAL COUNCILS, LOCAL COMMITTEES
OF ADJUSTMENT, GENERAL COMMITTEES OF ADJUSTMENT AND STATE LEGISLATIVE BOARDS



## SECTION 91 – ASSOCIATION OF GENERAL CHAIRPERSONS

**SEC. 91.** The Chairpersons of the General Committees in each district, as hereinafter set forth, shall form an Association of General Chairpersons, each to function independently of the other, for the purpose of formulating concerted movements relating to wages, rules, and working conditions of transportation service employees in their district.

- District No. 1 shall include all rail lines in the United States.
- District No. 3 shall include all bus lines in the United States.

All General Chairpersons on properties where the combined membership represented by SMART Transportation Division is one hundred (100) or more, shall be members of the Association of General

Chairpersons in their respective districts as outlined above. Where          12
the combined membership represented by SMART Transportation                  13
Division on a property is less than one hundred (100) the General            14
Chairpersons on that property shall elect one of their group to be a         15
member of the Association in their respective districts. Members of          16
the Association of General Chairpersons shall attend all meetings of         17
their Association and represent their committees with pay and proper         18
expenses to be paid from the General Fund of the International.              19

The President Transportation Division shall convene the General             20
Chairpersons during the year 1969 for the purpose of organizing the         21
Association in each district. Each district shall elect, by secret ballot, a  22
Chairperson, a Vice Chairperson, and a Secretary to serve as officer of     23
their Association.                                                           24

Following the reorganization of General Committees in 1971, and            25
quadrennially thereafter, the President Transportation Division shall        26
convene the Association of General Chairpersons for the purpose of          27
reorganizing and electing officers.                                         28

Each Association shall adopt bylaws for its special government             29
consistent with the provisions of this Constitution.                        30

The Association will be convened by the President Transportation           31
Division whenever necessary and will be convened by them when a             32
majority of the General Chairpersons within a district of the Associ-       33
ation request a special meeting, provided the requests are uniform in        34
object and purpose and the meeting is limited to subjects over which        35
the Association has jurisdiction.                                            36

In any general or concerted wage-rules movement, members in an            37
Association cannot withdraw support of a movement which has been            38
approved by a two-thirds (⅔) vote of the members of an Association,         39
unless sanction thereto is given by a majority vote of eligible members     40
of the Association and approved by the President Transportation             41
Division. In the event any transportation company refuses to be repre-      42
sented by the conference committee representing the companies in a          43

<sup>44</sup> general or concerted movement, the President Transportation Division

<sup>45</sup> may exclude the General Committee on such company from participa-

<sup>46</sup> tion in the movement.

<sup>47</sup> A strike may be authorized by the President Transportation Divi-

<sup>48</sup> sion, with approval of the General President, in support of a general

<sup>49</sup> or concerted wage-rules movement, provided such action under this

<sup>50</sup> Section is approved by a two-thirds (⅔) vote of the members in any

<sup>51</sup> Association. Such vote may be taken as the President Transportation

<sup>52</sup> Division may direct by mail, wire, or while in session.

<sup>53</sup> In any general or concerted wage-rules movement the President

<sup>54</sup> Transportation Division shall appoint a negotiating committee

<sup>55</sup> representative of each of the former organizations and crafts repre-

<sup>56</sup> sented by them, which are involved in the movement. The negotiating

<sup>57</sup> committee shall assist in the prosecution of the wage-rules movement

<sup>58</sup> as directed by the President Transportation Division.

<sup>59</sup> When in the judgment of the President Transportation Division

<sup>60</sup> and the negotiating committee a final offer of settlement has been

<sup>61</sup> received, the offer with the committee's recommendation shall be

<sup>62</sup> submitted by referendum to the Membership of the crafts involved in

<sup>63</sup> the movement for their acceptance or rejection. Following receipt of

<sup>64</sup> the offer of settlement, each General Chairperson shall have fifteen (15)

<sup>65</sup> days to submit questions pertaining to the offer. The negotiating com-

<sup>66</sup> mittee will, consolidate the submitted questions into a single, uniform

<sup>67</sup> list. When the answers to these questions are determined by the nego-

<sup>68</sup> tiating committee and the carriers' representatives, the agreed-upon

<sup>69</sup> questions and answers will be distributed to the General Chairpersons

<sup>70</sup> and made a part of the offer of settlement.

<sup>71</sup> A majority of the members voting of each of the crafts to be covered

<sup>72</sup> or affected by the terms of the proposed agreement shall be required

<sup>73</sup> to ratify the offer of settlement.

