**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FT. WORTH DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:22-cv-0052-P |
| | ) | |
| INTERNATIONAL ASSOCIATION OF | ) | |
| SHEET METAL, AIR, RAIL AND | ) | |
| TRANSPORTATION WORKERS – | ) | |
| TRANSPORTATION DIVISION and | ) | |
| BROTHERHOOD OF LOCOMOTIVE | ) | |
| ENGINEERS AND TRAINMEN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMENDED ANSWER, ADDITIONAL DEFENSES AND COUNTERCLAIM OF
DEFENDANT BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN**

Defendant-Counterclaim Plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET" or "Union") hereby answers to the First Amended Complaint ("FAC") of Plaintiff-Counterclaim Defendant BNSF Railway Company ("BNSF" or "Carrier"). BLET denies the allegations contained in the FAC except to the extent specifically admitted herein. In response to the like-numbered paragraphs of the FAC, BLET answers as follows:

       1.      Admitted.

       2.      Admitted.

       3.      Admitted.

       4.      Admitted.

       5.      Admitted.

       6.      Admitted.

7.     Admitted only that in the past BNSF has unilaterally changed practices, policies, and standards governing attendance for employees represented by BLET. BLET expressly denies that such unilateral actions constitute a "long-standing and well-settled past practice."

8.     Admitted except that the Availability Policy was not implemented in 1999, and therefore that allegation is denied. As further response to the allegations in Paragraph 8, BNSF delayed implementation of the Availability Policy until February 1, 2000 after participating in National Mediation Board facilitated discussions between BNSF and BLET.

9.     Admitted.

10.    Admitted.

11.    Admitted.

12.    The first sentence of Paragraph 12 is admitted. The second sentence is denied. As further response to the allegations in Paragraph 12, BLET objected to proposed ATG modifications in 2006 and BNSF agreed to suspend such modifications pending discussions with BLET during their "Safety Summit II" meeting. Based on those discussions and concerns raised by BLET, changes were made to the original modifications proposed by BNSF before any modifications were implemented.

13.    Admitted except the actions taken in 2010 by BNSF were called a "low-performance process," not a "low-performance standard." As further response to the allegations in Paragraph 13, the BLET objected in writing to the low-performance process and BNSF's unilateral implementation of it.

14.    Admitted.

15.    Admitted.

16.    Admitted.

2

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     BLET is without sufficient knowledge to form a belief as to the truth of what employees have expressed to BNSF, and therefore, denies the allegations of Paragraph 20. As further response to the allegations in Paragraph 20, BLET is aware of many complaints made to it from employees about BNSF's ATG regarding many aspects of it, including but not limited to when they may be subject to discipline under it.

21.     BLET is without sufficient knowledge to form a belief as to the truth of why BNSF developed Hi Viz, and therefore, denies the allegations of Paragraph 21.

22.     Denied.

23.     The first sentence of Paragraph 23 is denied. With respect to the second sentence, BLET submits that the Kasher Award speaks for itself and, therefore, denies BNSF's characterization of it.

24.     Denied.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Denied.

29.     Denied.

30.     BLET admits the first and second sentence of Paragraph 30. BLET is without sufficient knowledge to form a belief as to the truth of the allegations in the third sentence and, therefore, denies the allegations therein. The fourth sentence is denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     BLET reincorporates its response to Paragraphs 1-33.

35.     Paragraph 34 states conclusions of law to which no response is required.

36.     Denied.

37.     BLET admits that its position is that the dispute over BNSF's Hi Viz policy is a major dispute under the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et sq.* All other allegations of Paragraph 37 are denied.

38.     BLET admits that it has stated that it intends to engage in self-help should BNSF proceed with implementation of its Hi Viz policy in violation of the RLA. All other allegations of Paragraph 38 are denied.

39.     BLET reincorporates its response to Paragraphs 1-38.

40.     Paragraph 40 states conclusions of law to which no response is required.

41.     Paragraph 41 states conclusions of law to which no response is required. To the extent a response is required, then allegations of Paragraph 41 are denied.

42.     Denied.

Prayer for Relief: BLET denies that BNSF is entitled to any of the relief sought in its Prayer for Relief.

