**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FT. WORTH DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:22-cv-052-P |
| | ) | |
| INTERNATIONAL ASSOCIATION OF | ) | |
| SHEET METAL, AIR, RAIL AND | ) | |
| TRANSPORTATION WORKERS – | ) | |
| TRANSPORTATION DIVISION and | ) | |
| BROTHERHOOD OF LOCOMOTIVE | ) | |
| ENGINEERS AND TRAINMEN, | ) | |
| | ) | |
| Defendants-Counterclaim Plaintiffs. | ) | |
| | ) | |

**APPENDIX IN SUPPORT OF BROTHERHOOD OF LOCOMOTIVE**
**ENGINEERS AND TRAINMEN'S OPPOSITION TO BNSF'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

NOW COMES, Defendant Brotherhood of Locomotive Engineers and Trainmen and files

this Appendix in Support of Its Opposition to Plaintiff's Motion for a Preliminary Injunction.

| **EXHIBIT** | **DESCRIPTION** | **PAGE NO.** |
|---|---|---|
| 1 | Declaration of Dennis R. Pierce | App. 1-9 |
| 2 | Declaration of M. Rob Cunningham | App. 10-27 |
| 3 | Declaration of Kent Psota | App. 28-41 |

Dated: February 7, 2022     Respectfully submitted,

          */s/ James Petroff*
          James Petroff (*Admitted Pro Hac Vice*)
          Joshua D. McInerney (*N.D. Tex. Bar*
          *Admission Pending*)
          **WENTZ, MCINERNEY,**
          **PEIFER & PETROFF, LLC**
          3311 Bear Point Circle
          Powell, OH 43065
          Phone: (614) 756-5566
          jpetroff@lawforlabor.com
          jmcinerney@lawforlabor.com

          Rod Tanner (Texas State Bar No. 19637500)
          Tanner and Associates, PC
          6300 Ridglea Place, Suite 407
          Fort Worth, Texas 76116-5706
          Ph: 817.377.8833
          Fax: 817.377.1136
          rtanner@rodtannerlaw.com

          *Counsel for Defendant BLET*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF System, which will provide electronic notice and copies of such filing to the parties.

          */s/ James Petroff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FT. WORTH DIVISION**

| | |
|---|---|
| BNSF RAILWAY COMPANY, ) | |
| ) | |
| Plaintiff-Counterclaim Defendant, ) | |
| ) | |
| v. ) | Civil Action No. 4:22-cv-052-P |
| ) | |
| INTERNATIONAL ASSOCIATION OF ) | |
| SHEET METAL, AIR, RAIL AND ) | |
| TRANSPORTATION WORKERS – ) | |
| TRANSPORTATION DIVISION and ) | |
| BROTHERHOOD OF LOCOMOTIVE ) | |
| ENGINEERS AND TRAINMEN, ) | |
| ) | |
| Defendants-Counterclaim Plaintiffs. ) | |

## DECLARATION OF DENNIS R. PIERCE

I, Dennis R. Pierce, pursuant to 28 U.S.C. § 1746, declare that the following facts are true and correct:

1.     I am the National President of the 58,000-member Brotherhood of Locomotive Engineers and Trainmen, a Division of the Rail Conference of the International Brotherhood of Teamsters. I have served as the Brotherhood President since my elevation to the Brotherhood's highest office on July 1, 2010 and have been reelected to subsequent four year terms in 2010, 2014 and 2018.

2.     I was also elected to serve as President of the Teamsters Rail Conference on June 24, 2010, and have been reelected to additional four-year terms on May 4, 2014, and on May 2, 2018. The Teamsters Rail Conference is made up of two Craft Divisions, BLET and BMWED.

3.     I was also elected to serve as Chairman of the Cooperating Railway Labor Organizations (CRLO) in August of 2020. I also serve as one of the spokesmen for the

Coordinated Bargaining Coalition, an eleven Union coalition currently involved in national negotiations under the terms of Section 6 of the RLA with multiple rail carriers, including BNSF.

4.      Prior to my election to the BLET's top post, I served the Brotherhood as First Vice President and Alternate President, since December 17, 2009. Prior to that, I served the Union as a National Vice President assigned to assist the Brotherhood on the CSX, CN and BNSF properties.

5.      Prior to this service with the National Division, I served as General Chairman of the Burlington Northern-Northlines/ Montana Rail Link General Committee of Adjustment, a position I assumed in 2001. As General Chairman, I participated in many on-property negotiations with BNSF, the most important of which lead to on-property addendums to the National Agreement settlements in 2003 and 2007.

6.      I began my railroad career as a Burlington Northern Maintenance of Way employee in 1977 in Lincoln, Nebraska. In 1979, I transferred to a clerical position with Burlington Northern. In 1980, I transferred again to the firemen's craft and earned promotion to locomotive engineer in 1981.

7.      I understand this Declaration is being offered in support of the BLET's opposition to BNSF's Motion for Preliminary Injunction. This Declaration is based on personal knowledge, and I am competent to testify to the matters set forth herein.

8.      As National President, I am responsible for negotiating, interpreting, and enforcing the national collective bargaining agreements ("CBAs") under my jurisdiction between BLET and BNSF. I am familiar with the applicable local and national agreements, and the work practices relevant to this dispute which have become an integral and implicit part of those agreements between BLET and BNSF. Locomotive engineers are within the craft or class of workers

2

represented by BLET, and subject to the terms and conditions of employment set forth in the CBAs between BLET and BNSF.

9.      BLET and BNSF are parties to multiple CBAs that govern the rates of pay, rules, and working conditions of BNSF's engineers represented by the Union. Some of the parties' collective bargaining agreements stem from National Agreements and some are system-wide in scope, meaning they cover all the engineers represented by BLET who are employed by BNSF. Other CBAs cover only those portions of the BNSF system that correspond to the properties of former railroads that have since been merged into BNSF.

10.     On November 1, 2019, BNSF through the National Carriers Conference Committee ("NCCC"), in national bargaining on a multi-carrier and multi-union basis, served a Section 6 notice on me as BLET National Division President proposing changes to the parties' CBAs. A true and correct copy of the NCCC's Section 6 Notice is attached hereto as Exhibit A. The issues in this round of bargaining include engineer quality of life issues, employee availability for work and sick leave. Since the parties served their Section 6 Notices, they have been discussing these matters at the bargaining table, but no resolution has been reached yet.

11.     Despite these matters being put in issue and actively being negotiated under Section 6, BNSF unilaterally implemented its new High Visibility ("Hi Viz") attendance policy on February 1, 2022.

12.     I have familiarized myself with the terms of the new Hi Viz policy. Indeed, I am intimately aware of the previous permutations of the BNSF attendance policy and how it has been litigated and arbitrated in the past since 1999.

13.     I conclude that the Hi Viz policy will have devastating consequences not only for Union leaders who are being punished for lawful union activity, but most importantly, it will

completely disrupt the lives of engineers and their families. It truly is an egregious assault on the workforce – a dedicated group of thousands of engineers who have loyally worked long hours through the pandemic, risking their health and well-being so that the freight on BNSF's trains are moved for America. It is clear to me that by implementing this policy, BNSF has repudiated its obligation to even remotely abide by the agreements collectively bargained with its employees.

14.    This Hi Viz policy is one of the harshest attendance policies in the industry and is absolutely uncalled for at any time, let alone during a pandemic. It will have a devastating impact on hard working Americans by making sick engineers come to work short of termination – spreading COVID-19.

15.    The Court should recognize BNSF's rhetoric is unfounded here as the policy comes with a proverbial two-edged sword. Under the policy, an engineer loses points for certain lay offs, but you cannot work your way out of that life changing loss of points going forward if you lay off again for any reason during the next fourteen days. BNSF is claiming that the good attendance credit is it being benevolent, but it is just as egregious as the point deductions process because any lay off (paid or unpaid) takes away your reset points for that fourteen-day period. As a result, the policy treats me negatively for taking my CBA provided paid leave, personal leave days or vacation. In application, this loss of point restoration creates an attendance penalty when I avail myself of my collectively bargained vacation and personal leave days, guaranteed to me by CBA. As such, the policy completely repudiates my CBA provided right to access to all forms of negotiated paid leave without any penalty from the employer.

16.    Our CBA also expressly includes the right to reasonable lay off privileges, which as crafted, includes paid and unpaid time off. This policy is so obviously unreasonable that it repudiates that CBA. It reduces the number of previously permissible lay off days by more than

4

seventy percent. Understanding how engineers work due to the demands of the job, where the vast majority remain on-call 24 hours per day, seven days per week with no assigned or predictable days off, this policy is simply unconscionable. This is not a test of reasonableness, as argued by BNSF, that only an arbitrator can examine; the policy is so blatantly unreasonable that it constitutes a repudiation of the CBA, thus creating a major dispute.

17.     For example, losing points and facing discipline for an unplanned medical event, not of the employee's choice, also fails all tests of reasonableness. It is important to understand that BNSF engineers have no paid sick leave by contract. Instead, they are entitled by contract to paid personal leave days, incrementally available based upon years of service, and paid vacation, also incrementally available based upon years of service. Prior to implementing this latest policy, BNSF implemented strict allocation limits location by location for all forms of paid leave, thus denying engineer requests to utilize the paid leave that they own by contract. When combined with the new policy, engineers have no choice when experiencing an unplanned medical event but to lay of sick. As has been established, that now "unpaid lay off" due to bona fide unplanned illness, including COVID-19, will take considerable points away from a sick employee. On the other side of the policy, the "unpaid lay off" will also eliminate the ironically named good attendance restoration of points, by no fault of the engineer. BNSF's policy relentlessly punishes sick employees – during a global pandemic, and as such fails all tests of reasonableness.

18.     The same is true for a fatigued engineer who was not given adequate train line up information to be rested for work. For example, an engineer may anticipate being called for work at 8:00 am and be ready and rested for that call. But with little if any warning, the engineer is called at midnight the night before, having had inadequate predictability to be physically rested. Because there is no fatigue-related lay off exception in the policy, the involved engineer must work

5

fatigued or lay off in some fashion. As previously noted, access to contractually provide paid leave is routinely denied and a fatigued engineer is forced to lay off unpaid, thus creating an unreasonable application of his or her CBA provided rights to be away from work due to the loss of points. The message is: work tired and work sick, or get fired.

