UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**BNSF RAILWAY COMPANY,**

    Plaintiff,

v.                                 **No. 4:22-cv-0052-P**

**INTERNATIONAL ASSOCIATION OF SHEET
METAL, AIR, RAIL AND TRANSPORTATION
WORKERS – TRANSPORTATION DIVISION
ET AL.,**

    Defendants.

## OPINION & ORDER

This case arises under the Railway Labor Act ("RLA"). At issue is whether Plaintiff BNSF Railway Company's ("BNSF") unilateral implementation of the High Visibility ("Hi Viz") attendance standard is a "major" or "minor" labor dispute. Whether the Hi Viz attendance standard is good or bad policy, however, is not at issue for this Court.

BNSF argues that the dispute is minor. Defendants International Association of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division ("SMART-TD") and Brotherhood of Locomotive Engineers and Trainmen ("BLET") (collectively, the "Unions") argue that it is major.

Each Party filed a Motion for a Preliminary Injunction. BNSF seeks injunctive relief barring what it argues would be an illegal strike over a minor dispute; the Unions seek injunctive relief preserving the status quo as the RLA requires in what they argue is a major dispute. As explained below, the Court will **GRANT** BNSF's Motion and **DENY** the Unions' Motions.

## FACTUAL BACKGROUND

### A. The Parties

BNSF is a common carrier engaged in interstate commerce and headquartered in Fort Worth, Texas. ECF No. 5 at 2; *see also* 45 U.S.C. § 151 First (defining "carrier"). SMART-TD, formerly United Transportation Union, and BLET are duly authorized representatives of the crafts or classes of train-service employees and locomotive engineers employed by BNSF. ECF Nos. 35 at 7, 38 at 6; *see also* 45 U.S.C. § 151 Sixth (defining "representative" labor organization).

### B. The Dispute

Over two years ago, the Parties began negotiating new attendance standards. These specific negotiations were initiated by the service of Section 6 Notices. Despite these ongoing negotiations, BNSF *unilaterally* implemented the Hi Viz attendance standard on February 1, 2022.[1] In response, the Unions threatened to strike. Accordingly, this dispute stems from BNSF's unilateral implementation of the Hi Viz attendance standard.

### C. The Hi Viz Attendance Standard

Simply stated, the Hi Viz attendance standard is harsh. *See generally* ECF Nos. 8 at 178–88, 22-1 at 39–51, 41 at 15–25. Employees start with 30 attendance points and are subject to various point deductions—or no deduction at all—based on different types of absences.[2] If, or when, an employee exhausts their 30 points, that employee is then subject to progressive discipline.[3] After an employee exhausts their points, their point total is reset to 15 points.

To help employees avoid exhausting their points and facing potential discipline, the Hi Viz attendance standard grants employees the

---

[1]Based on employee feedback, several adjustments were made to the Hi Viz attendance standard prior to its roll-out. *See* ECF No. 46-1 at 41.

[2]*See* ECF No. 49-1 (articulating the various layoff codes and describing, in detail, how each layoff is treated under the Hi Viz attendance standard).

[3]The first time an employee exhausts their points, they are subject to a 10-day suspension with a 12-month review period. The second time an employee exhausts their points, they are subject to a 20-day suspension with a 24-month review period. The third time an employee exhausts their points, they are subject to dismissal.

opportunity to earn "good-attendance credits"—a feature not available under BNSF's former attendance standard. Specifically, an employee can earn 4 points for any 14-day period that the employee is available for work. An employee could potentially make-up for any absence that caused a point deduction by being *available* to work for a 14-day period.

## PROCEDURAL HISTORY

On January 13, 2022, BNSF filed this civil action seeking declaratory and injunctive relief against SMART-TD and BLET. ECF Nos. 1, 5. Because the Unions represented that a strike was imminent, BNSF filed a Motion for a Temporary Restraining Order on January 18, 2022. ECF Nos. 6–8. To ensure proper venue, the case was then transferred to the Fort Worth Division. ECF No. 15.

On January 24, 2022, the Court held a hearing on the Motion for a Temporary Restraining Order. ECF No. 18. At the hearing, the Parties cemented their respective positions: BNSF insisted it would implement the Hi Viz attendance standard on February 1, 2022, and the Unions insisted they would strike in response. ECF No. 30; *see also* ECF No. 56 at 13–14 ("Your Honor, we've already told the company that if they implement, then we've had that strike vote and we *would* strike." (emphasis added)).

The Court granted the Motion for a Temporary Restraining Order. ECF No. 30. The Unions then filed their answers to the Complaint and asserted counterclaims seeking declaratory and injunctive relief. ECF Nos. 33, 35. Due to the importance of the dispute, the Court ordered expedited briefing. ECF Nos. 31, 37.

Because the Court's Temporary Restraining Order would have expired on February 8, 2022, and the Unions still intended to strike, BNSF filed a Motion to Extend Temporary Restraining Order (ECF No. 47). To allow full consideration of the Motions for a Preliminary Injunction, the Court extended the Temporary Restraining Order, which is now set to expire on February 22, 2022. ECF No. 52. The Motions for a Preliminary Injunction are ripe for review.

## LEGAL STANDARD

### A. The Railway Labor Act

"[R]elations between railroads and their workers have often been stormy." *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*, 143 F. Supp. 2d 672, 678 (N.D. Tex. 2001) (McBryde, J.). "As another judge noted, 'the origins of this matter (as well as many other disputes) can probably be traced back prior to 1894, when Eugene V. Debs led members of the American Railway Union in a turbulent strike against the Pullman Palace Car Company of Illinois.'" *Id.* (quoting *Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps.*, 883 F. Supp. 755, 756 (D.D.C. 1995); *see also* 1 HARRY S. TRUMAN, MEMOIRS BY HARRY S. TRUMAN: YEAR OF DECISIONS 500–02 (1995) (discussing the "drastic measures" that might be necessary to quash railroad labor disputes).

Accordingly, the "major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes'" in order to "safeguard the vital interests of the country" in uninterrupted rail service. *Tex. & N. O. R.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930); *see also* 45 U.S.C. § 151a.

At the "heart of the [RLA]," *Atlanta & W. Point R. Co. v. United Transp. Union*, 439 F.2d 73, 77 (5th Cir. 1971), is the "duty of all carriers . . . and employees to exert every reasonable effort to make and maintain agreements . . . and to settle all disputes . . . between the carrier and the employees thereof." 45 U.S.C. § 152 First. To that end, the RLA sets out a mandatory and "virtually endless" process of "negotiation, mediation, voluntary arbitration, and conciliation." *Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987).