<sup>74</sup> The terms of the settlement shall be submitted, by the President

<sup>75</sup> Transportation Division, to each Local involved in the movement, in

sufficient quantity to permit circulation to the membership, and/or the     76
terms may be mailed to each member in a special edition of the SMART     77
Transportation Division News. Recommendations of the President     78
Transportation Division and/or Negotiating Committee may be included     79
along with a digest or summary of the provisions of the settlement.     80

    The Board of Directors shall establish and publish procedures     81
for the conduct of referendum elections which shall thereafter be     82
contained as an appendix to this Section; guaranteeing each affected     83
member the right-to-vote on wages, rules and working conditions.     84

    Voting and tabulation of the results must be completed within     85
twenty-one (21) days from the date the proposal is dispatched or     86
presented by the President Transportation Division. The final result     87
and tabulation of voting shall be furnished to each Local involved     88
in the movement and shall be printed in the SMART Transportation     89
Division News.     90

## APPENDIX:     91

Agreements shall be sent via first-class mail in an envelope marked     92
"Important – Agreement and Ballot Enclosed". The ballot will be a     93
self-addressed, postage paid postcard that will contain space for the     94
member to print name, Local number and railroad employer, or a     95
telephone electronic voting system supervised by the American Arbi-     96
tration Association or similar neutral organization.     97

## SECTION 92 – STRIKES     1

When a strike has been inaugurated by SMART Transportation     2
Division, the President Transportation Division, shall be the recog-     3
nized leader and shall have authority, in conjunction with the General     4
President, to appropriate from the Strike Fund such money for legal     5
assistance and incidental expenses as may be required for a successful     6
prosecution of the strike.     7

SHEET METAL | AIR | RAIL | TRANSPORTATION

**SMART**®

NORTH OLMSTED, OHIO 44070-5333
PHONE: 216-228-9400 • FAX: 216-228-5755
www.smart-union.org

JEREMY R. FERGUSON
President

January 12, 2022

<u>SENT VIA EMAIL ONLY</u>
All BNSF General Chairpersons
SMART Transportation Division

RE: Request for strike authority, BNSF attendance policy

Dear Sirs and Brothers:

This is in reference to the enclosed letter dated January 11, 2022, regarding the above-referenced subject, jointly signed by SMART-TD General Chairpersons whose Committees have jurisdiction over the BNSF railroad. This will also serve to acknowledge and address the emailed and telephoned complaints received in this office, submitted by several SMART-TD members and officers who will be impacted by BNSF's unilateral decision to impose a new attendance policy for its employees, effective February 1, 2022.

Be advised this office completely understands and shares the disappointment, frustration and anger that many of you are expressing in the wake of BNSF's actions. More specifically, the draconian availability standards that BNSF intends to impose on our members will not only circumvent our efforts to mutually agree on such a policy; it will also infringe on provisions of agreements that are currently in effect on the property. Put simply, BNSF's decision to disregard our good-faith bargaining only serves to further decay our members' quality of life, which is simply unacceptable.

In view of the above, all BNSF General Chairpersons are hereby authorized to conduct a polling of the members of your respective Committees, posing the question of whether or not this office should proceed with the necessary steps to order a strike on the affected properties. In doing so, please note that SMART Constitution Article 21B, Section 85, states in pertinent part:

*… such strike action under this Section must be authorized by a two-thirds (2/3) vote of the members of the General Committee. Such vote may be taken by wire, mail, or personal contact with written confirmation as the General Chairperson may direct.*

**It is also vitally important to note that the approval of this proposition by a General Committee, as outlined above, does not constitute imminent authority to engage in any strike action**, as additional steps must be taken under the governing provisions of the SMART Constitution, and must be handled in accordance with the Railway Labor Act, as amended. With this in mind, upon the completion of such polling, please apprise this office of the results and await further instruction.

With best wishes, I remain

Ex. F

SHEET METAL | AIR | RAIL | TRANSPORTATION

24950 COUNTRY CLUB BLVD #340
NORTH OLMSTED, OHIO 44070-5333
PHONE: 216-228-9400 • FAX: 216-228-5755
www.smart-union.org

JEREMY R. FERGUSON
President

January 22, 2022

<u>SENT VIA EMAIL ONLY</u>
All BNSF General Chairpersons
SMART Transportation Division

**RE: January 11 letter requesting strike authority over BNSF Hi-Viz policy**

Dear Sirs and Brothers:

My office is in receipt of confirmation from your respective committees' recent strike polls concerning the BNSF HI-VIZ policy. All have been received with a "YES" vote.

As you are aware, the Carrier's policy is not slated to be implemented until February 1, 2022, and the Union has informed the Carrier that no strike action will be taken prior to implementation of the policy.

Please note however that authorization regarding a strike, if any, must await the outcome of the Carrier's Motion for a Temporary Restraining Order filed January 18, 2022. Currently the matter is pending before the U.S. District Court for the Northern District of Texas and has been set for an in-person hearing on Monday, January 24, 2022. I too have been summoned to appear before the judge.

You should be advised that the Union will be obligated to comply with the Court's decision. We will be in touch after the Monday hearing.

**To be clear: no strike is authorized at this time.**

With best wishes, I remain

Fraternally yours,

Jeremy R. Ferguson
President – Transportation Division

cc:    All Rail Vice Presidents – SMART Transportation Division
       Certain (BNSF) State Legislative Directors
       J.L. Gibson Jr., Chief of Staff – Transportation Division
       M.E. Dolin, Director of Administration – Transportation Division
       J.J. Brandow, Executive Assistant to the President – Transportation Division
       R.E. Leichliter, Administrative Assistant to the President – Transportation Division

Ex. G

Fraternally yours,

Jeremy R. Ferguson
President – Transportation Division

cc:    All Rail Vice Presidents – SMART Transportation Division
J.L. Gibson Jr., Chief of Staff – Transportation Division
M.E. Dolin, Director of Administration – Transportation Division
J.J. Brandow, Executive Assistant to the President – Transportation Division
R.E. Leichliter, Administrative Assistant to the President – Transportation Division