## BLET'S ADDITIONAL DEFENSES

BLET reserves the right to assert any and all applicable defenses to BNSF's FAC and to amend or otherwise supplement this pleading. Without limiting the generality of the foregoing and without regard to whether defenses set forth below are affirmative defenses within the meaning of

4

Rule 8(c) of the Federal Rules of Civil Procedure, and without conceding that any such defenses must be set forth in its Answer or assuming any burden of proof that it would not otherwise bear, BLET states as follows:

1.      BNSF's FAC fails to state a claim upon which relief can be granted.

2.      The parties' dispute over BNSF's Hi Viz attendance policy is properly characterized as a "major dispute" under Section 2, First and Seventh and Section 6 of the RLA, 45 U.S.C. §§ 152, First and Seventh, and 156.

3.      BNSF's complaint fails to set forth an actual controversy for declaratory judgment under 22 U.S.C. § 2201 or Fed. R. Civ. R. 57.

4.      BNSF's complaint is not a proper subject of a declaratory judgment action as its claims are based upon past facts and rights, not future events, or rights.

5.      BNSF lacks clean hands.

6.      BNSF is estopped from asserting its claims.

7.      BNSF's claims are barred by its circumvention of and noncompliance with the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.,* and thus, this court lacks jurisdiction over them.

### VERIFIED COUNTERCLAIM FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES

Defendant-Counterclaim Plaintiff BLET for its Complaint against BNSF hereby states:

### JURISDICTION AND VENUE

1.      This is an action brought, *inter alia,* pursuant to the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, (hereinafter "the RLA" or "the Act"). This Court has subject matter jurisdiction as follows: (a) under 28 U.S.C. § 1331 because the case arises under the laws of the United States, namely, the RLA; (b) under 28 U.S.C. § 1337 because the matter in controversy arises under an

Act of Congress regulating commerce, namely, the RLA; and (c) under 28 U.S.C. §§ 2201 and 2202 because this is an actual controversy in which the BLET seeks declaratory judgment.

2.    Venue under 28 U.S.C. § 1391(b)(2) and (3) is proper, and personal jurisdiction over BNSF exists in this District wherein BNSF is located and where it regularly conducts business operations and has substantial contacts.

## PARTIES

3.    BLET is an unincorporated labor organization with headquarters in Independence, Ohio. It is the exclusive collective bargaining representative of the craft or class of Locomotive Engineers (also known as "engineers") in the employ of BNSF. It is a "representative" within the meaning of Section 1, Sixth of the RLA, 45 U.S.C. §151 Sixth. The collective bargaining agreements that govern the engineers involved in this dispute are administered by four BLET General Committees of Adjustment ("GCA"): 1) BNSF–ATSF GCA, 2) BNSF–C&S/CRI&P/FWD GCA, 3) BNSF/MRL GCA, and 4) BNSF–SLSF GCA, which also are all unincorporated labor organizations. The principal officer of each GCA is known as the General Chairman.

4.    BNSF is a corporation engaged in the interstate transportation of goods by rail and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. BNSF has its corporate headquarters in Fort Worth, Texas, and operates within this judicial district.

5.    This action is brought by BLET on its own behalf and on behalf and in the interest of all engineers in the craft or class in the service of BNSF that BLET represents.

## FACTS

6.    BLET and BNSF are parties to multiple CBAs that govern the rates of pay, rules, and working conditions of BNSF's engineers represented by the Union. Some of the parties'

collective bargaining agreements are system-wide in scope, meaning they cover all of the engineers represented by BLET who are employed by BNSF. Other CBAs cover only those portions of the BNSF system that correspond to the properties of former railroads that have since been merged into BNSF.

## RLA SECTION 6 BARGAINING

7.      On or about November 15, 2019, each of the BLET GCAs served a notice pursuant to Section 6 of the RLA on BNSF to initiate the statutory collective bargaining process for amending the parties' CBAs. The parties have been engaged in negotiations since that time but have not reached an agreement to amend any of the CBAs.

8.      In BNSF's Section 6 notice to BLET, it communicated to the BLET that it sought to negotiate attendance issues in Section 6 bargaining.

9.      Among other things, Section 6 of the RLA requires the parties to maintain the *status quo* until a new agreement is reached, which means that rates of pay, rules and working conditions of employees represented by the Union shall not be altered by the carrier until a new agreement is reached.

## BNSF'S UNILATERAL REPUDIATION OF CBA TERMS

10.      Despite BNSF's obligation to maintain the *status quo* while the parties are engaged in Section 6 negotiations under the RLA, on January 10, 2022, BNSF announced new attendance standards called the "Hi Viz" program to be made effective February 1, 2022.