19.     The fact that there is also no exception for a lay off of any kind to attend a routine doctor's visit is also completely unreasonable. At the national negotiations currently underway, the rail carriers have argued that their employees refuse to play a big enough role in their own health care outcomes. Because you have to schedule the doctor's appointments for routine visits in advance in most cases, and these employees have no idea what days they will be home between trips, they have no choice but to take time off to participate in their improved medical outcome. BNSF engineers do not sit at desks with the ability to leave work for a few hours to see their doctor. Instead, these employees who possess no scheduled days off, and who must schedule their doctor visits days, weeks or months in advance, have no idea if they will be able to see their doctor without needing to lay off in some fashion from work. Under the unreasonable application of the new policy, they must risk their employment and access to their health care insurance as it is tied to their employment if they lay off, or cancel their appointment incurring unrecoverable costs, and potentially being dropped by the doctor. It must also be noted that, as a form of costs savings to BNSF, the prescription drug benefits provided by contract include drug formulary adjustments every six months. In many cases, medically necessary and previously prescribed drugs are removed from the formulary with little notice. To continue to receive the removed drug, or to obtain a prescription for a new drug, the engineer must schedule a doctor's visit to obtain a medical exception to continue to receive the removed drug, or to obtain a prescription for a replacement drug. Again, the doctor's visit must be scheduled in advance, with little if any way of knowing if

6

the engineer can make that visit without laying off, thus jeopardizing employment and again jeopardizing access to health care insurance. The hypocrisy of suggesting that engineers won't participate more in their health care outcomes, when doing so routinely requires an absence that could get them terminated is truly astounding. Even more egregious is that engineers must take routine vision and hearing testing to maintain their engineer certification. Under one policy, BNSF requires that I schedule a medical visit, then BNSF takes away attendance points, or takes away the good attendance restoration of points, with no known exceptions available, when I must lay off to satisfy that obligation. This is also a repudiation of everything reasonable.

20.     With respect to paid leave, personal leave days and vacation start at a fixed time for these employees. The vast majority of BNSF engineers do not have fixed or scheduled on duty times as they roll into any scheduled time off, including their paid leave. The long-standing practice has been to allow engineers to lay off prior to their approved and scheduled time off if they are called for an unscheduled shift that would require them to work into it, and in some cases, all the way through their approved time off. The new policy takes points away and eliminates good attendance restoration of points if you have to take off in advance of your CBA-provided paid leave, which has always been an understood and unavoidable application of the CBA. In application, the policy deprives the employee of his CBA provided paid leave, short of discipline, if he must lay off in advance to access paid leave guaranteed under contract, thus repudiating BNSF obligation under the contract.

21.     Moreover, many of our members are divorced and subject to visitation orders, issued by the involved courts. The current policy has no exception for any lay off necessary to satisfy court ordered visitation, and as such, it again fails all tests of reasonableness. If an engineer with no scheduled days off is slated by court order to have a visit at his home with his minor

7

children, he either lays off in some fashion incurring loss of points or loss of points restoration, or he violates his obligations to provide court ordered child visitation. If any lay off is reasonable, it is one that is required to satisfy a court order; this is just one more way that the policy repudiates BNSF's obligation to provide reasonable lay off privileges without threat of retaliation up to and including termination.

22. As part of the Union's request for injunctive relief, it simply is not true that everything that happens to an employee in the application of this policy can be remedied through arbitration (which can take years), as BNSF claims. BNSF does not talk about the loss of income for months and years before the slow processes of RLA arbitration obtains results. They do not talk about the loss of health care benefits while in terminated status, depriving those employees of treatments for medical events, all while we are in the midst of the COVID 19 pandemic. Medical events and costs while terminated, and related bankruptcies while waiting for arbitration, do not get addressed when only "back pay" is won in arbitration. The loss of homes and families tied to the loss of employment and income are also ignored by BNSF in its callous suggestion that the employees will suffer no "irreparable harm".

23. BNSF is one of the largest railroads in the world. It essentially has a duopoly with Union Pacific Railroad Company ("UP") in the western United States in the Class I rail business. It is extremely profitable. Its claims that it needs to make these changes are simply not true. It has laid off several thousand workers during the pandemic and the so-called supply chain crisis. These moves are simply part of its Precision Scheduled Railroading business model, which like other "lean and mean" staffing models in other industries inevitably leads to a "race to the bottom." The problem is, in a mature market like railroading, everyone can race to the bottom, and no one gets a comparative advantage at all. In the end, it is just a business model which puts short term profits

8

ahead of workers and the public. Cutting workers and making the remaining workers work beyond reason eventually weakens the business.

24.     BNSF is not at a competitive disadvantage with UP; rather, BNSF is the one racing to the bottom. In reality, the policy is nothing more than a reflection of the corporate mindset of BNSF management. It is an attempt to increase short term profits with no regard to the impact on the employees. In the long run, this policy actually hurts the carrier in its efforts to staff its workforce, but more importantly, it hurts their employees. Ultimately, it is the American public that suffers as these self-inflicted wounds negatively impact the supply chain.

25.     BNSF's arguments that it needs this policy because of abuse of time off during the Superbowl is equally ludicrous. BNSF always has had the power to discipline employees who abuse the system. But the Hi Viz policy does not target those people – it targets every engineer. It targets their quality of life, stealing it in contravention of the express terms of our CBA. Finally, the fact that any previous attendance policy has been considered a minor dispute does not mean that BNSF can adopt any subsequent policy and have it automatically be considered the same. This policy is "a bridge to far" as it repudiates multiple contractual obligations that BNSF voluntarily entered into with its employees. As such, it does satisfy the test required of all major disputes.

26.     The parties have treated these issues as a major dispute in national rail negotiations. The Court must as well.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 7, 2022

Dennis R. Pierce

9

BLET Ex. 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FT. WORTH DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:22-cv-052-P |
| | ) | |
| INTERNATIONAL ASSOCIATION OF | ) | |
| SHEET METAL, AIR, RAIL AND | ) | |
| TRANSPORTATION WORKERS – | ) | |
| TRANSPORTATION DIVISION and | ) | |
| BROTHERHOOD OF LOCOMOTIVE | ) | |
| ENGINEERS AND TRAINMEN, | ) | |
| | ) | |
| Defendants-Counterclaim Plaintiffs. | ) | |
| | ) | |

## DECLARATION OF M. ROB CUNNINGHAM

I, M. Rob Cunningham, pursuant to 28 U.S.C. § 1746, declare that the following facts are true and correct:

1.     I am the General Chairman ("GC") of the Brotherhood of Locomotive Engineers & Trainmen ("BLET") BNSF (formerly ATSF) General Committee of Adjustment ("GCA"). I have served as GC for the GCA since 2019 and have been employed at Burlington, Northern, Santa Fe Railway Company ("BNSF") since 1993. I understand this Declaration is being offered in support of the BLET's opposition to BNSF's Motion for Preliminary Injunction. This Declaration is based on personal knowledge, and I am competent to testify to the matters set forth herein.

2.     As GC, I am responsible for negotiating, interpreting, and enforcing the collective bargaining agreements ("CBAs") under my jurisdiction between BLET and BNSF. I am familiar with the applicable local and national agreements, and the work practices relevant to this dispute which have become an integral and implicit part of those agreements between BLET and BNSF.

1

Locomotive engineers are within the craft or class of workers represented by BLET, and subject to the terms and conditions of employment set forth in the CBAs between BLET and BNSF.

3.      BLET and BNSF are parties to multiple CBAs that govern the rates of pay, rules, and working conditions of BNSF's engineers represented by the Union. Some of the parties' collective bargaining agreements are system-wide in scope, meaning they cover all the engineers represented by BLET who are employed by BNSF. Other CBAs cover only those portions of the BNSF system that correspond to the properties of former railroads that have since been merged into BNSF.

4.      I have previously provided my verification to the facts of the BLET Counterclaim (ECF Doc. 38) in this action.

5.      BNSF's new Hi-Viz policy gives Train Yard and Engine service employees ("TYE") 30 points to use when they need to take time off away from the railroad. That is, BNSF has created a point scale to deduct points for lay offs from the original 30 points based on the day of the week and the type of service in which the employee is working. The two types of service are assigned and unassigned through freight. Employees in assigned service have a more severe point deduction for taking days off outside of the scheduled days off.

6.      Attached is a document provided by BNSF which provides explanation for the codes used on the BNSF Hi Viz policy.

7.      Here is a chart I developed to explain the various codes and rail terminology to assist the Court:

| TYE | Train Yard and Engine service employees |
|---|---|
| Pool or chain gang pool | A "pool" of employees that rotate in order. Once reaching the first out position the TYE employee stands to be called for service. Once called the next "pool turn" moves up to the first out position. When returning from duty the TYE employee is placed to the bottom or foot of the pool board and the rotation repeats. |

| | |
|---|---|
| Assigned Service | Assigned service typically consists of a 5-day work week with 2 scheduled rest days. |
| Unassigned Through Freight Service or Pool Service | Unassigned service employees have no scheduled or guaranteed rest days. These employees work a 24/7/365 schedule using paid leave and layoffs when they need to be off. |
| 4-2 rest cycle boards | These are unassigned through freight pools that could earn rest days. They must work 4 starts to get the ability to earn 24 or 48 hours off. |
| Layoff (mark off) | A layoff is a term used when a railroad employee removes him/herself from service. |
| Marked up | This means a TYE employee is available for service |
| Unavailable Time | Anytime the TYE employee is unavailable for call outside of contractual time off. |
| Bump Time (BMP) | When an employee is displaced from a job by a senior employee, the displaced employee is allowed 24 hours to find a new job and displace a junior person. |
| Failure to take bump notification (LXU) | When an employee is bumped (displaced) by a senior employee the BNSF will call to notify the employee that he/she was displaced. The employee is given 10 hours to accept the notification. After 10 hours, if the employee has not accepted the notification the time is treated as unavailable time same as a layoff. |
| Tie Up | This is when employees "clock out" after a shift. |
| Failure to Tie Up (LFT) | When an employee fails to tie up at the end of a shift the computer system shows them on continuous duty possibly making them unavailable for the next tour of duty. When this happens, it can be charged as a layoff. |
| Employee Missed Call (EMC) | When a TYE employee standing first out to be called for service does not answer the phone to take the call for work. |
| Layoff on Call (LOC) | When a TYE employee standing first out to be called for service answers the phone call for service and instead must layoff and cannot take the call for duty. |
| No Show (NOS) | When a TYE employee accepts a call for duty, then fails to show up, or a regular scheduled employee fails to show up for the starting time of the job scheduled to work. |
| High Impact Day (HID) | Days BNSF has designated as having higher impact on TYE availability than other days. These are mostly holidays but also include Super Bowl Sunday. |
| Union Business (UNB) | This is the code union representatives use to remove them from the calling order to handle union related task; Representation, settle grievances, etc. |
| Layoff Sick (LOS) | This is the layoff code used in the BNSF system when an employee is removing themselves from service due to illness. |