Traditionally, labor disputes in the railroad industry have fallen into two distinct categories: those that are "major" and those that are "minor." *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302–04 (1989) ("*Conrail*"). Although the terms "major dispute" and "minor dispute" are not found in the statute, RLA jurisprudence adopted the phrases "major" and "minor" as "terms of art." *Bhd. of Locomotive Eng'rs & Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017).

Major disputes find their statutory basis in 45 U.S.C. § 152 Seventh and 45 U.S.C. § 156; they "relate[] to disputes over the formation of collective agreements or efforts to secure them." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). That is, in a major dispute, the "issue is not whether an existing agreement controls the controversy." *Id.* Rather, major disputes "arise where there is no such agreement or where it is sought to change the terms of one," *id.*, and "[t]hey look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) (quoting *Elgin*, 325 U.S. at 723).

The process for resolving a major dispute is extensive. And until the parties exhaust the statutorily mandated procedures, "neither party may unilaterally alter the status quo" by resorting to illegal self-help. *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969). Should one of the parties unilaterally alter the status quo during the bargaining and mediation process, however, a court has "subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures." *Conrail*, 491 U.S. at 303.

Conversely, minor disputes are based on 45 U.S.C. § 152 Sixth and 45 U.S.C. § 153 First; they "relate either to the meaning or proper application of a particular provision" with reference to a specific situation. *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail and Transp. Workers – Transp. Div.*, 973 F.3d 326, 335 (5th Cir. 2020) (quoting *Elgin*, 325 U.S. at 723) (cleaned up). In other words, minor disputes "contemplate the existence of a collective agreement already concluded," *id.* (cleaned up), and the claim central to the dispute is "to rights accrued, not merely to have new ones created for the future." *Wright*, 990 F.3d at 435 (quoting *Elgin*, 325 U.S. at 723).

To summarize, "a proposed action creates a minor dispute 'if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.'" *BNSF Ry. Co.*, 973 F.3d at 335 (quoting *Conrail*, 491 U.S. at 307).

Accordingly, the proper inquiry is *not* who is right or wrong on the merits of the contract interpretation question, but rather, whether the carrier's asserted contractual position is "arguably justified" or "frivolous." *Conrail*, 491 U.S. at 306–07. "And if the dispute is capable of resolution by reference to the express or implied terms of the Parties' collective bargaining agreement (i.e., arguably justified), the actual resolution of the dispute is for the arbitrator—not this Court." *BNSF Ry. Co. v. Int's Ass'n of Sheet Metal, Air, Rail & Transp. – Transp. Div.*, No. 4:21-CV-432-P, 2022 WL 138518, at *5 (N.D. Tex. Jan. 14, 2022) (Pittman, J.).

## B. The Norris-LaGuardia Act

In addition to the RLA, labor disputes are also subject to the Norris-LaGuardia Act ("NLGA"). Enacted in 1932, the NLGA was meant to "take the federal courts out of the labor injunction business." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982); *see also* 29 U.S.C. § 101, *et seq.* To that end, Congress stripped federal courts of "jurisdiction to issue any . . . temporary or permanent injunction in a case involving or growing out of a labor dispute, except in . . . strict conformity" with the provisions of the NLGA. 29 U.S.C. § 101.

"If the NLGA totally divested the courts of power to issue an injunction, however, the RLA's mandates would ring hollow." *BNSF Ry. Co.*, 973 F.3d at 338. As such, a court has "'jurisdiction and power to issue necessary injunctive orders' to enforce compliance with the requirements of the RLA 'notwithstanding the provisions of the [NLGA].'" *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 490, 513 (1989) (quoting *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R Co.*, 353 U.S. 30, 42 (1957)).

Thus, when an action violates the RLA, the "specific provisions of the [RLA] take precedence over the more general provisions of the [NLGA]." *Id.* (quoting *Chi. River*, 353 U.S. at 41–42).

## C. Preliminary Injunction Standard

To be entitled to a preliminary injunction, a movant must establish: (1) a likelihood of success on the merits; (2) a substantial threat of

6

irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (quoting *Trottie v. Livingston*, 766 F.3d 450, 451 (5th Cir. 2014)).

If a party fails to satisfy any one of the four essential elements, a district court may not grant a preliminary injunction. *Miss. Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985). A preliminary injunction is an "extraordinary and drastic remedy" that is to be granted "only when the movant, by a clear showing, carries the burden of persuasion" as to each element. *Digital Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 772 (N.D. Tex. 2012) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).

## ANALYSIS

The Court's analysis is five parts. *First*, the Court determines whether this dispute is "major" or "minor" under the RLA. Guided by long-standing precedent, the Court concludes that it is minor. *Second*, the Court concludes that BNSF's unilateral implementation of the Hi Viz attendance standard does not constitute an independent statutory violation. *Third*, the Court concludes that the RLA permits the Court to enter a preliminary injunction barring an illegal strike over a minor dispute. *Fourth*, the Court concludes that entering such a preliminary injunction does not violate the NLGA. *Finally*, the Court concludes that BNSF carried their burden to establish the requirements for a preliminary injunction.

The Court will therefore **GRANT** BNSF's Motion for a Preliminary Injunction and **DENY** the Unions' Motions for a Preliminary Injunction.

## A. Whether BNSF can unilaterally implement the Hi Viz attendance standard is a minor dispute.

Despite the Unions' arguments that BNSF is violating the RLA, the Court concludes that the instant dispute can be resolved[4] by

---

[4]Under the RLA and the *Conrail* framework, the Court does *not* resolve the merits of a dispute. Indeed, the Court lacks jurisdiction to decide that question; instead, a case involving a minor dispute is "subject exclusively to resolution by arbitration under the RLA." *Allied Pilots Ass'n v. Am. Airlines, Inc.*, 898 F.2d 462, 465 (5th Cir. 1990).

interpreting the Parties' *current* agreements—i.e., BNSF's Hi Viz attendance standard is "arguably justified" by the implied and express terms of the Parties' current agreements, as interpreted through past practice. BNSF has thus met the "relatively light burden" necessary to show that the instant dispute is minor.

Before analyzing the arguments of the Parties, however, the Court addresses this dispute from a macro level to frame the Court's analysis. As noted, this dispute involves BNSF's unilateral implementation of the Hi Viz attendance standard. The action at issue—and what must be arguably justified by the terms of the Parties' agreement—is BNSF's unilateral implementation of the new attendance standard.