11.      Instead of bargaining to an agreement with the BLET, BNSF unilaterally promulgated the Hi Viz policy.

12.      BNSF did not engage any BLET representatives regarding the Hi Viz policy, nor attempt to engage in any bargaining over the matter although it had every opportunity to do so.

7

***The Hi Viz Policy Penalizes Union Officials for Laying Off Work for Union Business, Including to Represent Employees, and Restricts Employees in Choice of Representatives in Violation of Existing Agreements.***

13.     In at least two agreements between the parties, Union officials are expressly permitted to lay off work (*i.e.*, to remove themselves from availability to operate a locomotive trip) in order to attend Union meetings, to represent employees in disciplinary investigations, and to meet with Carrier officials to discuss claims and grievances. The Hi Viz policy, which penalizes Union officials for laying off in such situations, repudiates those agreements.

14.     In the first such agreement dated November 24, 2003, "a duly-elected local chairman, acting local chairman, local president or local secretary-treasurer of the Brotherhood of Locomotive Engineers" is permitted to "lay[] off to attend a bona-fide union meeting, represent an employee in a formal investigation, or meet with Carrier official(s) on items such as discussing time claims, grievances, and/or related schedule matters . . . ." This agreement goes on in Section 1.2 to expressly provide, "In the application of the foregoing a union officer laying off for the purposes stipulated will not be considered as laying off or missing a call." (Id.) The second agreement, dated January 1, 1972, in Rule 64 provides substantially similar lay off rights for Union officials and likewise provides, "In the application of the foregoing, a Local Chairman laying off for the purposes stipulated will not be considered as laying off or missing a call . . . ."

15.     Despite the unambiguous language of these agreements that prohibit BNSF from considering a Union official who removes himself from availability for an assignment for the stipulated purposes as "laying off," the Hi Viz policy does treat Union officials in such situations as being absent from work and denies such Union officials Good Attendance Credits when exercising their contractual right to lay off for union business or to represents employees.

16.     This penalty that is applied to Union officials for exercising their contractual right is clearly intended to and will have the effect of restricting Union officials from laying off to conduct Union business or to represent members because doing so places their own continued employment in jeopardy. By penalizing Union officials in such circumstances, BNSF Hi Viz policy renders the contractual right previously possessed by Union officials in these agreements illusory and effectively repudiates the agreements.

17.     Further, multiple agreements between the parties expressly grant employees the right to select the representative of their choice in formal disciplinary investigations that may be scheduled by the Carrier. For example, in the January 1, 1972 agreement, Rule 50(c) expressly permits employees to "obtain a representative or representatives of his choice, if desired."

18.     In an agreement dated February 1, 1947, in Section C., it states, "At the investigation the employe may present witnesses in his behalf and *may be assisted by his committeeman or an employ of his choice*." (emphasis added).

19.     In an agreement dated March 1, 1981, Rule 50(A) states, employees "may arrange for representatives of their choice to assist them in the investigation."

20.     In an agreement dated July 1, 2005, Article 29 makes multiple references to an Engineer employee being represented by "an Engineer of his choice," which has historically and nearly universally been a Union official.

21.     By applying the Hi Viz policy to Union officials and penalizing them for laying off to represent members in disciplinary investigations, BNSF has effectively repudiated employees' contractual right to the choice of Union official representative because such Union officials will be unable to provide such representation where their own continued employment becomes as risk. Thus, the Hi Viz policy not only repudiated Union officials right to lay off to represent employees,

but also the employee concomitant contractual right to the representative of their choice. This, the implementation of the Hi Viz policy constitutes a major dispute that, if implemented, permits the BLET to resort to its own self-help in response.

### The Hi Viz Policy Repudiates the Parties' Agreement Guaranteeing Employees Reasonable Lay Off Privileges.

22.     In an agreement dated April 4, 1994, dealing with Engineer extra board assignments, in Section 1(a), the parties expressly agreed that "[t]he Carrier shall maintain a sufficient number of engineers to permit reasonable lay off privileges and to protect the service including vacations and other extended vacancies."

23.     "Reasonable lay off privileges" are tied to attendance and the policies implemented by the Carrier related to such. Thus, in order for any given attendance policy to be consistent with the parties' April 4, 1994 agreement, it must not be so restrictive or harsh so as to deny employees' reasonable lay off privileges.

24.     The draconian Hi Viz policy is so restrictive or harsh that it denies employees reasonable lay off privileges, and any arguments that the Hi Viz policy permits reasonable lay off privileges is obviously insubstantial.