App. 12

| Layoff Personal (LOP) | This is the layoff code used in the BNSF system when an employee is removing themselves from service for reasons of a personal nature. |
|---|---|
| Sickness in Family (SIF) | This is the layoff code used in the BNSF system when an employee is removing themselves from service due to a family illness. |
| Family Emergency (FEM) | This code is used in cases of an emergency layoff. This type of layoff requires the employee to follow up with BNSF within 24 hours. |
| Layoff Fatigue (LOF) | This code is used when an employee needs time off due to fatigue. |
| Lay of Away/Active or after shift starts (LOA) | Employees who layoff from the active board, at the AFHT or after a shift has begun will be shown as LOA. LOA is considered an unavailable event. |
| Layoff Dressed and Ready (LOD) | Employees who are not ready to perform service at the on-duty time can be set home and laid off LOD. This could be an employee who was on time but did not have his proper PPE and work gear ready to go at the on-duty time. |
| Good attendance Credits (New Policy) | These are points that are earned by TYE employees for being marked up and working for 14 days without using any paid leave or unavailable time. 4 points will be earned for every 14-day period. |
| Vacation day (VAC, SDV) | Vacation days can be taken in single day increments or in blocks. The vacation code for single days is SDV and a block of vacation code is VAC. VAC can and is used for both. |
| Personal Leave Day (PLD) | Personal Leave Days are days that must be requested and granted by the Carrier. Engineers earn PLDs by agreement. |
| Family and Medical Leave (FML) | Employees who qualify for leave under the Family and Medical Leave Act use the FML code when laying off. |
| Smart Rest (SRS) | Smart rest allows a TYE employee to take a 24-hour period off to break the start count outlined in the Rail Safety Improvement Act. This allows employees to work more days without taking a mandatory 48 or 72 hours off under the law. Smart Rest was created by agreement. |
| Computer Based Training (CBT) | TYE employees use this code to layoff when required to complete computer-based training. |
| Rules (RUL) | Like CBT code. Used to attend rules training. |
| Layoff Company Business (LCB) | TYE employees use this code when attending company meetings or other company required events IE: Safety Meetings, Rules Briefings |
| Death in Family (DIF) | Employees who lose a family member covered by the bereavement agreement use this code when they are off. |
| Layoff Medical Leave (LAM) | TYE employees who must be off for medical reason are laid off by the Carrier with this code when approved. |
| Layoff Jury Duty (LOJ) | This code is used when summoned to jury duty. |
| Layoff Investigation (LOI) | This code is used for employees who are required to attend a disciplinary hearing. |

4

App. 13

| Any Day layoff | This is from the old attendance policy. Employees in assigned service could take 1 "ANY DAY" off per month. This means it didn't matter if it were a weekend or a weekday. |
|---|---|

8.     In 2020, the entire world was faced with a pandemic - something most of us have never seen in our lifetime. The Engineers and Conductors on the Nation's rail carriers picked up the slack and continued to take calls for work and keep the freight of the American people moving. While shelves were bare and the American people lived in fear for what could happen if they got sick, railroaders continued to go to work: eating gas station burritos, sleeping in hotels, not knowing if their accommodations were really sanitized.

9.     Our BLET members worked in conditions that others refused. When our members came down with COVID-19, they were sent home. The employee that worked with the sick employee was also sent home for 14 days. These employees, although exposed at work, were paid for 4 out of 14 days by their employer.

10.     Furloughed employee numbers were high, but BNSF would not recall employees to get relief for those that were working. Our members were expected to be at work while the BNSF managers decided that their cubicles were not safe, and they should all work from home.

11.     Then, in the middle of this pandemic, BNSF decided that it would reduce the layoff and vacation allocations for employees. Reducing the employee's ability to access their paid leave time. The reductions were drastic. In locations with large workforces, allocations were reduced to where only 3 people could get a paid leave day at any time. If that day were a weekend, it was an even lower allocation number. The workforce was already tired and frustrated, now the employees were just mad. How could their employer treat them this way? We have all asked this question.

12.     Rolling into 2021, we began to hear rumors of attendance policy changes. On multiple occasions I asked BNSF to negotiate any change that was to be made. BLET and SMART-

App. 14

TD together asked to negotiate changes so that we could secure predictable time off for our members. BNSF refused.

13.     Now here we are in 2022. The pandemic is not over. People are sick with the Omicron variant. Our members are still going to work and doing what they have been since the beginning, but instead of rewarding the employees, they get a mandate that they must work more to secure more profits for the railroad and its shareholders.

14.     My office has been flooded with calls and emails. Many of them are angry and frustrated, but others sound hopeless. Engineers and trainmen with 20+ year careers are walking away from their careers because the demand is too much for their mental and physical health.

15.     Younger employees are searching for other options because the railroad job they thought would be a career is no longer sustainable for them. BNSF has seen this and acknowledged this, but the response is the same, we must continue to compete.

16.     This truly feels like a concerted job action by the BNSF: make the working conditions harsh enough that employees will quit or be fired. Hiring will become nearly impossible. Considering that the BNSF has driven the SMART-TD to bargain for crew size, the next step will be to beg the government for help because BNSF cannot get people to work for them. BNSF is creating its own manpower shortage and blaming the employees for the problem.

17.     BNSF employees have been subject to an attendance policy since 2000. As an employee, I was subject to the policy. As a Union officer, I have represented numerous employees who have run afoul of the policy. In the policy, it was stated that "Managers should never act in a rigid or "wooden" manner, and in every case should use common sense". BNSF is such a large corporation that the application of the attendance policy became mechanistically applied in short order.

App. 15

18.     I have witnessed employees who have had legitimate health issues or family members with life threating illnesses, be terminated without a second thought. Some of these employees were returned to service through the section 3 arbitration process, but because the railroad could show a technical violation of its policy, the dismissed employee was returned without back pay. These employees who have been and will be terminated and returned to service suffer irreparable harm. They end up losing their homes, their health care, their savings, their families, only to be returned to work with the threat of another dismissal looming. The point I make here, the arbitration process is not a process that reverses any harm created to the employees as the BNSF would lead the Court to believe. To say an employee can get their home back, their health back or their destroyed marriage back through the arbitration process is a blatant lie to this Court.

19.     The employees stand to face irreparable harm by BNSF's new Hi-Viz policy. The "old" attendance policy, while far from perfect, allowed the employees to take time off outside of paid leave time to spend time a child's ballgame or to take a family member to a doctor's appointment 5 or 6 hours from home. The old policy required employees to be available 75% of the time; weekdays and weekends measured separately. The policy also allowed employees to "bunch" their days off in a 90-day rolling period. This would allow an employee to take more than the 5 weekdays and 2 weekend days in a single month to cover some unforeseen issue. The employee would have to make that time up in the following months.

20.     The new Hi-Viz policy will require employees to be available over 90% of the time. This will not allow employees to be off for life events with their children. This will not allow employees to spend a couple of days with a dying relative. This will not allow employees to take a mental health break from a job that keeps them on call 24/7/365.

21.     BNSF's new Hi-Viz policy creates new issues for employees. When working in unassigned freight service, an employee is required to take calls day and night with 1.5 to 2 hours of notice. There are no schedules for these employees. They must carry a phone or be close by their phones nearly all the time. Other than our work lives, everything else is scheduled. Our children play sports, preform in school plays, have parent teacher conferences, have doctor and dentist appointments, all on schedules. When an unassigned employee goes to work, he/she could be away from home 12 hours up to 48 hours depending on the service required. If an employee has a vacation scheduled to start on a Monday morning, flights scheduled, vacation rental already paid in advance, and that employee is called to go to work on Sunday afternoon, there is only one choice to be made. Go to work and forfeit the family vacation and money spent, or layoff to get to the vacation.

22.     The latter is what will and has occurred for a century. BNSF's new policy will now penalize the employee additional points because of the layoff prior to vacation. BNSF will certainly argue that you should have points to spend for this, but life is uncertain. This could put an employee in a situation to choose between family or BNSF.

23.     This should not be the case because this is a penalty for using scheduled vacation time. Vacation time is a collectively bargained leave accrued by years of service. The BNSF has no right to penalize employees for using their vacation. The penalty is a mechanism to keep employees working even if it means working into their vacation time.

24.     BNSF contends that the prior policy did not create a buffer to get to paid leave and Hi-Viz does not change that. While it may be somewhat factual, it is not an apples-to-apples comparison. Under the old policy, the employees were allotted more time, so having to layoff to access vacation was not a large issue. The old policy also did not penalize the employee for laying

off to get to vacation. The employee was simply shown as unavailable for the day prior to vacation. then on vacation. There was no penalty involved for tying vacation to a layoff as there now is under the Hi-Viz policy.

25      Furthermore, BNSF has stated that employees enjoy substantial time off. BNSF considers the amount of time the Federal law requires them to give employees off to be a substantial amount. The Federal Law requires that an employee working in covered service to have a minimum of 10 hours off after performing service. Employees can work six (6) shifts or starts and after the sixth it requires a mandatory 48 hours off. At the end of that 48 hours, the employee will be first on the board to go to work.