Analyzing whether BNSF's action is arguably justified, however, must be kept separate and distinct from analyzing whether the result of that action—here, the Hi Viz attendance standard—violates a specific term of the Parties' agreements. The former is for this Court; the latter goes to the merits of the issue and is solely for the arbitrator.

1. The Parties' implied terms—as interpreted through established past practice—provide an arguable basis for the Hi Viz attendance standard.

The Court concludes that BNSF's contested attendance standard is "arguably justified" by the "implied contractual terms, as interpreted through established past practice." *Gen. Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 591–92 (3d Cir. 1990).

Because "collective-bargaining agreements may include implied as well as express terms," the Court must consider both the express and implied provisions to determine whether an action is arguably justified by the terms of the agreement. *Conrail*, 491 U.S. at 311. To that end, the Parties' "practice, usage[,] and custom" is significant in interpreting the agreement. *Id.*; *see also Bhd. of Locomotive Eng'rs & Trainmen*, 879 F.3d at 758 ("[T]he relevant terms of an agreement are not only those

---

Importantly, being subject to arbitration does not mean the railroad's interpretation is correct. "The very fact of arbitration presupposes that the railroad's interpretation will not always prevail . . . ." *Ry. Lab. Execs. Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 120 (4th Cir. 1990).

that are written down; they also include the parties' past practice, usage, and custom as they carry out their agreement.").

Accordingly, "either express or implied contractual terms, as interpreted through established past practice, will serve to classify a dispute as minor." *Gen. Comm. of Adjustment*, 893 F.2d at 591–92; *see also Bhd. of Ry. Carmen (Div. of TCU) v. Atchison, Topeka & Santa Fe Ry. Co.*, 894 F.2d 1463, 1469 (5th Cir. 1990) (concluding that a dispute is minor based on "the past practices of the parties").

"The type of past practice relied on need not be identical to the challenged practice to satisfy the carriers' burden of showing arguable contractual justification." *Bhd. Ry. Carmen of U.S. & Can., Div. of Transp. Commc'ns Union v. Mo. Pac. R. Co.*, 944 F.2d 1422, 1429 (8th Cir. 1991); *see also Conrail*, 491 U.S. at 315–20 (railroad's past practice of requiring drug testing only when a drug problem was known or suspected satisfied the railroad's burden of showing an arguable justification for requiring routine drug screening of employees).

Here, BNSF argues that "the railroad has a long and well-established practice of unilaterally altering attendance standards." ECF No. 40 at 5. The record contains numerous examples of BNSF "unilaterally establishing, modifying, and applying attendance standards." ECF No. 7 at 19–21; *see also* ECF Nos. 8, 40 at 5–6.

In response, SMART-TD[5] argues that BNSF's reliance on past-practice "mischaracterize[s] the current situation" and demonstrates nothing more than examples of "mere alternations to an existing policy." ECF No. 50 at 10. Because the Hi Viz attendance standard is "a new and distinct availability policy," *id.*, not merely an alteration, the contested attendance standard cannot be "arguably justified" the past practice between the Parties.

"The Court, however, is not deciding the merits of whether the past practice does in fact allow BNSF's contested [Hi Viz attendance standard]. Rather, the Court is deciding only whether the evidence in

---

[5]BLET does not attempt to rebut BNSF's apparent past practice.

the record provides an arguable basis for the contested [Hi Viz attendance standard]." *BNSF Railway Co.*, 2022 WL 138518 at *7.

As other courts have noted, "[t]he type of past practice relied on need not be identical to the challenged practice." *See, e.g.*, *Bhd. Ry. Carmen*, 944 F.2d at 1429. Accordingly, a court should not parse the past practice to determine whether it supports only "mere alterations to an existing policy" or whether it also supports unilateral implementation of "a new and distinct availability policy." ECF No. 50 at 10. Under *Conrail*, it is sufficient for a court to find that the evidence of past practice in the record is credible and is similar in kind to the contested action.

Here, the Court finds that "BNSF and its predecessors have a history of implementing policies regarding availability for work, attendance, and absenteeism through implementing various policies, practices, and works rules for at least twenty years." *Burlington N. & S.F. Ry. Co. v. Bhd. of Locomotive Eng'rs*, No. 4:99-CV-675-R (N.D. Tex. Sept. 8, 1999). Any argument over what the past practice between the Parties allows demonstrates that the heart of the dispute is over whether a right has accrued based on the Parties' past practice, not whether a new right is being created for the future. *See Conrail*, 491 U.S. at 303. And while it is indeed arguable that the Parties' past practice allows only unilateral alterations—not new and distinct availability standards—the opposite argument is not frivolous.

The Court thus concludes that BNSF has met the "relatively light burden" necessary to show that contested Hi Viz attendance standard is arguably justified by the Parties' implied terms, as interpreted through established past practice.

The implied terms, however, do not exist in a vacuum. Thus, if the Hi Viz attendance standard directly repudiates any *express* terms, then the dispute is major despite the attendance standard being "arguably justified" by the Parties' *implied* terms. If, however, the Hi Viz attendance standard is also "arguably justified" by the express terms, the dispute is minor.

The Court thus analyzes whether the Hi Viz attendance standard is "arguably justified" by the express terms. Or whether, as the Unions argue, the attendance standard directly repudiates those same terms.

> 2. BNSF's Hi Viz attendance standard does not directly repudiate any of the Parties' express terms.

Because the Hi Viz attendance standard is "arguably justified" by the "implied terms, as interpreted through established past practice," BLET argues that the Hi Viz attendance standard directly repudiates certain express terms between the Parties. Essentially, BLET argues that BNSF's repudiation of those terms is an attempt to unilaterally change the express terms of the Parties' agreement, which would be a major dispute under *Conrail*.

Simply stated, a major dispute "arise[s] where there is no such agreement or where it is sought to change the terms of one." *Elgin*, 325 U.S. at 723. Violating the terms of an agreement, however, is not the same as repudiating (or "unilaterally changing") those same terms. That is, a repudiation cannot be equated with a violation of certain contractual terms. *See, e.g.*, *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*, 869 F.2d 1518, 1523 (D.C. Cir. 1989); *IBT/HERE Emp. Representatives' Council v. Gate Gourmet Div. Ams.*, 377 F. Supp. 2d 54, 61 (D.D.C. 2005). Thus, even if a court is convinced that an express term prohibits a party's actions, it may not infer that the party repudiated those express terms. *Air Line Pilots Ass'n*, 869 F.2d at 1523. A contrary conclusion would allow a court to conclude that a dispute was major solely on its view of the merits—"usurping the role of the arbitrator in interpreting and applying the contract." *Id.*

Analyzing the instant dispute through this framework leads the Court to the same conclusion: the Hi Viz attendance standard is "arguably justified by the [express] terms of the parties' [agreements]." *Conrail*, 491 U.S. at 303. And while it is arguable that the Hi Viz attendance standard violates a term of the Parties' agreements, there is nothing to indicate that BSNF is attempting to unilaterally "change the terms" of the agreements or to acquire new "rights for the future." *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) (quoting *Elgin*, 325 U.S. at 723).