25.     The change in the number of days employees in 7-day a week, un-assigned service may be off in any given year from the prior policy is outrageous, shocks the conscience and in no way can be considered to allow maintenance of reasonable lay off privileges. This is because employees in 7-day a week, un-assigned service prior to implementation of the Hi Viz policy are permitted to lay off or be absent, outside of contractual paid leave (e.g., vacation or personal days) up to 24 weekend days and 60 weekday days per year. Once the Hi Viz policy is put into effect, however, by the BLET's calculation, those same employees will be reduced to be off only 7 weekend days and 15 weekday days per year without placing their employment in jeopardy. This

unilateral reduction in days that an employee may lay off from 84 (24 weekend plus 60 weekday) to a mere 22 days under the Hi Viz policy is what shocks the conscience and utterly repudiates such employees' contractual right to reasonable lay off privileges.

### The Hi Viz Policy Repudiates Agreement Language That Gives Employees 24 Hours to Select A New Assignment When Displaced by a Senior Engineer.

26.    In an agreement dated June 24, 2007, BLET and BNSF agreed to the following language regarding an employee being displaced, also know as bumped, from an assignment by a more senior employee:

> I. An engineer displaced from a run or assignment by a senior engineer or whose assignment is reduced or abolished as part of a board adjustment in accordance with schedule rules and/or agreements will have displacement rights to any assignment/board on which he holds active engineer's seniority. This displacement must be exercised within 24 hours of notification of displacement. In the event displacement is not exercised within 24 hours, such engineer will be required to displace the junior engineer working at the location. For those engineers who are displaced while off for any reason, the notification process will begin upon markup and they must also place within 24 hours of notification.

27.    This contract language gives an employee who is displaced up to 24 hours to select a new assignment, and if no new assignment is selected in that 24 hours, the employee then bumps the most junior engineer at the location as default.

28.    In Section 6 bargaining, BNSF sought to reduce or eliminate the 24-hour period.

29.    The new Hi Viz policy changes the contract language concerning displacement by penalizing an employee if he does not select a new assignment in less than 2 hours by breaking an employee's ability to earn Good Attendance Credit and resetting the 14-day period in which to earn such credits. Thus, the intended effect of this portion of the Hi Viz policy penalizing employees who exercise their contractual entitlement to wait up to 24 hours to select a new

assignment, or to just default to a new assignment after 24 hours, is to render the above referenced language illusory and effectively repudiated it.

30.     By penalizing engineers for utilizing existing contractual entitlements with regard to selecting a displacement assignment, BNSF has altered existing terms and conditions of employment as embodied in the displacement language and repudiated the language. Thus, once again, implementation of the Hi Viz policy constitutes a major dispute that, if implemented, permits the BLET to resort to its own self-help in response.

### *The Hi Viz Policy repudiates Employees' Contractual Vacation and Personal Day Rights.*

31.     The 1947 National Agreement between BLET and the involved rail Carriers (including BNSF) grant BLET represented employees vacation rights based upon years of service. The 1947 National Agreement has been modified by subsequent National Agreements as well as by the 2007 on property agreements between BLET and BNSF.

32.     Insofar as BNSF engineers in un-assigned/on call basis service are concerned, pre-approved vacation days and Personal Leave Days have a fixed start time, even though the involved employees do not have fixed on duty/call times. As a result, the involved engineers are routinely called in the hours preceding their fixed time to start their contractually provided vacation and personal leave time for round trips out of town that could exceed 24-48 hours.

33.     In application, the HI Viz policy violates the employees' right to contractually granted vacation time by assessing disciplinary action to those who by no choice of their own must reject a call to work in order to access their agreed to vacation absence. Taking that additional unpaid leave under the new Hi Viz policy will now trigger the application of either a reduction in points, or the inability to earn points back, thus impeding the employees right to access

contractually provided paid leave, in effect repudiating employees' contractual right to vacation in some instances. Thus, this also constitutes a major dispute.

### BNSF'S HI VIZ POLICY PRESENTS A MAJOR DISPUTE, AS IT IS PATENTLY ILLEGAL UNDER THE FMLA

34.     The Family Medical Leave Act ("FMLA") prohibits employers from "interfering with, restraining, or denying" an employee's exercise of FMLA rights. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(a)(1).

35.     The FMLA also prohibits employers from "discriminating or retaliating against an employee … for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Employers, therefore, cannot consider "FMLA leave as a negative factor in employment actions" and must provide an employee who takes FMLA leave with the same benefits that "an employee on leave without pay would otherwise be entitled to [receive]." *Id*.