26.      This usually means with call time; the employee is back on duty exactly on the 48-hour mark. Keep in mind that an unassigned employee had to be called at home to go to work on three (3) occasions, stay at the away terminal three (3) times to get to this 48 hours. Those trips could range from 32-48 hours. This means the employee spent 4.5 days away from home to get to those 48 hours off.

27.      Working at all hours of the day or night, the first 10 hours of that 48 are trying to get rested or staying up all day while exhausted just to enjoy some time with family and maybe mow the lawn. When all is said and done, these employees might get 24 hours of real time off and it is not scheduled. The management that makes these claims of employees getting sufficient time off, work a daylight schedule in an office with weekends off.

28.      BNSF's Hi-Viz policy punishes employees who also work for the Unions. When a Union representative must layoff to represent another employee, meet with the Carrier to settle grievances, or attend a union meeting, the layoff will disrupt the employee's ability to earn good attendance credit. In 2021, on six of BNSF's territories that my GCA represents, our local

representatives had to handle 5183 scheduled investigations. These are disciplinary hearings scheduled by the BNSF that require our representatives time to handle. Many of these are settled before ever going to a hearing, but that is due to the representation provided. This does not include the thousands of declined time claims these representatives must handle. When a Union officer must layoff to handle his own personal business or illness, he/she will be deducted points for those days. Let's say the illness was for multiple days and the deduction was 13 points. Because of the amount of work to be done as a union representative, those points will be impossible to earn back. The only way to earn those points back is to be available without any paid leave, UNB, FML, etc. for 14 days. If the Union representative never lays off again but cannot maintain the 14-day period to earn points, by virtue of using Union business, vacation, and personal leave this employee could spend the rest of his/her career at 17 points. BNSF can and will penalize these individuals for being off to handle their elected duties under the Hi Viz policy.

29.    Our agreement states that a Local Chairman laying off for the purposes stipulated will not be "considered as laying off or missing a call." BNSF's Hi-Viz treats the Union business as a layoff plain and simple. This is a clear repudiation of the agreement.

30.    BNSF will suffer no harm by a delay or interruption of the Hi-Viz policy. In the first Macedonio declaration, paragraph 8, BNSF stated its policy does not change anything. It only consolidates current policy and processes already being used on the property. If this statement is true, then there is no proof of any harm.

31.    The harm that will be done to the employees is immense and irreversible. Employees will have to decide between seeing their children grow and being a part of their lives or work for BNSF. Many employees are already making life altering decisions and walking away. Others will continue to work until they can no longer continue or end up dismissed. Then some

will endure. No matter what path is chosen by the employees, harm is being done and arbitration will not remedy that harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 7, 2022

_____
M. Rob Cunningham

11

**Layoff Code Listing (Updated 1/24/22)**

| Layoff Codes Eligible for Good Attendance Credit & No Points Deducted | | | |
|---|---|---|---|
| **Layoff Code** | **Description** | **Layoff Code** | **Description** |
| CIR | Critical Incident Report | FOB/NFB/BFB | Move to Foot of Board |
| LAH | Layoff Alternative Handling | LCB | Layoff Company Business |
| LET | Layoff Engineer Training | LRC/LRP/LRD | Layoff Rest Day for pools and extra boards with 7/3 rest day agreements |
| LXX | Failure to Take Notification | LYM | Working as Yardmaster |
| MLV/LML | Military Leave of Absence | NGD | National Guard, Drill Training, State Emergencies |
| RUL/CBT /ERC/DRC /TRN | Rules Class, Computer Based Training, Engineer Recertification, Decertification Retraining, Training | | |

| Layoff Codes Ineligible for Good Attendance Credit & No Points Deducted | | | |
|---|---|---|---|
| **Layoff Code** | **Description** | **Layoff Code** | **Description** |
| CLD | Canadian Leave Day | DIF | Death in Family |
| FML | Family Medical Leave Act | ION/INJ | Injury On-Duty |
| LOI | Layoff Investigation | LOJ | Layoff for Jury Duty |
| LPA/LAB | Personal Leave of Absence | MED/LAM | Medical Leave of Absence |
| MEV | Layoff code for vaccine appointments only | OFL | Other Family Leave (Available in CA only) |
| PLD | Paid Leave Day | PRE | Pre-vacation, not available for call |
| SCA | School Conference & Activity (Only available in specific states) | UNB | Union Business |
| VAC | Vacation | | |

| Layoff Codes with Points Deducted & Ineligible for Good Attendance Credit | | | |
|---|---|---|---|
| **Layoff Code** | **Description** | **Layoff Code** | **Description** |
| EMC | Employee Missed Call | FEM | Family Emergency |
| LFT | Failed to Tie Up | LOA | Layoff away-from-home-terminal or after the start of the shift / Layoff on Active Board |
| LOC | Layoff on Call | LOD | Layoff Dressed & Ready to Work |
| LOF | Layoff Fatigue | LOP | Layoff Personal Business |
| LOS | Layoff Sick | LXU | Failure to Take Notification |
| NOS | No Show for Work | SIF | Sick in Family |

**Code Explanations:**
**(E) Eligible for Good Attendance Credit & No Points Deducted**
**(I) Ineligible for Good Attendance Credit & No Points Deducted**
**(P) Points Deducted & Ineligible for Good Attendance Credit**

## Layoff Codes Eligible for Good Attendance Credit & No Points Deducted:

**Critical Incident Report (CIR)**: This code is for employees distressed following a critical incident, such as a highway grade crossing accident. A supervisor must authorize the time off and the employee is eligible for trauma intervention with authorized paid leave. The supervisor provides a letter to the employee explaining the program. If additional time off is needed, the employee must secure a medical leave of absence. See your General Notices for instructions.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Foot of Board (FOB/NFB/BFB)**: This code is only applicable to pools that have a Foot of Board Agreement. FOB means the employee has notified the Crew system that the turn assigned to the employee should be dropped to the bottom of the board immediately. NFB is applied to a turn after an employee notifies the Crew system, they may drop the turn to the bottom of the board, but the action does not take place until the turn reaches a set number of times out (identified in the agreement). NFB can be removed from the turn any time before reaching that set number of times out and the turn stays in its original pool rotation. In pools with a BFB provision, when an employee bids in a pool turn, the turn drops to the bottom of the board and starts working its way up.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Layoff Alternative Handling (LAH)**: In some cases of rules violations, employees may be eligible for alternative handling in lieu of discipline. The violation must have resulted in an investigation notice which lists the employee as a principal. If the employee accepts responsibility for the violation and meets the eligibility criteria, this code can be used for the training time.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Layoff Company Business (LCB)**: This code is available for employees who need to be absent from their regular assignment to perform other company business. A few examples are:

☐ Directed by a supervisor to attend a meeting
☐ Attend safety meetings if member of the safety team
☐ Training other employees during activities, such as a safety marathon, etc.

This code should not be used when marking off for an investigation (use LOI), computer-based training (use CBT) or other instances where a detailed layoff code is already available.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Layoff Engineer Training (LET):** This code is for engineers who have instructions to report for training in Overland Park.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Layoff Rest Day (LRC/LRP/LRD)**: This code represents layoffs for rest days in unassigned service (e.g., extra boards and pool service).

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Not Notified (LXX)**: LXX indicates an employee has been moved to a different assignment and the Crew Support Center is attempting to notify the employee. This code is automatic, and an employee cannot mark to this status on their own. Failure to take notification for employees not subject to call is LXX and is excluded time (which reduces the overall layoff threshold but is not considered unavailable). For employees subject to call, the employee has 10 hours of excluded time to take the call; if notification has not been accepted after 10 hours, all time is counted as unavailable in the Hi-Viz Guidelines and the LXX code is changed to LXU.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Working as Yardmaster (LYM)**: Employees working in train service, who are qualified yardmasters, are marked off their TYE assignments to work yardmaster assignments with the LYM code. TY&E employees that are extra list Yardmasters are contractually obligated to protect Yardmaster service even when on rest days; however, we have provided the option for employees to use the LYR code up to two times per month on rest days. (LYR does not count against any guarantee).

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**Military Leave (MLV/LML)**: This code can be used by employees who leave the services of BNSF Railway to enlist, be inducted or who are called or recalled to duty into the Armed Forces of the United States, the State National Guard, one of the various Reserve Units of the Armed Services, or any other service in the uniformed services as defined in the Uniformed Services Employment and Reemployment Rights Act (USERRA). This is not the code for National Guard drills.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

**National Guard (NGD)**: Employees enlisted in National Guard service can use this code to mark off and report for service. NGD is initially ineligible for Good Attendance Credit, however, once orders or LES are provided, that time will be considered available.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted (upon verification of military service through Leave and Earning Statement or orders)

**Rules/Computer based training/Recertification/Decertification/Training (RUL/CBT/ERC/DRC/TRN)**:   Codes available for employees who must be absent from their regular assignment to attend rules classes, computer-based training, recertification, decertification, or other required training.   Because the employee is working, this time is considered available in the Hi-Viz Guidelines. Layoffs may be subject to availability and if the layoff is declined, the employee should contact their supervisor. Some division general notices state these codes should not be used over the weekend.