> *a. It is arguable that the Hi Viz attendance standard does not penalize union officials for laying off work for union business.*

BLET argues that the Hi Viz attendance standard repudiates Section 1.2 of the Parties' 2003 Agreement. Although it is arguable that BNSF has *violated*—rather than repudiated—Section 1.2, it is likewise arguable that the Hi Viz attendance standard comports with Section 1.2.

Generally, Section 1 of the 2003 Agreement permits "a duly-elected local chairman, acting local chairman, local president or local secretary-treasurer of [BLET]" to "lay[] off to attend a bona-fide union meeting, represent an employee in a formal investigation, or meet with Carrier official(s) on items such as discussing time, claims, grievances, and/or related schedule matters . . . ." ECF No. 21 at 3. Specifically, Section 1.2 provides: "In the application of the foregoing a union officer laying off for the purposes stipulated will not be considered as laying off or missing a call." *Id.*

BLET argues this "unambiguous language" prohibits "BNSF from considering a Union official who removes himself from availability for an assignment for the stipulated purposes as 'laying off.'" ECF No. 44-1 at 5. And because a union official's good-attendance credit is reset when they lay off or miss a call for official union business, the Hi Viz attendance standard directly repudiates Section 1.2. Any argument to the contrary, BLET argues, is frivolous. *Id.* at 5–6.

BNSF responds with evidence that the Hi Viz attendance standard does not consider a union official who removes himself from availability for union business as "laying off." ECF No. 55 at 6. Accordingly, the Hi Viz attendance policy deducts attendance points when a union official lays off or misses call for an unexcused reason; but, when that same union official lays off or misses a call for union business, no attendance points are deducted. *Id.* Thus, because a union official's attendance points are not deducted for union business, the Hi Viz attendance standard is "arguably justified" by the express terms of Section 1.2. It is immaterial, BNSF argues, that a union official cannot earn good-

attendance credit while "laying off" or "missing a call" for union business because that is not a penalty.[6] ECF No. 40 at 7–8.

BLET's argument fails for two reasons. *First*, there is no evidence that BNSF is attempting to either directly repudiate Section 1.2 or to change its terms via the Hi Viz attendance standard. *Second*, BLET presumes Section 1.2 must be interpreted as barring a union official's good-attendance credit from being reset and that resetting a union official's good-attendance credit must be interpreted as a penalty.

But good-attendance credits were not a consideration of either Party when Section 1.2 was adopted. Thus, missing from BLET's interpretive presumption, is any authority demanding BLET's interpretation that a union official has a right to their good-attendance credit and that the resetting of those credits is a penalty. And without persuasive authority completely foreclosing an alternative interpretation of Section 1.2— especially as it applies in conjunction with the Hi Viz attendance standard and the creation of a good-attendance credit—the Court cannot conclude that BNSF's argument is frivolous.

This portion of the instant dispute clearly pertains to how an existing term must be enforced or applied to a new attendance standard. And it is at least arguable that the Hi Viz attendance standard comports with Section 1.2 of the Parties' 2003 Agreement, which is all *Conrail* requires.

   *b. It is arguable that the Hi Viz attendance standard comports with the Parties' agreement that gives employees 24 hours to select a new assignment when displaced by a senior engineer.*

Although an employee's good-attendance credit is reset if they fail to select a new assignment in less than 2 hours, the contested attendance

---

[6]Although BLET's interpretation of Section 1.2 might be correct, the following example demonstrates that BNSF's position is not frivolous, which is all *Conrail* requires. Consider two union officials: the first union official lays off or misses a call for an unexcused reason; the second lays off or misses a call for union business. Under the Hi Viz attendance standard, the former would lose attendance points *and* have their good-attendance credit reset. The latter, however, would only have their good-attendance credit reset. Accordingly, it is at least arguable that the union officer that lays off or misses a call for union purposes is not "considered as laying off or missing a call" because they do not lose attendance points like the union official that lays off or misses a call for an unexcused reason. In other words, the two union officials in this example are not treated the same, which is arguably all Section 1.2 requires.

standard is nonetheless arguably justified by the express terms of the Parties' agreement.

The 2007 Agreement, in pertinent part, states:

> An engineer displaced from a run or assignment by a senior engineer or whose assignment is reduced or abolished as part of a board adjustment in accordance with schedule rules and/or agreements will have displacement rights to any assignment/board on which he holds active engineer's seniority. This displacement must be exercised within 24 hours of notification of displacement. In the event displacement is not exercised within 24 hours, such engineer will be required to displace the junior engineer working at the location. For those engineers who are displaced while off for any reason, the notification process will begin upon markup and they must also place within 24 hours of notification.

ECF No. 21 at 53. In layman terms, the 2007 Agreement "gives an employee who is displaced up to 24 hours to select a new assignment, and if no new assignment is selected in that 24 hours, the employee then bumps the most junior engineer at the location as default." ECF No. 44-1 at 14.

BLET argues that the Hi Viz attendance standard repudiates this term because it resets an employee's good-attendance credit if that employee either exercises their right to select a new assignment or simply defaults to a new assignment after the 24 hours. *Id.* BNSF argues that the Hi Viz attendance standard does not penalize an employee for exercising their rights under the 2007 Agreement. ECF No. 53 at 10. The Court concludes that BLET's argument fails for the same two reasons discussed above.

*First*, there is no evidence that BNSF is attempting to either directly repudiate the 2007 Agreement or to change its terms via the Hi Viz attendance standard. *Second*, BLET presumes that the 2007 Agreement *must* be interpreted as barring an employee's good-attendance credit from being reset and that resetting an employee's good-attendance credit *must* be interpreted as a penalty. Again, BLET fails to present any authority demanding that the 2007 Agreement or the Hi Viz attendance standard be interpreted according to their argument.

14

Without any persuasive authority foreclosing any other interpretation of the Hi Viz attendance standard resetting an employee's good-attendance credit, or any authority guaranteeing a right to the good-attendance credit, the Court cannot conclude that BNSF's argument is frivolous.