36.     Similarly, "FMLA leave [cannot] be counted under no-fault attendance policies," meaning employees cannot accrue points for taking FMLA leave under a no-fault attendance policy. 29 C.F.R. § 825.220(c); *see also* WHD Opinion Letter FMLA 2003-4, 2003 WL 25739620 (July 29, 2003). "'[N]o-fault' attendance policies [] do not necessarily violate the FMLA as long as points are not assessed for employees who are absent due to any FMLA qualifying reason." WHD Opinion Letter FMLA2003-4, 2003 WL 25739620, at *1.

37.     When a no-fault policy such as BNSF's Hi Viz policy provides for a set period of specified attendance that removes attendance points but restarts the period from scratch if the employee misses work due to an FMLA absence, the policy is unlawful. *See Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472 (6th Cir. 2019); *see also* 1999 FMLA Ltr., 1999 WL 1002428, at *2 (January 12, 1999) ("If the employee had 45 days without a recordable [absence] at the time the unpaid FMLA leave commenced, the employer would be obligated to restore the employee to this

number of days credited without an [absence])."

38.     The Hi Viz policy likewise provides for a set period of good attendance that will cause a reduction in potential discipline. Rather than adding points for attendance violations, the Hi Viz Policy starts the employee off with thirty and then reduces points for every specified absence. It provides for a good attendance credit period to add four points back (and thus reduce the chance of discipline). In this case, that is 14 days of uninterrupted attendance to obtain restoration of positive attendance points.

39.     On its face, the Hi Viz policy restarts the clock during the 14-day period if FMLA is taken. That is, the progress earned under the 14-day period for point  positive accumulation is not frozen, but rather, is forfeited upon return from the FMLA leave. Hence, the Hi Viz policy is identical to the unlawful policy under *Dyer*, and unilateral implementation of the illegal policy creates a major dispute as there is no arguable basis to enact such an illegal policy under the CBA.

40.      BLET's CBAs with BNSF do not contain any provisions that permit BNSF adopt such Hi Viz attendance standards. Further, there are absolutely no implied terms, past practice or any course of dealing between the parties that permit BNSF to do so.

41.     Through the actions described above, BNSF has openly disregarded its legal duty under the RLA to bargain with the BLET. BNSF's pattern of taking unilateral action in altering the terms and conditions of employment of engineers represented by the BLET is a flagrant violation of Section 6 *status quo*.

42.     With each of these unilateral actions, the phones and emails at BLET are being flooded with questions and concerns from its membership. The resulting chaos of these and a multitude of unanswered questions have resulted in a drain on BLET's limited resources and its ability to represent its membership.

14

43.     The only way to remedy this situation and protect the integrity of good faith bargaining is for this Court to order BNSF to stop its unilateral action and to bargain with BLET to reach agreement.

44.     For the above reasons, a breach of the statutory *status quo* has occurred and is continuing to occur, and/or further breaches of the same have been threatened and will occur, unless and until injunctive relief is granted.

## IRREPARABLE INJURY

45.     The allegations of paragraphs 1 through 44 are incorporated by reference pursuant to Fed. R. Civ. P. Rule 10(c).

46.     BNSF's violations of its obligations under Sections 2 First and Seventh, and Section 6 of the RLA set forth in Counts I-III, below, undermine the RLA's statutory purpose to prevent disruptions to interstate commerce through bargaining in conference between carriers and their employees and, therefore, are contrary to the public interest. As such, there is no obligation on the part of the BLET to show irreparable injury because courts may enjoin a violation of the *status quo* pending completion of the required Section 6 procedures without the customary showing of irreparable injury.

47.     In addition to the irreparable injury to the statutory purposes and machinery of the RLA, the illegal and wrongful acts and conduct described under Counts I-III are continuing and, if not enjoined, the BLET and engineers it represents will be injured in ways that cannot be measured accurately in terms of money, either as to extent or amount.

48.     As a proximate result of the BNSF's unlawful practices:

    a.      By means of the aforementioned acts, BNSF has undermined the BLET's status as the exclusive bargaining representative of engineers by unilaterally altering terms and conditions of employment;

15

b.     The bargaining process will be undermined and the parties effectively prevented from reaching agreement;

c.     Certain BLET members will immediately be forced under threat of loss of employment to undergo increased exposure to COVID-19 health risks to them and their families as a consequences of more infected employees coming to work sick on account of the Hi Viz policy;

d.     BNSF's conduct is contrary to the public interest in stable labor relations and the maintenance of agreements, as well as their orderly change through the RLA's procedures; and

e.     The injury being suffered by the public, the BLET and engineers is irreparable and continuing and cannot be recovered in an action at law or in administrative or contractual proceedings.