☐ (E) Eligible for Good Attendance Credit & No Points Deducted

App. 23

## **Layoff Codes Ineligible for Good Attendance Credit & No Points Deducted:**

**Canadian Leave Day (CLD)**: Employees in Canada may use this code when, (a) treating their illness or injury, (b) carrying out responsibilities related to the health or care of any of their family members, (c) carrying out responsibilities related to the education of any of their family members who are under 18 years of age, (d) addressing any urgent matter concerning themselves or their family members, (e) attending their citizenship ceremony or (f) any other reason prescribed by regulation.  BNSF may request the employee provide documentation to support the reasons for leave if that information is reasonably practicable to obtain. Up to 5 days each calendar year with the first 3 days paid if the employee has completed 3 consecutive months of continuous employment. (Subject to change with pending legislation)

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted & No Points Deducted

**Death in Family (DIF)**:  This code is for employees who have experienced the unfortunate loss of a family member that is covered by Bereavement Pay and need an immediate layoff. For family members not covered by bereavement pay, you should obtain a pre-approved LOP, PLD or VAC. In case of emergency, please see the code for Family Emergency (FEM). Check General Notices for complete instructions on use of this code.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Family Medical Leave Act (FML)**: To qualify for this code, a person must complete a Notice of Intent to Take Paid/Unpaid FMLA Leave and be approved for the use of FMLA through BNSF Employee Services. FMLA is to be used for reasons and within the parameters of the approved leave. For an FMLA application, click on the link below and follow the steps to apply. https://employee.bnsf.com/employee/Pages/fmla.aspx

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Injury on Duty (ION/INJ)**: All on-duty injuries must be reported immediately and, as a result, use of this code must be approved by a supervisor.  If the injury requires extended time off beyond 10 days, you should seek a medical leave with your supervisor; at that point the layoff should be converted to a Medical Layoff to protect your benefit coverage.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Layoff Investigation (LOI)**: Employees required to attend formal investigations for rules violations may use this layoff code prior to the investigation, if working their assignment will result in not returning to the home terminal in time to attend the hearing.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Layoff Jury Duty (LOJ)**: The labor agreements between the organizations and BNSF allow employees summoned to perform their civic duties without a loss of pay. Employees instructed by the courts to report for jury duty at a specific date and time are authorized to mark off for Jury Duty. Do not use this code without being summoned for Jury Duty. To ensure this layoff qualifies for compensation and how to submit for that compensation, refer to the Jury Duty General Notice.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

App. 24

**Personal Leave of Absence (LPA/LAB)**: These codes are used when an employee is approved for a Personal Leave of Absence. Employees are expected to mark up for duty by the LOA end date. If for any reason the employee is unable to report for duty, they must request a leave extension. Extension requests must be made in time to permit action by Leaves Administration prior to the expiration of the leave.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Medical Layoff (MED/LAM)**: These codes require a statement from the physician describing the length of time an employee will need to be absent from work. The statement should not include any medical details, just the length of time. After a supervisor grants a medical leave of absence, the employee must keep the leave current by extending the leave or returning to work prior to the expiration of the leave. When returning to work, a medical release from the physician and approval from BNSF's Medical Department must be obtained before marking up.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Medical Vaccine (MEV)**: As with any type of vaccine, employees are encouraged to try and schedule an appointment outside of work hours. However, we understand that COVID-19 vaccinations appointments may be limited in some areas. Under these circumstances, should an appointment conflict with work hours, Transportation employees should layoff using code "MEV" (Medical Vaccine) so they can make their appointment and mark-up immediately afterward.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Other Family Leave (OFL)**: Employees in California may use this code to mark off when they need time off to bond with their new baby, or to care for themselves or a family member with a serious health condition. The time off must be pre-approved and not immediate.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Personal Leave Days (PLD)**: The number of personal leave days an employee receives each year is based on the agreement applicable to the assignment and territory where the person works. Days are accumulated based on the number of years employed by BNSF in the train or engine craft, not on the number of seniority dates you have in a craft. For example, if you receive 10 days each year as an engineer and 10 days each year as a conductor, the total number of personal leave days you can take off each year is 10.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Pre-Vacation (PRE)**: Engineers taking seven or more days of vacation, whose assignments are called to protect service between 12:01 AM and 9:00 AM on the first vacation day, will be moved into the PRE status and they will not have to protect that call.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**School Conference & Activity (SCA)**: Employees in California, Colorado, Illinois, Louisiana, and Minnesota may use this code to mark off when they need to attend their child's school conference and/or activity. The time off must be pre-approved and not immediate.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

App. 25

**Union Business (UNB)**: This code is reserved for union representatives who must be absent from work to perform work with their organization. Union officers should contact the Crew Support Center or their General Chairman for authorization to use this code if they're not set up in the Crew system.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Vacation (VAC)**: This code is for single day vacations and vacations of seven days or more. If an employee has a vacation scheduled, the system will automatically place the employee in this status when the vacation starts.

☐ (I) Ineligible for Good Attendance Credit & No Points Deducted

**Layoff Codes with Points Deducted & Ineligible for Good Attendance Credit:**

**Employee Missed Call (EMC)**: Employee Missed Call is prohibited. An EMC has potential to delay trains and adversely affect other employees filling the vacancy. Employees are subject to call and must not be absent from their calling place without notifying those required to call them.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Family Emergency (FEM)**: This code allows for an immediate layoff in the event an employee needs to assist their family during an emergency. System General Notice requires that the employee contact a supervisor within 24-hours to advise the nature of the emergency.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Failure to Tie-Up (LFT):** This code is applied for employees who fail to tie up at the end of their shift per system general notice. This code is generated in TSS.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Layoff Active Board / Away Terminal or After Start of Shift (LOA)**: Dual purpose code used for employees that layoff while on a "Planner Activated Board" and/or for employees that layoff for emergencies where the employee cannot complete a shift or return to the home terminal because of illness or an emergency at home. (LOA - Layoff Away Terminal can only be used for emergencies and must have supervisor authorization)

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Layoff on Call (LOC)**: Layoff on Call is prohibited. An LOC has potential to delay trains and adversely affect other employees filling the vacancy. If the layoff on call is unavoidable, employees must talk to a Crew Support representative to be placed in this status.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Layoff Dressed & Ready to Work (LOD)**: Used in the event an employee is not dressed & ready to work either at the on-duty time or after lunch. All BNSF Crewmembers must report to the designated location ready to work dressed in proper PPE (boots on & laced), with a charged radio, company iPad and any other necessary items to perform service at on duty time.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Layoff Fatigue (LOF)**: BNSF wants to ensure that everyone is rested and prepared to work safely. Employees who work numerous trips in a row or have worked consecutive long trips can use the LOF to take 24-hours off for rest. This code should not be used to extend rest days, vacation, or other codes.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Layoff Personal (LOP)**: Personal layoffs are non-paid and approved based on the availability of manpower. Approvals for personal layoffs can be obtained through the pre-approved layoff programs found in TSS Crew or through the supervisor. These layoffs count as absences and can affect your standing in the Hi-Viz Guidelines.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Layoff Sick (LOS)**: Employees suffering from a short-term illness may use this code to mark off. Unfortunately, this code is frequently misused and should be used sparingly. These layoffs count as absences and can affect your standing in the Hi-Viz Guidelines.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Not Notified (LXU)**: LXX indicates an employee has been moved to a different assignment and the Crew Support Center is attempting to notify the employee. This code is automatic, and an employee cannot mark to this status on their own. Failure to take notification for employees not subject to call is LXX and is excluded time (which reduces the overall layoff threshold but is not considered unavailable). For employees subject to call, the employee has 10 hours of excluded time to take the call; if notification has not been accepted after 10 hours, all time is counted as unavailable in the Hi-Viz Guidelines and the LXX code is changed to LXU.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**No Show (NOS)**: Workforce Management places an employee in this status when the employee fails to show for work. The time lost will count as an absence in the Hi-Viz Guidelines.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**Sick in Family (SIF)**: Employees may use this code to mark off when immediate family members require care due to a short-termed illness. Unfortunately, this code is frequently misused and should be used sparingly. These layoffs do count as absences and can affect your standing in the Hi-Viz Guidelines.

☐ (P) Points Deducted & Ineligible for Good Attendance Credit

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FT. WORTH DIVISION**

| | |
|---|---|
| BNSF RAILWAY COMPANY, | ) |
| | ) |
|     Plaintiff-Counterclaim Defendant, | ) |
| | ) |
| v. | )     Civil Action No. 4:22-cv-052-P |
| | ) |
| INTERNATIONAL ASSOCIATION OF | ) |
| SHEET METAL, AIR, RAIL AND | ) |
| TRANSPORTATION WORKERS – | ) |
| TRANSPORTATION DIVISION and | ) |
| BROTHERHOOD OF LOCOMOTIVE | ) |
| ENGINEERS AND TRAINMEN, | ) |
| | ) |
|     Defendants-Counterclaim Plaintiffs. | ) |
| | ) |

## DECLARATION OF KENT PSOTA

I, Kent Psota, pursuant to 28 U.S.C. § 1746, declare that the following facts are true and correct:

1.     I am the General Chairman ("GC") of the Brotherhood of Locomotive Engineers & Trainmen ("BLET") BNSF General Committee of Adjustment ("GCA"). I have served as GC for the GCA since 2019, and have been employed at Burlington Northern Santa Fe Railway Company ("BNSF") since 1994. I understand this Declaration is being offered in support of BLET's opposition to BNSF's Motion for Preliminary Injunction. This Declaration is based on personal knowledge, and I am competent to testify to the matters set forth herein.

2.     As GC, I am responsible for negotiating, interpreting, and enforcing the collective bargaining agreements ("CBAs") under my jurisdiction between BLET and BNSF. I am familiar with the applicable local and national agreements, and the work practices relevant to this dispute which have become an integral and implicit part of those agreements between BLET and BNSF.

1

Locomotive engineers are within the craft or class of workers represented by BLET, and subject to the terms and conditions of employment set forth in the CBAs between BLET and BNSF.

3.      BLET and BNSF are parties to multiple CBAs that govern the rates of pay, rules, and working conditions of BNSF's engineers represented by the Union. Some of the parties' collective bargaining agreements are system-wide in scope, meaning they cover all the engineers represented by BLET who are employed by BNSF. Other CBAs cover only those portions of the BNSF system that correspond to the properties of former railroads that have since been merged into BNSF.

4.      The figures offered by BNSF on the effect of Hi Viz policy on Union leaders are not credible. They will have a severe impact eventually.  For instance, Attachment 1 is a work history chart for A.J. McAfee, who was Vice Local Chairman of BLE-T Division 98, in calendar year 2021, a local division under my GCA. It is color-coordinated with movement codes.