This portion of the dispute (again) clearly pertains to how an existing term must be enforced. The Court concludes is at least arguable that the Hi Viz attendance standard comports with the 2007 Agreement, which is all *Conrail* requires.

   c. *It is arguable that the Hi Viz attendance standard comports with the Parties' agreement guaranteeing reasonable lay-off privileges for employees.*

Contrary to BLET's argument, the Hi Viz attendance standard does not directly repudiate the Parties' agreement guaranteeing reasonable lay off privileges for employees. Section 1(a) of the Parties' 1994 Agreement provides, in relevant part, that "[t]he Carrier shall maintain a sufficient number of engineers to permit reasonable lay off privileges and to protect the service including vacations and other extended vacancies." ECF No. 21 at 49.

BLET argues that the "change in the number of days employees . . . may be off in any given year from the prior BNSF attendance policy is outrageous [and] shocks the conscience." ECF No. 44-1 at 13. To that end, BLET submits evidence that the "Hi Viz policy will require employees to be available over 90% of the time." ECF No. 49-1 at 18. As a result, the Hi Viz attendance standard strips employees of their reasonable lay off privileges, which are contractually guaranteed.

BNSF responds that BLET mischaracterizes the way the Hi Viz attendance standard works. Under BNSF's view, "[b]y increasing availability and reducing the number of employees who take excessive unplanned time off, BNSF employees overall should have more time at home with their families because they will be called upon to cover shifts or travel less." ECF No. 41 at 28. BNSF therefore argues that BLET's calculations cannot establish that BNSF's argument is frivolous.

15

The Court agrees with BNSF. *First*, there is no evidence that BNSF is attempting to either directly repudiate Section 1(a) of the Parties' 1994 Agreement or to change its terms via the Hi Viz attendance standard. *Second*, the Parties submitted dueling affidavits arguing whether the Hi Viz attendance standard complies with an *existing* term. Accordingly, the record—pertaining to the 1994 Agreement—centers on whether the Hi Viz attendance standard complies with Section 1(a). Seeking to enforce an existing term is axiomatically a minor dispute. *See Conrail*, 491 U.S. at 302 (citing *Elgin*, 325 U.S. at 711). And interpreting the scope of a right that vested in the past is the exact question that *Conrail* directs to binding arbitration.[7] *See generally* ECF No. 8 at 63–74.

Simply stated, the dispute is whether the Hi Viz attendance standard permits the reasonable lay off privileges required by Section 1(a) of the 1994 Agreement. And it is at least arguable that the Hi Viz attendance standard comports with the 1994 Agreement, which is all *Conrail* requires.

### d. It is arguable that the Hi Viz policy comports with the employees' contractual vacation and personal-leave rights.

Because the Hi Viz attendance standard does not repudiate the employees' right to contractually granted vacation, the Hi Viz attendance standard is arguably justified by the Parties' express terms.

The 1947 National Agreement, as modified by other agreements, grants BLET represented employees vacation rights based upon years of service. ECF No. 21 at 52–55. BLET argues that an employee *might* reject a call to work that *might* come right before their contractually granted vacation or personal-leave time. Because that rejection would cause the employee to lose both attendance points and have their good-attendance credit reset, the Hi Viz attendance standard directly repudiates their ability to exercise their contractual right to vacation.

---

[7]On this point, the Court has no metric to determine what would qualify as "reasonable lay-off privileges" in the railroad industry. To avoid Courts analyzing industry-specific terms, Congress directs minor disputes to those with "accepted expertise in the field." *Gunther v. San Diego & Ariz. E. Ry.*, 382 US. 257, 262 (1965).

16

The Court rejects BLET's argument. *First*, although BLET alleges that BNSF is repudiating this express term, there is no evidence that BNSF is attempting to either directly repudiate the 1947 Agreement or to change its terms via the Hi Viz attendance standard. *Second*, besides conjuring up a hypothetical employee scheduling a hypothetical vacation and having to reject a hypothetical call prior to their hypothetical vacation, BLET provides no evidence for this Court to conclude that the Hi Viz attendance standard even violates the Parties' express terms.

Based on the record at this stage in the proceedings, the Hi Viz attendance standard appears to place the employees in the same hypothetical predicament as the previous attendance standard. Thus, the Hi Viz attendance standard is arguably justified by the express terms of the Parties' agreement.

Again, this aspect of the dispute clearly pertains to how an existing term must be enforced. And it is at least arguable that the Hi Viz attendance standard comports with the 1947 Agreement, which (again) is all *Conrail* requires.

### e. It is arguable that the Hi Viz policy comports with the Family Medical Leave Act.

Whether the instant dispute is major or minor does not turn on whether the Hi Viz policy violates the Family Medical Leave Act ("FMLA"). But even if that was a proper consideration under *Conrail*, the Hi Viz attendance standard arguably comports with the FMLA.

BLET argues that, because the Hi Viz attendance standard violates the FMLA, BNSF cannot possibly assert an arguable basis for the contested action.[8] The dispute must therefore be major. BNSF argues

---

[8]The canon of constitutional avoidance provides that "[w]hen 'a serious doubt' is raised about the constitutionality of an act of Congress, ' . . . [c]ourts will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Nielson v. Preap*, 139 S. Ct. 954, 971 (2019) (citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018)). Essentially, BLET's theory would require this Court to adopt a canon of statutory avoidance that mandates a dispute be classified as major based on a potential statutory violation separate from the RLA. As explained above, there is no basis for such a canon of statutory avoidance under the RLA or the *Conrail* framework. And even if there was a basis, the Court rejects the opportunity to sail into uncharted waters and create such a cannon for labor disputes brought under the RLA.

that *Conrail* directs courts to consider only whether the instant dispute can be resolved by interpreting the Parties' *agreements*—it does not direct courts to consider separate statutory violations. The Court agrees with BNSF.

*Conrail* is clear: "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the collective-bargaining agreement." *Conrail*, 491 U.S. at 307. Thus, under the plain language of the *Conrail* test, the Court does not analyze whether the contested action violates a separate statute.[9] As such, an alleged FMLA violation cannot transform a minor dispute into a major one.

If, however, a separate statutory violation could create a major dispute under *Conrail*, this is not case. Stated another way, the Hi Viz attendance standard arguably comports with the FMLA. To avoid this conclusion, the Unions argue that a recent Sixth Circuit decision forecloses any arguable basis to support the unilateral implementation of the Hi Viz attendance standard. BNSF argues the opposite.