49.     For all the foregoing reasons, the BLET and the engineers are without an adequate remedy at law and will suffer serious, substantial, and irreparable injury unless BNSF's unlawful conduct is enjoined. The public interest in the RLA and interstate commerce requires that injunctive relief issue.

50.     BNSF will not be injured by granting of injunctive relief requiring it to comply with its duties under the RLA and to restore the *status quo*. BNSF is required by statute to address any operational or financial need for changes to existing agreements only through bargaining under the procedures of the RLA.

51.     The aforesaid unlawful acts have been threatened and will be committed unless restrained and BNSF authorized them with actual knowledge thereof.

52.     Substantial and irreparable injury to BLET's property will follow if the injunctive relief is not granted.

53.     As to each item of relief granted, greater injury will be inflicted upon the BLET by the denial of relief than will be inflicted upon BNSF by the granting of relief.

54.     There are no public officers charged with the duty to protect the BLET from these actions.

55.     The BLET has made every reasonable effort to settle such dispute by negotiation.

## CAUSES OF ACTION

### COUNT I
### (Violation of Section 6 of the RLA, 45 U.S.C. § 156)

56.     The allegations of paragraphs 1 through 55 are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

57.     Section 6 of the RLA, 45 U.S.C. § 156, provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

58.     RLA Section 6 provides that carriers shall not alter the terms of a collective bargaining agreement or working conditions except as provided in Section 6, which requires express notice and bargaining during the amendable period set forth by parties.

59.     BNSF did not amend the CBAs in accordance with Section 6 bargaining under the RLA, but instead unilaterally and unlawfully altered the CBAs by unilaterally implementing the Hi Viz policy and, thus, altered rates of pay, rules, or working conditions in continuing violation of Section 6 of the Act.

## COUNT II
### (Violation of Section 2 Seventh of the RLA)

60.     The allegations of paragraphs 1 through 60 of the Complaint are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

61.     Section 2 Seventh of the RLA, 45 U.S.C. §152 Seventh, states:

> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

62.     The continuing acts and conduct by BNSF of unilaterally implementing the Hi Viz Policy are unilateral changes in the terms and conditions of employment of engineers as embodied in the parties' CBAs, and such actions taken during negotiations for amendments to the CBAs are in violation of RLA Section 2 Seventh's requirement that it maintain the *status quo* while such bargaining continues.

## COUNT III
### (Violation of Section 2 First of the RLA)

63.     The allegations of paragraphs 1 through 62 of the Complaint are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

64.     Section 2 First of the RLA, 45 U.S.C. §152 First, states:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any

carrier growing out of any dispute between the carrier and the employees thereof.

65.     The continuing acts and conduct by BNSF of unilaterally implementing the Hi Viz Policy during negotiations for amendments to the CBAs are in violation of Section 2 First of the RLA, 45 U.S.C. §152 First, in that BNSF has not exerted every reasonable effort to maintain agreements as to rates of pay, rules and working conditions, nor to settle disputes.

### COUNT IV
### (Violation of Section 2 Third of the RLA)

66.     The allegations of paragraphs 1 through 65 of the Verified Counterclaim are hereby incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

67.     Section 2 Third of the RLA, 45 U.S.C. § 152 Third, provides:

> Representatives for the purposes of this chapter, shall be designated by the respective parties without interference, influence or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with influence, or coerce the other in its choice of representatives.

68.     By enacting a Hi Viz policy targeting Union business leave utilized by Union representatives, and CBA terms allowing for choice of representatives and witnesses, BNSF has targeted union officials and other union representatives and supporters, and has interfered with, influenced and/or coerced engineers in the exercise of their right to designate representatives of their choosing and the right of the Union and its members to freely participate in protected activity under the RLA.

69.     The actions of BNSF referenced herein were motivated by anti-union animus, have a disparate impact on Union representatives, and were taken for the purpose of impairing the ability of the Union and its members to function and freely associate, as well as to destroy support for the Union, to weaken the BLET and ultimately to destroy it.