5.      On this chart, A.J. laid off sick 2 times in 2021, both touching union business days. He worked an "Unassigned Through Freight" (UTF) pool but now under the guise of Hi Viz he is included in assigned service, so each layoff would be 7 points plus an additional 3 points due to the conjunction penalty. He averaged over 18 starts and over 162 hours worked per month. During this year he only averaged 3 paid leave days per month. Only 1 time throughout 365 days would he  have earned 4 points back for perfect attendance credit under Hi Viz. Under Hi Viz, he would have ended the year with 14 points, but in two 2 years he would be issued discipline for attendance.

6. Attachment 2 is a work history for Andrew Weingart, Vice Local Chairman of BLET Local Division 622. It shows that he laid off roughly 50 times within the calendar year of 2021 which were for Union business.

2

7.      At his local division, they have 2 monthly meetings.   He generally works approximately 100 time claims per month that require research and attachment of documents to the BNSF.

8.      BNSF operational and clerical claims require 2 separate conferences generally accounting for a minimum of 2 separate layoffs per month to argue the claims that the carrier refused to pay according to collectively bargained agreements and contracts.

9.      This is a time-consuming system and if this Hi-Viz attendance policy is allowed to be kept in place, it will severally limit his ability and other Union officer's ability to adequately represent and defend our members' collectively bargained rights and agreements.

10.      Attachment 3 is a letter from the four BNSF BLET GC's trying to address BNSF's planned changes to the attendance policy (that are incorporated into Hi Viz now) as early as 2020. Despite BNSF's claims that it direly needs to enact the policy at this time, it had planned to make these changes as early as 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 7, 2022                        _____

                                                              Kent Psota

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | UNB | UNB | UNB | | UNB | | | | | | |
| 2 | | | UNB | UNB | | UNB | VAC | VAC | | | | |
| 3 | UNB | | | VAC | UNB | UNB | VAC | VAC | LXX | UNB | | |
| 4 | | | VAC | | UNB | UNB | VAC | PLD | UNB | UNB | | |
| 5 | | | VAC | UNB | | | VAC | VAC | UNB | UNB | PLD | UNB |
| 6 | | VAC | VAC | UNB | | | VAC | | UNB | PLD | PLD | UNB |
| 7 | | VAC | | | | | VAC | | | | PLD | UNB |
| 8 | | | | UNB | | | VAC | UNB | | | | |
| 9 | | UNB | UNB | | | UNB | | | | | | |
| 10 | | UNB | UNB | UNB | VAC | | | | | UNB | | UNB |
| 11 | UNB | UNB | | UNB | | | | | | | | UNB |
| 12 | UNB | | | UNB | | UNB | UNB | | | | | PLD |
| 13 | | | | | | | | | UNB | | | |
| 14 | | | | | | UNB | | | UNB | | | |
| 15 | | | | | | UNB | | | | | PLD | |
| 16 | | | UNB | | | | UNB | | | NTF | | |
| 17 | | | | | | UNB | | | | UNB | | |
| 18 | LXX | | | UNB | | UNB | | | | UNB | | |
| 19 | | | | | | VAC | | | | | | UNB |
| 20 | | | LOS "-10" | | | VAC | UNB | UNB | | | | UNB |
| 21 | UNB | VAC | UNB | | UNB | | | | | | | |
| 22 | UNB | UNB | UNB | | | | | UNB | | | | |
| 23 | | | | | | | | UNB | | | | |
| 24 | VAC | | | "+4 Points" | | | | UNB | | | | |
| 25 | | | | | | | | UNB | | | | |
| 26 | | | | | | | | | | | UNB | UNB |
| 27 | | | | | | | | | UNB | | | |
| 28 | | UNB | | | | UNB | | | UNB | | UNB | |
| 29 | | | | | | UNB | | | UNB | | UNB | |
| 30 | UNB | | UNB | | | | | LOS "-10" | UNB | | | |
| 31 | PLD | | UNB | | UNB | | | | | PLD | | |

| | January | February | March | April | May | June | July | August | September | October | November | December | Total | Per Month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starts | 19 | 16 | 17 | 19 | 23 | 18 | 20 | 15 | 15 | 19 | 15 | 21 | 217 | 18 |
| Hours Worked | 169.7 | 147.6 | 176.4 | 171.2 | 186.1 | 157.6 | 178.2 | 132.9 | 159.3 | 178.9 | 132.9 | 164.4 | 1955 | 162.9 |
| Paid Leave (Days) | 1.6 | 3.4 | 3.0 | 1.0 | 0.7 | 2.0 | 7.0 | 3.7 | 0.0 | 3.2 | 4.3 | 1.0 | 31 | 3 |
| End Month Points | 30 | 30 | 20 | 24 | 24 | 24 | 24 | 14 | 14 | 14 | 14 | 14 | | |

# ATTACHMENT 1

- Crew History -

**     No Currently Valid Report Selected      **ATTACHMENT 2**

Movement History Records for Date Range 01/01/21 to 10/04/21 at ALL STNS

| IN Last Name | Mve Cde | ---- Job From | Oc | / Board --- To | Oc | Permanent Asgnmt | Oc | A W | Movement Date | Time | Program Date | Tim |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 010421 | 0008 | 0104 | 010 |
| * MEETING | | | | | | | | | | | | |
| *   Followed by employee J LINDSAY | | | | | | 0315507 | | | | | | |
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 011421 | 2141 | 0114 | 224 |
| * CLAIMS | | | | | | | | | | | | |
| *   Followed by employee DM SPAHN | | | | | | 0048140 | | | | | | |
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 011821 | 2150 | 0118 | 225 |
| * Immediate Layoff Request | | | | | | | | | | | | |
| *   Followed by employee BD DAVES | | | | | | 0258806 | | | | | | |
| AJ WEINGART | UNB | ALN 1 | | ALN | 1 | ALN 30 | | W | 011921 | 2123 | 0119 | 222 |
| * CLAIMS | | | | | | | | | | | | |
| *   Followed by employee J COX | | | | | | 0323550 | | | | | | |
| AJ WEINGART | UNB | ALN 1 | | ALN | 1 | ALN 30 | | W | 012021 | 2249 | 0120 | 234 |
| * MEETING | | | | | | | | | | | | |
| *   Followed by employee SC WHITTON | | | | | | 0273433 | | | | | | |
| AJ WEINGART | | | | | | | | A | 012921 | 0804 | 0129 | 090 |
| * Bumped AI HEUPEL | | | | | | | | | | | | |
| AJ WEINGART | UNB | ALNE034 01 | | ALN | 1 | ALNE034 01 | | W | 021521 | 1054 | 0215 | 115 |
| * Immediate Layoff Request | | | | | | | | | | | | |
| AJ WEINGART | UNB | ALNE034 01 | | ALN | 1 | ALNE034 01 | | W | 022221 | 0637 | 0222 | 073 |
| * CLAIMS CONFERENCE | | | | | | | | | | | | |
| AJ WEINGART | UNB | ALNE034 01 | | ALN | 1 | ALNE034 01 | | W | 030221 | 0916 | 0302 | 101 |
| * Immediate Layoff Request | | | | | | | | | | | | |
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 031021 | 0640 | 0310 | 074 |
| * Immediate Layoff Request | | | | | | | | | | | | |
| *   Followed by employee JR GLASSBURN | | | | | | 0314476 | | | | | | |
| AJ WEINGART | UNB | ALN 1 | | ALN | 1 | ALN 30 | | W | 031821 | 0657 | 0318 | 075 |
| * CLAIMS RESEARCH | | | | | | | | | | | | |
| *   Followed by employee SM MARSH | | | | | | 1114867 | | | | | | |
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 031921 | 0924 | 0319 | 102 |
| * Immediate Layoff Request | | | | | | | | | | | | |
| *   Followed by employee WR SHINN | | | | | | 1711035 | | | | | | |
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 040521 | 1212 | 0405 | 131 |
| * MEETING | | | | | | | | | | | | |
| *   Followed by employee FL DOSS | | | | | | 0348573 | | | | | | |
| AJ WEINGART | UNB | ALN 1 | | ALN | 1 | ALN 30 | | W | 040621 | 1102 | 0406 | 120 |
| * CONFERENCE | | | | | | | | | | | | |
| *   Followed by employee DC BREEN | | | | | | 1711019 | | | | | | |
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 042621 | 2035 | 0426 | 213 |
| * CLAIMS | | | | | | | | | | | | |
| *   Followed by employee JR GLASSBURN | | | | | | 0314476 | | | | | | |
| AJ WEINGART | UNB | ALN 1 | | ALN | 1 | ALN 30 | | W | 042721 | 1826 | 0427 | 192 |
| * CLAIMS | | | | | | | | | | | | |
| *   Followed by employee WR SHINN | | | | | | 1711035 | | | | | | |
| AJ WEINGART | UNB | ALN 30 | | ALN | 1 | ALN 30 | | W | 050321 | 1349 | 0503 | 145 |
| * CLAIMS CONFERENCE | | | | | | | | | | | | |
| *   Followed by employee WN SIMMONS | | | | | | 0305920 | | | | | | |
| AJ WEINGART | | | | | | | | A | 051321 | 2120 | 0513 | 222 |
| * Bumped GH ISKE | | | | | | | | | | | | |

```
* MEETING
*          Followed by employee T   GRAY                    0305722
AJ WEINGART              UNB ALN  3    ALN  1      ALN 30    W 060721 0653 0607 075
* CLAIMS
*          Followed by employee LP RAMIREZ                   7354632
AJ WEINGART              UNB ALN 30    ALN  1      ALN 30    W 061121 0552 0611 065
* CLAIMS CONFERENCE
*          Followed by employee WR SHINN                     1711035
AJ WEINGART                                                  A 062021 1523 0620 162
* Bumped GH ISKE
AJ WEINGART              UNB ALN6026 01 ALN  1      ALN6026 01 W 062221 2211 0622 231
* CLAIMS.
AJ WEINGART              UNB ALN6026 01 ALN  1      ALN6026 01 W 062521 0731 0625 083
* CLAIMS AND RESEARCH
*          Denied Layoff on 2021-06-25 07.30.00 on layoff code PLD
AJ WEINGART              UNB ALN6026 01 ALN  1      ALN6026 01 W 062821 2150 0628 225
* SCAN DOCUMENTS AND WORK CLAIMS
AJ WEINGART                                                  A 063021 0000 0630 010
* Bumped FL DOSS
AJ WEINGART              UNB ALN  1    ALN  1      ALN 30    W 070221 2338 0703 003
* CLAIMS AND SCAN ATTACHEMENT
*          Followed by employee BJ SLUNECKA               0097832
AJ WEINGART              UNB ALN 30    ALN  1      ALN 30    W 070521 2023 0705 212
* MEETING
*          Followed by employee J   LINDSAY               0315507
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 072021 0104 0720 020
* CLAIMS
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 072421 2003 0724 210
* CLAIMS CONFERENCE
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 080121 1900 0801 200
* MEETING
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 081521 2341 0816 004
* SCAN CLAIM DOCUMENTS
AJ WEINGART              UNB ALN  1    ALN  1      ALN6058 01 W 081521 2345 0816 004
* CLAIMS
*          Followed by employee K   MAY                   3053691
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 083021 0656 0830 075
* LOCKER CLAIMS
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 090521 1916 0905 201
* MEETING
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 092421 2226 0924 232
* SCANNING
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 093021 1533 0930 163
* Immediate Layoff Request
AJ WEINGART              UNB ALN6058 01 ALN  1      ALN6058 01 W 100421 1833 1004 193
* MEETING
```