BLET's argument presumes that a Sixth Circuit decision controls this dispute. *See Dyer v. Ventra Sandusky*, 934 F.3d 472 (6th Cir. 2019). But if the Sixth Circuit cannot create binding precedent for courts in the Fifth Circuit, how can a Sixth Circuit decision demand that an argument for the opposite result be frivolous?[10] Further, even if the Sixth Circuit could resolve a question so clearly that arguments for a different result would be frivolous, *Dyer* is not the case.

---

[9]Under the RLA and the *Conrail* framework, the analysis is a jurisdictional—not a merits-based—inquiry. As such, if the dispute is minor, a court (generally) dismisses the case for lack of jurisdiction. Thus, a court typically has no opportunity to analyze the merits of the dispute. To analyze the FMLA as a means of classifying the dispute as major or minor would require the Court to analyze the merits of the dispute so that it could then analyze whether it has jurisdiction over that dispute. The RLA is clear: in a minor dispute, the merits are reserved for arbitration, not this Court. The Court therefore rejects the invitation to analyze the merits of this dispute under the FMLA as a means of determining whether the dispute is major or minor under the RLA.

[10]On this point, the prevalence of circuit splits illustrates that (generally) an argument to the contrary is far from frivolous.

In *Dyer*, the Sixth Circuit merely found that a fact-issue existed on the question of whether the attendance policy at issue interfered with an employee's FMLA rights. *Id.* at 478. The Sixth Circuit did not hold, as a matter of law, that the attendance policy violated that employee's FMLA rights. *Id.* A genuine issue of material fact that could affect the outcome of a case is practically the quintessential example of an "arguable basis." Thus, no matter how the Sixth Circuit decision is viewed, it is not so conclusive that BNSF's argument is frivolous.

In sum, resolution of this dispute turns on the application or interpretation of the express or implied terms of Parties' agreements—i.e., the instant dispute is comprehended within the *existing* agreements between the Parties. The Court therefore concludes that BNSF has met the "relatively light burden" of establishing that this dispute is minor under the RLA.[11]

## B. The Hi Viz attendance standard does not constitute an independent statutory violation.

Recognizing that the Hi Viz attendance standard is arguably justified by the express and implied terms of the Parties' Agreements,

---

[11]Like other courts, the Court rejects the argument that the service of a Section 6 Notice converts a minor dispute into a major one. *See, e.g., Bhd. Ry. Carmen of U.S. & Can., Div. of Transp. Commc'ns Union v. Mo. Pac. R. Co.*, 944 F.2d 1422, 1427–28 (8th Cir. 1991); *Ry. Lab. Execs. Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 120 (4th Cir. 1990), *cert. denied*, 499 U.S. 921 (1991); *Chi. & N.W. Transp. Co. v. Ry. Labor Execs. Ass'n*, 908 F.2d 144, 151 (7th Cir.1990), *cert. denied*, 498 U.S. 1120 (1991); *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 1000–01 (2d Cir. 1989); *Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Inc.*, 863 F.2d 891, 900 (D.C.Cir. 1988).

The Court also denies the invitation to issue an injunction preventing the carrier from disrupting the status quo during a minor dispute. Typically, "once the court finds that an employer's actions are arguably justified under the terms of existing agreements, the status quo issue is mooted." *Bhd. Ry. Carmen v. Mo. Pac. R.R. Co.*, 944 F.2d 1422, 1428 (8th Cir.1991); *see also CSX Transp. Inc. v. UTU,* 879 F.2d 990, 999 (2d Cir.1989), *cert. denied,* 493 U.S. 1020 (1990) (same). Here, the Unions failed to establish that BNSF "disrupting the status quo would result in irreparable injury of the magnitude that would render a decision in favor of the unions virtually meaningless." *Int'l Ass'n of Machinists & Aerospace Workers, Airline Dist. 146 v. Frontier Airlines, Inc.*, 664 F.2d 538, 542 (5th Cir. 1981). This does not, however, imply that minor disputes are unimportant or insignificant. Indeed, minor disputes—like this dispute—involve disagreements of great practical or economic significance. *Int'l Bhd. of Teamsters v. Sw. Airlines Co.,* 875 F.2d 1129, 1133 (5th Cir.1989) (en banc).

the Unions attempt to frame the dispute as an independent statutory violation.[12]

1. <u>The Hi Viz attendance standard does not violate Section 2 Third and 2 Fourth of the Railway Labor Act.</u>

The Court concludes that there is no violation of Section 2 Third or 2 Fourth of the RLA for two reasons: *First*, the Hi Viz attendance standard is not a fundamental attack on the union or union representation, and *second*, the RLA's dispute resolution procedures are available for the Parties.

The Unions argue that the Hi Viz attendance standard violates Sections 2 Third or 2 Forth of the RLA. Section 2 Third states, in pertinent part:

> Representatives . . . shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.

45 U.S.C. § 152 Third. Further, Section 2 Fourth states, in pertinent part:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. . . . No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .

---

[12]Unlike minor disputes, this Court has jurisdiction to resolve any independent statutory violation. At this early stage in the case, however, the Court cannot conclude that such an independent statutory violation exists.

*Id.* § 152 Fourth.

Despite these statutory guarantees, federal courts have typically applied Sections 2 Third and Fourth to disputes arising in the pre-certification context. *Trans World Airlines, Inc. v. Indep. Fed. of Flight Attendants*, 489 U.S. 426, 440 (1989) (limiting post-certification jurisdiction). In "exceptional circumstances," however, "a federal court may exercise jurisdiction over violations of the [RLA] without regard to the court's characterization of the dispute as major or minor." *Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 408 (7th Cir. 1988). Essentially, there are two instances where jurisdiction is trigged: (1) cases where extrajudicial dispute-resolution is unavailable or ineffective, and (2) cases where the employer evinces a specific intent to weaken or destroy a union. *Bhd. of Ry. Carmen (Div. of TCU)*, 894 F.2d at 1468 n.10, *cert. denied*, 498 U.S. 846 (1990); *see also Ruby v. TACA Int'l Airlines, S.A.*, 439 F.2d 1359, 1364 (5th Cir. 1971).

The Unions argue that BNSF's actions surrounding the Hi Viz attendance standard "strike a fundamental blow to union or employer activity and the collective bargaining process itself," and that BNSF is attempting to destroy the Unions.[13] At this stage of the proceedings, the Unions' arguments can neither withstand scrutiny nor establish an independent statutory violation. Indeed, nothing the Unions have alleged demonstrates that this case presents any sort of "exceptional circumstance." *Ass'n of Pro. Flight Attendants v. Am. Airlines, Inc.*, 843 F.2d 209, 211–12 (5th Cir. 1988).