## COUNT V
## (Violation of Section 2 Fourth of the RLA)

70.     The allegations of paragraphs 1 through 69 of the Verified Counterclaim are hereby incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

71.     Section 2 Fourth of the RLA, 45 U.S.C. § 152, Fourth provides:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing . . . No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier . . . to influence or coerce employees in an effort to induce them . . . not to join or remain members of any labor organization.

72.     By enacting the Hi Viz Policy disparately impacting Union officials, Union representatives, and Union supporters as well as the activities of Union members, BNSF has interfered and continues to interfere with the rights of employees to organize and bargain collectively, has interfered and continues to interfere with the organization of its employees, has used and continues to use the funds of the rail carrier in an effort to induce the members of the Union not to join or remain members of the Union, and has interfered and continues to interfere with the right of Union members to freely participate in protected activity under the RLA.

73.     The actions of BNSF referenced herein were motivated by anti-union animus, have a disparate impact upon Union representatives, and were taken for the purpose of impairing the ability of the Union and its members to function and freely associate, to destroy support for the Union, to weaken the Union and to ultimately destroy it.

74.     By engaging in said actions, BNSF violated Section 2 Fourth of the RLA, 45 U.S.C. § 152 Fourth.

## COUNT VI
### (Minor Dispute Injunction Preserving Status Quo)

75.     The allegations of paragraphs 1 through 74 of the Verified Counterclaim are hereby incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

76.     In the alternative, to the extent that the Court finds the Hi Viz Policy in whole or in part to be a minor dispute, this Court has jurisdiction to issue an injunction to preserve the status quo and remedy of arbitration.

77.     Courts have recognized that "even where a dispute has been found to be *minor*, a trial court may exercise its equitable power to impose conditions requiring the employer to maintain the status quo pending resolution of the dispute in arbitration." *See ALPA v. Eastern Airlines*, 863 F.2d 891, 922 (D.C. Cir. 1988). Such an injunction falls under the exception to the Norris LaGuardia Act's prohibition on federal court injunctions in labor disputes. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235(1970).

78.     The award of injunctive relief to preserve arbitration has been issued to prohibit strikes over a "minor dispute" conditioned upon the carrier's submitting the underlying minor dispute to arbitration. *See Burlington N. R.R. v. Brotherhood of Maintenance of Way Emps.,* 143 F. Supp. 2d 672, 679–85 (N.D. Tex. 2001), a*ff'd*, 286 F.3d 803 (5th Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003); *cf. Norfolk S. Ry. v. Int'l Longshoremen's Ass'n,* 190 F. Supp. 2d 1021, 1029 (N.D. Ohio 2002) (issuing declaratory judgment that dispute was minor and that "work stoppages are not permitted over this dispute").

79.     Likewise, courts have recognized that unions can seek injunctions to preserve arbitration as well. *See Bhd. of Ry. Clerks, Westchester Lodge 2186 v. Ry. Express Agency*, 329 F.2d 748 (2d. Cir. 1964); *ALPA v. American Airlines, Inc.*, 898 F.2d 462 (5th Cir. 1990); *Bhd. of Maintenance of Way Employees v. Burlington N. R.R.*, 802 F.2d 1016, 1023 (8th Cir. 1986); *Ry.*

*Labor Executives Ass'n v. Norfolk v. W. Ry.*, 833 F. 2d 700, 708 (7th Cir. 1987); *ALPA v. Eastern Air Lines*, 869 F.2d 1518, 1520 n.2 (D.C. Cir. 1989).

80.    In *IAM v. Frontier Airlines, Inc.*, 664 F.2d 538, 541-42 (5th Cir. 1981), the Court recognized that the union was correct that an injunction in aid of arbitration was permissible for a minor dispute, writing:

> First, injunctions may issue to prevent strikes that would deprive the congressionally established grievance procedures of jurisdiction. ***Second, injunctions may issue to prevent the carrier from disrupting the status quo when doing so would result in irreparable injury of a magnitude that would render a decision in favor of the unions virtually meaningless, and consequently also deprive the grievance mechanism of jurisdiction.*** Third, the determination of whether carrier action is serious enough to warrant jurisdiction-preserving injunctive relief is addressed to the equitable power of the court, with review restricted as to whether there has been an abuse of discretion.

(emphasis added) (citations omitted).

81.    Here, the actions threatened by the BNSF are precisely the type of irreparable injury that render arbitration meaningless.

82.    BNSF's draconian Hi Viz policy will effectively force COVID-19 positive engineers who fear for their jobs to eschew tests or eschew staying home from work to stop the spread. They will likely cause more infections at BNSF as well as at BNSF employees' homes and communities. The so-called Omicron variant is widely reported to be incredibly contagious through just airborne exposure, and for the unvaccinated, poses a risk of death. It is resistant to monoclonal antibodies.