******* End of Report ********

```
INFPC001                   ***** BNSF Crew Management *****           02/01/22
BNSF ALLINE                      - Crew History -                     13:53:43MT


Movement History Records for Date Range 10/05/21 to 02/01/22 at


                   Mve   From         To            Permanent   A Movement  Program
FM Last Name       Cde   Job/Board    Job/Board     Assignmnt   W Date Time Date Time
----------------   -----  -----------  -----------  -----------  -  --------- --------
AJ WEINGART        UNB   ALN   1       ALN   1       ALN 6058 01 W 1009 0014 1009 0114
* WORKING CLAIMS AND SCANNING DOCUMENTS
*          Followed by employee J   CANOVA
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 1020 2136 1020 2238
* MEETING
AJ WEINGART        UNB   ALN   1       ALN   1       ALN 6058 01 W 1020 2140 1020 2240
* MEETING AND CLAIMS
*          Followed by employee CE RAMSEY
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 1101 1317 1101 1418
* MEETING AND CONFERENCE
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 1108 0927 1108 1027
* CLAIMS CATCHUP
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 1116 1157 1116 1257
* MEETING
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 1204 1248 1204 1349
* CLAIMS RESEARCH
AJ WEINGART        UNB   ALN   1       ALN   1       ALN 6058 01 W 1205 1123 1205 1223
* MEETING AND CLAIMS
*          Followed by employee RJ ROBB
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 1219 0852 1219 0953
* CLAIMS CONFERENCE
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 0109 0431 0109 0532
* CLAIMS RESEARCH
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 0110 0606 0110 0707
* MEETING
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 0112 2212 0112 2312
* CONFERENCE CALL
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 0119 2026 0119 2126
* MEETING
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 0123 1944 0123 2045
* CLAIMS
AJ WEINGART        UNB   ALN 6058 01 ALN   1        ALN 6058 01 W 0128 1845 0128 1945
* INVEST AND CLAIMS
AJ WEINGART        UNB   ALN   1       ALN   1       ALN 6058 01 W 0129 1747 0129 1848
* REGULAR MEETING AND GCA
*          Followed by employee MD EVERAGE-JOHNSON


                        ***** End of Report *****
```



Kent Psota
*General Chairman*
*BNSF(CB&Q/GN/NP/SP&S)*

Rob Cunningham
*General Chairman*
*BNSF (ATSF)*

Brotherhood of Locomotive
Engineers and Trainmen

Bobby Brown
*General Chairman*
*BNSF (C&S/CRI&P/FWD)*

Jeff Thurman
*General Chairman*
*BNSF (SLSF)*

**ATTACHMENT 3**

Sam Macedonio
AVP Labor Relations
P.O. Box 961030
Fort Worth, TX  76161-0030

December 18, 2020
File: ATG and Layoffs

Sam,

We are writing you out of concern based upon BNSF Management's continued disregard of their obligation to abide by existing collective bargaining rules and established practices in relation to allowing a sufficient number of employee's time off, which would enable them to spend time with their loved ones and have a life outside of the workplace. Our members work in an unforgiving work environment that requires they be ready for a call to duty at any time, day or night, 24/7. BNSF's squeeze to "do more with less" is putting undue hardship on TY&E employees and their families.  The repeated calls for TY&E employees to do more and more, due to rapidly changing business models is growing tiresome. We are asking that BNSF take an approach that helps provide employees when they are needed and allows the employees the ability to have time off to participate in the lives of their families.

First, we must look at some history of the actions taken previously by upper management at BNSF. Under previous administrations, BNSF systematically began taking a unilateral approach to operational changes involving longstanding TY&E work rules, agreements and work-rest initiatives.

In the past, we have had rest cycle boards such as 11-4, 10-5, 7-3, to name a few. When RSIA was first introduced some locations had rest cycle boards stripped without ever discussing feasible rest options. In 2014, after a heated discussion in a SACP meeting, BNSF canceled all of the remaining rest cycle initiatives in effect. These rest cycles boards allowed employees to get needed rest and time away from the workplace.  (**Attachment A**)

One thing this did accomplish was the erosion of the working relationships between the employees, their representative organizations and management. All of these work-rest initiatives were eventually stripped from the employees.

Following this unilateral action by BNSF cancelling all work-rest initiatives across the system, a commitment was made that there would be an emphasis placed upon a "new" style of rest initiative called PWS – Predictive Work Schedule, as outlined in your letter dated June 12, 2014, that would serve to give the employees a predictable work schedule using home cycle times. This empty promise has fallen short, as there are only a handful of locations that were ever actually offered a PWS fatigue mitigation program.  As example, on the former CB&Q, SP/NP, and GN locations, only 2 of our terminals currently enjoy the benefits of a PWS work-rest system.

Unfortunately, as of late, PWS has now also evolved into an unacceptable word in the BNSF's Senior Management vocabulary.

Also, during this period, BNSF also went all out in cancelling the long-established provision of FIFO (First, in First Out) that was acknowledged and memorialized in our various CBA schedules. This was done to make employees immediately available instead of waiting for their turn to return to town as agreed to for previous 80+ years. This too served little relief to the Carrier as it single-handedly changed the system to which an employee could have some predictable time off and instead served to place the employees at the bottom of the home working board on their return from any layoff in attempts to get them back in place to "work-faster". While the premise of this could only be assumed to force people into working more, in actuality it did little more than expand the layoff problems by allowing an employee to miss a day of work, suffer no financial consequence and mark up for work the next day. Like the above, this solved nothing, but in reflection, destabilized the workforce and led to more layoffs and unpredictability.

Undeterred by the failure of these unilaterally imposed changes to provide the Carrier relief with their self-imposed manpower issues, BNSF then moved on with their "throw everything against the wall and see what sticks" tactics by use of Article IX's. The changes sought through these Article IX notices involved attempts to consolidate the multiple pools at individual terminals and make an employee work any direction, in any pool, at any time. This, too was met with much criticism from the Organizations. Seniority now meant nothing, and the perks of having an employee assigned to his/her "preferred run," which was well deserved after a successful career working their way up in seniority, was immediately stripped away by the serving of these notices.

Likewise, this change of turn handling to the "new" use of turn-removal when an employee is absent, was then imposed on all other former committees on the property other than the ATSF, which had it prior. This action has served only to further confuse employees, making it extremely challenging to obtain proper rest before being called to service by the Carrier. These reactive and obviously imprudent actions taken under your predecessors' direction have served as nothing gainful to either the employees or the Carrier. In fact, these operational changes in crew handling did nothing to solve or even improve the TY&E attendance issues and instead only further caused increased difficulties with layoff issues and unpredictability.

After the Organizations repeated pleas, that these consolidations were running employees into the ground, and we needed a rest structure, BNSF moved on to allow some 4-2 rest cycles However, only those who agreed to a Pilot have been allowed the utilization of a 4/2 work/rest cycle. As you are aware, this allowed for an employee who worked 4 working starts to be afforded the option of requesting up to 24/36/48 hours of earned rest after accumulating the required number of work events. If your current conversations are any indication of your upcoming intentions, it is believed those 4/2 cycles are no longer in favor with the Carrier either, and are now becoming yet another "dirty-word" within the management hallways at BNSF.

We include all of the above to briefly outline all of these changes in policy and handling, which unmistakably have not yielded the results *you* expected. We also must express our frustration that the Carrier insists to go it alone and seek little to no input form the employees or their representatives. It is also commonplace when making suggestions for improvement that we are often with met with a *"NO"* or *"They aren't interested in doing that,"* which fixes nothing. It is

clear that the unilateral actions taken above have not made the workplace better for the employees or the Carrier. Instead, is can be argued that all of these changes have made the conditions much worse and an employee/employer relationship non-existent.

The BLET has attempted repeatedly to offer suggestions and comments on how to achieve these needed improvements through the collective bargaining process, which historically has served both parties well, but they seem to give this proven method of working together no consideration whatsoever. We are now at a crossroads wherein the Carrier is making veiled threats under the guise of needing improvements in predictability and availability, but currently will not and does not solicit the BLET for any constructive talks or input. Being repeatedly met with the above *NO's* or *They* rhetoric serves to solve nothing.

In summary of the above, all of these actions have done nothing to make the workforce more predictable but has instead made the workforce unpredictable and unnecessarily incensed the employees. It gives good reason that we had did things for 100 plus years the way we did because it simply worked better. To believe that changing the rules and the processes has made any actual gains in productivity is simply unfounded.