The Unions argue that the Hi Viz attendance standard penalizes union officials who lay off or miss a call for union business. This discriminatory treatment of union business, according to the Unions, is evidence of anti-union animus and interferes with an employee's choice of representative. The Unions cite *Atlas Air, Inc. v. Air Line Pilots Ass'n* in support. 232 F.3d 218 (D.C. Cir. 2000). There, "Atlas Air adopted a facially discriminatory policy that penalized employees by terminating

---

[13]Neither Union argues that the extrajudicial dispute-resolution is unavailable or ineffective. The Court's analysis is therefore limited to whether this is a case "where the employer evinces a specific intent to weaken or destroy a union."

their participation in profit sharing for *no other reason than their decision to unionize*." *Id.* at 225 (emphasis added).

Here, the Parties' history forecloses any argument that BNSF unilaterally implemented the Hi Viz attendance standard "for no other reason than their decision to unionize." *Id.* Thus, *Atlas Air* is inapposite. And while "actions against unionized labor by an employer can in and of itself provide evidence of the animus generating those acts," the Unions cannot point to any actions for the Court to draw such a conclusion. *Id.* Accordingly, at this early stage, the Unions cannot establish that BNSF was motivated by anti-union animus.

Further, the Unions cannot establish that the Hi Viz attendance standard is discriminatory and will interfere with an employee's choice of representative. To this point, any potential evidence would be the Unions speculating as to how union officials will react to, or operate under, the Hi Viz attendance standard. Also, the Unions' argument requires that resetting a union official's good-attendance credit be considered a penalty. As discussed above, there is no persuasive authority to conclude that resetting an employee's good-attendance credit must be considered a penalty. And without establishing this, the Unions cannot establish that the alleged discriminatory nature of Hi Viz attendance standard creates an independent statutory violation.

Thus, the Court cannot conclude—based on speculation—that the Hi Viz attendance standard is an attempt to "destroy the Unions through acts of discrimination, coercion, or intimidation." Instead, the record indicates that the "purpose of Hi Viz is to set a clear standard for full-time employment; allow employees to easily, accurately, and contemporaneously determine where they stand in comparison to BNSF attendance standards; and to provide employees with an opportunity to improve their standing through regular, steady attendance." ECF No. 41 at 7. Although the Unions could uncover compelling evidence of "anti-union animus" or an "intent to interfere with employees' choice of representative" during discovery, the Unions cannot produce evidence, at this stage in the proceedings, to prove those were motivating factors in the Hi Viz attendance standard.

The Unions also argue that the Hi Viz attendance standard interferes with the collective bargaining process. As discussed above, the Court concludes that the Parties are engaged in a minor dispute. BNSF therefore had no obligation to serve Section 6 Notices over two years ago. *See, e.g.*, *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 1000 (2d Cir. 1989). And because there is no obligation to maintain the status quo during a minor dispute, the Unions cannot argue that implementing the Hi Viz attendance standard interferes with the collective bargaining process. On the contrary, an illegal strike over a minor dispute would interfere with the collective bargaining process.

The Court concludes, based on the record before the Court, that the Hi Viz attendance policy does not constitute an independent statutory violation under the RLA.

2.  <u>SMART-TD cannot bring an independent claim under the Family Medical Leave Act.</u>

SMART-TD argues that the Hi Viz attendance standard violates the FMLA. SMART-TD, however, is not an "eligible employee" within the meaning of the FMLA; thus, it cannot bring an independent FMLA claim.

The FMLA provides a private right of action to "any one or more employees for and in behalf of (A) the employees; or (B) the employees and other employees similarly situated." 29 U.S.C. § 2617(a)(2). The FMLA contains two definitions for employees. *First*, the FMLA expressly adopts the Fair Labor Standard Act's ("FLSA") definition of "employee." *Id.* § 2611(3). Under the FLSA, an "employee" is "any individual employed by an employer." *Id.* § 203(e)(1). *Second*, the FMLA defines "eligible employee" as an individual "who has been employed (i) for at least 12 months by the employer . . . ; and (ii) for at least 1,250 hours of service with such employer during the previous 12 month period." *Id.* § 2617(a)(2).

Based on the plain language, a union does not qualify as either an "employee" or "eligible employee." *See Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 202 (1819) (Marshall, C.J.) ("It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which

the words of an instrument expressly provide, shall be exempted from its operation."). Therefore, the FMLA does not provide a cause of action for a union to bring a claim on its own or on behalf of its members. *See, e.g.*, *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 283 F. Supp. 3d 72, 90 (S.D.N.Y. Oct. 24, 2017); *Burrell v. AT&T Corp.*, No. 3-CV-2490, 2005 WL 2656124, at *3 (S.D.N.Y. Oct. 18, 2005); *Local 100, Serv. Emps. Int'l Union, AFL-CIO v. Integrated Health Servs.*, 96 F. Supp. 2d 537, 539 (M.D. La. 2000), *order vacated on other grounds*, 2000 WL 33948946 (M.D. La. Sept. 19, 2000).

Accordingly, a union cannot bring a claim on its own or on behalf of its members. The Court therefore rejects SMART-TD's attempt to seek injunctive relief pursuant to the FMLA.

## C. The Court has authority to issue an injunction under the RLA.

A court's jurisdiction in a labor dispute is limited to preserving and enforcing the RLA's dispute resolution procedures. *BNSF Ry. Co.*, 973 F.3d at 338. As such, a court has authority to issue an injunction in a minor dispute, but only in "exceptional circumstances" *Allied Pilots Ass'n*, 898 F.2d at 465. As the Fifth Circuit has explained, an injunction in a minor dispute is appropriate where: (1) it is "necessary to preserve the jurisdiction of the grievance procedure"; or (2) "a disruption of the status quo would result in irreparable injury of such magnitude that it would render any subsequent decision meaningless." *BNSF Ry. Co.*, 973 F.3d at 337.

Here, the Court concludes that the dispute is minor. Thus, a strike over the Hi Viz attendance standard would violate the RLA. *See Ry. Exp. Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers*, 437 F.2d 388, 392 (5th Cir. 1971) (noting that the RLA "prohibits all strikes over minor disputes"). Accordingly, this Court is empowered to issue a strike injunction to "compel compliance with the provisions of the [RLA]" and to "preserve the jurisdiction of the grievance procedure." *BNSF Ry. Co.*, 973 F.3d at 337.