83.    Arbitration cannot ever remedy the loss of life of engineers, their family member, or the public.

84.     There is no sure way for engineers to protect themselves from infection or spreading the COVID-19 infection to others, thus creating a larger risk in communities around the nation in which they travel of injury and death.

85.     It is in the public interest to put off the implementation of the Hi Viz Policy pending expedited arbitration.

86.     The Court should delay implementation of the policy until arbitration is completed.

## **PRAYER FOR RELIEF**

The BLET requests judgment against BNSF for the following relief:

A.     That BNSF and its officers, agents and representatives be ordered to restore the *status quo* regarding the unilateral change and breaches outlined above, to cease and desist from altering the terms of the parties' CBAs, including ceasing implementation of the Hi Viz Policy, and to adhere to the terms of the parties' CBAs and *status quo* working conditions unless and until those terms are altered in Section 6 bargaining with BLET;

B.     That BNSF and its officers, agents and representatives be ordered to refrain from interfering with, influencing, coercing, or discriminating against engineers represented by the BLET, and further be ordered to bargain in good faith pursuant to Section 6 of the RLA;

C.     That BNSF be ordered to expunge any adverse job action taken against affected BLET members, restore them to work, and make them whole as if the adverse action had not been taken;

D.     That BNSF be ordered to conspicuously post copies of this Court's order at all locations staffed by engineers for a period of one-hundred eighty (180) days;

E.     That BNSF be ordered to provide a copy of this Court's order to every engineer who is covered by any of the CBAs, by certified mail at their most current address of record, to

ameliorate the effects of BNSF's unlawful conduct on these employees' rights under the RLA;

F.      That the Court issue preliminary and permanent injunctive relief restoring the *status quo* and enjoining BNSF and its officers, agents, and representatives from: 1) breaching the CBAs and *status quo* working conditions; 2) from interfering with, coercing, or discriminating against engineers covered by the CBAs; and 3) from negotiating in bad faith with the BLET;

G.      That BNSF be ordered to make engineers adversely affected by its violations whole;

H.      That the BLET be awarded its costs;

I.      That the Court grant the BLET all additional relief that may be equitable, including a reasonable award of attorneys' fees.

Dated: January 28, 2022                   Respectfully submitted,

/s/ James Petroff
James Petroff (*Admitted Pro Hac Vice*)
Joshua D. McInerney (*N.D. Tex. Bar Admission Pending*)
**WENTZ, MCINERNEY, PEIFER & PETROFF, LLC**
3311 Bear Point Circle
Powell, OH 43065
Phone: (614) 756-5566
jpetroff@lawforlabor.com
jmcinerney@lawforlabor.com
*Counsel for Defendant BLET*

Rod Tanner
Texas State Bar No. 19637500
Tanner and Associates, PC
6300 Ridglea Place, Suite 407
Fort Worth, Texas 76116-5706
Ph: 817.377.8833
Fax: 817.377.1136
rtanner@rodtannerlaw.com

*Attorneys for BLET*

24

**VERIFICATION**

I, Kent Psota, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the allegations of the foregoing Verified Counterclaim are true and correct and that I can testify as such based upon personal knowledge in court.

Dated: January 28, 2022         _____

Kent Psota, General Chairman

**VERIFICATION**

I, Rob Cunningham, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the allegations of the foregoing Verified Counterclaim are true and correct and that I can testify as such based upon personal knowledge in court.

Dated: January 28, 2022         _____

Rob Cunningham, General Chairman

**VERIFICATION**

I, Jeff Thurman, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the allegations of the foregoing Verified Counterclaim are true and correct and that I can testify as such based upon personal knowledge in court.

Dated: January 28, 2022         _____

Jeff Thurman, General Chairman

**VERIFICATION**

I, Troy Martin, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the allegations of the foregoing Verified Counterclaim are true and correct and that I can testify as such based upon personal knowledge in court.

Dated: January 28, 2022         _____

Troy Martin, General Chairman

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2022, I electronically filed the foregoing Answer, Additional Defenses and Counterclaim of Defendant-Counterclaim Plaintiff Brotherhood Of Locomotive Engineers and Trainmen with the Clerk of the Court using the ECF System, which will provide electronic notice and copies of such filing of the to the parties.

/s/ *James Petroff*