BNSF is going out of their way again to change processes in attempts to force an employee to work more. Recently, *you* took a position concerning "high impact" layoffs. This was nothing more than a confusing unwritten policy that was once again implemented with no forewarning to the employees or input from the Organizations whatsoever. You nor your front-line management can clearly explain how this policy works, yet you selectively intimidate employees into not taking a day off for fear of being in violation of a General Notice, which was finally released to the employees on December 18, 2020. This unfair handling, which has already caused many unnecessary disciplinary events, implores employees to work in a fashion that could put them in harm's way for actions that happened up to a year previously and being held accountable for something they were not even given the common courtesy of knowing about until December 18, 2020. BNSF has selectively intimidated employees to keep them from taking a day off by instilling fear of discipline.

The latest attack, which will roll-out on January 1, 2021, now limits allocations for single-day layoffs to levels that will not even accommodate the current CBA earned days that our membership have earned by their various years of employment. This is discernably just another misaligned process that will yield little productivity from the workforce and serve only to antagonize hard working TY&E employees across the system. Our memberships simply have had their fill with the constant manipulation of chasing an earned day off. **(Attachment B)**

All of the attempts the Carrier has put forth to this point to limit an employee's time away from the workplace while allowing even a modicum of predictable and well-deserved time off have had little success. Perhaps it is time to move on and try something new and have a cooperative partnership.

We would request that BNSF open meaningful conversations with the BLET. We feel that we have a lot to offer and would like to discuss, for example:

Expansion of PWS – (let the organizations manage, we will do it)
Systemwide 4 & 2
Location Specific 7 &3's, 10 & 5's or similar.  Many options here.
Bid- Packs
Expediter Agreements
Weekend Incentive or Weekend Coverage Boards.
Plus, many other ideas can be discussed.

In closing, you can unilaterally continue to tighten the screws all you want. Those actions will, much like the other efforts already put forth and mentioned above, not fix a thing. A draconian attendance policy that you plan to introduce early in 2021, that is modeled after other RR Carriers will not solve your problems either. Strangling allocations to never provide a day off from work will not solve your problems. This will instead have quite the opposite effect and lead to a host of current dependable, hardworking employees to voluntary leave service or be dismissed from BNSF. If you want to see real improvement, we once again offer our experienced people to run your operations via detached employees and have honest feedback in the decision-making. We can and will show you how it can be done safely, effectively, and profitably.

For all the reasons listed above, we would request and encourage you to bring the parties to the table to have real and meaningful conversations to work towards a path forward. Our memberships who have worked throughout the COVID-19 pandemic with much uncertainty and any clear option to some much-needed time away from the workplace deserve to be treated much better.  We will await your reply.

Respectfully,


BLET General Chairman


BLET General Chairman


BLET General Chairman


BLET General Chairman


cc: Matt Garland



MILTON H. SIEGELE, JR.
*Assistant Vice President*
*Labor Relations*

**BNSF RAILWAY COMPANY**

P.O. Box 961030
Ft. Worth, Texas 76161-0030
2600 Lou Menk Drive
Ft. Worth, Texas 76131-2830
Phone (817) 352-1068
Fax (817) 352-7319
E-mail milton.siegele@bnsf.com

June 12, 2014

Matt Wilson
General Chairman, BLET
1716 Western Center Blvd.
Fort Worth, TX  76131-2233

Dear Mr. Wilson:

I am writing to confirm cancellation of the work/rest agreements listed on the attachment.

These agreements were implemented on a location-by-location basis following the implementation of the Rail Safety Improvement Act of 2008 (RSIA), to provide work/rest arrangements over and above that provided by RSIA.  However, these agreements have become impracticable and obsolete.

I want to emphasize the commitment we made regarding Predictive Work Schedules (PWS).  PWS is a more advanced, indeed, state-of-the-art, approach to work/rest issues.  We remain ready to discuss with you, at your earliest convenience, PWS for each of these locations.  We believe PWS, like we recently implemented at Tulsa and Lincoln, is simply a much better model.

**Please consider this letter the cancellation notice for the agreement(s) listed in the attachment.**

On the effective date of the cancellation, the following will pertain:

- Rest days otherwise beginning on or after the cancellation date will not go into effect.  If employees have made plans for those days off, they must confirm time off through a pre-approved layoff request or through their supervisors.

- Rest days that started prior to the cancellation date and have not yet ended will end at 7 a.m. on the date of cancellation.  Again, if additional time off is needed, the employee should make prior arrangements to extend the time.

Please be assured that we will strive to make this transition as smooth as possible.  As always, we will continue to provide the other work/rest programs such as RSIA mandatory time off, monthly hourly caps, "Smart Rest," etc. We would welcome any questions or recommendations to improve the process.

Sincerely,

Milton H. Siegele, Jr.

App. 39

| Div | Station | Brd | Agmt | Brd Type | Craft | Description | Rest Cycle | Set-Up Sfx | TYE Comp Rule | RSIA | Cycles | Effective Date | Cancel Date |
|-----|---------|-----|------|----------|-------|-------------|-----------|-----------|--------------|------|--------|---------------|-------------|
| MON | GLENDI | 111 | NP | RD | BLET | GLE/FOR POOL - HOME ENGR (7/3) | 0703 | 02 (L) | 8002 | Attach C | | 01/25/12 | 07/12/14 |
| MON | GLENDI | 211 | NP | RD | BLET | GLE/GLE HELPER POOL - HOME ENGR 7/3 | 0703 | 01 (M) | 8000 | Attach A | | 10/20/09 | 07/12/14 |
| MON | GLENDI | 30 | NP | XB | BLET | GLENDIVE ENGR XTB | 0602 | 01 (M) | 8001 | Attach B | | 10/20/09 | 07/12/14 |
| MON | GREFAL | 30 | GN | XB | BLET | GREFALLS ENGINEERS XTB | 0602 | 01 (M) | 8001 | Attach B | | 10/20/09 | 07/12/14 |
| MON | GREFAL | 101 | GN | RD | BLET | GRF/SHM POOL - HOME ENGR | 0602 | 01 (M) | 8001 | Attach B | | 10/20/09 | 07/12/14 |
| MON | GREFAL | 201 | GN | RD | BLET | GRF/LAU POOL - HOME ENGR | 0703 | 01 (M) | 8000 | Attach A | | 10/20/09 | 07/12/14 |
| MON | MANDAN | 101 | NP | RD | BLET | MAN/GLE POOL - HOME ENGR 7/3 | 0703 | 02 (L) | 8002 | Attach C | | 02/08/12 | 07/12/14 |
| TWI | MANDAN | 30 | NP | XB | BLET | MANDAN ENG 6/2 XTB | 0602 | 01 (M) | 8001 | Attach B | | 10/21/09 | 07/12/14 |
| TWI | MANDAN | 201 | NP | RD | BLET | MAN/DIL POOL - HOME ENGR (ACT @ 5) | 0703 | 01 (M) | 8000 | Attach A | | 10/21/09 | 07/12/14 |
| TWI | SIOCIT | 30 | GN | XB | BLET | SIOCITY ENGR XTB | 0602 | 01 (M) | 8001 | Attach B | | 10/21/09 | 07/12/14 |
| TWI | SUPEWI | 30 | GN | XB | BLET | SUPERIOR ENG XBRD | 0502 | 04 (L) | 8003 | or E w/101 | A/C/E | 08/07/12 | 07/12/14 |
| TWI | SUPEWI | 101 | NP | RD | BLET | SUP/CSL-NTW-SVW POOL - HOME ENGR | 0603 | 01 (L) | 8003 | h E with Board 30 | | 06/01/12 | 07/12/14 |
| TWI | SUPEWI | 601 | NP | RD | BLET | SUP/DIL POOL - HOME ENGR | 0703 | 02 (L) | 8003 | h D with Board 30 | | 06/01/12 | 07/12/14 |

| LOCATION | CURRENT ALLOCATION | ALLOCATION AS OF 01/01/21 | LAYOFF DAYS LOST PER WEEK | ALLOCATION NEEDED |
|---|---|---|---|---|
| | WD/WE | WD/WE | | TO COVER FLOAT DAYS |
| KANSAS CITY, MO | 3 WD/2 WE | 2 WD / 1 WE | 7 | 2.2 PER DAY |
| ALLIANCE | 14 WD / 10 WE | 6 WD / 4 WE | 50 | 4.4 PER DAY |
| LINCOLN | 13 WD / 9 WE | 6 WD / 4 WE | 43 | 6.5 PER DAY |
| LACROSSE | 6WD / 4 WE | 3 WD / 2WE | 18 | 2.1 PER DAY |
| GALESBURG | 11 WD / 8 WE | 6 WD / 4 WE | 32 | 5.0 PER DAY |
| W. QUINCY | 4 WD/ 3 WE | 1 WD / 1 WE | 18 | 1.4 PER DAY |
| VANCOUVER | 7 WD / 5 WE | 3 WD / 2 WE | 25 | 3.3 PER DAY |
| SPOKANE | 12WD / 9 WE | 6 WD / 4 WE | 39 | 5.5 PER DAY |
| SHERIDAN | 4 WD / 2 WE | 2 WD / 1 WE | 11 | 1.8 PER DAY |
| PASCO | 2 WD / 2 WE | 1 WD / 1 WE | 7 | 1.1 PER DAY |
| WHITEFISH | 6WD / 4 WE | 3WD / 2WE | 18 | 3.2 PER DAY |
| GREAT FALLS | 2 WD / 1 WE | 1 WD / 1 WE | 4 | 1.1 PER DAY |
| WILLMAR | 2 WD/ 1 WE | 1 WD / 1 WE | 4 | 1.2 PER DAY |
| SIOUX CITY | 3 WD/2 WE | 1 WD / 1 WE | 11 | 1.5 PER DAY |
| CRESTON | 2 WD / 2 WE | 1 WD / 1 WE | 7 | 1 PER DAY |
| GILLETTE | 7 WD / 5 WE | 3 WD / 2WE | 25 | 3.2 PER DAY |
| DILLWORTH | 5 WD / 3 WE | 2 WD / 1 WE | 18 | 2.3 PER DAY |
| SUPERIOR | 3 WD/2 WE | 1 WD / 1 WE | 11 | 1.3 PER DAY |
| MANDAN | 3 WD/2 WE | 2 WD / 1 WE | 7 | 2.3 PER DAY |