**D. The Norris-LaGuardia Act does not bar an injunction.**

Like the RLA, the Norris-LaGuardia Act ("NLGA") also limits a court's authority to issue injunctions in railway labor disputes. 29 U.S.C. § 108, *et seq*. "By narrowing the courts' jurisdiction to enjoin labor disputes, Congress hoped to stop courts from indiscriminately awarding injunctions against striking employees—a practice that had become commonplace across federal courts." *BNSF Ry. Co.*, 973 at 337 (citing *Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 620 (1967)).

Although the NLGA is phrased in absolute language, the Supreme Court has held that the "competing demands of the RLA and the [NLGA]" must be "accommodate[d]." *Burlington N. R.R. Co.*, 481 U.S. 429, 445 (1987). "To accommodate the competing demands of the RLA and the Norris-LaGuardia Act, our cases establish that the Norris-LaGuardia Act does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *BNSF Ry. Co.*, 973 at 338 (quoting *Burlington N. R.R. Co.*, 481 U.S. at 445). Thus, when an action violates the RLA, the "specific provisions of the [RLA] take precedence over the more general provisions of the [NLGA]." *Id.* (quoting *Chicago River*, 353 U.S. at 41–42).

Here, the Court concludes that the proper accommodation of the NLGA with the RLA in this dispute causes the procedural requirements of the NLGA to not be prerequisites to the relief requested by BNSF against the Unions. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co.*, 143 F. Supp. 2d at 691.

However, the Court's findings still give effect to the NLGA's specific procedural requirements. *First*, the Parties do not dispute the reliability of the evidence submitted in support of each Motion for a Preliminary Injunction. *See Ry. Exp. Agency, Inc.*, 437 F.2d at 395; *Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 238 F.3d 1300, 1311 (11th Cir. 2001) (stating that the "purpose of [S]ection 107 is served if the evidence is inherently reliable and there is no harm to the parties"). *Second*, the Parties expressly waived an evidentiary hearing. *See, e.g.*, *Ry. Express Agency, Inc.*, 437 F.2d at 395. *Third*, because the general preliminary injunction standard overlaps with the requirements of the NLGA, the

procedural requirements of Section 107 are satisfied. *Finally*, there is no evidence in the record to suggest any Party failed to "make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108.

Accordingly, based on the record currently before the Court, the NLGA does not impede the Court's ability to grant injunctive relief.

### E. BNSF has established the requisite factors for a preliminary injunction.

"To be entitled to a preliminary injunction, a movant must establish: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (quoting *Trottie v. Livingston*, 766 F.3d 450, 451 (5th Cir. 2014)).

BNSF has established the four essential elements for a preliminary injunction; the Court will therefore **GRANT** BNSF's Motion.

#### 1. Likelihood of Success on the Merits

As explained above, the Court concludes that: (1) the instant dispute is minor, and (2) the Unions failed to establish that this dispute involves an independent statutory violation. Thus, BNSF has established a likelihood of success on the merits of its claim that the Unions' threatened strike over a minor dispute violates the mandatory dispute resolution procedures set forth in the RLA.

Because the Unions failed to carry their burden to show that they are likely to succeed on the merits of their claims, the Court will **DENY** their Motions for a Preliminary Injunction. *See, e.g.*, *Miss. Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

#### 2. Substantial Threat of Irreparable Injury

Having considered the record, the Court concludes that BNSF has carried its burden to show a substantial threat of irreparable injury. Under this inquiry, the Court "focu[es] on the plaintiff—and our ability to remedy the plaintiff's injury—not the identity of the defendant."

*Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841–42 (5th Cir. 2021) (Ho, J., dissenting).

As explained above, the instant dispute is minor, meaning that any strike over the Hi Viz attendance standard would be unlawful under the RLA. On this point, the Fifth Circuit is clear: A carrier has no cause of action under the RLA for damages caused by illegal strike due to a minor dispute. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 584–85 (5th Cir. 2000), *cert denied*, 531 U.S. 1191 (2001); *Louisville & Nashville R.R. Co. v. Brown*, 252 F.2d 149 (5th Cir. 1958). Thus, without a cause of action to recover damages caused by an illegal strike, there is no adequate remedy at law and any harm is irreparable. *Cf Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *16 (5th Cir. Feb. 17, 2022) (Smith, J., dissenting) ("Preliminary injunctive relief is unavailable where there's an adequate remedy at law.").

And to the potential harm, BNSF presents evidence as to the devastating impact an illegal strike would have on its operations across the entire United States. *See* ECF Nos. 7 at 26–27, 8 at 174–77, 40 at 23, 41 at 1–2, 27–28, 55 at 10. And even if the shutdown was only temporary, the disruption in service would still result in permanent and irreparable loss for BNSF, as well as the public-at-large. The Court therefore concludes that the substantial threat of irreparable injury favors a preliminary injunction.

### 3. Balancing the Harms

Two things are clear: BNSF faces irreparable harm, and any strike would be unlawful under the RLA. Thus, the harm that BNSF and the public-at-large would suffer from an illegal strike far outweighs any harm the Unions would face from the Court enjoining an illegal strike. Even with an injunction, the Unions are not without recourse. The Unions remain free to follow the appropriate dispute resolution procedures set forth in the RLA. The Court therefore concludes that the balance of the harms favors an injunction.

### 4. Public Interest

Because there is no credible suggestion that the public interest would be harmed by the issuance of an injunction, the Court concludes that the

public interest favors issuance of a preliminary injunction. An illegal strike over a minor dispute would produce severe repercussions for numerous individuals and industries that rely on BNSF. Arguably, an illegal strike would adversely impact every single American. The public interest therefore favors an injunction that bars a strike over a minor dispute and requires the Unions to abide by the RLA.

## ORDER

As explained above, the Court concludes that BNSF has established the four essential elements for a preliminary injunction. The Court therefore **GRANTS** BNSF's Motion for a Preliminary Injunction (ECF No. 39) and **DENIES** the Unions' Motions for Preliminary Injunction (ECF Nos. 44–45).

Accordingly, the Court **ORDERS** that SMART-TD and BLET—as well as their divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert or participation with any of them—are hereby **RESTRAINED** and **ENJOINED** from authorizing, encouraging, permitting, calling, or otherwise engaging in any strikes, work stoppages, picketing, slowdowns, sickouts, or other self-help against BNSF or its operating rail subsidiaries over any dispute relating to the Hi Viz attendance standards.

The Court further **ORDERS** that this preliminary injunction will remain in effect for the pendency of the present case unless rescinded or otherwise modified by the Court. The Court further concludes that the current bond is sufficient and will not be increased.

**SO ORDERED** on this **22nd day** of **February, 2022.**

_Mark T. Pittman_
Mark T. Pittman
UNITED STATES DISTRICT JUDGE